# DEFENDANT'S APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------x

PARK PROPERTIES ASSOCIATES,
L.P., et al.,

Plaintiffs,

v. No. 04-1757C

THE UNITED STATES,

Defendant.

-------------------------------x

July 1, 2005
9:33 a.m.

Deposition of STEPHEN BOLDUC, taken by Defendant, at the offices of Nixon Peabody LLP, 437 Madison Avenue, New York, New York, before Brandon Rainoff, a Federal Certified Realtime Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

NIXON PEABODY LLP
Attorneys for Plaintiffs
401 Ninth Street, N.W. #900
Washington, D.C. 20004
(202) 585-8712
BY: HARRY J. KELLY, ESQ.

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
Attorneys for Defendant
1100 L Street, N.W.
Room 12052
Washington, DC 20005
(202) 307-0282
BY: JOHN E. KOSLOSKE, ESQ.



INDEX OF EXHIBITS

Exhibit 1 ................................ Page 14
Complaint

Exhibit 2 ................................ Page 15
Defendant's Revised Notice of Rule 30(b)(6)
Deposition

Exhibit 3 ................................ Page 33
Document Bates Stamped PPAP-NYH-00001 through 18

Exhibit 4 ................................ Page 36
Document Bates Stamped PPAP-NYH-00019

Exhibit 5 ................................ Page 37
Document Bates Stamped PPAP-NYH-00020

Exhibit 6 ................................ Page 39
Document Bates Stamped PPAP-NYH-00023 through 25

Exhibit 7 ................................ Page 42
Document Bates Stamped PP0275



EXHIBITS (Continued):

Exhibit 8 ................................ Page 45
Document Bates Stamped PPAP-QUA-00064 through 66

Exhibit 9 ................................ Page 52
Notice H 95-12 (HUD) issued 3/7/95

Exhibit 10 .............................. Page 53
Fiscal Year 1997 Annual Adjustment Factor (AAF)
Requirements

Exhibit 11 .............................. Page 54
Document Bates Stamped PPAP-QUA-00001 through 62

Exhibit 12 .............................. Page 57
Document Bates Stamped PPAP-QUA-00151

Exhibit 13 .............................. Page 60
Document Bates Stamped PPAP-QUA-00152 through 15

Exhibit 14 .............................. Page 62
Document Bates Stamped PPAP-QUA-00154

Exhibit 15 .............................. Page 64
Document Bates Stamped PPAP-QUA-00484 through 54



EXHIBITS (Continued):

Exhibit 16 .............................. Page 66
Document Bates Stamped PPAP-QUA-00167 through 16

Exhibit 17 .............................. Page 68
Document Bates Stamped PPAP-QUA-00254

Exhibit 18 .............................. Page 68
Document Bates Stamped PPAP-QUA-00265

Exhibit 19 .............................. Page 70
Document Bates Stamped PPAP-QUA-00266 through 26

Exhibit 20 .............................. Page 71
Document Bates Stamped PPAP-QUA-00343 through 34

Exhibit 21 .............................. Page 72
Document Bates Stamped PPAP-QUA-00345

Exhibit 22 .............................. Page 73
Document Bates Stamped PPAP-QUA-00346 through 34

Exhibit 23 .............................. Page 74
Document Bates Stamped PPAP-QUA-00354

EXHIBITS (Continued):

Exhibit 24 .............................. Page 76
Document Bates Stamped PPAP-QUA-00398

Exhibit 25 .............................. Page 77
Document Bates Stamped PPAP-QUA-00390

Exhibit 26 .............................. Page 78
Document Bates Stamped PPAP-QUA-00393

Exhibit 27 .............................. Page 78
Document Bates Stamped PPAP-QUA-00399 through 401

Exhibit 28 .............................. Page 79
Document Bates Stamped PPAP-QUA-00409

Exhibit 29 .............................. Page 80
Document Bates Stamped PPAP-QUA-00403 through 408

Exhibit 30 .............................. Page 82
Document Bates Stamped PPAP-QUA-00559 through 560

Exhibit 31 .............................. Page 84
Document Bates Stamped PPAP-QUA-00561



EXHIBITS (Continued):

Exhibit 32 .............................. Page 84
Document Bates Stamped PPAP-QUA-00565

Exhibit 33 .............................. Page 85
Document Bates Stamped PPAP-QUA-00562 through 564

Exhibit 34 .............................. Page 86
Document Bates Stamped PPAV-NYH-0001 through 15

Exhibit 35 .............................. Page 87
Document Bates Stamped PPAV-NYH-00016 through 17

Exhibit 36 .............................. Page 88
Document Bates Stamped PPAV-NYH-00018

Exhibit 37 .............................. Page 89
Document Bates Stamped PPO530 through 533

Exhibit 38 .............................. Page 90
Document Bates Stamped PPO526 through 533

Exhibit 39 .............................. Page 91
Document Bates Stamped PPO502



EXHIBITS (Continued):

Exhibit 40 .............................. Page 93
Document Bates Stamped PPAV-NYH-00026

Exhibit 41 .............................. Page 93
Document Bates Stamped PPAV-NYH-00033

Exhibit 42 .............................. Page 95
Document Bates Stamped PPAV-NYH-00034

Exhibit 43 .............................. Page 96
Document Bates Stamped PPAV-QUA-0001

Exhibit 44 .............................. Page 96
Document Bates Stamped PPAV-QUA-00085

Exhibit 45 .............................. Page 98
Document Bates Stamped PPAV-QUA-00086

Exhibit 46 .............................. Page 99
Document Bates Stamped PPAV-QUA-00015 through 75

Exhibit 47 .............................. Page 100
Document Bates Stamped PPAV-QUA-00099 through 100



EXHIBITS (Continued):

Exhibit 48 .............................. Page 101
Document Bates Stamped PPAV-QUA-000337

Exhibit 49 .............................. Page 101
Document Bates Stamped PPAV-QUA-000219 through 00221

Exhibit 50 .............................. Page 102
Document Bates Stamped PPAV-QUA-00329 through 00330

Exhibit 51 .............................. Page 103
Document Bates Stamped PPAV-QUA-00331

Exhibit 52 .............................. Page 104
Document Bates Stamped PPAV-QUA-00334

Exhibit 53 .............................. Page 105
Document Bates Stamped PPAV-QUA-00334

Exhibit 54 .............................. Page 106
Document Bates Stamped PPAV-QUA-00338

Exhibit 55 .............................. Page 107
Document Bates Stamped PPAV-QUA-00400

EXHIBITS (Continued):

Exhibit 56 .............................. Page 108
Document Bates Stamped PPAV-QUA-00401

Exhibit 57 .............................. Page 109
Document Bates Stamped PPAV-QUA-00404

Exhibit 58 .............................. Page 110
Document Bates Stamped PPAV-QUA-00406 through 407

Exhibit 59 .............................. Page 111
Document Bates Stamped PPAV-NYH-00408

Exhibit 60 .............................. Page 111
Document Bates Stamped PPAV-QUA-00451

Exhibit 61 .............................. Page 112
Document Bates Stamped PPAV-QUA-00453

Exhibit 62 .............................. Page 113
Document Bates Stamped PPAV-QUA-00501 through 504

Exhibit 63 .............................. Page 114
Document Bates Stamped PPAV-QUA-00477



EXHIBITS (Continued):

Exhibit 64 .............................. Page 115
Document Bates Stamped PPAV-QUA-00455 through 460

Exhibit 65 .............................. Page 116
Document Bates Stamped PPAV-QUA-00517 through 518

Exhibit 66 .............................. Page 118
Document Bates Stamped PPAV-QUA-00519

Exhibit 67 .............................. Page 118
Document Bates Stamped PPAV-QUA-00524

Exhibit 68 .............................. Page 119
Document Bates Stamped PPAV-QUA-00520 through 522

Exhibit 69 .............................. Page 120
Document Bates Stamped PPAV-QUA-00654 through 655

Exhibit 70 .............................. Page 121
Document Bates Stamped PPAV-NYH-00658

Exhibit 71 .............................. Page 121
Document Bates Stamped PPAV-QUA-00650 through 652



STEPHEN BOLDUC,
having been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. KOSLOSKE:
Q. Would you spell your name for the record, please?
A. S-T-E-P-H-E-N, B-O-L-D-U-C.
Q. What is your occupation?
A. I am employed by JZG Resources, I guess in an executive capacity.
Q. What is your position with JZG Resources?
A. An executive capacity. I do an assortment of things. Doesn't have a specific title.
Q. What is the nature of JZG Resources' business?
A. It is some real estate, it is real estate development, does some investing, has a variety of activities.
Q. Do you have an ownership interest in JZG Resources?
A. No, I do not.
Q. Who is the owner of JZG Resources?



