Page 94

A. Looks like a cover sheet for a rent increase request.
Q. For the year 2001?
A. Yes.
Q. It is a letter dated May 11, 2001 from Valentine to Quadel, is that correct?
A. Yes, that's when it is dated.
Q. Do you recognize the signature at the bottom of the page?
A. It appears to be Mr. Ginsburg's.
MR. KELLY: John, for the record do you know in connection with this exhibit, for example, several others like it earlier, it indicates there were enclosures from a certain number of documents. In the copies that were provided to us, do you know if those attachments are connected or are these just individual correspondence letters?
MR. KOSLOSKE: Some, not necessarily all of the attachments appear to be there. I don't know that I have seen any copy of letters like Exhibit 41 in which all enclosures are there, but, again, my memory may be faulty on that point. It is what it is in the files.
MR. KELLY: Understood. I just

Page 95

wanted, to the extent there were additional documents which may or may not be attached to it, I just wanted to note for the record that the fact that there is a letter here doesn't mean that it was by itself in the record, in the files, but there could be some additional attachments actually there, so --
(Exhibit 42, Document Bates Stamped PPAV-NYH-00034, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 42. Do you recognize this document?
A. Not specifically.
Q. Exhibit 42 is a letter dated July 12, 2001 from Tracy S. Newman of Quadel to Friendly Management. The subject of the letter is a rent adjustment for Lane Hill. The letter states among other things the effective date of the increase is August 1, 2001, and the adjusted rents are $892 per month for the zero-bedroom units, $1,016 per month for the one-bedroom units, and $1,162 for the two-bedroom units.
Does that comport with your understanding of a rent adjustment that was

Page 96

received by Valentine for Lane Hill in 2001?
A. I don't off the top of my head know what the numbers were, so in terms of comporting that without looking at the rent schedules I can't say, but that's what this says.
(Exhibit 43, Document Bates Stamped PPAV-QUA-0001, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 43, do you recognize this document?
A. It looks like the application for a rent increase for Valentine for 2002 fiscal year, cover letter.
Q. It is a letter dated May 8, 2002 from Valentine to Kim Shirtz of Quadel.
There is a signature at the bottom of the page. Do you recognize that?
A. Looks like Mr. Ginsburg's.
(Exhibit 44, Document Bates Stamped PPAV-QUA-00085, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 44, do you recognize this document?

Page 97

A. Not specifically, but it is a request for additional information.
Q. It is a letter dated May 30, 2002 from Romdoul Kim of Quadel to Jerome Ginsburg.
The requested information is for a rent roll report or a move-in-move-out report for the unit turnover, is that correct?
A. That appears to be what it is asking for, yes.
Q. Do you recall providing that information?
MR. KELLY: You asked the witness whether he provided it personally or provided it for through the company?
BY MR. KOSLOSKE:
Q. Do you recall whether you provided it personally?
A. I cannot recall specifically whether I was -- responded to this particularly. I can recall at some point in time for one of the buildings we gave them some sort of move in move out -- we responded in some way to something like this. I don't know if it was precisely this because there was difficulty with TRACS, so we just gave them everything and said, you know,

Page 98

here is what it is, you figure out how it is supposed to match. We can't deal with TRACS, we can only deal with what physically happened.
(Exhibit 45, Document Bates Stamped PPAV-QUA-00086, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 45, do you recognize this document?
A. It is also a request for -- cover sheet to an application for fiscal year 2002 increase.
Q. This is a letter dated June 4, 2002 from Valentine to Kim Shirtz of Quadel, correct?
A. That's correct.
Q. The signature at the bottom of the page, do you recognize it?
A. I'm not sure.
Q. Do you recognize this as being correspondence from Valentine to Quadel?
A. Yes, I do.
Q. This letter indicates that the increase applied for is a rent increase for zero-bedroom units?
A. That's correct.

Page 99

Q. The letter indicates that eight items are enclosed. Item number six is rent comparability study dated May 20, 2002, do you see?
A. Yes, I see that.
(Exhibit 46, Document Bates Stamped PPAV-QUA-00015 through 75, marked for identification)
BY MR. KOSLOSKE:
Q. I am showing you what's been marked for identification as Exhibit 46. Do you recognize this document?
A. Yes, I do.
Q. What is Exhibit 46?
A. It is the rent comparability study on Lane Hill referenced in the previous letter, previous exhibit.
Q. This is a rent comparability study provided by Kenneth Golub of American Property Counselors to JZG Resources?
A. Yes, it is.
Q. If you will turn to the second page of Exhibit 46, this is a cover letter dated May 20, 2002 from Mr. Golub to Mr. Ginsburg, correct?
A. That's what it shows.

Page 100

Q. And it indicates that the current market rent for a one-bedroom apartment is $1,100 per month and that the market rent for a studio or zero-bedroom apartment is $950 per month?
A. That appears to be what it says, yes.
(Exhibit 47, Document Bates Stamped PPAV-QUA-00099 through 100, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 47, Exhibit 47, do you recognize it?
A. Yes, it is the same letter as Exhibit 16.
Q. The first page is the same as Exhibit 16, but the second page of Exhibit 47 is different, correct?
A. Okay. I'm sorry, I was just looking at the first page. Okay. It is the same -- even the second page is the same although there are some different markings on it. One has an arrow at LaMartine Terrace, the other one has an arrow at a circle on Valentine Lane. It appears to be two copies of the same document that

Page 101

someone made different marks on.
(Exhibit 48, Document Bates Stamped PPAV-QUA-000337, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's marked for identification as Exhibit 48, it is a letter dated August 12, 2002 from Romdoul Kim of Quadel to Jerome Ginsburg, subject, additional information required relative to rent increase for 2002.
A. It appears to be a copy of Exhibit 18 with a check mark next to Valentine Lane instead of LaMartine Terrace.
Q. Exhibit 48 is requesting a list of each property's bedroom size and apartment number for both LaMartine Terrace and Lane Hill, is that correct?
A. I believe so, yes.
(Exhibit 49, Document Bates Stamped PPAV-QUA-000219 through 00221, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 49, do you recognize this document?

A. Not specifically, no.
Q. The first page of the document says it is to the attention of Romdoul Kim, New York, Quadel, regarding LaMartine Terrace and Valentine Lane or Lane Hill, and there is a note. It says: "Thank you, Stephen Bolduc."
Is that your note, sir?
A. I believe it is, yes.
Q. Is Exhibit 49, the second and third pages of that exhibit, is that a listing of the apartment sizes and unit numbers that was requested in the August 12, 2002 letter, Exhibit 48?
A. I believe it is.
Q. And Exhibit 49 has some information at the top that indicates that it was faxed by JZG Resources to Quadel on August 14, 2002?
A. That's correct.
(Exhibit 50, Document Bates Stamped PPAV-QUA-00329 through 00330, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 50, do you recognize this document?



A. Not specifically.
Q. This is a letter dated September 10, 2002 from Romdoul Kim of Quadel to Jerome Ginsburg concerning rent increase for Lane Hill, is that correct?
A. That's what it appears to be, yes.
Q. This document indicates that the effective date of the rent increase is October 14, 2002?
A. Yes, that's what the document indicates.
Q. And that the new contract rents are $928 per month for the zero-bedroom units, $1,053 per month for the one-bedroom units, and $1,204 per month for the two-bedroom units?
A. Yes, that's what the document indicates.
Q. The document also indicates that an enclosure are some draft rent schedule forms reflecting the increase?
A. Yes.
(Exhibit 51, Document Bates Stamped PPAV-QUA-00331, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for



identification as Exhibit 51, do you recognize this document?
A. It appears to be something we have gone over previously. Yes, it looks like it is a copy of Exhibit 21 with an arrow pointing to Valentine instead of LaMartine.
Q. Exhibit 51 is a letter dated September 24, 2002 from Friendly Management to Quadel transmitting executed copies of rent schedule forms reflecting the rent increase for 2002.
A. I'm sorry?
Q. Exhibit 51 is a letter dated September 24, 2002 from Friendly Management to Quadel transmitting rent schedule forms that reflect the rent increase approved by Quadel for 2002?
A. It appears to be a transmittal letter doing that, yes.
(Exhibit 52, Document Bates Stamped PPAV-QUA-00334, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 52, do you recognize this document?
A. Not specifically, no.
Q. It is a letter dated October 8, 2002



from Romdoul Kim of Quadel to Jerome Ginsburg, subject, final notification of AAF rent adjustment for Lane Hill, is that correct?
A. Yes, that's what it says.
Q. This document indicates that it is enclosing a rent schedule for Valentine's files, is that correct?
A. That's correct.
(Exhibit 53, Document Bates Stamped PPAV-QUA-00332 through 333, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 53, do you recognize this document?
A. I don't recognize it specifically. It appears to be a rent schedule for Valentine Lane.
Q. Is this a rent schedule reflecting the rents as of October 14, 2002 at Lane Hill?
A. That appears to be the date, the effective date, yes.
Q. And the rents are shown as $928 for zero-bedroom units, $1,053 for one-bedroom units, and $1,204 for two-bedroom units?

Page 106

A. Yes, that's what's shown.
Q. Turn to the second page of Exhibit 53. There are three signatures at the bottom. Do you recognize the first signature?
A. I believe it is Mr. Ginsburg's.
(Exhibit 54, Document Bates Stamped PPAV-QUA-00338, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 54, do you recognize this document?
A. Not specifically.
Q. It is a letter dated October 22, 2002 --
A. I don't have that. This is dated November 21.
MR. KELLY: That's what I have.
(Pause)
MR. KOSLOSKE: Let me take them back and renumber them.
Q. Strike the last question that I had on the record regarding Exhibit 54.
Showing you what's been marked for identification or remarked as Exhibit 54, do you recognize this document?