A. I believe it is Jerome Ginsburg.
Q. Do the initials JZG --
A. Mr. Ginsburg's initials, yes.
Q. Jerome Z. Ginsburg?
A. Yes.
Q. What is the business address of JZG Resources?
A. 84 Business Park Drive, Suite 108, Armonk, New York 10504.
Q. What is your business telephone number?
A. 914-273-5800.
Q. Mr. Bolduc, my name is John Kosloske. I represent the United States in the litigation styled Park Properties Associates LP, et al. versus United States. It is number 04-1757 C, a lawsuit that's pending in the United States Court of Federal Claims.
The litigation involves claims against the United States by three partnerships, Park Properties Associates, Valentine Associates, and St. John's 1 Associates relating to rate adjustments and Section 8 Housing Assistance Payments contracts between those partnerships and the United States acting through the

Page 14

Department of Housing and Urban Development.
Are you familiar with this litigation?
A. Somewhat, yes.
Q. Have you read the complaint filed in this litigation upon behalf of Park Properties Associates, Valentine Associates, and St. John's 1 Associates?
A. No, I do not believe I have.
(Exhibit 1, Complaint, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what has been marked for identification as Exhibit 1, do you recognize this document?
A. I'm not sure.
Q. What is your understanding of the claims by Park Properties Associates and Valentine Associates in this litigation?
MR. KELLY: Object to the form of the question. This is a deposition under Rule 30(b)(6) and the witness was not asked to be prepared to represent the partnership with respect to the complaint itself. The witness has testified that he hasn't seen the complaint. If he has any personal knowledge he may respond,

Page 15

but I believe this is outside the scope of the 30(b)(6) deposition.
You may respond if you can.
A. Could you restate the question?
Q. Yes. What is your understanding of the claims by Park Properties Associates and Valentine Associates in this litigation?
A. My understanding, I believe, is that there were rent increases called for by the contract that were not received by the partnership, in a nutshell.
(Exhibit 2, Defendant's Revised Notice of Rule 30(b)(6) Deposition, marked for identification)
BY MR. KOSLOSKE:
Q. Mr. Bolduc, showing you what has been marked for identification as Exhibit 2, this is a copy of the notice of deposition in this case.
Have you seen this document before?
A. I may have, I'm not sure.
Q. Have you been designated to testify on behalf of Park Properties Associates with respect to topics numbered one through three listed in the deposition notice marked Exhibit 2?

Page 16

A. Yes.
Q. Have you been designated to testify on behalf of Valentine Associates with respect to topics numbered four through six in the deposition notice marked Exhibit 2?
A. Yes.
Q. Mr. Bolduc, for the sake of brevity in this deposition, I will refer to the plaintiff Park Properties Associates LP as Park Properties and I will refer to the plaintiff Valentine Associates LP as Valentine and I will refer to the Department of Housing and Urban Development as HUD, do you understand that?
A. Yes, I do.
Q. So that the court reporter can accurately transcribe my questions and your responses, it is important that you allow me to finish a question before you begin your response, and I for my part will do my best to allow you to complete your response to a question before I pose a new question.
Also, the court reporter cannot transcribe nods and shakes of the head in response to questions. Therefore, if a question calls for a yes or no answer, please respond by

Page 17

stating yes or no as appropriate rather than by nodding or shaking your head.
Please listen carefully to my questions and answer the questions posed. If you did not hear all or any part of the question, let me know and I will repeat the question or have the court reporter read the question back to you. If you do not understand all or any part of a question, please let me know and I will attempt to restate or clarify the question. If you need to take a break, just say so and we will take one.
Mr. Kelly, would you like to state your appearance for the record?
MR. KELLY: Yes, my name is Harry Kelly. I am appearing on behalf of the plaintiffs in the case and defending the deposition of 30(b)(6) deponents.
BY MR. KOSLOSKE:
Q. What is your date of birth, sir?
A. 2/22/59.
Q. Are you a high school graduate, sir?
A. Yes, I am.
Q. When did you graduate from high school?

Page 18

A. 1977.
Q. Did you attend college or university?
A. Yes, I did.
Q. What college or university did you attend?
A. Dartmouth.
Q. During what period of time did you attend Dartmouth?
A. '77 to '81.
Q. Did you receive a degree?
A. Yes, I did.
Q. What degree did you receive?
A. I think it is a BA, I think that is what they give.
Q. Did you have a major?
A. It was special major in psychology and education.
Q. Do you have any postgraduate education?
A. Yes.
Q. What is that?
A. I have an MBA from NYU.
Q. That's a Master's of Business Administration?
A. Yes.

Page 19

Q. You say NYU, New York University?
A. New York University. It used to be called GBA, Graduate School of Business Administration. I think they changed it to the Stern School now, I'm not sure.
Q. When did you receive the MBA?
A. 1984.
Q. Do you have any professional certifications?
A. I'm not sure I know what that means.
Q. Are you, for example, a licensed real estate broker?
A. No.
Q. Do you have any professional licenses of any kind?
A. No.
Q. Are you a member of any professional organizations?
A. No.
Q. Are you familiar with Park Properties?
A. Yes.
Q. Is Park Properties --
MR. KELLY: Excuse me, Park Properties, you are talking about the plaintiff or the physical building?

Page 20

MR. KOSLOSKE: I'm sorry.
Q. When I refer to Park Properties I am referring to the plaintiff in the lawsuit, Park Properties Associates LP. If I refer to a building such as, for example, the LaMartine Terrace, I will refer to that by a different name.
A. Okay. That's a little confusing.
Q. Are you familiar with Park Properties, the partnership?
A. Somewhat.
Q. Is Park Properties a limited partnership organized under the laws of the State of New York?
A. I'm not sure.
Q. Are you familiar with the firm Friendly Management, Inc.?
A. Somewhat.
Q. What kind of business is Friendly Management?
A. Precisely I'm not sure.
Q. Do you know what kind of service Friendly Management provides?
A. I'm not sure.
Q. Is Jerome Ginsburg the president of

Page 21

Friendly Management?
A. I'm not sure of the exact structure.
Q. Do you know when Friendly Management was created?
A. No, I do not.
Q. Do you know whether it was created before 1994?
A. I believe it was but I am not sure of that.
Q. Do you know the address of Friendly Management's place of business?
A. I assume it is 84 Business Park Drive.
Q. Why do you assume that?
A. Because I know of no other address. But I don't know for a fact if it has a stated address.
Q. Have you ever been employed by Friendly Management?
A. No, I don't think so.
Q. You don't think so?
Is Mr. Ginsburg responsible for the day-to-day management of Friendly Management?
A. I'm not sure.
Q. Do you know whether Friendly Management is the general partner of Park

Page 22

Properties?
A. I do not know.
Q. Is Mr. Ginsburg a limited partner in Park Properties?
A. I don't know that. I don't think so but I don't know that.
Q. Are you familiar with a rental housing project known as LaMartine Terrace?
A. Yes.
Q. Is LaMartine Terrace a rental housing project?
A. Yes, it is.
Q. Is that LaMartine Terrace also known as Water View Apartments?
A. Yes.
Q. Is Park Properties the owner of LaMartine Terrace?
A. Yes.
Q. Is LaMartine Terrace located at 28 LaMartine Avenue, Yonkers, New York?
A. Yes.
Q. Is LaMartine Terrace located in Westchester County, New York?
A. Yes.
Q. Does Park Properties own any rental

Page 23

housing projects besides LaMartine Terrace?
A. No.
Q. Is Friendly Management the property management agent for LaMartine Terrace?
A. I'm not sure.
Q. Do you know who the property management agent for LaMartine is?
A. I'm not sure, it may be Friendly. I just -- I don't know for sure.
MR. KELLY: For the record, I just object to the line of questions. It is not covered in the items listed under the deposition notice. Obviously to the extent the witness has information we have no objection to him responding, but for the record this is outside the scope of what we were asked to present today.
BY MR. KOSLOSKE:
Q. Since 1994, what if any involvement have you personally had in the processing of rent adjustments under the Section 8 Housing Assistance Payments contract between Park Properties and HUD?
A. I typically did the calculations and compiled the applications and sent them to

Page 24

Quadel.
Q. Did Mr. Ginsburg sign correspondence between HUD and Park Properties with respect to rent adjustments for LaMartine Terrace?
MR. KELLY: During what time period? Any time period?
MR. KOSLOSKE: During the period after 1994.
A. I believe so, yes.
Q. Since 1994, what if any involvement have you personally had with respect to the preparation of rent schedules for LaMartine Terrace?
A. I'm sorry, how is that different than the last question?
MR. KELLY: Do you mean how does the rent schedule differ --
A. The rent -- when you say preparing the rent schedule, it is what I would think of as preparing the rent schedule would be part of that application for a rent increase.
Q. So you prepared rent schedules, then, for LaMartine Terrace?
A. As part of the application for rent increases, yes. I don't know if that's actually