Page 107

A. It appears to be a request for a rent increase for Valentine Lane. It appears to be for fiscal year 2003.
Q. It is a letter dated October 22, 2002 from Valentine to Ed Przywara of Quadel?
A. Yes, it is.
Q. Do you recognize the signature at the bottom of the page?
A. Appears to be Mr. Ginsburg's.
(Exhibit 55, Document Bates Stamped PPAV-QUA-00400, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 55, do you recognize this document?
A. Not specifically.
Q. This is a letter dated November 21, 2002 from Edward F. Przywara of Quadel to Valentine, subject annual adjustment factor rent increase for Lane Hill, is that correct?
A. That appears to be what it is, yes.
Q. The letter indicates that the effective date of the rent increase is February 19, 2003?
A. That's what the letter says, yes.

Page 108

Q. And the adjusted rents are $964 per month for the zero-bedroom units, $1,092 per month for the one-bedroom units, and $1,204 per month for the two-bedroom units?
A. Yes, that's what it shows.
(Exhibit 56, Document Bates Stamped PPAV-QUA-00401, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 56. Do you recognize this document?
A. It looks like a similar letter to Exhibit 55 except -- no, not specifically.
Q. Exhibit 56 is a letter dated November 26, 2002 from Mr. Przywara of Quadel to Mr. Ginsburg concerning an annual adjustment factor rent increase for Valentine Lane, is that correct?
A. That's what it is about, yes.
Q. It concerns your rent adjustment for 2003, the difference between Exhibit 56 and 55, would you agree, is that 56 shows an amended effective date of the rent increase as of January 2, 2003?
A. Allow me to just check the rest of it.

Page 109

It appears that outside of the date of the letter, that's the change that's been made, yes.
(Exhibit 57, Document Bates Stamped PPAV-QUA-00404, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 57, do you recognize this document?
A. Not specifically.
Q. Exhibit 57 is a file copy of a letter dated December 10, 2002 from Edward F. Przywara of Quadel to Valentine regarding the 2003 rent adjustment for Lane Hill. Is that your understanding?
A. I'm sorry.
Q. Want me to repeat the question?
A. No, let me read the document first.
(Pause)
A. Okay, now if you could repeat the question.
Q. Exhibit 57 is a letter dated December 10, 2002 from Edward F. Przywara of Quadel to Valentine regarding the 2003 rent adjustment for Lane Hill?

Page 110

A. Yes, that's correct.
Q. You see that document indicates that it is enclosing a rent schedule for Valentine's files, correct?
A. Yes, that's correct.
(Exhibit 58, Document Bates Stamped PPAV-QUA-00406 through 407, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 58, do you recognize this document?
A. It is a -- appears to be a rent schedule for Valentine.
Q. Is this a rent schedule that shows the rents for Lane Hill effective as of January 2, 2003?
A. Yes, I believe that's what it shows.
Q. The rents reflected in this rent schedule are $964 for the zero-bedroom units, $1,092 per month for the one bedroom units, and $1,204 per month for the two-bedroom units?
A. Yes, those are the rents reflected.
Q. If you turn to the second page of this document, there are three signature at the

Page 111

bottom. Do you recognize the first signature?
A. Appears to be Mr. Ginsburg's.
(Exhibit 59, Document Bates Stamped PPAV-NYH-00408, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 59. Do you recognize this document?
A. It appears to be a cover letter to a rent increase application for Valentine Lane for fiscal year 2004.
Q. It is a letter dated November 11, 2003 from Valentine to Ed Przywara of Quadel, is that correct?
A. Appears to be what it is, yes.
Q. Do you recognize the signature at the bottom of the page?
A. I believe it is Mr. Ginsburg's.
(Exhibit 60, Document Bates Stamped PPAV-QUA-00451, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 60, do you recognize this document?
A. Not specifically.

Page 112

Q. Exhibit 60 is a letter dated November 19, 2003 from Barbara A. Locke of Quadel to Jerome Ginsburg regarding rent adjustment for Valentine Lane or Lane Hill, is that correct?
A. I believe so. Could you repeat the question?
Q. Exhibit 60 is a letter dated November 19, 2003 from Barbara A. Locke of Quadel to Jerome Ginsburg regarding rent adjustment for Lane Hill?
A. Yes.
Q. In this document Quadel requests an updated rent comparability study and a corrected unit turnover report, do you see that?
A. Yes, I see that.
Q. Do you recall whether either of those items were provided by Valentine to Quadel?
A. I believe they both were.
(Exhibit 61, Document Bates Stamped PPAV-QUA-00453, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 61, do you recognize this document?
A. Not specifically.

Page 113

Q. This is a letter dated December 8, 2003 from Barbara A. Locke of Quadel to Jerome Ginsburg regarding a rent increase for Lane Hill, is that correct?
A. That's correct.
Q. This letter is dated approximately three weeks after Exhibit 60 and it indicates that in order to process a rent increase, Quadel would have to receive a rent comparability study and a reported unit turnover, is that correct?
A. That appears to be what it says, yes.
(Exhibit 62, Document Bates Stamped PPAV-QUA-00501 through 504, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 62, do you recognize this document?
A. Not specifically.
Q. Exhibit 62 is -- the first page is a fax from Lindy Gravina of Quadel to Stephen Boldwick, B-O-L-D-W-I-C-K.
Is that a misspelling of your name?
A. I would assume so.
Q. It is dated March 10, 2004, and

Page 114

appended to the fax is a format for reporting unit turnover, is that correct?
A. That's what this appears to be, yes.
Q. Did you have a conversation with Ms. Gravina in which you requested that she provide you this form?
A. I don't have the specific recollection of my conversation with Ms. Gravina. My recollection is -- I don't have the specifics of the recollection of my conversation with Ms. Gravina.
(Exhibit 63, Document Bates Stamped PPAV-QUA-00477, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 63, do you recognize this document?
A. Not specifically but it looks like a request for a rent increase for Valentine Lane for fiscal year 2004.
Q. It is a letter dated March 10, 2004 from Valentine to Ed Przywara of Quadel, is that correct?
A. That appears to be what it is, yes.
Q. Do you recognize the signature at the

Page 115

bottom of the page?
A. Appears to be Mr. Ginsburg's.
Q. This document, Exhibit 63, indicates that the basis on which a rent adjustment is sought for the two-bedroom units is an application of the annual adjustment factor and the basis for a rent adjustment for the zero and one-bedroom units as a rent comparability study?
A. That appears to be what it indicates, yes.
Q. In the body of the letter the letter indicates that eight items are enclosed, and item number six is a rent comparability study update letter, is that correct?
A. That's what item six says, yes.
(Exhibit 64, Document Bates Stamped PPAV-QUA-00455 through 460, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 64, do you recognize this document?
A. Yes, I do.
Q. What is Exhibit 64?
A. It is the update letter referenced in

Page 116

Exhibit 63.
Q. If you turn to the second page of Exhibit 64?
A. Yes.
Q. Directing your attention to the last paragraph of the second page, does this indicate that in the opinion of Mr. Golub of American Property Counselors, that the market rent for a one-bedroom apartment was at least $1,100 per month, and for a studio or zero-bedroom apartment was at least $950 per month as of on or about March 1, 2004?
A. That's what it appears to say, yes.
(Exhibit 65, Document Bates Stamped PPAV-QUA-00517 through 518, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 65, do you recognize this document?
A. Not specifically.
Q. Exhibit 65 is a letter dated April 2, 2004 from Barbara A. Locke of Quadel to Jerome Ginsburg regarding a rent adjustment for Valentine Lane, is that correct?

Page 117

A. That's what it appears to be, yes.
Q. When I say Valentine Lane, I mean Lane Hill, correct?
A. This is where I get into the confusion of Lane Hill, Valentine Lane, St. Andrews Place. The building is St. Andrews Place for the project called Valentine Lane or the building called Lane Hill.
Q. This letter indicates that a rent increase for Lane Hill has been approved with an effective date of May 10, 2004, correct?
A. That's what it appears to indicate, yes.
Q. The letter indicates that the new contract rents are $994 per month for the zero-bedroom units, $1,128 per month for the one-bedroom units, and $1,241 per month for the two-bedroom units, is that correct?
A. That appears to be what it indicates, yes.
Q. And the letter indicates also, that is, Exhibit 65, that it is enclosing rent schedule forms reflecting the rent increase, correct?
A. Yes, it indicates that.

Page 118

(Exhibit 66, Document Bates Stamped PPAV-QUA-00519, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 66, do you recognize this document?
A. Not specifically.
Q. This is a letter dated April 6, 2004 from Park Properties Associates to Barbara A. Locke of Quadel. The subject of the letter, however, is a rent increase for Valentine Lane or Lane Hill, is that correct?
A. That's correct.
Q. Do you recognize the signature on the page?
A. I'm not sure.
(Exhibit 67, Document Bates Stamped PPAV-QUA-00524, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 67, do you recognize this document?
A. Not specifically.
Q. Exhibit 67 is a letter dated April 14, 2004 from Lindy J. Gravina of Quadel to Park

Page 119

Properties concerning a rent adjustment for Lane Hill in 2004, is that correct?
A. Yes, that appears to be what it is.
Q. This document, Exhibit 67, indicates that a rent schedule is enclosed for Valentine's files, is that correct?
A. Yes, that's what it indicates.
(Exhibit 68, Document Bates Stamped PPAV-QUA-00520 through 522, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 68, do you recognize this document?
A. Not specifically, but it is a rent schedule for Valentine Lane, appears to be.
Q. Is this a rent schedule that shows the rents effective at Lane Hill on May 10, 2004?
A. That appears to be when it is shown to be effective, yes.
Q. Exhibit 68 reflects that the rents effective are $994 per month for the zero-bedroom units, $1,128 per month for the one-bedroom units, and $1,241 per month for the two-bedroom units?