Page 25

preparation of the rent schedule or not, because typically the rent schedule gets sent back by Quadel. I mean, they actually, I would think, are the ones who prepare it.
Q. Did you sign rent schedules?
A. No, I don't believe so.
Q. Did Mr. Ginsburg sign rent schedules for LaMartine Terrace on behalf of Park Properties?
A. I believe so.
Q. Who if anyone besides yourself and Mr. Ginsburg had any involvement in the processing of contract rent adjustments under the Section 8 HAP contract between Park Properties and HUD with respect to LaMartine Terrace?
A. I'm sorry, could you repeat that?
Q. Who if anyone besides yourself and Mr. Ginsburg had any involvement in the processing of contract rent adjustments under the Section 8 HAP contract between Park Properties and HUD?
A. Under what time period?
Q. After 1994.
A. Okay, I'm sorry, could you repeat the question one more time?
Q. After 1994, who if anyone besides

Page 26

yourself and Mr. Ginsburg had any involvement in the processing of contract rent adjustments under the Section 8 HAP contract between Park Properties and HUD?
A. By processing, does that include the implementation into the voucher?
Q. No, by processing -- okay, let me clarify that for you.
By processing, what I am driving at is the steps up to the point where a contract rent increase is approved, not the actual vouchering for assistance payments.
A. I believe it was -- I believe other than the office manager, Lorraine Ciero, maybe Paul Richards back in '94, '95, I really don't remember. I don't know that there was anyone else.
Q. Could you spell for the record Lorraine Ciero?
A. L-O-R-R-A-I-N-E, I think, C-I-E-R-O, I think.
Q. And you referred to her as an office manager?
A. She's the office manager.
Q. For what?

Page 27

A. JZG Associates. She would have typed them up and, you know, made copies, any letters that were done.
Q. How long has Ms. Ciero been the office manager for JZG Resources?
A. Since inception.
Q. When was the --
A. Sometime in the eighties, I believe. Predates me. I don't know.
Q. When were you initially employed by JZG Resources?
A. December 1985.
Q. So your first involvement with LaMartine Terrace would have been in December 1985?
A. That's correct.
Q. Did JZG Resources retain Kenneth L. Golub, NAI, of American Property Counselors to perform rent comparability studies or analyses with respect to the rents of LaMartine Terrace?
A. Yes.
Q. In what year did JZG Resources initially employ Mr. Golub to perform rent comparability studies or analyses with respect to the rents of LaMartine Terrace?

Page 28

A. Without looking at the documents, I don't know.
Q. Do you recall whether it was before the year 2000?
A. I don't think it was before the year 2000.
Q. Are you familiar with Valentine? By that I mean the partnership?
A. Again, somewhat.
Q. Is Valentine a limited partnership organized under the laws of the State of New York?
A. I'm not sure.
Q. Is Friendly Management the general partner of Valentine?
A. Again, I'm not sure.
Q. Is Jerome Ginsburg a limited partner in Valentine?
A. Again, I'm not sure.
Q. How long have you known Mr. Ginsburg?
A. First acquaintance, almost thirty years.
Q. Prior to December 1985, were you at any point employed by Mr. Ginsburg or employed by a firm that Mr. Ginsburg had an interest in?

Page 29

A. No.
Q. Is Mr. Ginsburg responsible for the management of the affairs of Valentine, the partnership?
A. I'm not sure.
Q. Does Valentine have a business address?
A. I believe it is 84 Business Park Drive.
Q. Armonk, New York?
A. Yes.
Q. Is the business address of Park Properties the same?
A. Yes, I believe so.
Q. Are you familiar with a rental housing project known as Lane Hill Senior Citizen Residence?
A. Yes.
Q. For the sake of brevity in this deposition, I will refer to Lane Hill senior citizen residence as Lane Hill.
You understand what I am referring to?
A. Okay.
Q. Is Valentine the owner of Lane Hill?
A. I believe so.

Page 30

Q. Is Lane Hill located at 50 St. Andrew's Place, Yonkers, New York?
A. Yes.
Q. Is Lane Hill located in Westchester County, New York?
A. Yes.
Q. Does Valentine own any rental housing projects besides Lane Hill?
A. No.
Q. Is Friendly Management the property management agent for Lane Hill?
A. I'm not sure.
Q. Do you know who the property management agent for Lane Hill is?
A. I'm not sure.
Q. Since 1994, what if any involvement have you had personally in the processing of rent adjustments under the Section 8 HAP contract between Valentine and HUD?
A. The same as for LaMartine.
Q. For the record, when I say HAP contract, that's initials H-A-P, all caps, stands for Housing Assistance Payments.
Since 1994, what if any involvement have you had personally with the preparation of

Page 31

rent schedules for Lane Hill?
A. The same as with LaMartine.
Q. Since 1994, aside from preparation of applications for rent adjustments, what if any responsibilities have you had with respect to the day-to-day management of LaMartine Terrace?
A. It varies or has varied depending upon time period. Sort of on an overall basis I have -- I would be involved in any construction issues that came up dealing with a boiler or an elevator or a roof or some sort of major capital expenditure.
In a varying timeframe, depending upon whether -- who else was involved, did we have an occupancy manager, we were looking for an occupancy manager, did we have, you know, a maintenance individual to service supervise the maintenance of the buildings, I might have to get more involved in either dealing with vouchers or the computer program or recertifications or going down to the buildings more often for maintenance issues, depending upon who else was there.
So I have been involved in a number of other areas with buildings, none -- with the

Page 32

exception overall construction and sort of just general oversight on a consistent basis.
Q. You mentioned recertifications. What do you mean by that term?
A. Tenant recertifications every year. Tenants need to get recertified.
Q. Recertified for what?
A. For their subsidy.
Q. By recertifications, you mean eligibility for rent subsidy?
A. No, it's -- at least I wouldn't refer to it like that. I mean, I suppose eligibility is part of it, but it is more a calculation of what the rent subsidy would be.
Q. Since 1994, what if any involvement have you had in the day-to-day management of Lane Hill besides preparation of applications for rent adjustments?
A. The same as with LaMartine.
Q. Who if anyone besides yourself is involved in the processing of contract rent adjustments under the Section 8 HAP contract between Valentine and HUD?
A. This is the same question as for LaMartine?

Page 33

Q. Yes.
A. Okay. Same answer.
Q. Did JZG Resources retain Kenneth Golub of American Property Counselors to perform rent comparability studies or analyses with respect to the rents of Lane Hill?
A. Yes.
Q. Do you know when JZG Resources initially employed Mr. Golub to perform rent comparability studies or analysis with respect to the rents of Lane Hill?
A. Not without checking the documents.
Q. Do you know whether it was prior to the year 2000?
A. I don't think so.
Q. I am going to be showing you some documents now that pertain to Park Properties and LaMartine Terrace.
(Exhibit 3, Document Bates Stamped PPAP-NYH-00001 through 18, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 3, if you take a look at this document, could you tell us whether you

Page 34

recognize it?
A. I believe so, yes.
Q. Is what's marked for identification as Exhibit 3 the Section 8 HAP contract between Park Properties Associates and the United States acting through HUD?
A. Yes, I believe so.
Q. The HAP contract for Park Properties Associates, it was for an initial term of five years and five additional terms of five years each at the sole option of the owner, is that correct?
A. Yes, I believe so.
Q. Would you turn to the page that has a Bates stamp number at the bottom PPAP-NYH-00012?
A. Yes.
Q. This is a signature page for the HAP contract, correct?
A. I believe so, yes.
Q. At the top of the page there are two signatures. The one at the very top, do you recognize that signature?
A. Looks -- I believe so, yes.
Q. Is that Jerome Ginsburg's signature?
A. I believe so, yes.

Page 35

Q. You have seen Mr. Ginsburg's signature over the years many times, correct?
A. Yes.
Q. The HAP contract states that the effective date of this contract is June 1, 1979, do you see that?
A. Yes.
Q. Does that comport with your understanding that the anniversary date for the HAP contract for Park Properties is June 1 of each year?
A. Yes, I believe so.
MR. KELLY: I object to the question to the extent it calls for a legal conclusion, but to the extent you have knowledge with respect to that --
A. In terms of asking me what I believe, I think that's correct, yes.
Q. Mr. Bolduc, do you recall that the HAP contract for LaMartine Terrace was transferred from the original partnership entity to the current plaintiff, Park Properties Associates LP, in or about 1996?
A. I don't have specific knowledge, no.
(Exhibit 4, Document Bates Stamped

Page 36

PPAP-NYH-00019, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's marked for identification as Exhibit 4, it is a letter dated February 8th, 1995 addressed to Gerard W. Sheridan, director, Housing Management Division of HUD, New York regional office. There is a signature at the bottom for Park Properties Associates and Valentine Properties Associates.
Is that the signature of Mr. Ginsburg?
A. It appears to be, yes.
Q. In the first paragraph of this letter Mr. Ginsburg states in part: "It is my intention to transfer both of the above-referenced properties to limited partnerships in which I will remain majority owner. The general partners of these limited partnerships will be corporations of which I will be the owner thereof and manager."
Do you see that?
A. Yes.
Q. Did you have any discussions with Mr. Ginsburg regarding the transfer of interest referred to in that paragraph?
A. None at all.