Page 120

A. That's what it indicates, yes.
Q. Would you turn to the second page of Exhibit 68? There are three signatures at the bottom. Do you recognize the first one?
A. Appears to be Mr. Ginsburg's.
(Exhibit 69, Document Bates Stamped PPAV-QUA-00654 through 655, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 69, do you recognize this document?
A. Not specifically.
Q. Exhibit 69 is a letter dated April 28, 2004 from Lindy J. Gravina of Quadel to Park Properties but it concerns a 2004 rent adjustment for Valentine Lane or Lane Hill, correct?
A. I'm sorry, could you repeat that?
Q. Exhibit 69 is a letter dated April 28, 2004 from Lindy J. Gravina of Quadel to Park Properties but concerning a rent adjustment in 2004 for Lane Hill, correct?
A. That appears to be what it is for, yes.

Page 121

Q. This letter indicates a corrected rent for the zero-bedroom units of $992 per month, is that correct?
A. It appears to do that, yes.
(Exhibit 70, Document Bates Stamped PPAV-NYH-00658, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 70, do you recognize this document?
A. Not specifically.
Q. Exhibit 70 is a letter dated May 4, 2004 from Lindy J. Gravina of Quadel to Park Properties concerning 2004 rent adjustment for Lane Hill, correct?
A. Appears to be what it is about, yes.
Q. The letter indicates that it is enclosing a corrected rent schedule for Valentine's files?
A. That's what it indicates, yes.
(Exhibit 71, Document Bates Stamped PPAV-QUA-00650 through 652, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for

Page 122

identification as Exhibit 71, do you recognize this document?
A. Not specifically but it appears to be -- not specifically.
Q. Would you agree that Exhibit 71 is a rent schedule?
A. Yes, I would.
Q. Would you agree that this is a rent schedule that reflects that the rents for Lane Hill as of May 10, 2004 are $992 per month for the zero-bedroom unit, $1,128 per month for the one-bedroom units, and $1,241 per month for the two-bedroom units?
A. That's what it indicates, yes.
Q. Would you also agree that in the upper right-hand corner under project name this rent schedule indicates that it is corrected zero-bedroom rent?
A. Yes, it indicates that.
Q. Would you turn to the second page of Exhibit 71?
A. Yes.
Q. There are three signatures at the bottom. Do you recognize the first signature?
A. Looks like Mr. Ginsburg's.

Page 123

MR. KOSLOSKE: I don't have any further questions.
EXAMINATION
BY MR. KELLY:
Q. If you pull out Exhibits 14, 15, 23 and 59.
A. 59, did you say?
Q. 14, 15, 23, 59. Mr. Bolduc, you have been presented with a large number of documents today. Just for the record, I have asked you to look at a couple of examples of what it is that has been shown to you in the course of your deposition?
A. Yes.
Q. Several of these are letters that were submitted, appeared to have been submitted and identified as coming from either Park Properties Associates in the case of Exhibit 14, or Valentine Properties Associates in the case of Exhibit 59. Exhibit 23 also came from Park Properties Associates.
In the re line they discuss a subject rent increase for various fiscal years for the reports. Below that is text that says, for example, on Exhibit 4: 0 BR units over FMR

Page 124

increase applied for under RCS. That's on Exhibit 14. And there is other language on the re lines of Exhibits 23 and 59.
Just for the record, in your testimony today, to the extent that you were asked questions with respect to whether at any given time these letters were mailed, whether the rents for these units were in fact over or above fair market rents, you were relying on the information contained in these Exhibits 14, 23 and 59 as opposed to any personal information you may have, is that right?
A. In answering what these documents indicate?
Q. Yes.
A. Yes.
Q. So sitting here today you do not know in fact whether at the time these letters or other similar letters to these were filed as to whether in fact the rents were above or below --
A. Not specifically, no.
Q. With respect to the information contained in the rent comparability studies that you were shown today, and I am not going to pull them all out, but using Exhibit 15 as an

Page 125

example, to the extent that Mr. Golub reached any conclusions with respect to what in fact the market rents were for comparable units, again, to the extent that you testified today it was based solely on the information that was contained in these rent comparability studies as opposed to any personal information you may possess, is that right?
A. Could you restate that?
Q. Sure. Referring to the rent comparability studies which you were presented with today, to the extent that you were asked questions with respect to what in fact the current market rents for apartments were, was your testimony based on the information presented in these rent comparability studies or on your personal information?
A. I believe the questions that I was asked were all specific to what these documents indicated and my answered were based on what the documents indicated.
Q. Not your personal information?
A. No.
MR. KELLY: No further questions.
MR. KOSLOSKE: I don't have anything

Page 126

further. That concludes this segment of the deposition.

(Time noted: 1:36 p.m.)

____________________________
STEPHEN BOLDUC

____________________________
NOTARY PUBLIC

Subscribed and sworn to before me
this_____day of_____________, 2005.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PARK PROPERTIES ASSOCIATES, L.P., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 04-1757C |
| v. | ) | |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REVISED NOTICE OF RULE 30(b)(6) DEPOSITION

To: PARK PROPERTIES ASSOCIATES, L.P., VALENTINE PROPERTIES ASSOCIATES, L.P., AND ST. JOHN'S I ASSOCIATES, L.P., AND THEIR ATTORNEY

Pursuant to Rule 30(b)(6) of the Rules of the United States Court of Federal Claims and by agreement of counsel, please take notice that defendant, by counsel, will take the deposition of plaintiffs Park Properties Associates, L.P., Valentine Properties Associates, L.P., and St. John's I Associates L.P., beginning at 9:30 a.m., on July 1, 2005, at the offices of Nixon Peabody LLP, 437 Madison Avenue, New York, NY 10022, with respect to the following matters:

A. Park Properties Associates

1. The Park Properties HAP Contract, including any and all exhibits, amendments, and modifications.

2. Rent adjustments under the Park Properties HAP Contract during the period from January 1, 1994, to the present.

3. Rents under the Park Properties HAP Contract in effect during any part of the period from January 1, 1994, to the present.

B. Valentine Associates

4. The Valentine HAP Contract, including any and all exhibits, amendments, and modifications.

PENGAD 800-631-6989
EXHIBIT
2

5. Rent adjustments under the Valentine HAP Contract during the period from January 1, 1994, to the present.

6. Rents under the Valentine HAP Contract in effect during any part of the period from January 1, 1994, to the present.

C. St. John's I Associates

7. The St. John's HAP Contract, including any and all exhibits, amendments, and modifications.

8. Rent adjustments under the St. John's HAP Contract during the period from January 1, 1994, to the present.

9. Rents under the St. John's HAP Contract in effect during any part of the period from January 1, 1994, to the present.

10. Termination or expiration of the St. John's HAP Contract.

11. The "Housing Assistance Payments Interim (Full) Mark-to-Market Renewal Contract" effective on July 1, 2002, relative to St. John's Phase I.

12. The "Housing Assistance Payments Interim (Full) Mark-to-Market Renewal Contract" effective on September 22, 2002, relative to St. John's Phase I.

13. The "Housing Assistance Payments Interim (Full) Mark-to-Market Renewal Contract" effective on December 15, 2002, relative to St. John's Phase I.

14. The "Housing Assistance Payments Watch List Renewal Contract" effective on August 1, 2003, relative to St. John's Phase I.

15. The "Housing Assistance Payments Basic Renewal Contract" effective August 1, 2004, relative to St. John's Phase I.

16. The "Housing Assistance Payments Renewal Contract for Mark-Up-To-Market Project" effective on August 6, 2004, relative to St. John's Phase I.

17. Any contracts or agreements for housing assistance payments for St. John's Phase I under the Section 8 Housing Assistance Payments Program (42 U.S.C. § 1437f) effective on or after July 1, 2002 (other than the contracts that are the subject of deposition topics 11-16 above).

Under Rule 30(b)(6), plaintiff is required to designate one or more of its officers, directors, managing agents, or other persons who consent to testify upon its behalf, with respect to the matters set forth above.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, DC

JUNE 20, 2005

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 20th day of JUNE, 2005, I caused to be sent by facsimile transmission and by United States mail (postage prepaid) "DEFENDANT'S NOTICE OF RULE 30(b)(6) DEPOSITION" addressed as follows:

HARRY J. KELLY, ESQ.
Nixon Peabody LLP
401 9th Street, N.W., Suite 900
Washington, D.C. 20004

HOUSING ASSISTANCE PAYMENTS CONTRACT – PART I

| HAP CONTRACT LIST NUMBER AND DATE: NY 78-6081 9/27/78 | PROJECT NUMBER: NY 36-0010-003 |
|---|---|

This Housing Assistance Payments Contract ("Contract") is entered into by and between the United States of America acting through the Department of Housing and Urban Development ("Government") and PARK PROPERTY ASSOCIATES pursuant to the United States Housing Act of 1937 ("Act"), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq.

The parties hereto agree as follows:

1.1 SIGNIFICANT DATES AND OTHER ITEMS; CONTENTS OF CONTRACT.

a. Effective Date of Contract. The effective date of this Contract is See Stages Attached, 19__. [This date shall not be earlier than the date of Government acceptance of the project.]

~~b. Term of Contract Where Relative Cost of Rehabilitation is Less Than 15 Percent of Value. The term of this Contract for any unit (see Section 1.4a, Alternative 1) shall be ___ years [not to exceed five years], beginning with the effective date of this Contract for such unit.~~

c. Term of Contract Where Relative Cost of Rehabilitation Is 15 Percent or More of Value.

(1) Initial Term. The initial term of this Contract for any unit (see Section 1.4a, Alternative 2) shall be 5 years [not to exceed five years], beginning with the effective date of this Contract for such unit.

(2) Number and Length of Optional Additional Terms. The number and length of optional additional terms (see Section 1.4c, 5 terms of 5 years each [not to exceed five years each].