Page 37

(Exhibit 5, Document Bates Stamped PPAP-NYH-00020, marked for identification)
BY MR. KOSLOSKE:
Q. Mr. Bolduc, showing you what has been marked for identification as Exhibit 5, do you recognize this document?
A. No.
Q. This is a document that's captioned Assignment of HAP Contract, and then in the lower portion there is a caption Acceptance by Assignee, and the document is signed in the first instance by Jerome Z. Ginsburg doing business as Park Properties Associates, is that your understanding?
MR. KELLY: Are you asking whether this is his understanding of the content of the document or -- again, he is not a lawyer, not qualified to give a legal opinion about this. If you are asking what his personal understanding is --
MR. KOSLOSKE: Let me rephrase it.
Q. The first signature that appears on the page, do you recognize it?
A. It appears to be Mr. Ginsburg's.
Q. The second signature at the bottom of

Page 38

the page, do you recognize it?
A. It appears to be Mr. Ginsburg's.
Q. This document indicates that the HAP contract between Park Properties Associates and HUD was assigned on the first day of July 1996 to the entity Park Properties Associates Limited Partnership.
Are you familiar with that?
MR. KELLY: Familiar with the document or actual --
MR. KOSLOSKE: The transfer.
MR. KELLY: The transfer?
A. No.
Q. Is it accurate to say that while you have been employed by JZG Resources over the years and have had involvement in at least some aspects of the day-to-day management of Lane Hill and LaMartine Terrace, that you have not been involved in the management of the partnership's per se, Park Properties and Valentine?
A. Yes, that would be fair.
(Exhibit 6, Document Bates Stamped PPAP-NYH-00023 through 25, marked for identification)

Page 39

BY MR. KOSLOSKE:
Q. Mr. Bolduc, showing you what's been marked for identification as Exhibit 6, would you take a look at this document and can you tell us whether you recognize it?
A. I don't recognize it per se but I am sure I have seen it before.
Q. It is a letter dated April 7, 1994 addressed to you as manager, Park Properties Associates, is that correct?
A. That's correct.
Q. It is a letter from the New York HUD office, is that correct?
A. That's correct.
Q. The purpose of this letter is to advise Park Properties that HUD had approved a rent adjustment for LaMartine Terrace effective June 1, 1994, is that correct?
A. Yes.
Q. The new Section 8 rents as a result of the rent adjustment are listed in column D in the letter, is that your understanding?
A. Yes.
Q. And it shows a rent of $872 per month for zero bedroom or studio units, is that

Page 40

correct?
A. That's correct.
Q. And a rent of $959 per month for a one-bedroom unit?
A. That's correct.
Q. And a rate of $1,053 per month for two-bedroom units, is that correct?
A. That's correct.
Q. Is it your understanding that Park Properties implemented those new rents consistent with this letter?
A. I believe so, yes.
Q. Did Park Properties receive a rent adjustment for LaMartine Terrace under the HAP contract between Park Properties and HUD in 1995?
A. I don't think so, no.
Q. Same question 1996?
A. I don't think so.
Q. Same question 1997?
A. I don't think so.
Q. Same question 1998?
A. I don't think so.
Q. Same question 1999?
A. Without looking at the documents I'm

Page 41

not sure but I don't think so.
Q. Do you know whether Park Properties received a rent adjustment for LaMartine Terrace for the year 2000?
A. I believe they did. Again, exactly which year it was, I believe that's the year it was.
Q. Was that rent adjustment processed and approved by HUD directly or through an agent?
MR. KELLY: Which rent adjustment, John?
BY MR. KOSLOSKE:
Q. The last one you mentioned that you said you received in or around the year 2000.
A. In or around the year 2000, I mean, it would be in the documents. It was processed by Quadel.
Q. When you say Quadel, are you referring to a firm, New York Quadel Consulting?
A. Quite honestly I'm not sure what their name is. They seem to go under a couple of different names. But the firm could be Quadel Consulting or -- I don't know what their various divisions are called. But they are the firm that took over as contract administrator from

Page 42

HUD, so whichever title Quadel company that is, that's the one I am referring to.
Q. You know them as Quadel and refer to them as Quadel?
A. Yes.
(Exhibit 7, Document Bates Stamped PP0275, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 7, could you take a look at that document, tell us whether you recognize it?
A. I'm not sure.
Q. There is a letter dated February 27, 2001 from bill O'Neil, a rent specialist at Quadel addressed to Park Properties Associates, re notice of potential rent adjustment for LaMartine Terrace.
The letter states: "Effective December 1, 2000, New York Quadel Consulting Corporation became a Section 8 contract administrator for this contract."
The letter goes on to say that if it is your -- your meaning Park Properties Associates' -- intention to apply for a rent

Page 43

adjustment, please submit a request letter, turn over information, utility allowance recommendation on or before April 1, 2001.
Do you see that?
A. Yes.
Q. What if any action was taken by Park Properties Associates in response to Exhibit 7?
A. I don't know if anything specific was taken with respect to this exhibit. I believe that there had been communications between Bill O'Neil and Paul Richards in our office prior to this basically back in December, the net result being rent increases were applied for. But I don't know if it was specifically in response to this exhibit.
Q. During the period from 1995 through 1999, did Park Properties take any action to obtain rent adjustments for LaMartine Terrace?
A. I don't think so.
Q. Do you know why that is?
A. Precisely, no, but I think it had something to do with the regulations pass and an explanation coming from HUD and/or our occupancy managers that we weren't eligible for them.
Q. Who were the occupancy manager?

Page 44

A. At one point, and I can't speak to who was where at what date, but Carla Valentine and Marge Bennett I think were the occupancy managers.
Q. These were employees of JZG Resources?
A. Yes.
Q. Why did they believe that LaMartine Terrace was not eligible for rent adjustment?
MR. KELLY: Objection to the extent that this witness -- if he has knowledge he may respond, but it calls for speculation about their motives. I object to the question, but you may respond?
A. I really don't know. You know, the occupancy managers were trained by Quadel on HUD regulations. We relied on them and we relied on HUD as the contract administrator to administer the contract.
Q. When did they receive this training?
A. Typically shortly after employment.
Q. Well, you have in front of you a letter from Quadel dated February 27, 2001, that's Exhibit 7?
A. Right.
Q. It indicates that effective December

Page 45

1, 2000, Quadel became the contract administrator.
Is the training that you are referring to, would that have occurred after December 1, 2000 when Quadel became the contract administrator?
A. No. No. Quadel also does training on the program. I mean, it would have taken place back from the eighties, I mean, could have depended upon when they started. HUD -- Quadel actually certified the occupancy managers. They provided the certified occupancy manager certificates.
(Exhibit 8, Document Bates Stamped PPAP-QUA-00064 through 66, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 8, do you recognize this document?
MR. KOSLOSKE: John, before we go further, I just want to state on the record that, again, the scope of your 30(b)(6) notice asked for information on several topics including rent adjustments and rents for the

Page 46

Park Properties and Valentine projects.
The witness has been designated to respond. There could be aspects of some of these questions that he may not have all the information, and if it turns out that there are some aspects of these questions we will try to find -- specific questions we will try to find someone who may have further information, but this witness will respond as fully as he can with respect to the information that he has.
A. I'm sorry, if there is a question, I don't --
Q. Do you recognize Exhibit 8?
A. It looks familiar. I don't know if I have actually read it all.
Q. Did you draft Exhibit 8?
A. No.
Q. Turn to the third page of Exhibit 8. Do you recognize the exhibit on the third page?
A. Yes.
Q. Whose signature is that?
A. Looks like Mr. Ginsburg's.
Q. This is a letter dated July 23, 2001 from Mr. Ginsburg to Tracy Newman of New York Quadel.

Page 47

Would you turn to the second page of this letter which is Bates stamped PPAP-QUA-00065?
A. Yes.
Q. Directing your attention to the penultimate paragraph at the bottom of this page, and I will read it, it reads: "We sent an employee to various HUD seminars, and either through her ignorance or the complexity of the process, she arrived at the conclusion that no increases were possible in this building."
Do you see that?
A. Yes.
Q. Do you know what the name of the employee is that's referred to in this statement?
A. No, I do not.
Q. The next paragraph reads: "Mr. Bolduc and myself spent a week reviewing the head rent increase process, and contrary to her opinion, found that the RCS program would allow us to obtain rent increases since it does account for projects in areas where rent control is imposed."
Do you see that?