(3) Maximum Total Term. The maximum total term of this Contract for any unit, including all renewals (see Section shall be 30 years. [Insert number as authorized by the Government pursuant to 24 CFR, Section 881.101, but except more than 20 years, or, in the case of a project owned by, or financed by a loan or a loan guarantee from or local agency, the number, not to exceed 40, which will provide a term ending with the scheduled maturity date the last payment under such financing.]

d. Fiscal Year. The ending date of each Fiscal Year (see Section 1.4b) shall be Sept. 30th [insert March 31, June 30, September 30, or December 31, as determined by the Government].

e. Maximum Housing Assistance Commitment. The maximum amount of the commitment for housing assistance payments under the Contract (see Section 1.5c) is \$ 521,232. per annum.

f. Minimum Percentage of Occupancy by Very Low-Income Families. In the initial renting of the Contract Units, the Owner shall lease at least 30 percent [insert 30, or lower number if authorized by the Government in accordance with 24 CFR, Section 881.117] Low-Income Families (determined in accordance with the Government-established schedules and criteria) and shall thereafter exert best efforts to achieve and maintain at least 30 percent occupancy of the Contract Units by Very Low-Income Families as determined in accordance with such schedules and criteria.

g. Contents of Contract. This Contract consists of Part I, Part II, and the following exhibits:

Exhibit A: The schedule showing the number of units by size ("Contract Units") and their applicable rents ("Contract Rents");

Exhibit B: The project description; See attached for Exhibits A, B, C & D.

Exhibit C: The statement of services, maintenance and utilities to be provided by Owner;

Exhibit D: The Affirmative Fair Housing Marketing Plan, if applicable; and

Additional exhibits: [Specify additional exhibits, if any. If none, insert "None."] None

Exhibit E – Daily Debt Service-Computation

This Contract, including said exhibits, comprises the entire agreement between the parties hereto with respect to the matters contained herein, and neither party is bound by any representations or agreements of any kind except as contained herein or except agreements entered into in writing which are not inconsistent with this Contract.

2 OWNER'S WARRANTIES.

a. Legal Capacity. The Owner warrants that he has the legal right to execute this Contract and to lease dwelling units covered by this

b. Completion of Work. The Owner warrants that the project as described in Exhibit B is in good and tenantable condition and that the project has been completed in accordance with the terms and conditions of the Agreement to Enter into Housing Assistance Payments Contract ("Agreement") or will be completed in accordance with the terms on which the project was accepted. The Owner further warrants that he will remedy any defects or omissions covered by this warranty if called to his attention within 12 months of the effective date of this Contract. The Owner and the Government agree that the continuation of this Contract shall be subject to the conditions set forth in Section 1.4f of the Agreement.

3 FAMILIES TO BE HOUSED; GOVERNMENT ASSISTANCE.

a. Families To Be Housed. The Contract Units are to be leased by the Owner to eligible Lower-Income Families ("Families") for use as occupancy by such Families solely as private dwellings.

b. Government Assistance.

(1) The Government hereby agrees to make housing assistance payments on behalf of Families for the Contract Units, to enable such Families to lease Decent, Safe, and Sanitary housing pursuant to section 8 of the Act. Such housing assistance payments shall be the difference between the Contract Rents for units leased by Families and the portion of such rents payable by Families as determined by the Owner in accordance with schedules and criteria established by the Government.

EXHIBIT 3



PPAP-NYH-00001

a. Term of Contract.

[Alternative provisions - incorporate alternative 1 or 2.]

Alternative 1 – Where HUD has Determined that the Cost of Rehabilitation Is Less Than 15 Percent of Value.

The term of this Contract for any unit shall be as stated in Section 1.1b, with no option for renewal in either party. If the [illegible] is completed in stages, the term shall be separately related to the units in each stage; Provided, however, that the total Contract term for all the stages, beginning with the effective date of the Contract with respect to the first stage, shall not exceed said Contract term plus two years.

Alternative 2 – Where HUD Has Determined that the Cost of Rehabilitation Is 15 Percent or More of Value.

The initial term of this Contract for any unit shall be as stated in Section 1.1c(1). This Contract may be renewed at the sole [illegible] the Owner, for the number and length of additional terms stated in Section 1.1c(2), provided that the total Contract term for [illegible] all renewals, shall not exceed the number of years stated in Section 1.1c(3). Renewal shall be automatic unless the Owner [illegible] Government, no later than 90 days prior to the expiration of the current term, of his intention not to renew. If the project [illegible] in stages, the dates for the initial term and renewal terms shall be separately related to the units in each stage; Provided, [illegible] the total Contract term for all the stages, beginning with the effective date of the Contract with respect to the first stage, [illegible] exceed the total Contract term stated in Section 1.1c(3), plus two years. In any case where the project is owned by, or financed [illegible] or loan guarantee from, a State or local agency, the housing assistance payments pursuant to this Contract with respect to any [illegible] shall be payable over a period not to exceed 40 years.

b. Fiscal Year. The Fiscal Year for the project shall be the 12-month period ending on the date stated in Section 1.1d; Provided, however, that the first Fiscal Year for the project shall be the period beginning with the effective date of the Contract and ending on the last said established Fiscal Year which is not less than 12 months after such effective date. If the first Fiscal Year exceeds 12 months, the maximum total annual housing assistance payment in Section 1.5a may be adjusted by the addition of the pro rata amount applicable to the period of operation in excess of 12 months.

5 MAXIMUM HOUSING ASSISTANCE COMMITMENT; PROJECT ACCOUNT.

a. Maximum Housing Assistance Commitment. Notwithstanding any other provisions of this Contract *(other than paragraph b of this* [illegible] or any provisions of any other contract between the Government and the Owner, the Government shall not be obligated to make and [illegible] not make any housing assistance payments under this Contract in excess of the amount per annum stated in Section 1.1e; Provided, however, that this amount shall be reduced commensurately with any reduction in the number of Contract Units or in the Contract [illegible] or pursuant to any other provisions of this Contract.

b. Project Account. In order to assure that housing assistance payments will be increased on a timely basis to cover increases in Contract [illegible] or decreases in Family Incomes:

(1) A Project Account shall be established and maintained, in an amount as determined by the Government consistent with its [illegible] bilities under section 8(c)(6) of the Act, out of amounts by which the maximum Contract commitment per year exceeds amo[illegible] paid under the Contract for any *Fiscal Year*. *This account shall be established and maintained by the Government as a specific* identified and segregated account. To the extent funds are available in said account, the maximum total annual housing assist[illegible] payments for any *Fiscal Year* may exceed the maximum amount stated in paragraph a of this Section to cover increases in Con[illegible] Rents or decreases in Family Incomes *(see Section 1.8)*. Any amount remaining in said account after payment of the last hous[illegible] assistance payment with respect to the project shall be applied by the Government in accordance with law.

(2) Whenever the Government approved estimate of the required Annual Contribution exceeds the maximum Contract commitment then in effect, and would cause the amount in the Project Account to be less than an amount equal to 40 percent of such maxi[illegible] Contract commitment, the Government shall, within a reasonable period of time, take such additional steps authorized by sec[illegible] 8(c)(6) of the Act as may be necessary to carry out this assurance, including *(as provided in that section of the Act)* "the reser[illegible] of annual contributions authority for the purpose of amending housing assistance contracts or the allocation of a portion of ne[illegible] authorizations for the purpose of amending housing assistance contracts."

HOUSING ASSISTANCE PAYMENTS TO OWNERS.

a. General.

(1) Housing assistance payments shall be paid to the Owner for units under lease by Families in accordance with the Contract. The housing assistance payment will cover the difference between the Contract Rent and that portion of said rent payable by the Fa[illegible] as determined in accordance with the Government-established schedules and criteria.

(2) The amount of housing assistance payment payable on behalf of a Family and the amount of rent payable by such Family shall [illegible] subject to change by reason of changes in Family income, Family composition, or extent of exceptional medical or other unusu[illegible] expenses, in accordance with the Government-established schedules and criteria; or by reason of adjustment by the Government [illegible] any applicable Allowance for Utilities and Other Services. Any such change shall be effective as of the date stated in a notificati[illegible] of such change to the Family.

b. Vacancies During Rent-up. If a Contract Unit is not leased as of the effective date of the Contract, the Owner shall be entitled to housi[illegible] assistance payments in the amount of 80 percent of the Contract Rent for the unit for a vacancy period not exceeding 60 days from the effective date of the Contract, provided that the Owner (1) commenced marketing and otherwise complied with Section 1.2b of the A[illegible] [illegible], (2) has taken and continues to take all feasible actions to fill the vacancy, including, but not limited to, contacting applicants on [illegible] waiting list, if any, requesting the Public Housing Agency ("PHA") and other appropriate sources to refer eligible applicants, and adverti[illegible] the availability of the unit, and (3) has not rejected any eligible applicant, except for good cause acceptable to the Government.

c. Vacancies After Rent-up.

(1) If a Family vacates its unit *(other than as a result of action by the Owner which is in violation of the Lease or the Contract or any applicable law)*, the Owner shall receive housing assistance payments in the amount of 80 percent of the Contract Rent for a va[illegible] period not exceeding 60 days; Provided, however, that if the Owner collects any of the Family's share of the rent for this period [illegible] [illegible] which, when added to the 80 percent payments, results in more than the Contract Rent, such excess shall be pa[illegible] to the Government or as the Government may direct. *(See Section 1.9c.)* The Owner shall not be entitled to any payment [illegible] [illegible]

[illegible]



PPAP-NYH-00002

[illegible] the Contract [illegible]

d. [illegible] Payments for Vacant Units. The Owner shall not be entitled to housing assistance payments with respect to vacant units under this Section to the extent he is entitled to payments from other sources (e.g., payments for losses of rental income incurred [illegible] pursuant to Title I of the Housing and Community Development Act of 1974 or payments under [illegible] of this Contract).

e. Government Not Obligated for Family Rent. The Government has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any Family other than in accordance with Section 1.5b of this Contract. The financial obligation of the Government is limited to making housing assistance payments on behalf of Families in accordance with this Contract.