Page 48

A. Yes.
Q. Was it the opinion of the employee that LaMartine Terrace would not be eligible for rent adjustments because of rent control?
MR. KELLY: Objection. This document the witness has testified he did not draft. It is not his document. To the extent he has personal information that's responsive he may answer.
A. I'm sorry, could you repeat the question?
Q. Was it the opinion of the employee that was sent to the various HUD seminars that's referred to in the paragraph that I just read, was it the opinion of that employee that LaMartine Terrace would not be eligible or able to obtain a rent adjustment under the HAP contract between Park Properties and HUD because of rent control?
MR. KELLY: Same objection. You may respond.
A. I have no idea.
Q. Mr. Ginsburg states that you and he spent a week reviewing the HUD rent increase process, do you see that?

Page 49

A. Yes.
Q. Do you recall that?
A. I remember looking through the various regulations researching back through HUD clips the regulatory history, yes.
Q. Park Properties began applying for rent adjustments for LaMartine Terrace after 2000, correct?
A. I would have to look at the documents whether it is after 2000 or in 2000. Thereabouts, yes.
Q. What caused Park Properties at that point, if you know, to begin pursuing rent adjustments under the HAP contract between Park Properties and HUD?
A. Specifically I don't know.
Q. Did you have a conversation with Mr. Ginsburg in which he basically asked or directed you to begin preparing rent adjustment applications for LaMartine Terrace?
A. At some point in time either Mr. Ginsburg or Mr. Richards asked me to do so, yes.
Q. What position did Mr. Richards have with JZG Resources?
A. He was another executive, he was an

Page 50

accountant.
Q. Do you recall specifically what Mr. Richards said to you?
A. I don't have a specific recollection, no.
Q. If you will turn to the top of the next page of Exhibit 8 which is the page that has a Bates stamp on it, PPAP-QUA-00066, the first sentence reads: "However, because of this error, approximately seven years went by without an increase."
Do you see that?
A. Yes.
Q. Is that your understanding as to why rent increases were not pursued for LaMartine Terrace by Park Properties from 1995 through 1999?
A. I'm not sure.
Q. If you will turn back to the second page of Exhibit 8 which is PPAP-QUA-00065, and again directing your attention once again to the last paragraph on that page, there is a reference in that paragraph to the RCS program, do you see that?
A. Yes.

Page 51

Q. Do you have an understanding as to what that is a reference to?
A. I assume that means rent comparability studies but I don't have a specific knowledge of a quote-unquote RCS program.
Q. Do you have an understanding as to a change in the way that rent adjustments would be administered or processed by HUD after 1994?
MR. KELLY: Are you asking the witness whether he has that knowledge now or whether he had that knowledge of July 2001?
MR. KOSLOSKE: Now.
A. I'm sorry, could you repeat that?
Q. Do you have an understanding as to a change after 1994 in the way in which HUD administered and processed rent adjustments for Section 8 HAP contracts such as the HAP contract that Park Properties had with HUD?
MR. KELLY: Objection to the extent it calls for a legal opinion, but you may respond if you have personal knowledge.
A. Am I aware HUD changed their regulations? Yes.
Q. After 1994?
A. Whether it was in '94, after '94, I

Page 52

can't say specifically, but in or about.
Q. What do you understand the change to have been?
MR. KELLY: Same objection, but you may respond.
A. The change implemented a regulation, the number of which I can't recall, that was then sort of a stream of annual renewals of that regulation which gave new instruction or gave instructions for making rent increases.
(Exhibit 9, Notice H 95-12 (HUD) issued 3/7/95, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 9, would you take a look at this document and can you tell us whether you recognize it?
A. Yes.
Q. What is Exhibit 9?
A. This is H 95-12 from notice -- beyond that I don't know how to describe it, but this was the reference I was talking about.
Q. Have you read HUD notice 95-12?
A. Not recently, but yes.
Q. When did you first become aware of HUD

Page 53

notice 95-12?
A. Probably sometime in 2001, maybe.
(Exhibit 10, Fiscal Year 1997 Annual Adjustment Factor (AAF) Requirements, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 10, do you recognize this document?
A. Yes, I believe so.
Q. What is Exhibit 10?
A. I'm sorry, is saying notice H 97-14 sufficient?
Q. Okay. And what is the subject of that notice?
A. Is that a sufficient answer to describe what this is?
Q. Yes, we will take your answer on that. This is HUD notice 97-14, correct?
A. Yes, I believe so. I believe it is an update of 95-12.
Q. Have you reviewed this document before?
A. I believe I have.
Q. When did you first review HUD notice

Page 54

97-14 that's Exhibit 10?
MR. KELLY: Just for the record I note on the bottom right corner it appears to bear a printing date of 11/02/2004. The document indicates it was issued on March 17 of 1997, expires March 31, 1998, and I just point out the printing date of 2004.
MR. KOSLOSKE: I will just represent for the record that it was printed from a website more recently and the date refers to the printing date, not the date on the document.
A. I am aware of that -- in the same timeframe that I read the other one.
Q. So that would be somewhere around 2001?
A. 2001.
(Exhibit 11, Document Bates Stamped PPAP-QUA-00001 through 62, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 11, do you recognize this document?
A. Yes.
Q. What is Exhibit 11?

Page 55

A. It is a rent comparability study prepared by Ken Golub for Water View.
Q. That's the same as LaMartine Terrace?
A. Yes.
Q. This is a rent comparability study that was prepared in 2001 by Mr. Golub, is that correct?
A. That's correct.
Q. Who requested that Mr. Golub perform this study?
A. I'm not sure.
Q. Do you know for what purpose the study was performed?
A. I expect that the study was performed as part of the process to apply for rent increase.
Q. I will represent to you that the copy of Exhibit 11 that you have in front of you I obtained from the files of the Quadel.
Was this rent study submitted by Park Properties to Quadel?
A. Yes.
Q. If you will turn to the second page of this exhibit which has a Bates number of PPAP-QUA-0002, it is a transmittal letter dated

Page 56

April 17, 2001 from Mr. Golub to Mr. Ginsburg, is that correct?
A. That's correct.
Q. This transmittal letter, in this letter Mr. Golub indicates that current market rent for a one bedroom apartment in this building is $1,000 per month and the market rent for a studio apartment is 875 per month, is that correct?
A. That's correct.
Q. Did you personally have dealings with Mr. Golub with respect to the rent comparability study?
A. Timeframe?
Q. Well, I am referring to Exhibit 11 which is the 2001 timeframe.
A. I don't recall specifically.
Q. Do you recall having had any dealings at any time with Mr. Golub with regard to rent comparability studies that he performed regarding LaMartine Terrace?
A. Yes.
Q. What was the occasion for your contacts with Mr. Golub?
A. I'm not sure that I have a complete

Page 57

recollection, but we at some point had to do another study and then needed some update letters in future years.
Q. When you refer to update letters, you are referring to updates of the rent comparability studies?
A. Yes.
Q. For subsequent points in time?
A. Yes, and further submissions.
(Exhibit 12, Document Bates Stamped PPAP-QUA-00151, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 12, do you recognize this document?
A. I am sure I have seen it. Without the full history of documents I can't place it precisely.
Q. This is a letter dated May 21, 2002 from Romdoul Kim of Quadel to Mr. Ginsburg concerning corrected annual adjustment factor rent increase for LaMartine Terrace?
A. Yes.
Q. The letter indicates that the effective date of the increase is July 12, 2001,

Page 58

is that correct?
A. Yes.
Q. And the new contract rents as a result of the increase are $917 per month for zero-bedroom units, $1,002 per month for one-bedroom units, and $1,102 per month for two-bedroom units, is that correct?
A. That's correct.
Q. Is it your understanding that consistent with this letter that is Exhibit 12 that Park Properties implemented those rents for LaMartine Terrace?
A. As I said, without a complete review of the documents here, I can't be sure because I know there were in a number of cases corrected rents that never got implemented because there were errors, so I don't know if this is one that got implemented or not.
Q. Now, on this Exhibit 12, in the chart in the middle of the correspondence there is a column Current Contract Rents, do you see that?
A. Yes.
Q. The current contract rents are $896 per month for zero-bedroom units, $981 per month for one-bedroom units, and $1,079 per month for

Page 59

two-bedroom units, do you see that?
A. That's correct.
Q. Now, would you turn to I think it is Exhibit 6. Do you have that in front of you?
A. I just went back to that.
Q. Exhibit 6 is a rent adjustment correspondence from HUD in 1994 that indicates that the new Section 8 contract rents are $872 per month for zero-bedroom units, $959 per month for one-bedroom units, and $1,053 per month for two-bedroom units.
Did Park Properties receive a rent adjustment for LaMartine Terrace sometime after 1994 and prior to the rent adjustments that's referred to in what's marked for identification as Exhibit 12?
A. It would appear so.
Q. Do you know when the rent adjustment occurred that resulted in rents being increased from $872 per month to $896 per month in the case of zero-bedroom units, and from $959 per month to $981 per month in the case of one-bedroom units, and from $1,053 per month to $1,079 per month in the case of two-bedroom units?