SEE RIDER ATTACHED

f. Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to the Government for housing assistance payments. Each such request shall set forth (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of units, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contract Rent as set forth in Exhibit [illegible] for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit (or, where applicable, the amount to be paid the Family in accordance with Section 1.5b(2)); and (v) the total amount of housing assistance payments requested by the Owner.

(2) Each of the Owner's monthly requests shall contain a certification by him that to the best of his knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of this Contract and is payable under the Contract, and (iv) none of the amount claimed has been previously claimed or paid.

(3) If the Owner has received an excessive payment, the Government, in addition to any other rights to recovery, may deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for housing assistance payments shall be made subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

g. Recoupment of Savings in Financing Cost.

(1) In the event that interim financing is continued after the first year of the term of the Contract and the debt service of the interim financing for any period of three months, after such first year, is less than the anticipated debt service under the permanent financing on which the Contract Rents were based, an amount reflecting the savings in financing cost, computed in accordance with paragraph g(2) of this Section, shall be credited by the Government to the Project Account, and withheld from housing assistance payments to the Owner. If during the course of the same year there is any period of three months in which the debt service is greater than the anticipated debt service under the permanent financing, an adjustment shall be made so that only the net amount of savings in financing cost for the year is credited by the Government to the Project Account and withheld from housing assistance payments to the Owner as aforesaid. (Increased payments shall be made to the Owner on account of any net excess for the year of actual interim debt service over the anticipated debt service under the permanent financing.) Nothing in this paragraph g shall be construed as requiring a reduction in the Contract Rents or precluding adjustments of Contract Rents in accordance with Section 1.8.

(2) The computation and recoupment under this paragraph g may be made on an annual or on a quarterly or other periodic basis, but in any event no later than as of the end of each Fiscal Year: Provided, however, that if recoupment is to be made less often than quarterly, the amounts of recoupment shall be computed on at least a quarterly basis and the funds shall be deposited in a special account from which withdrawals may be made only with the authorization of the Government. The manner of computing the amount of recoupment shall be as follows:

(i) Determine the amount by which the interest cost for the debt service for the period in question is less than the anticipated debt service under the permanent financing on which the Contract Rents were based;

(ii) Determine what percentage the amount found under paragraph g(2)(i) of this Section is of the aggregate Contract Rents for all Contract Units for the period in question;

(iii) Apply the percentage found in paragraph g(2)(ii) of this Section to the aggregate Contract Rents for those Contract Units which are included in the Owner's claim(s) for housing assistance payments for the period in question; and

(iv) The amount found in paragraph g(2)(iii) of this Section shall be credited to the Project Account and withheld from the next housing assistance payment or payments to the Owner.

MAINTENANCE, OPERATION AND INSPECTION.

Maintenance and Operation. The Owner agrees (1) to maintain and operate the Contract Units and related facilities so as to provide Decent, Safe, and Sanitary housing, and (2) to provide all the services, maintenance and utilities set forth in Exhibit C. If the Government determines that the Owner is not meeting one or more of these obligations, the Government shall have the right, in addition to its other rights and remedies under this Contract, to abate housing assistance payments in whole or in part.

Inspection.

(1) Prior to occupancy of any unit by a Family, the Owner and the Family shall inspect the unit and both shall certify, on forms prescribed by the Government, that they have inspected the unit and have determined it to be Decent, Safe, and Sanitary in accordance with the criteria provided in the prescribed forms. Copies of these reports shall be kept on file by the Owner for at least three years.

(2) The Government shall inspect or cause to be inspected each Contract Unit and related facilities at least annually and at such other times (including prior to initial occupancy and rerenting of any unit) as may be necessary to assure that the Owner is meeting his obligation to maintain the units in Decent, Safe, and Sanitary condition and to provide the agreed upon utilities and other services. The Government shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

Units Not Decent, Safe, and Sanitary. If the Government notifies the Owner that he has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, the Government may exercise



PPAP-NYH-00003

[illegible] the reduced ... [illegible] the expenses [illegible]
[illegible] the event.

Notification of Abatement. Any abatement of housing assistance payments shall be effective as provided in written notification to the Owner. The Government shall promptly notify the Family of any such abatement.

Overcrowded and Underoccupied Units. If the Government determines that a Contract Unit is not Decent, Safe, and Sanitary by reason of increase in Family size, or that a Contract Unit is larger than appropriate for the size of the Family in occupancy, housing assistance payments with respect to such unit will not be abated, unless the Owner fails to offer the Family a suitable unit as soon as one becomes vacant and ready for occupancy. In the case of an overcrowded unit, if the Owner does not have any suitable units or if no vacancy of a suitable unit occurs within a reasonable time, the Government will assist the Family in finding a suitable dwelling unit and require the Family to move to such a unit as soon as possible. The Owner may receive housing assistance payments for the vacated unit if he complies with the requirements of Section 1.6c(1).

T ADJUSTMENTS.

Funding of Adjustments. Housing assistance payments will be made in increased amounts commensurate with Contract Rent adjustments under this Section, up to the maximum amount authorized under Section 1.5a of this Contract.

Automatic Annual Adjustments.

(1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

Special Additional Adjustments. Special additional adjustments shall be granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs (*i.e., assessments, and utilities not covered by regulated rates*), but only if and to the extent that the Owner clearly demonstrates that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments. The Owner shall submit to the Government financial statements which clearly support the increase.

Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Incorporation of Rent Adjustments. Any adjustment in Contract Rents shall be incorporated into Exhibit A by a dated addendum to the exhibit establishing the effective date of the adjustment.

Adjustment to Reflect Actual Cost of Permanent Financing. This paragraph f shall apply if the project is not permanently financed until after the effective date of the Contract. After the project is permanently financed, the Financing Agency shall submit a certification to the Government as to the actual financing terms. If the actual debt service under the permanent financing is lower than the anticipated debt service on which the Contract Rents were based, the Contract Rents currently in effect shall be reduced commensurately, and the amount of the savings shall be credited to the Project Account. The maximum Contract commitment shall not be reduced. If the actual debt service is higher, the Contract Rents shall not be increased.

MARKETING AND LEASING OF UNITS.

Compliance with Equal Opportunity. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's Government-approved Affirmative Fair Housing Marketing Plan, shown as Exhibit D, and with all regulations relating to fair housing advertising.

Security and Utility Deposits.

(1) The Owner may require Families to pay a security deposit in an amount equal to one month's Gross Family Contribution. If a Family vacates its unit, the Owner, subject to State and local law, may utilize the deposit as reimbursement for any unpaid rent or other amount owed under the Lease. If the Family has provided a security deposit, and it is insufficient for such reimbursement, the Owner may claim reimbursement from HUD, not to exceed an amount equal to the remainder of one month's Contract Rent. Any reimbursement under this Section shall be applied first toward any unpaid rent. If a Family vacates the unit owing no rent or other amount under the Lease or if the amount owed is less than the amount of the security deposit, the Owner shall refund the full amount or the unused balance, as the case may be, to the Family.

(2) In those jurisdictions where interest is payable by the Owner on security deposits, the refunded amount shall include the amount of interest payable. All security deposit funds shall be deposited by the Owner in a segregated bank account, and the balance of this account, at all times, shall be equal to the total amount collected from tenants then in occupancy, plus any accrued interest. The Owner shall comply with all State and local laws regarding interest payments on security deposits.

(3) Families shall be expected to obtain the funds to pay security and utility deposits, if required, from their own resources and/or other private or public sources.

c. Eligibility, Selection and Admission of Families.

(1) The Owner shall be responsible for determination of eligibility of applicants, selection of families from among those determined to be eligible, and computation of the amount of housing assistance payments on behalf of each selected Family in accordance with schedules and criteria established by the Government. [illegible] 1.11.1

(2) The Lease entered into between the Owner and each selected Family shall be on the form of Lease approved by the Government.

[illegible]



PPAP-NYH-00004

5. Continued .....

C. Community contacts will be used extensively. Minority and white organizations will be contacted initially by letter with a personal visit follow-up to inform them of the Housing Project and to encourage them to refer persons in need of housing to make applications. In the ~~same~~ manner, local churches with a large portion of Whites and Hispanic members will be contacted also as a special outreach. In addition, contact will be made with the major employers in the area to attract some of their employees to the project.

D. As a result of these various means of contact, and considering the existing racial mix of the immediate area, it is anticipated that approximately 30% of the occupants will be of minority race.

E. After the initial rent-up, contacts will be maintained as mentioned to increase the White and Hispanic groups percentage if necessary. As indicated in Item 1, special effort by the sponsors will be made to attract retired elderly residents of the city to the project.

8. Staffing:

A. The firm that has been chosen to manage the proposed project is Parkledge Management Corporation located in Yonkers.

B. The firm of Parkledge Management Corporation is an experienced management firm and they presently manage the largest HUD/UDC project in Yonkers.

9. A. All staff personnel employed by Parkledge Management Corp. will be instructed both orally and in printed form to obey all fair housing laws that are applicable to the area, to refrain from discrimination regarding an application for housing on the basis of race, color, religion or natural origin and to promote fair housing practices in every respect. All staff will be provided with a copy of the Affirmative Fair Housing Marketing Plan, Executive Order 10063 and Title VIII of the Civil Rights Act of 1968. They will be instructed to read and understand through discussion and study all policies of HUD regulations.

ATTACHMENT TO

AFFIRMATIVE FAIR HOUSING MARKETING PLAN

4. Direction of Marketing Program:

Because of the existing composition of the immediate surrounding area and of the entire City of Yonkers, the groups least likely to apply to the proposed project would be Hispanics and Whites. Special outreach efforts would be required to attract Hispanics and White residents. The area is largely minority Black, and an effort to maintain 30% minority will be strived for. Elderly will also be contacted and we expect to obtain tenants for the building in this category.