Page 60

A. Not without looking at all the documents.
(Exhibit 13, Document Bates Stamped PPAP-QUA-00152 through 153, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 13, do you recognize this document?
A. Not specifically, but in terms of having seen it before, this particular document, I can't say I specifically recognize it, but it looks like a signed rent schedule.
Q. You have seen rent schedules before?
A. Yes.
Q. Exhibit 13, now, is an example of a rent schedule form that HUD issues, correct?
A. That -- or Quadel, yes.
Q. The Exhibit 13, if you will turn to the second page which is PPAP-QUA-00153?
A. Yes.
Q. There are three signatures at the bottom of the page. Is the first signature that of Mr. Ginsburg?
A. I believe it is, yes.

Page 61

Q. This rent schedule indicates it is effective 7/12/01, July 12, 2001, is that correct?
A. That's correct.
Q. This would be the rent schedule you would agree that implements the rent adjustment that is the subject of Exhibit 12?
A. As I said, without looking at the -- this was a very confusing circumstance for these increases and there have been a number -- there may well have been something that was signed and then something sent by HUD saying -- or by Quadel saying don't do that, we have corrected something, so please disregard, and another rent schedule might have had to have been sent.
Normally there would be a cover letter saying execute these rents or implement these rents, and even then I'm not sure that they didn't send back and, before they were implemented, correct something. So without looking at everything I can't tell you whether this was implemented or not.
MR. KELLY: It is almost 11. Can we take a short break?
MR. KOSLOSKE: Sure.

Page 62

(Recess)
(Exhibit 14, Document Bates Stamped PPAP-QUA-00154, marked for identification)
BY MR. KOSLOSKE:
Q. Mr. Bolduc, showing you what's been marked for identification as Exhibit 14, do you recognize this document?
A. Again, I believe so.
Q. This is a letter dated June 4, 2002 from Park Properties to Quadel, subject rent increase for fiscal year 2002, is that correct?
A. That's correct.
Q. It is signed by Jerome Ginsburg, is that correct?
A. That's correct.
Q. This letter in the subject heading indicates zero-bedroom units over FMR increase applied for under RCS, do you see that?
A. No, I'm sure I can find it. Okay, now I see it. I am trying to read it now.
(Pause)
A. I see it, yes.
Q. Could you explain what that means?
MR. KELLY: Objection, I don't believe the witness has indicated he drafted the

Page 63

document, so to the extent that he -- the document speaks for itself, if it does so. If you have any personal knowledge you can respond.
THE WITNESS: I am trying to figure it out.
MR. KOSLOSKE: Just for the record, this is a 30(b)(6) deposition and the witness is designated to speak for the knowledge of Park Properties, the organization.
MR. KELLY: I understand. I am pointing out -- what Mr. Ginsburg may have meant is outside the scope, but you may respond if --
A. The wording is kind of odd on this but what this appears to be in total -- oh, in here.. The increase for zero bedrooms based on a rent comparability study, so I assume that's what that means. The wording is peculiar to me.
Q. Why is the increase based on the rent comparability study?
A. I would assume because one is needed, one was needed.
Q. Well --
A. Yes.
Q. The subject line says zero-bedroom units over FMR increase applied for under RCS.

Page 64

Is it your understanding that a determination was made that the existing rents exceeded applicable fair market rents, therefore the owner was submitting a rent comparability study in conjunction with a rent increase for zero-bedroom units?
MR. KELLY: Same objection, you may respond.
A. Yes, that would make sense.
Q. The letter indicates that several documents are enclosed, one of which is a rent comparability study dated May 22, 2002?
A. Yes.
Q. Do you see that?
(Exhibit 15, Document Bates Stamped PPAP-QUA-00484 through 542, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 15, do you recognize this document?
A. Yes, I believe so.
Q. Exhibit 15 is a rent comparability study with respect to LaMartine Terrace prepared by Kenneth Golub of American Property Counselors

Page 65

and it is dated May 22, 2002, is that correct?
A. That's correct.
Q. Is Exhibit 15 the rent comparability study that's referred to as item number six on Exhibit 14, the letter dated June 4, 2002 from Mr. Ginsburg to Quadel?
A. Yes, I believe so.
Q. If you turn to the second page of Exhibit 15 which has a Bates number PPAP-QUA-00485, this is a transmittal letter for the rent comparability study, is that correct?
A. That's correct.
Q. And this transmittal letter indicates that the current market rent for a one-bedroom apartment at LaMartine Terrace is $1,150 per month and the current market rent for a studio apartment that is zero-bedroom unit is $975 per month?
MR. KELLY: Objection. I believe you said this is the rent at LaMartine Terrace and I think this is simply the current market rent as opposed to the rent at the property. But you may respond.
A. Okay, I am confused. Could you restate the question?

Page 66

Q. Sure. The May 22, 2002 cover letter included in the rent comparability study performed by Mr. Golub, Exhibit 15, indicates that current market rent for a one-bedroom apartment is $1,150 per month and a current market rent for a studio or zero-bedroom apartment is $975 per month?
A. Yes, I believe so.
(Exhibit 16, Document Bates Stamped PPAP-QUA-00167 through 168, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 16, do you recognize this document?
A. Yes.
Q. What is Exhibit 16?
A. It looks like a discussion of additional supporting documentation that Quadel wished.
Q. First page of Exhibit 16 is a June 28, 2002 letter from Romdoul Kim of Quadel to Mr. Ginsburg, correct?
MR. KELLY: Objection, the document speaks for itself, but you may respond if you

Page 67

have --
A. Appears to be, yes.
Q. There is some handwriting in the lower right-hand portion, it says: "See attached." Do you recognize the handwriting?
A. No.
Q. Now, would you turn to the second page of Exhibit 16?
A. Yes.
Q. There are some initials at the bottom of this page, do you see that?
A. Yes.
Q. Whose initials are they?
A. That's actually my signature.
Q. That's your signature? Okay. Is this a note that you prepared to Ms. Kim of Quadel?
A. Yes.
Q. Do you know when this note was provided to Quadel?
A. My guess would be July 1st, 2002. At least that's the date this was noted as being. Well, it says it was received July 2nd, so it must have been sent to him.
(Exhibit 17, Document Bates Stamped PPAP-QUA-00254, marked for identification)

Page 68

BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 17, this is another copy of the second page of Exhibit 16, correct?
A. Yes.
Q. This copy has some information at the top, appears to be fax information, and that indicates that this document was faxed from JZG Resources to Quadel on July 1st, 2002, is that right?
A. Yes.
Q. There is some writing below your signature, says: "Romdoul, papers are being Fed Ex'd to you today, L. 7102."
Do you see that?
A. Yes.
Q. Do you recognize that writing?
A. Yes.
Q. Whose writing is that?
A. Well, I don't necessarily recognize the writing but the "L." would be Lorraine Ciero.
(Exhibit 18, Document Bates Stamped PPAP-QUA-00265, marked for identification)
BY MR. KOSLOSKE:

Page 69

Q. Showing you what's been marked for identification as Exhibit 18, do you recognize this document?
A. I have probably seen it, I don't have specific recollection of it.
Q. This is a letter dated August 12, 2002 from Romdoul Kim of Quadel to Jerome Ginsburg of Park Properties Associates, subject additional information required, annual adjustment factor rent increase FY 2002.
In the first paragraph, the last two lines read: "I called Stephen Bolduc on July 12 asking him to send me a list of each property's bedroom size and apartment number. He told me he would send it to me. As of today I have not received it."
Do you recall what that was about?
A. Do I have a specific recollection of it? No. It appears, however, to be that they -- first they wanted the Con Ed bills and then needed to know what the apartment size was or were asking for the bedroom size for each apartment number.
Q. Do you recall advising Ms. Kim that you would provide that information?

Page 70

A. I don't have that specific recollection, no.

(Exhibit 19, Document Bates Stamped PPAP-QUA-00266 through 267, marked for identification)

BY MR. KOSLOSKE:

Q. Showing you what's been marked for identification as Exhibit 19, do you recognize this document?

A. Specifically no, but it appears to be a printout from the HUD management program.

Q. This is a list of information for LaMartine Terrace that reflects bedroom size and apartment number, among other things, is that correct?