5. Marketing Program:

A. Newspapers and community contacts will be the most effective means of reaching the Hispanic and White sector of the City to encourage their applications. The newspapers in which we will advertise will be "El Diario-La Prensa", a daily paper with Hispanic readership and the Herald Statesman, with White readership. Ads will be approximately 1/8 page to 6 column inches to appear daily for initial rent-up, and as necessary to maintain occupancy. The ads will feature an Equal Housing Opportunity logo or slogan, at least to be 8 point bold face type. The content will adhere to the Advertising Guidelines for Fair Housing.

B. Brochures and flyers (8-1/2 x 11) will be used in depicting the units and displaying the Equal Housing Opportunity logotype or slogan. If the brochure depicts persons they will be shown as persons of both minority and majority groups. They will be made available to special outreach community contact groups so they may encourage majority applications. On site at the most viable and convenient location, a sign will be erected on the day of rehabilitation commencement. It will measure 5' x 6' and will display the Equal Housing Opportunity logo and slogan at a size of 2' x 2'.

8. STAFFING AND EXPERIENCE:

*(Give the information requested in the table below for your organization (Developer/Sponsor) and for the other companies/organizations identified if applicable; provide total staffing figures, i.e., do not limit staffing to those staff persons connected with or working on this housing. NOTE: HUD FHEO should be notified of any changes in the companies named in this chart.)*

| Name of Company, Address and Telephone No. | Job Classification | | Present: Totals | White (non-minority) | Negro/Black | Spanish Am. | Am. Indian | Oriental | Other Minority | Anticipated: Vacancies | Date of 1st Opening | Recruitment steps taken or to be taken to attract all persons | Company's last two experiences with those persons least likely to apply for jobs/housing: Housing | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. Developer/Sponsor: DHI Enterprises, Inc. 984 North Broadway Yonkers, New York | Prof | M | | 7 | | | | | | | | | | |
| | | F | | 3 | | 2 | | | | | | | | |
| | Other | M | | | | | | | | | | | | |
| | | F | | | | | | | | | | | | |
| B. Advertising (Answer if different from A): Parkledge Management Corporation 984 North Broadway Yonkers, New York | Prof | M | | 1 | | | | | | | | | | |
| | | F | | | | | | | | | | | | |
| | Other | M | | | | | | | | | | | | |
| | | F | | | | | | | | | | | | |
| C. Management and Sales/Rental Staff (Answer if different from A and/or B): Parkledge Management Corporation 984 North Broadway Yonkers, New York | Prof. | M | 1 | | | | | | | | | 1 Supt. and 1 Porter will be hired for maintenance using local advertising under Equal Opportunity Employment | | |
| | | F | 1 | 1 | | | | | | | | | | |
| | Other | M | | | | | | | | | | | | |
| | | F | | | | | | | | | | | | |

9. STAFF INSTRUCTIONS:

Fair Housing Training. All persons engaged in the sales/rental of real property have to be instructed periodically to insure that they are aware and knowledgeable of Fair Housing requirements.

A. Are regular sales/rental staff meetings conducted? [X] Yes, when? weekly ☐ No.
If yes, is Fair Housing training provided to the sales/rental staff at that meeting? ☐ Yes. ☐ No

B. If you answered "no" for either of the questions in item 9A, when is Fair Housing training provided to the sales/rental staff?

C. Is a copy of the instructions used or proposed to be used for training sales/rental staff in Fair Housing attached to this plan? [X] Yes ☐ No, indicate when information will be submitted 3 months prior to Rental office opening

D. Do the instructions include and relate to local, state and Federal Fair Housing Laws, including Executive Order 11063, the Civil Rights Act of 1968 and this Affirmative Marketing Plan? [X] Yes ☐ No, explain.

10. ADDITIONAL CONSIDERATIONS.

Other Efforts. Please describe other efforts your plan, as part of your outreach program, to attract persons in those groups that you have designated as least likely to apply for housing in the project under consideration, that are not covered elsewhere in this plan. Efforts to attract female headed households should be employed.

We shall meet with the Yonkers Community Groups and have meeting and mailings to groups and individuals in the outreach program.

11. The applicant agrees to make any changes in a plan covering a multifamily project, which may reasonably be required, after initial rent up to assure continued compliance with Section 200.620 of HUD's Affirmative Fair Housing Marketing Regulations.

| FOR FHEO'S USE ONLY | | SIGNATURE OF PERSON SUBMITTING PLAN |
|---|---|---|
| APPROVAL BY SIGNATURE | DISAPPROVAL BY SIGNATURE | [signature] |
| NAME (Type or print) | NAME (Type or print) | NAME (Type or print) Arthur Margulis |
| TITLE | TITLE | TITLE AND COMPANY Manager Parkledge Management Corporation 984 North Broadway, Yonkers N.Y. |
| DATE | DATE | DATE July 12, 1977 |

HUD 935.2 (3-76)

GPO

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

AFFIRMATIVE FAIR HOUSING MARKETING PLAN

FOR HUD USE ONLY

ASP FILE NUMBER *(Insured Home Mortgage Program)*

COMPLETE FORM AND SUBMIT TO: FAIR HOUSING AND EQUAL OPPORTUNITY DIRECTOR/SPECIALIST AREA/INSURING OFFICE

1. INTRODUCTION:

The Affirmative Fair Housing Marketing Regulations require that each applicant subject to these Regulations carry out an affirmative program to attract prospective buyers or tenants of all minority and non-minority groups to the housing, including Whites *(non-minorities)* and members of minority groups Negro/Black, Spanish American, American Indian, Oriental, or other minority groups in the Standard Metropolitan Statistical Areas *(SMSA)* or housing market area who may be subject to housing discrimination on the basis of race, color, religion, sex or national origin

2. APPLICANT AND PROJECT IDENTIFICATION:

A. APPLICANT'S

NAME: DHI Enterprises, Inc.

ADDRESS: 984 North Broadway Yonkers, New York

TELEPHONE NO.: 914-968-3700

B. PROJECT OR APPLICATION NUMBER ________

SECTION OF ACT: ________ NUMBER OF UNITS 82

PRICE OR RENTAL RANGE OF UNITS:

FROM $ 415 TO $ 561

C. PROJECT:

NAME: Lamartine Terrace

LOCATION ADDRESS: 28 Lamartine Avenue

CITY: Yonkers STATE N.Y.

COUNTY: Yonkers CENSUS TRACT: 4-2

D. FOR MULTIFAMILY HOUSING ONLY.

[X] ELDERLY [X] NON-ELDERLY

E. APPROXIMATE STARTING DATES:

ADVERTISING 6 months prior to completion of Rehabilitation OCCUPANCY Summer, 197

3. TYPE OF AFFIRMATIVE MARKETING PLAN. [X] Project Plan; [ ] Annual Plan *(for scattered sites)*.

NOTE: A separate Annual Plan must be developed for each type area in which housing is to be built. Indicate the specific area for which this plan applies: [ ] Minority Area [ ] White *(non minority)* Area [X] Mixed Area *(with 30 % minority residents)*

4. DIRECTION OF MARKETING ACTIVITY.

Each applicant is required to carry out an affirmative marketing program to attract buyers or tenants of all minority and non-minority groups to the housing. The purpose of this program is to assure that any group(s) of persons normally NOT likely to apply for the housing without special outreach efforts *(because of existing neighborhood racial or ethnic patterns, price, and/or other factors)* know about the housing, feel welcome to apply and have the opportunity to buy or rent. Indicate below which group(s) are least likely to apply for the housing without special outreach efforts

[X] White *(non minority)* [ ] Negro/Black [X] Spanish American [ ] American Indian [X] Oriental [ ] Other Minority *(specify)* ________

5. MARKETING PROGRAM: All advertising will include a) methods to attract minority and non minority persons, especially persons in the group(s) checked above, and b) prominent use of the approved Equal Housing Opportunity Logotype, Slogan and/or Statement.

6. COMMERCIAL MEDIA Check the media to be used to advertise the availability of this housing.

[X] Newspaper(s)/Publication(s) [ ] Radio [ ] TV [ ] Billboard(s) [X] Others *(specify)* Mailings to Community groups, hospitals, etc.

For the media identified above, provide the requested information *(If more space is needed attach an additional sheet)*

| NAME OF MEDIA | STATE IN PERCENTAGES THE RACIAL/ETHNIC IDENTIFICATIONS OF MAJOR READERS/AUDIENCE | | | | | | ADS/BROADCASTS, ETC. | |
|---|---|---|---|---|---|---|---|---|
| | White *(non-minority)* | Negro/Black | Spanish American | American Indian | Oriental | Other Minority | Size and/or Duration | Frequency or Intervals |
| Yonkers Herald Statesman | 50 | 30 | 20 | | 10 | | | |
| El Diario | | | 100 | | | | | |

NOTE: Attach copy of ad or state when it will be submitted

7. BROCHURES, SIGNS AND HUD'S FAIR HOUSING POSTER: 1) Will brochures, leaflets or handouts be used to advertise? [X] Yes. [ ] No. If yes, attach a copy or submit when available. 2) For project site sign; indicate sign size ____ x ____; Logotype size ____ x ____. Attach a photograph of project sign or submit when available. 3) HUD's Fair Housing Poster must be conspicuously displayed wherever sales/rentals and showings take place. Fair Housing Posters will be displayed in the [X] Sales/Rental Office(s), [ ] Real Estate Office(s), [ ] Model Unit(s); [ ] Other *(specify)* ________

8. COMMUNITY CONTACTS To further inform the group(s) least likely to apply about the availability of the housing, the applicant agrees to establish and maintain contact with the groups/organizations located in the housing market area or SMSA listed below. If more space is needed attach an additional sheet. Notify HUD-FHEO of any changes in this list. Submit a copy of correspondence to be mailed to these groups/organizations. *(Provide all requested information)*

| Name of Group, Organization | Racial/Ethnic Identification | Approximate Date of Contact or Proposed Contact | Person Contacted or to be Contacted | Address and Telephone No. | Method of Contact(s) | Indicate the specific function group/organization will undertake in implementing this plan |
|---|---|---|---|---|---|---|
| see attached list | | 3-6 mos prior to completion of Rehab. | attached | | Mailing Personal Contact | Parkledge Management Corporation staff |

9. FUTURE MARKETING ACTIVITIES *(Rental Units Only)* Check the block(s) that best describe future marketing activities to fill vacancies as they occur after the project has been initially occupied.