A. Yes.

Q. Does this document indicate on the top of the first page that it was faxed by JZG Resources to Quadel on August 14, 2002?

A. Yes, it does.

Q. Is the information contained in Exhibit 19 the information that is the subject of the last two sentences of the first paragraph in Exhibit 18?

A. Yes.

Page 71

(Exhibit 20, Document Bates Stamped PPAP-QUA-00343 through 344, marked for identification)

BY MR. KOSLOSKE:

Q. Showing you what's been marked for identification as Exhibit 20, do you recognize this document?

A. Specifically no in terms of do I know for a fact that this particular document have I seen, but it is the cover letter approving a rent increase that would accompany a new rent schedule.

Q. It is a letter dated September 11, 2002 from Romdoul Kim of Quadel to Jerome Ginsburg of Park Properties Associates. The subject of the letter is rent adjustment increase for LaMartine Terrace effective 10/14/2002, that is, October 14, 2002, correct?

A. That's correct.

Q. And the letter indicates that the rents have been adjusted by the annual adjustment factor 1.046, is that correct?

A. That's correct.

Q. And the new contract rents, according to this letter, are $956 per month for the

Page 72

zero-bedroom units, $1,040 per month for the one-bedroom units, and $1,143 per month for the two-bedroom units, is that correct?

A. That's correct.

Q. The letter indicates that an enclosure are three draft rent schedule forms reflecting the approved increase, correct?

A. That's correct.

(Exhibit 21, Document Bates Stamped PPAP-QUA-00345, marked for identification)

BY MR. KOSLOSKE:

Q. Showing you what's been marked for identification as Exhibit 21 do you recognize this document?

A. Specifically, no.

Q. This is a letter dated September 24, 2002 from Friendly Management, Inc., to Romdoul Kim of Quadel regarding rent increase for LaMartine Terrace in 2002, is that correct?

A. That's correct.

Q. Is the letter signed by Lorraine A Ciero?

A. That's correct.

Q. She is signing this letter on behalf of Friendly Management, Inc., is that correct?

Page 73

A. That's correct.

Q. This letter that is Exhibit 21 is a cover letter transmitting signed copies of the rent schedule forms reflecting the approved increase for 2002, is that correct?

A. Yes, it is.

(Exhibit 22, Document Bates Stamped PPAP-QUA-00346 through 347, marked for identification)

BY MR. KOSLOSKE:

Q. Showing you what's been marked for identification as Exhibit 22, do you recognize the document?

A. It is a rent schedule for LaMartine Terrace.

Q. It is a rent schedule that reflects the rents that are effective as of October 14, 2002, is that correct?

A. That's correct.

Q. And the contract rents effective on that date are $956 for a zero-bedroom unit, $1,040 for a one-bedroom unit, and $1,043 for a two-bedroom unit, is that correct?

A. That's correct.

Q. On the second page of Exhibit 22 are

Page 74

three signatures at the bottom. Is the first signature that of Jerome Ginsburg?
A. I believe so, yes.
(Exhibit 23, Document Bates Stamped PPAP-QUA-00354, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 23, do you recognize this document?
A. I believe I do.
Q. Exhibit 23 is a letter from Park Properties Associates to Mr. Ed -- is it Przywara?
A. Probably. I don't honestly know.
Q. The spelling is E-D, P-R-Z-Y-W-A-R-A.
The signature at the bottom is the signature of Mr. Ginsburg, is that correct?
A. Yes, I believe so.
Q. The subject of Exhibit 23 is an application request for rent adjustment for 2003, is that correct?
A. Yes.
Q. Is it correct that in this rent adjustment application, Park Properties is taking the position that the two-bedroom unit

Page 75

rents are below the applicable fair market rent and that therefore they are entitled to a factor-based rent adjustment for that year and that the zero-bedroom and one-bedroom units, the current rents exceed the fair market rents and that therefore you are applying for rents based upon rent comparability study information?
MR. KELLY: Objection. The document speaks for itself, but if you have knowledge you may respond.
A. That appears to be what the document says.
Q. The body of the letter indicates that several documents are enclosed, and item number six is cover sheet of rent comparability study, and then it says parenthetically: "Already on file from earlier this years."
Do you see that?
A. Yes.
Q. Can you tell us whether the rent study -- rent comparability study that's referred to at that point in Exhibit 23 is the rent comparability study that is marked for identification as Exhibit 15?
A. Yes.

Page 76

(Exhibit 24, Document Bates Stamped PPAP-QUA-00398, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 24, do you recognize this document?
A. I believe so.
Q. Exhibit 24 is a letter dated March 26, 2003 from Barbara A. Locke of Quadel to Park Properties Associates regarding an annual adjustment factor rent increase for LaMartine Terrace for 2003, is that correct?
A. That's correct.
Q. The letter indicates that the effective date of the increase is May 3, 2003?
A. That's correct.
Q. And the new contract rents as a result of the increase are $988 per month for the zero-bedroom units, $1,071 per month for the one-bedroom units, and $1,177 per month for the two-bedroom units?
A. That's correct.
Q. Exhibit 24 also indicates that draft rent schedules reflecting the approved increase are being transmitted or enclosed, is that

Page 77

correct?
A. Yes.
(Exhibit 25, Document Bates Stamped PPAP-QUA-00390, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 25, do you recognize this document?
A. Not specifically, no.
Q. This is a letter dated March 31, 2003 from Park Properties Associates to Barbara A. Locke of Quadel. There is a signature on behalf of Park Properties.
Is that the signature of Jerome Ginsburg?
A. I think so.
Q. Just below the signature Jerome Ginsburg there appears to be some initials, do you see that?
A. Yes.
Q. Did somebody sign this for Mr. Ginsburg?
A. I can't say for sure.
Q. This letter is a transmitting back to Quadel the signed rent schedules implementing

Page 78

the 2003 rent increase for LaMartine Terrace, correct?
A. Yes.
(Exhibit 26, Document Bates Stamped PPAP-QUA-00393, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 26, do you recognize this document?
(Pause)
A. Not specifically.
Q. Exhibit 26 appears to contain the same information basically as Exhibit 24 dated March 26, 2003?
A. That's correct.
(Exhibit 27, Document Bates Stamped PPAP-QUA-00399 through 401, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 27, do you recognize this document?
A. It is a rent schedule for LaMartine Terrace.
Q. This is a rent schedule that reflects

Page 79

the rents at LaMartine Terrace as of May 3, 2003?
A. That's correct.
Q. This rent schedule indicates that the rents for zero-bedroom units are $988 per month, the rents for one bedroom units are $1,071 per month, and the rents for two-bedroom units are $1,177 per month, is that correct?
A. That's correct.
Q. On the second page of Exhibit 27 are three signatures at the bottom. Is the first signature the signature of Jerome Ginsburg?
A. I believe so, yes.
(Exhibit 28, Document Bates Stamped PPAP-QUA-00409, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 28, do you recognize this document?
A. Not specifically.
Q. This is a letter dated March 10, 2004 from Park Properties to Ed Przywara of Quadel concerning a rent increase. It states in the letter: For fiscal year 2003.
There is a signature at the bottom of

Page 80

the document. Do you recognize the signature?
A. It appears to be Mr. Ginsburg's.
Q. This document, Exhibit 28, indicates that Park Properties is applying for a rent adjustment for the two-bedroom units based on the annual adjustment factor, the applicable annual adjustment factor, and that Park Properties is applying for rent adjustments for the zero-bedroom and one-bedroom units based on rent comparability study information?
A. That's correct.
Q. In the body of the letter there are a list of enclosed documents, and item number six is a rent comparability study update letter, do you see that?
A. That's correct.
(Exhibit 29, Document Bates Stamped PPAP-QUA-00403 through 408, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 29, do you recognize this document?
A. Yes.
Q. What is Exhibit 29?