[X] Newspapers/Publications [ ] Radio [ ] TV [X] Brochures/Leaflets/Handouts [X] Site Signs [X] Community Contacts

[ ] Others *(specify)* ________

10. ANTICIPATED OCCUPANCY RESULTS *(State in number of units the racial/ethnic mix anticipated as a result of implementation of this affirmative marketing plan)* 50 White *(non minority)* 30 Negro/Black 15 Spanish American __ American Indian 5 Oriental

Other Minority *(specify)* Applicants shall be treated equally according to Fair Housing Laws. Trying to achieve Marketing Goals

HUD 935.2 (3-76) Previous Edition is Obsolete

Proj.No. NY 36-0010-003

## EXHIBIT A – CONTRACT RENTS

| UNIT SIZE | NO. OF UNITS | CONTRACT RENTS |
|---|---|---|
| 0-Br. | 16 | $415. |
| 1-Br. | 30 | 490. |
| 2-Br. | 36 | 561. |

## EXHIBIT B – PROJECT DESCRIPTION

1-six story existing building to be substantially rehabilitated. Masonry and brick, full basement, slab on grade, oil, hot water, heat.

## EXHIBIT C – STATEMENT OF SERVICES

Gas ranges, electric refrigerators, air conditioning, sleeves, heat, hot and cold water, gas for cooking.

## EXHIBIT D – SEE PLAN ATTACHED

RIDER TO SECTION 1.6 OF HOUSING ASSISTANCE PAYMENTS CONTRACT

DEBT SERVICE PAYMENTS

(1) If a unit continues to be vacant after the 60 day period specified in paragraph b or c of this Section, the Owner may submit a claim to receive additional housing assistance payments on a semiannual basis with respect to such a vacant unit in an amount equal to the principal and interest payments required to amortize the portion of the debt attributable to that unit for the period of the vacancy, whether such vacancy commenced during rent-up or after rent-up.

(2) Additional Payments under this paragraph for any unit shall not be for more than 12 months for any vacancy period, and shall be made only if:

(i) The unit was in decent, safe and sanitary condition during the vacancy period for which payments are claimed.

(ii) The Owner has taken and is continuing to take the actions specified in paragraphs b(1)(2) and (3) or paragraphs c(1)(i) and (ii) and c(2) of this Section, as appropriate.

(iii) The Owner has demonstrated in connection with the semiannual claim on a form and in accordance with the standards prescribed by HUD with respect to the period of vacancy, that the project is not providing the Owner with revenues at least equal to the project costs incurred by the Owner, and that the amount of the payments requested is not in excess of that portion of the deficiency which is attributable to the vacant units for the period of the vacancies.

(iv) The Owner has submitted, in connection with the semiannual claim, a statement with relevant supporting evidence that there is a reasonable prospect that the project can achieve financial soundness within a reasonable time. The statement shall indicate the causes of the deficiency; the corrective steps that have been and will be taken; and the time by which it is expected that the project revenues will at least equal project costs without the additional payments provided under this paragraph.

(3) HUD may deny any application for additional payments or suspend or terminate payments if it determines, based on the Owner's statement and other evidence, that there is not a reasonable prospect that the project can achieve financial soundness within a reasonable time.

[illegible] Adjustment in Allowance for Utilities and Other Services. In the event that the Government [illegible] an adjustment in the Allowance for Utilities and Other Services applicable to any of the Contract Units, the Owner shall promptly make corresponding adjustment in the amount of rent to be paid by the affected Families and the amount of housing assistance payments.

[illegible] Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable Government requirements and shall maintain records and furnish such copies or other information as may be required by the Government.

[illegible] Government Review [illegible] Payments. In making housing assistance payments to Owners, the Government will review the Owner's determinations under this Section. If as a result of this review, or other reviews, audits or information received by the Government at any time, it is determined that the Owner has received improper or excessive housing assistance payments, the Government shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise effect recovery thereof.

TERMINATION OF TENANCY.

The Owner shall be responsible for termination of tenancies, including evictions. However, conditions for payment of housing assistance payments for any resulting vacancies shall be as set forth in Section 1.6c.

REDUCTION OF NUMBER OF CONTRACT UNITS FOR FAILURE TO LEASE TO ELIGIBLE FAMILIES.

a. After First Year Of Contract. If at any time, beginning six months after the effective date of this Contract, the Owner fails for a continuous period of six months to have at least 80 percent of the Contract Units leased or available for leasing by Families, the Government may on 30 days notice reduce the number of Contract Units to not less than the number of units under lease or available for leasing by Families plus 10 percent of such number if the number is 10 or more, rounded to the next highest number.

b. At End of Initial and Each Renewal Term. At the end of the initial term of the Contract and of each renewal term, the Government may by notice to the Owner, reduce the number of Contract Units to not less than (1) the number of units under lease or available for leasing by Families at that time or (2) the average number of units so leased or available for leasing during the last year, whichever is the greater number, plus 10 percent of such number if the number is 10 or more, rounded to the next highest number.

c. Restoration of Units. The Government will agree to an amendment of the Contract to provide for subsequent restoration of any reduction made pursuant to paragraph a or b of this Section if the Government determines that the restoration is justified as a result of changes in demand and in the light of the Owner's record of compliance with his obligations under this Contract and if annual contributions contract authority is available; and the Government will take such steps authorized by section 8(c)(6) of the Act as may be necessary to carry out this assurance *(see Section 1.5)*.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

OWNER ____________________

By ____________________

____________________ *(Official Title)*

Date ____________________ 19 ____

United States of America
Secretary of Housing and Urban Development

By ____________________

____________________ *(Official Title)*

Date ____________________ 19 ____

project is to be completed and accepted in stages, execution of the Contract with respect to the several stages appears on the following pages [illegible] ntract.] -

The effective date of this contract is June 1,1979 ______ Park Property Associates

June 1, 1979 ... By [signature]

(Official Title)

Date ______, 19__.

United States of America
Secretary of Housing and Urban Development

By [signature]

Deputy Director, MF Housing Division
(Official Title)

Date 7/20, 79

EXECUTION OF CONTRACT WITH RESPECT TO CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES
STAGE 2

This Contract is hereby executed with respect to the units described in Exhibit A-2.

CTIVE DATE. The effective date of this Contract is ______, 19____. [Insert date which shall be no earlier than :
e of Government acceptance of the project.]

OWNER ______

By ______

______
(Official Title)

Date ______, 19__

United States of America
Secretary of Housing and Urban Development

By ______

______
(Official Title)

Date ______, 19__

EXECUTION OF CONTRACT WITH RESPECT TO CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES
STAGE 3

is Contract is hereby executed with respect to the units described in Exhibit A-3.

CTIVE DATE. The effective date of this Contract is ______, 19____. [Insert date which shall be no earlier than th
e of Government acceptance of the project.]

OWNER ______

By ______

______
(Official Title)

Date ______, 19______

United States of America
Secretary of Housing and Urban Development

By ______

______
(Official Title)

Date ______, 19______

9. Continued .....

B. As anticipated, a resident superintendent will be necessary for this project.

C. Training of the Rental Staff will include attending a discussion with persons who are expert administering fair housing laws preferably with a HUD staff member. Personnel will be required to attend specially arranged HUD programs dealing with management matters when they are available. The staff will be selected on the basis of their responsiveness and sensitivity to persons that are expected to apply for proposed housing. It will be made clear to both staff and the applicant through distribution of printed circulars how applicants are taken and the nature and length of time that is required for processing the application. Further, it will be made clear to all staff that no discrimination as to location of tenants in the project or use of any portion of the project facility will exist.

10. <u>Solicitation of HUD referrals</u>:

Referrals of possible tenants made by HUD will initially be contacted by direct mail, then telephone contact and followed by personal contact or by a personal interview.

In addition to the above, it will be made very clear to the applicant that they also will be responsible for recruiting members of Hispanic and White families of the area to obtain marketing goals.

11. The applicant agrees to make any changes in a plan covering a multifamily project, which may reasonably be required after initial rent-up to assure continued compliance with Section 200.260 of HUD's Affirmative Fair Housing Marketing Plan.

PARKLEDGE MANAGEMENT CORP.

****** COMMUNITY GROUPS TO BE CONTACTED FOR

****** 28 LAMARTINE TERRACE, YONKERS, NY

Rev. Frank T. Moore
St. Augestines Episcopal Church
81 Locust Hill Ave.