Page 81

A. It is the update letter referred to in Exhibit 28.
Q. Exhibit 29 is a letter dated March 3, 2004 from Kenneth Golub of American Property Counselors to Mr. Ginsburg, correct?
A. That's correct.
Q. On the first page of the document Mr. Golub indicates that the market rents for one bedroom apartments are $1,150 per month and the market rents for studio or zero-bedroom apartments are $975 per month, is that correct?
A. I'm sorry, could you restate that?
Q. On the first page of Exhibit 29 in the second paragraph Mr. Golub indicates that market rents for one-bedroom units are $1,150 per month, and for zero-bedroom or studio units the market rents are $975 per month?
A. As of May 20, 2002, yes.
Q. Does Exhibit 29 indicate what the market rents for one-bedroom units are as of March of 2004, the date of the update?
MR. KELLY: Objection. The document speaks for itself, but you may respond.
A. On page two of the document -- the document speaks for itself, it speaks to that

Page 82

question in the last paragraph on page two, reference PPAP-QUA-00404.
Q. You are referring to the last paragraph which reads: "Based upon this updated rent survey, it is our considered opinion that market rent for Water View Apartments is at least $1,150 per month for a one bedroom apartment, and at least $975 per month for a studio apartment?
A. That's correct.
Q. He indicates that these rents are applicable under conditions in effect on and around March 1, 2004?
A. That's correct.
(Exhibit 30, Document Bates Stamped PPAP-QUA-00559 through 560, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 30, do you recognize this document?
A. Specifically, no.
Q. Exhibit 30 is a letter dated April 28, 2004 from Lindy J. Gravina of Quadel to Park Properties concerning rent adjustment for

Page 83

LaMartine Terrace in 2004, is that correct?
A. I'm sorry, could you state that again?
Q. Exhibit 30 is a letter dated April 28, 2004 from Lindy J. Gravina of Quadel to Park Properties concerning rent adjustment for LaMartine Terrace in 2004, is that correct?
A. That's correct.
Q. This letter indicates that the effective date of the rent increase is May 10, 2004, is that correct?
A. That's correct.
Q. The new contract rents as a result of the approved rent increase are $1,017 per month for zero-bedroom units, $1,105 for one-bedroom units, and $1,213 for the two-bedroom units?
A. That's correct.
Q. Now, the anniversary date of the HAP contract for Park Properties is June 1, correct?
A. That's correct.
Q. Do you know why the rent increase was made effective May 10, 2004?
A. No, I don't.
Q. Exhibit 30 indicates that enclosed is a draft rent schedule forms reflecting the rent adjustment, correct?

Page 84

A. I believe so, yes.
(Exhibit 31, Document Bates Stamped PPAP-QUA-00561, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 31, do you recognize this document?
A. Not specifically, no.
Q. This is a letter dated April 29, 2004 from Friendly Management to Lindy J. Gravina of Quadel concerning rent adjustment for LaMartine Terrace in 2004, is that correct?
A. That's correct.
Q. Is the signature at the bottom the signature of Mr. Ginsburg?
A. I'm not sure.
Q. This letter indicates that Friendly Management is returning executed copies of the rent schedule reflecting the approved rent increase for 2004?
A. That's correct.
(Exhibit 32, Document Bates Stamped PPAP-QUA-00565, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for

Page 85

identification as Exhibit 32, do you recognize this document?
A. It looks like a rent approval letter and instruction to begin vouchering.
Q. It is a letter dated May 4, 2004 from Lindy J. Gravina of Quadel to Park Properties?
A. That's correct.
Q. The letter indicates that it is enclosing a rent schedule for Park Properties files, is that correct?
A. Yes.
(Exhibit 33, Document Bates Stamped PPAP-QUA-00562 through 564, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 33, do you recognize this document?
A. It is a rent schedule for LaMartine Terrace.
Q. Does this rent schedule reflect the rents at LaMartine Terrace as of May 10, 2004?
A. This rent schedule states -- it is showing the rents that would be effective as of 5/10/04, yes.

Page 86

Q. And those rents are -- the contract rents are $1,017 for zero-bedroom units, $1,105 per month for one-bedroom units, and $1,213 per month for two-bedroom units?
A. That's correct.
Q. Turn to the second page of Exhibit 33, there are three signatures at the bottom. Is the first signature that of Jerome Ginsburg?
A. I believe so, yes.
(Discussion off the record)
(Recess)
BY MR. KOSLOSKE:
Q. Mr. Bolduc, I am going to switch now and show you some documents that relate to Valentine.
(Exhibit 34, Document Bates Stamped PPAV-NYH-0001 through 15, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 34, take a look at that document. Can you tell us whether you recognize it?
(Pause)
A. It appears to be the HAP contract for

Page 87

Valentine.
Q. If you look at the first page of Exhibit 34, it indicates that as to the effective date of the contract, see stages attached, do you see that?
A. Yes.
Q. If you will turn to the page that's marked PPAV-NYH-0007.
A. Yes.
Q. This sheet indicates that there were two stages for the Lane Hill project. The effective date of the first stage was January 2, 1980, and the effective date for the second stage was February 19, 1980, is that correct?
A. It appears to say that.
(Exhibit 35, Document Bates Stamped PPAV-NYH-00016 through 17, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 35, do you recognize this document?
A. No, I do not.
Q. It is a letter dated June 25, 1996 from Valentine Properties Associates and Park

Page 88

Properties Associates to Gerard W. Sheridan, Housing Management Division, New York HUD office.
Would you turn to the second page of Exhibit 35?
A. Yes.
Q. Do you recognize the signature at the bottom of the page?
A. It appears to be Mr. Ginsburg's.
(Exhibit 36, Document Bates Stamped PPAV-NYH-00018, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 36, do you recognize this document?
A. No, I do not.
Q. This is a document that is captioned as assignment of HAP contract, and the middle of the page there is a caption acceptance by Assignee.
There are signatures on the page. Do you recognize the signatures?
A. Appears to be that of Mr. Ginsburg.
(Exhibit 37, Document Bates Stamped PPO530 through 533, marked for identification)

Page 89

BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 37, do you recognize this document?
A. I believe I have seen it before.
Q. Exhibit 37 is a letter dated March 9, 1995 from Beryl H. Niewood of New York HUD office to Carla Forgione of Valentine Associates.
The subject of this letter is a rent adjustment for Lane Hill, is that correct?
A. I believe that's so.
Q. Who is Carla Forgione?
A. She was an occupancy manager. I mentioned earlier, Carla Valentine, that's her married name.
Q. Exhibit 37 approves a rent adjustment for Lane Hill effective January 2, 1994, is that correct?
A. Yes, that appears to be what it says.
Q. And the new approved rents for Lane Hill are reflected in Exhibit 37 as $853 per month for zero-bedroom units, $963 per month for one-bedroom units, and $1,103 per month for two-bedroom units, is that correct?

Page 90

A. Yes.
(Exhibit 38, Document Bates Stamped PPO526 through 533, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 38, do you recognize this document?
A. Not specifically.
Q. This is a letter dated May 10, 1995 from Beryl H. Niewood of the New York HUD office addressed to Carla Forgione of Valentine Lane Associates concerning a rent adjustment for Lane Hill. I will represent to you that this is a document that was produced by Valentine in this litigation with the government.
This document indicates that Lane Hill received a rent adjustment effective January 2, 1995, is that correct?
A. That appears to be what it says, yes.
Q. And the adjusted Section 8 contract rents are $880 per month for zero-bedroom units, $994 per month for the one-bedroom units, and $1,138 per month for the two-bedroom units?
A. Yes, that's what's listed.
Q. Did Valentine seek a rent adjustment

Page 91

for 1996?
A. I do not believe so.
Q. Same question for 1997?
A. I do not believe so.
Q. Same question for 1998?
A. I do not believe so.
Q. Same question for 1999?
A. I do not believe so.
Q. Same question for 2000?
A. I'm not sure. I don't think so but I'm not sure. I think the first one was 2001 that they requested. I could be off a year.
Q. For the years 1995 through 1999, do you know why Valentine did not pursue rent adjustments for Lane Hill?
A. Would be the same as in for LaMartine.
(Exhibit 39, Document Bates Stamped PPO502, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 39, do you recognize this document?
A. Yes, I have seen this.
Q. What is Exhibit 39?
A. It seems to be a letter from Bill

Page 92

O'Neil to Valentine Properties Associates regarding potential rent increase for Valentine.
Q. The letter is dated January 18, 2001?
A. Yes.
Q. There is a handwritten note in the upper right-hand corner: "Note: Please disregard the 'on/or before' submission state. Still your quick response to this letter would be greatly appreciated."
Do you know whose writing that is?
A. I don't know whose writing that is, but I believe that was a note from Bill O'Neil to Paul Richards. I don't know that for certain but that's what I believe it to be.
Q. What if any action did Valentine take with respect to Exhibit 39?
A. The same as I covered regarding Park, they were done at the same time.
Q. So you pursued a rent adjustment, Valentine pursued --
A. Again, we pursued a rent adjustment. Like I said, I believe this all started back in December with conversations between Bill O'Neil and Paul Richards, but part of what was done through that whole process was we pursued a rent

Page 93

adjustment, yes.
Q. You say December, you mean December 2000?
A. Yes.
(Exhibit 40, Document Bates Stamped PPAV-NYH-00026, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 40. It is a letter dated January 19, 2001 from Bill O'Neil of Quadel to Valentine regarding notice of potential rent adjustment. It is dated one day later than Exhibit 39 but at appears to be a similar piece of correspondence.
Do you recall receiving two letters?
A. I don't recall receiving either letter. I recall seeing the first letter. I don't know that I have ever seen the second letter.
(Exhibit 41, Document Bates Stamped PPAV-NYH-00033, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 41, do you recognize this document?