St. Margaret's R.C. Church
76 Locust Hill Avenue

Yonkers Child Care Assn.
156 North Broadway

First Westminister Presbyterian Church
111 North Broadway

Full Gospel Tabernacle
Assembly of God
57 Locust Hill Avenue

Community Bapist Church
156 North Broadway

Messiah Bapist Church
76 Warburton Avenue

# *Memorandum*

U.S. DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT

TO : Benjamin Skurnick, Area Counsel, 2.3G

DATE: JUNE 4, 1979

IN REPLY REFER TO 2.3HMA

FROM : Edwin S. Sprenger, Housing Management, 2.3H

SUBJECT: Daily Debt Service Computation

Below is the daily debt service information to be made an exhibit to the Housing Payments Contract for:
LAMARTINE TERRACE (N.Y. 36-0010-003)

DAILY DEBT SERVICE COMPUTATION WORKSHEET

| Bedroom Size (a) | Number of Units (b) | Contract Rent (c) | Total Contract Rent (d) | Contract Rent Percentage (e) | Debt Service by Bdr. Size (f) | Debt Service by Unit (g) | Daily Debt Service (h) |
|---|---|---|---|---|---|---|---|
| 0 | 16 | $415. | 6640. | 15.99% | $32,610.81 | 2038.18 | $5.66 |
| 1 | 30 | $490. | 14,700. | 35.39% | $72,176.14 | 2405.87 | $6.68 |
| 2 | 36 | $561. | 20,196. | 48.62% | 99,158.06 | 2754.39 | $7.65 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL | 82 | | 41,536 | 100.00% | $203945.01 | | |

Deputy Director

PREVIOUS EDITION IS OBSOLETE HUD-96 (7-75)

U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
SUBSTANTIAL REHABILITATION

PART II OF THE

# HOUSING ASSISTANCE PAYMENTS CONTRACT

PRIVATE-OWNER OR PHA-OWNER PROJECT

| HAP CONTRACT LIST NUMBER AND DATE: | PROJECT NUMBER: |
|---|---|
| 7473-608 9/27/7[illegible] | ~~[illegible] 36-[illegible]-003~~ |

2.1 NONDISCRIMINATION IN HOUSING.

a. The Owner shall not in the selection of Families, in the provision of services, or in any other manner, discriminate against any person on the grounds of race, color, creed, religion, sex, or national origin. No person shall be automatically excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program because of membership in a class such as unmarried mothers, recipients of public assistance, etc.

b. The Owner shall comply with all requirements imposed by Title VIII of the Civil Rights Act of 1968, and any rules and regulations pursuant thereto.

c. The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, Public Law 88-352, 78 Stat. 241; the regulations of the Department of Housing and Urban Development issued thereunder, 24 CFR, Subtitle A, Part 1, Section 1.1, et seq.; the requirements of said Department pursuant to said regulations; and Executive Order 11063 to the end that, in accordance with that Act, the regulations and requirements of said Department thereunder, and said Executive Order, no person in the United States shall, on the grounds of race, color, creed, religion or national origin, be excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program, or be otherwise subjected to discrimination. This provision is included pursuant to the regulations of the Department of Housing and Urban Development, 24 CFR, Subtitle A, Part 1, Section 1.1, et seq.; issued under Title VI of the said Civil Rights Act of 1964, and the requirements of said Department pursuant to said regulations; and the obligation of the Owner to comply therewith inures to the benefit of the Government and the said Department, either of which shall be entitled to invoke any remedies available by law to redress any breach thereof or to compel compliance therewith by the Owner.

2.2 TRAINING, EMPLOYMENT, AND CONTRACTING OPPORTUNITIES FOR BUSINESSES AND LOWER-INCOME PERSONS.[3]

a. The project assisted under this Contract is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

b. Notwithstanding any other provision of this Contract, the Owner shall carry out the provisions of said section 3 and the regulations issued pursuant thereto by the Secretary of Housing and Urban Development set forth in 24 CFR, Part 135 (published in 38 Federal Register 29220, October 23, 1973), and all applicable rules and orders of the Secretary issued thereunder prior to the execution of this Contract. The requirements of said regulations include, but are not limited to, development and implementation of an affirmative action plan for utilizing business concerns located within, or owned in substantial part by persons residing in, the area of the project; the making of a good faith effort, as defined by the regulations, to provide training, employment, and business opportunities required by section 3; and incorporation of the "section 3 clause" specified by section 135.20(b) of the regulations and paragraph d of this Section in all contracts for work in connection with the project. The Owner certifies and agrees that he is under no contractual or other disability which would prevent him from complying with these requirements.

c. Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of the Secretary issued thereunder prior to approval by the Government of the application for this Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, his successors and assigns. Failure to fulfill these requirements shall subject the Owner, his contractors and subcontractors, his successors and assigns to the sanction specified by this Contract, and to such sanctions as are specified by 24 CFR, Section 135.135.

d. The Owner shall incorporate or cause to be incorporated into any contract or subcontract for work pursuant to this Contract in excess of $50,000 cost, the following clause:

"EMPLOYMENT OF PROJECT AREA RESIDENTS AND CONTRACTORS

"A. The work to be performed under this Contract is on a project assisted under a program providing direct Federal financial assistance from the Department of Housing and Urban Development and is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

"B. The parties to this Contract will comply with the provisions of said section 3 and the regulations issued pursuant thereto by the Secretary of Housing and Urban Development set forth in 24 CFR, Part 135, and all applicable rules and orders of the Department issued thereunder prior to the execution of this Contract. The parties to this Contract certify and agree that they are under no contractual or other disability which would prevent them from complying with these requirements.

"C. The contractor will send to each labor organization or representative of workers with which he has a collective bargaining agreement or other contract or understanding, if any, a notice advising the said labor organization or workers' representative of his commitments under this section 3 clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment or training.

"D. The contractor will include this section 3 clause in every subcontract for work in connection with the project and will, at the direction of the applicant for or recipient of Federal financial assistance, take appropriate action pursuant to the subcontract upon a finding that the subcontract is in violation of regulations issued by the Secretary of Housing and Urban Development, 24 CFR, Part 135. The contractor will not subcontract with any subcontractor where it has notice or knowledge that the latter has been found in violation of regulations under 24 CFR, Part 135, and will not let any subcontract unless the subcontractor has first provided it with a preliminary statement of ability to comply with the requirements of these regulations.

"E. Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of the Department issued thereunder prior to the execution of the Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the applicant or recipient for such assistance, its successors, and assigns. Failure to fulfill these requirements shall subject the applicant or recipient, its contractors and subcontractors, its successors, and assigns to those sanctions specified by the grant or loan agreement or contract through which Federal assistance is provided, and to such sanctions as are specified by 24 CFR, Section 135.135."

3/ Strike this Section if the Contract Rents on the effective date of this Contract, over the maximum term of this Contract, are $500,000 or less.

c. The Owner agrees that he will be bound by the above Employment of Project Area Residents and Contractors clause with respect to his own employment practices when he participates in federally assisted work.

2.3 COOPERATION IN EQUAL OPPORTUNITY COMPLIANCE REVIEWS. The Owner shall cooperate with the Government in the conducting of compliance reviews and complaint investigations pursuant to all applicable civil rights statutes, Executive Orders, and rules and regulations pursuant thereto.

2.4 FLOOD INSURANCE. If the project is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and if the sale of flood insurance has been made available under the National Flood Insurance Act of 1968, the Owner agrees that the project will be covered, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less.

2.5 CLEAN AIR ACT AND FEDERAL WATER POLLUTION CONTROL ACT.[1] In compliance with regulations issued by the Environmental Protection Agency ("EPA"), 40 CFR, Part 15, 39 F.R. 11099, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 1857, et seq., the Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 11738, the Owner agrees that:

a. Any facility to be utilized in the performance of this Contract or any subcontract shall not be a facility listed on the EPA List of Violating Facilities pursuant to section 15.20 of said regulations;

b. He will promptly notify the Department of Housing and Urban Development field office director of the receipt of any communication from the EPA indicating that a facility to be utilized for the Contract is under consideration to be listed on the EPA List of Violating Facilities;

c. He will comply with all the requirements of section 114 of the Air Act and section 308 of the Water Act relating to inspection, monitoring, entry, reports, and information, as well as all other requirements specified in section 114 and section 308 of the Air Act and the Water Act, respectively, and all regulations and guidelines issued thereunder; and

d. He will include or cause to be included the provisions of this Section in every nonexempt subcontract, and that he will take such action as the Government may direct as a means of enforcing such provisions.

2.6 REPORTS AND ACCESS TO PREMISES AND RECORDS.

a. The Owner shall furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government.

b. The Owner shall permit the Government or any of its duly authorized representatives to have access to the premises and, for the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent to compliance with this Contract, including the verification of information pertinent to the housing assistance payments.

2.7 DEFAULT BY THE OWNER UNDER CONTRACT.

a. A default by the Owner under this Contract shall result if:

(1) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease; or

(2) The Owner has asserted or demonstrated an intention not to perform some or all of his obligations under this Contract or under any Lease.

b. Upon a determination by the Government that a default has occurred, the Government shall notify the Owner of (1) the nature of the default, (2) the actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default, and, where appropriate, abatement of housing assistance payments in whole or in part and recovery of overpayments), and (3) the time within which the Owner shall respond with a showing that he has taken all the actions required of him. If the Owner fails to respond or take action to the satisfaction of the Government, the Government shall have the right to terminate this Contract in whole or in part or to take other corrective action to achieve compliance.

c. The availability of any remedy under this Contract shall not preclude the exercise of any other remedy available under this Contract or under any provisions of law, nor shall any action taken in the exercise of any remedy be deemed a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

2.8 DISPUTES.

a. Except as otherwise provided herein, any dispute concerning a question of fact arising under this Contract which is not disposed of by agreement between the Department of Housing and Urban Development field office and the Owner may be submitted by the Owner to the Secretary of Housing and Urban Development. The decision of the Secretary or duly authorized representative for the resolution of such disputes shall be final and conclusive, unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any proceeding under this Section, the Owner shall be afforded an opportunity to be heard and to offer evidence in support of his position.

b. This Section does not preclude consideration of questions of law in connection with the decision rendered under paragraph a of this Section; Provided, however, that nothing herein shall be construed as making final the decision of any administrative official, representative, or board, on a question of law.

2.9 INTEREST OF MEMBERS, OFFICERS, OR EMPLOYEES OF PHA, MEMBERS OF LOCAL GOVERNING BODY OR OTHER PUBLIC OFFICIALS. No member, officer, or employee of the PHA, no member of the governing body of the locality (city and county) in which the project is situated, no member of the governing body of the locality in which the PHA was activated, and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the project, during his tenure or for one year thereafter, shall have any interest, direct or indirect, in this Contract or in any proceeds or benefits arising therefrom.

2.10 INTEREST OF MEMBER OF OR DELEGATE TO CONGRESS. No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise therefrom.

[1] *Strike this Section if the Contract Rents on the effective date of this Contract, over the maximum total term of this Contract, are $100,000 or less.*