# UNITROY CONSTRUCTION CORP.

Unitroy Construction Corp. ("Unitroy") is a corporation organized in 1969 and existing under the laws of the State of New York, with offices at 5 Beekman Street, New York, New York. Unitroy is currently involved in all phases of housing development, including property acquisition, processing, architectural design, construction and management.

During the last eight years, Unitroy has developed projects with an aggregate contract amount of approximately $4,669,650. These projects include both new construction and substantial rehabilitation work.

The officers of Unitroy are as follows:

| | |
|---|---|
| Troy D. Stevens, Jr. | President |
| Troy D. Stevens, Sr. | Vice President |
| Eunice Stevens | Secretary |

Projects which have been completed and are currently being constructed by Unitroy include the following:

| PROJECT NAME | LOCATION | STATUS | CONTRACT AMOUNT |
|---|---|---|---|
| T.D.S. Properties * | 100 West 114 St.<br>New York, N.Y. | Completed (1970) | $ 190,000.00 |
| Canaan Baptist Church | 132 West 116 St.<br>New York, N.Y. | Completed (1973) | $ 280,000.00 |
| Upper Park Avenue Community Association (U.P.A.C.A.) | 114-34 East 112 St.<br>New York, N.Y. | Completed (1973) | $ 130,000.00 |
| Grace Temple Church of God and Christ * | 325 Lenox Avenue<br>New York, N.Y. | Completed (1974) | $ 220,000.00 |
| Grace Temple Day Care Center * | 325 Lenox Avenue<br>New York, N.Y. | Completed (1974) | $ 198,000.00 |
| Pelham Bay Library | 3060 Middletown Rd.<br>Bronx, New York | Completed (1975) | $ 334,650.00 |
| Pitkin Avenue Project * | 1792-1812 Pitkin Ave.<br>Brooklyn, New York | Completed (1976) | $1,810,000.00 |
| Jobs for Youth, Inc. | 1831 Second Avenue<br>New York, N.Y. | Completed (1977) | $ 152,000.00 |
| Firehouse Engine Company 219 | 494 Dean Street<br>Brooklyn, New York | Completed (1977) | $ 450,000.00 |
| Atlantic Terminal * Bed-Stuy Restoration | 401,403,411 Adelphi St.<br>399 Clermont Avenue<br>34 Greene Ave.<br>Brooklyn, New York | Completed (1978) | $ 225,000.00 |
| St. Luke's Episcopal Church | 777 East 222nd St.<br>Bronx, New York | In Process | $ 680,000.00 |

* Rehabilitation Project

ASSIGNMENT OF PARTNERSHIP INTEREST

KNOW ALL MEN BY THESE PRESENTS that I, Joseph Neumann ("Assignor"), having an address at 39 Broadway, New York, N.Y. 10006, in consideration of the sum of $10.00 and other good and valuable consideration in hand paid to me, the receipt of which is hereby acknowledged, do hereby transfer, set over, sell and assign unto Troy D. Stevens, Jr. ("Assignee"), having an address at 1800 Pitkin Avenue, Brooklyn, N.Y. 11212, all of my right, title and interest in and to a certain general and managing partnership interest of a certain limited partnership known as St. Johns I Associates,

TO HAVE AND TO HOLD unto said Assignee, his heirs, executors, successors and assigns forever.

IN WITNESS WHEREOF, Assignor has subscribed and duly acknowledged this instrument this 2nd day of March, 1993.

Joseph Neumann

STATE OF NEW YORK )
ss.:
COUNTY OF NEW YORK)

On the 2nd day of March, 1993, before me personally came Joseph Neumann, to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he executed the same.

Notary Public

GILBERT WALLACH
Notary Public, State of New York
No. 31-4138028
Qualified in New York County
Commission Expires June 30, 1993

td\misc\4668assn.pi
td:ew

AMENDED CERTIFICATE OF LIMITED PARTNERSHIP

OF

ST. JOHNS I ASSOCIATES

The Certificate of Limited Partnership of St. Johns I Associates was filed in the Office of the Clerk of the County of Suffolk on May 1, 1981, and is hereby amended as follows:

1. Paragraph 1. NAME OF GENERAL MANAGING PARTNER: The name and address of the general managing partner is Troy D. Stevens, Jr., whose address is 1800 Pitkin Avenue, Brooklyn, New York 11212.

2. All other provisions of the Certificate of Limited Partnership filed May 1, 1981 in the Office of the Clerk of the County of Suffolk shall continue in full force and effect. The General Partner is hereby authorized to execute this Certificate by virtue of powers of attorney executed by the Limited Partners herein, appointing the General Partner their Attorney-in-Fact. The originals of the powers of attorney are kept in the principal office of the Partnership.

Dated: March 2, 1993

Joseph Neumann,
Managing General Partner

LIMITED PARTNERS
Toru A. Uchida, Sylvia Freeman, Howard Bagdorf, Jimmy U. Lim, Neil O. Lawner, Stanley A. Schwartz, Benedict G. Pace, Charles A. Blake, Jr., Jeffrey I. Kaufman, Hy Zazula, Stanley Bresticker,* Ira Shapiro, Irwin W. Shipper, Jeffrey C. Daniels, Henry Salmond - all of the
*and Richard Migliore

foregoing by Joseph Neumann, General Partner and Attorney-in-Fact.

Joseph Neumann
Attorney-in-Fact

STATE OF NEW YORK )
ss.:
COUNTY OF NEW YORK)

On the 2nd day March, 1993, before me personally came Joseph Neumann, to me known, who, being by me duly sworn, did depose and say that he resides at 39 Broadway, New York, N.Y., that he is the general partner and attorney-in-fact for Toru A. Uchida, Sylvia Freeman, Howard Bagdorf, Jimmy U. Lim, Neil O. Lawner, Stanley A. Schwartz, Benedict G. Pace, Charles A. Blake, Jr., Jeffrey I. Kaufman, Hy Zazula, Stanley Bresticker, Ira Shapiro, Irwin W. Shipper,* Jeffrey C. Daniels and Henry Salmond, pursuant to certain power of attorney heretofore executed by said limited partners and he executed this instrument in the name and stead of said limited partners.
*and Richard Migliore

Notary Public

GILBERT WALLACH
Notary Public, State of New York
No. 31-4138028
Qualified in New York County
Commission Expires June 30, 19

td\misc\4668amnd.clp
td:ew

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

PARK PROPERTIES ASSOCIATES, L.P., et al.,

Plaintiffs,

v. No. 04-1757C

THE UNITED STATES,

Defendant.

--------------------------------x

July 1, 2005
1:56 p.m.

Deposition of HENRY SALMOND, taken by Defendant, at the offices of Nixon Peabody LLP, 437 Madison Avenue, New York, New York, before Brandon Rainoff, a Federal Certified Realtime Reporter and Notary Public of the State of New York.

Page 2

APPEARANCES:

NIXON PEABODY LLP
Attorneys for Plaintiffs
401 Ninth Street, N.W. #900
Washington, D.C. 20004
(202) 585-8712
BY: HARRY J. KELLY, ESQ.

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
Attorneys for Defendant
1100 L Street, N.W.
Room 12052
Washington, DC 20005
(202) 307-0282
BY: JOHN E. KOSLOSKE, ESQ.

Page 3

INDEX OF EXHIBITS

Exhibit 72 .............................. Page 18
Document Bates Stamped PPAS-NYH-00152 through 168

Exhibit 73 .............................. Page 18
Document Bates Stamped PPAS-NYH-00169 through 171

Exhibit 74 .............................. Page 19
Document Bates Stamped PPAS-NYH-00172 through 175

Exhibit 75 .............................. Page 20
Document Bates Stamped PPAS-NYH-00192 through 194

Exhibit 76 .............................. Page 21
Document Bates Stamped PPAS-NYH-00176 through 191

Exhibit 77 .............................. Page 22
Document Bates Stamped PPAS-NYH-00195 through 197

Exhibit 78 .............................. Page 23
Document Bates Stamped PPAS-NYH-00198

Exhibit 79 .............................. Page 24
Document Bates Stamped PP0562

Page 4

EXHIBITS (Continued):

Exhibit 80 .............................. Page 25
Document Bates Stamped PP0565

Exhibit 81 .............................. Page 30
Document Bates Stamped PP0580 through 581

Exhibit 82 .............................. Page 31
Document Bates Stamped PPAS-QUA-0001

Exhibit 83 .............................. Page 32
Document Bates Stamped PPAS-QUA-0002

Exhibit 84 .............................. Page 33
Document Bates Stamped PPAS-NYH-00199 through 20

Exhibit 85 .............................. Page 33
Document Bates Stamped PPAS-NYH-00208 through 22

Exhibit 86 .............................. Page 34
Document Bates Stamped PPAS-NYH-00221 through 236

Exhibit 87 .............................. Page 35
Document Bates Stamped PPAS-NYH-00237 through 252

Page 5

EXHIBITS (Continued):

Exhibit 88 .............................. Page 36
Document Bates Stamped PPAS-NYH-00253 through 267

Exhibit 89 .............................. Page 36
Document Bates Stamped PP0615 through 633

Exhibit 90 .............................. Page 37
Document Bates Stamped PPAS-NYH-00283 through 295

Page 6

(Time noted: 1:56 p.m.)
HENRY SALMOND,
having been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. KOSLOSKE:
Q. Would you spell your name for the record, please?
A. First name is Henry Salmond, H-E-N-R-Y, S-A-L-M-O-N-D.
Q. What is your occupation, sir?
A. I am the assistant vice-president for Kenpit.
Q. What kind of business is Kinpit Management?
A. Property manager, managing agent.
Q. What is your business address?
A. We are at 875 Sixth Avenue, New York, New York 10001.
Q. What's your business telephone number?
A. 212-279-2833.
Q. Mr. Salmond, my name is John Kosloske. I represent the United States in litigation styled Park Properties Associates LP, et al., versus the United States, 04-1757 C. It is a

Page 7

lawsuit pending in the United States Court of Federal Claims.
The litigation involves claims against the United States by three partnerships, Park Properties Associates, Valentine Associates, and St. John's 1 Associates relating to rent adjustments under Section 8 Housing Assistance Payments Contracts between those partnerships and the United States acting through the Department of Housing and Urban Development.
Are you familiar with this litigation?
A. Yes.
(Pause)
BY MR. KOSLOSKE:
Q. Have you read the complaint filed in this litigation upon behalf of Park Properties Associates, Valentine Associates and St. John's 1 Associates?
A. Yes.
Q. Showing you what's been marked for identification as Exhibit No. 1, do you recognize that document?
A. Yes.
Q. That's the complaint in the case, and you have reviewed that, is that correct?

Page 8

A. Yes.
Q. Showing you what has been marked for identification as Exhibit 2, this is a notice of a deposition in this case. Have you seen what's marked for identification as Exhibit 2 before today?
A. Yes.
Q. Have you been designated to testify on behalf of St. John's 1 Associates with respect to topics 7 through 17 listed in the deposition notice?
A. Yes.
Q. For the sake of brevity in this deposition, I will refer to St. John's 1 Associates LP as St. John's and I will refer to the Department of Housing and Urban Development as HUD, do you understand that?
A. Yes. Excuse me, would you repeat that again, please?
Q. For the sake of brevity in this deposition I will refer to the plaintiff St. John's 1 Associates LP as St. John's, and I will refer to the Department of Housing and Urban Development as HUD.
So that the court reporter can

Page 9

accurately transcribe my questions and your responses, it is important that you allow me to finish a question before you begin your response. I for my part will do my best to allow you to complete your response to a question before I pose a new question.
Also, the court reporter cannot transcribe nods and shakes of the head in response to questions. Therefore, if a question calls for a yes or no answer, please respond by stating yes or no as appropriate rather than by nodding or shaking your head.
Please listen carefully to my questions and answer the questions posed. If you did not hear all or part of a question, let me know and I will repeat the question or have the court reporter read the question back to you.
If you do not understand all or any part of a question, please let me know and I will attempt to restate or clarify the question. If you need to take a break, just say so and we will take one.
Mr. Kelly, would you like to state your appearance for the record?

Page 10

MR. KELLY: Yes, my name is Harry Kelly. I am counsel for the plaintiffs in this case including counsel for St. John's 1 Associates.
MR. KOSLOSKE: Before we went on the record you indicated that you had a statement to make for the record regarding the scope of St. John's claim?
MR. KELLY: That's right. For the record, and to eliminate any confusion, the plaintiff St. John's 1 Associates is seeking damages in this case for the time period through and including the termination of the principal HAP contract and not seeking damages for the period that begins with the effective date of the first of the interim HAP contracts or subsequent.
BY MR. KOSLOSKE:
Q. Mr. Salmond, what is your date of birth?
A. 2/8/46.
Q. Are you a high school graduate, sir?
A. Yes.
Q. When did you graduate from high school?

Page 11

A. 1964.
Q. Did you attend college or university?
A. Yes.
Q. Which college or university did you attend?
A. Kingsborough Community College, in Brooklyn, New York; and CUNY Senior College in Jamaica, York College, which is CUNY Senior College.
Q. During what periods of time did you attend those institutions?
A. Kingsborough I attended from February 1975 until I graduated June 1978 with an AAS.
Q. What is an AAS, sir?
A. Applied Science, Associate Applied Science.
Q. Did you indicate that you attended SUNY?
A. CUNY.
Q. CUNY?
A. York College in Jamaica.
Q. When did you attend that school?
A. I attended from September 1978 and I graduated from there in June 1982.
Q. What degree did you receive?

Page 12

A. A BS in accounting.
Q. BS in accounting?
A. Yes.
Q. You indicated that Kinpit Management is a real property management firm?
A. It is a managing agent, that's correct.
Q. I will refer to Kinpit Management as Kinpit for short. Does Kinpit manage any properties other than St. John's Phase 1?
A. Yes.
Q. Which properties are they?
A. Kinpit Associates.
Q. So Kinpit Management manages Kinpit Associates as well as St. John's Phase 1?
A. Yes.
Q. What is Kinpit Associates?
A. It is units, apartment complex.
Q. How long have you been employed by Kinpit Management?
A. Since 1979.
Q. When did you become assistant vice-president?
A. I believe it was 2002 or 2000.
Q. Prior to becoming vice-president, what

Page 13

position or positions did you hold?
A. Office manager.
Q. As office manager what were your duties and responsibilities?
A. Well, I see that the rent was collected, that the tenants' complaints was taken care of, and I attend all the HUD seminars for rent collection, repairs, and seeing that the tenants' lease were renewed on time and that the voucher was processed on time.
Q. Did you prepare rent schedules for St. Johns Phase 1 as office manager?
A. Rent schedules?
Q. Yes.
A. Yes.
Q. As office manager, did you become involved in the process of obtaining rent adjustments for St. John's Phase 1?
A. Yes.
Q. What was the exact nature of your involvement in the rent adjustment process?
A. Well, involved in the rent adjustment process. What we did, we submitted a letter to HUD letting them know we was informed to write a letter to HUD, and we were informed by, I

Page 14

believe it was Ms. Maitland, sent a letter to her stating that our HAP contract expires like I believe it is like June 30 and we are requesting a rent increase.
Q. You say Ms. Maitland, you mean Carol Maitland?
A. Yes, at HUD, that's correct.
Q. Do you have any professional certifications?
A. Well, with New York Quadel.
Q. What kind of certification do you have with New York Quadel?
A. Well, I attend the management occupancy review.
Q. You received a certification from Quadel?
A. Yes.
Q. Are you a certified public accountant?
A. No.
Q. Are you a licensed real estate broker?
A. No.
Q. Are you a member of any professional organizations?
A. No.
Q. Are you familiar with St. John's?

Page 15

A. Yes.
Q. Is St. John's a limited partnership organized under the laws of the State of New York?
A. Yes.
Q. Are you familiar with a rental housing project known as St. John's Phase 1, correct?
A. Yes.
Q. Is St. John's the owner of St. John's Phase 1?
A. St. John's 1 Associates.
Q. Let me rephrase the question.
Does St. John's, the partnership, own St. John's Phase 1?
A. Yes.
Q. Is St. Johns Phase 1 located at 1280 to 1292 St. John's Place in Brooklyn, New York?
A. Yes.
Q. Do you have an ownership interest in Kinpit Management?
A. I personally?
Q. Yes.
A. No.
Q. Are you acquainted with Mr. Troy D. Stevens, Jr.?

Page 16

A. Yes.
Q. Does Mr. Stevens own Kinpit Management?
A. He is the president, yes.
Q. He is the president of Kinpit Management?
A. Yes.
Q. So you report to Mr. Stevens?
A. That's correct.
Q. Has Kinpit Management been the real property management agent for St. John's Phase 1 since you began working for Kinpit in 1979?
A. Since 1982.
Q. So since 1982 Kinpit Management has been the property management agent for St. John's Phase 1?
A. Yes.
Q. During the period 1994 to 2002, what if any involvement did Mr. Stevens have in the processing of rent adjustments under the Section 8 HAP contract between St. John's and HUD?
MR. KELLY: With respect to the word processing, you mean submitting the rent adjustment applications?
MR. KOSLOSKE: Yes.

Page 17

Q. Did Mr. Stevens become involved in preparation of requests for rent adjustments?
A. That's what the record says, yes.
Q. Was there anyone besides yourself and Mr. Stevens who had any involvement in the process of applying for requesting rent adjustments for St. John's Phase 1? Do you understand the question?
A. No, I don't understand.
Q. I think you have testified if I may summarize that you have had some involvement in rent adjustments?
A. Correct.
Q. In asking for rent adjustments?
A. Correct.
Q. And Mr. Stevens has had some involvement in asking for rent adjustments?
A. Correct.
Q. Is there anyone else at Kinpit who has had some involvement in seeking rent adjustments for St. John's Phase 1?
A. You mean in the organization?
Q. Yes.
A. No.
Q. Have you seen the HAP contract between

Page 18

St. John's and HUD?
A. Yes.
(Exhibit 72, Document Bates Stamped PPAS-NYH-00152 through 168, marked for identification)
BY MR. KOSLOSKE:
Q. I am showing you what's been marked for identification as Exhibit 72. Do you recognize this document?
A. Yes.
Q. What is Exhibit 72?
A. The Housing Assistance Payment Contract.
Q. This is the contract between St. John's and HUD with respect to St. John's Phase 1?
A. Yes.
(Exhibit 73, Document Bates Stamped PPAS-NYH-00169 through 171, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 73, can you take a look at this document, tell us whether you recognize it?

Page 19

A. Yes.
Q. Exhibit 73 is a letter dated October 7, 1994 from the New York HUD office to Mr. Stevens as president of Kinpit Management for a rent increase for St. John's Phase 1, is that correct?
A. Yes.
Q. This letter indicates that the rent increase that's the subject of the letter will be effective July 1, 1994, is that correct?
A. Yes.
Q. And the letter indicates that the approved adjusted rents are $812 for the zero-bedroom units, $950 for the one-bedroom unit, $1,082 for the two-bedroom units, and $1,257 for the three-bedroom units, is that correct?
A. Correct.
(Exhibit 74, Document Bates Stamped PPAS-NYH-00172 through 175, marked for identification)
BY MR. KOSLOSKE:
Q. I am showing you what's been marked for identification as Exhibit 74. Do you recognize this document?

Page 20

A. Yes.
Q. Exhibit 74 is a rent comparability study with respect to St. John's Phase 1 that was submitted by St. John's to HUD, is that correct?
A. Yes.
Q. The study was performed by an appraiser named Eugene Chin, is that correct?
A. Yes.
Q. This document indicates that Mr. Chin signed this study on August 2, 1996, is that correct?
A. Yes.
Q. Did St. John's Phase 1 receive a rent adjustment for 1995?
A. No.
(Exhibit 75, Document Bates Stamped PPAS-NYH-00192 through 194, marked for identification)
BY MR. KOSLOSKE:
Q. I am showing you what's been marked for identification as Exhibit 75. Do you recognize this document?
A. Yes.
Q. Is what's marked for identification as

Page 21

Exhibit 75 a letter from the New York HUD office to Kinpit Management regarding a rent adjustment for 1995?
A. Yes.
Q. This letter indicates that based upon the results of the rent comparability study that is Exhibit 74, the rents would not be increased in 1995, is that correct?
MR. KELLY: Objection, the document speaks for itself, but you may respond.
A. That's what the document says.
Q. Now, on the first page of Exhibit 75, towards the bottom there is an asterisk that says "see attached worksheet."
Do you see that? First page, sir, towards the bottom.
A. Yes.
Q. Says "see attached worksheet," do you see that?
A. Yes.
(Exhibit 76, Document Bates Stamped PPAS-NYH-00176 through 191, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for

Page 22

identification as Exhibit 76, is Exhibit 76 the worksheet that is referred to in Exhibit 75?
A. I think it speaks for itself.
Q. Do you recall receiving Exhibit 76 along with Exhibit 75?
A. No, I received 75 and that's all.
Q. Have you ever seen what's marked for identification as Exhibit 76?
A. I didn't receive it.
Q. Did St. John's Phase 1 receive a rent adjustment for 1996?
A. Yes.
(Exhibit 77, Document Bates Stamped PPAS-NYH-00195 through 197, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 77, do you recognize this document?
A. Yes.
Q. Is Exhibit 77 a letter from the New York HUD office to Kinpit Management regarding a rent adjustment for St. John's Phase 1 effective July 1, 1996?
A. The record speaks for itself.

Page 23

Q. You understand that letter to say that?
A. Yes.
Q. This letter indicates that the adjusted Section 8 contract rents are $831 for the zero-bedroom units, $973 for the one-bedroom unit, $1,108 for the two-bedroom units, and $1,287 for the three-bedroom units, does that comport with your understanding?
A. Yes.
Q. Now, on Exhibit 77, the first page, the bottom of the page, there is an asterisk and it says "see attached worksheet," do you see that? Bottom of the first page?
A. Yes.
Q. Did you receive a worksheet along with the letter?
A. I don't recall.
(Exhibit 78, Document Bates Stamped PPAS-NYH-00198, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 78, have you ever seen this document before?
A. I don't recall.

Page 24

Q. Did Kinpit Management seek a rent adjustment for St. John's Phase 1 in 1997?
A. Yes.
(Exhibit 79, Document Bates Stamped PP0562, marked for identification)
BY MR. KOSLOSKE:
Q. I am showing you what's been marked for identification as Exhibit 79. This is a letter dated April 7, 1997 from Troy D. Stevens, Jr., to Rochelle Printz, that's R-O-C-H-E-L-L-E, P-R-I-N-T-Z of the New York HUD office.
Do you recognize the signature on this page?
A. Yes.
Q. Whose signature is that?
A. That's Mr. Troy D. Stevens, Jr.'s signature.
Q. Now, in Exhibit 79, is this the correspondence to HUD requesting a rent adjustment for 1997?
A. Yes.
Q. What if anything occurred with respect to this request?
A. Well, I received a call, I don't recall the date. I remember Mrs. Lenore McJolly

Page 25

contact my office and said we were not going to receive an increase for '97.
Q. Did she say why?
A. I don't recall, but I know she says we was not going to receive an increase.
Q. Did you ask her to explain why the St. John's Phase 1 would not be receiving a rent adjustment for 1997?
A. I don't recall the conversation, but I know she told me we would not receive it.
Q. Did you or Mr. Stevens do anything after that call with respect to obtaining a rent adjustment for 1997?
A. I don't recall.
(Exhibit 80, Document Bates Stamped PP0565, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 80, do you recognize this document?
A. Yes.
Q. Is this a letter that you prepared and signed?
A. Yes.
Q. This letter is dated December 3, 1998,

Page 26

and it is a letter from you to Gay Associates in Brooklyn, New York, to the attention of Ms. Mary Gay.
What kind of firm was Gay Associates?
A. It was a real estate firm.
Q. A real estate --
A. She is a real estate firm. They do appraisals.
Q. What was the purpose of this letter?
A. This letter for her to do a comparability study from July '98 to June '99.
Q. Did Gay Associates perform a rent comparability study?
A. Yes.
Q. Did they provide it to you or to Kinpit?
A. They provided -- they sent it directly to Mrs. Lenore McJolly at HUD.
Q. Did Gay Associates provide you with a copy of the study?
A. Yes.
MR. KOSLOSKE: For the record, we have not seen a copy of a study in the documents produced by or on behalf of St. John's in this case.

Page 27

MR. KELLY: I understand, and I believe the witness has attempted to locate the document in the files and has not located them in the files.
BY MR. KOSLOSKE:
Q. What was the purpose of providing HUD with the rent comparability study?
A. That was one of the requirements, receiving inquiries.
Q. Did St. John's receive a rent increase for St. John's Phase 1 for 1998?
A. No.
Q. Do you know the reason why or why not?
A. I don't recall.
Q. Did you speak with anyone at the New York HUD office about rent adjustment for St. John's Phase 1 in 1998?
A. Yes.
Q. Who?
A. Ms. McJolly, but I don't recall at this time.
Q. You don't recall exactly what was said?
A. What was said, that's correct.
Q. You don't recall anything about what

Page 28

was said?
A. No, I don't remember exactly what was said.
Q. Did you speak with anyone besides Ms. McJolly about a rent adjustment for 1998?
A. When we called, that was the person designated to speak to as who we had to speak to.
Q. Did you attempt to speak to anyone else besides Ms. McJolly?
A. No.
Q. Did St. John's receive a rent adjustment for St. John's Phase 1 for 1999?
A. No.
Q. Did Kinpit Management seek a rent adjustment for St. John's Phase 1 for 1999?
A. Yes.
Q. What specifically did St. John's do to obtain a rent adjustment in 1999?
A. We just submitted a letter like this.
Q. Do you recall to whom the letter was addressed?
A. No.
MR. KOSLOSKE: For the record, the documents produced by St. John's in this case do

Page 29

not include a correspondence seeking a rent adjustment in 1999.
MR. KELLY: Same response, we were unable to locate it, that document.
BY MR. KOSLOSKE:
Q. Did St. John's receive a rent adjustment for St. John's Phase 1 for the year 2000?
A. No.
Q. Did Kinpit Management request a rent adjustment for St. John's Phase 1 for the year 2000?
A. Yes.
Q. How was that request communicated, in writing, orally or both?
A. It was requested in writing.
Q. To whom was the correspondence addressed?
A. In 2000 I believe we were dealing with New York Quadel.
Q. Do you know the reason why a rent adjustment was not made for St. John's Phase 1 for the year 2000?
A. Well, when the request was submitted I was told over the phone if I remember correctly

Page 30

and this I remember very clear, that the government was not -- it wasn't very easy -- they weren't giving out increases and the government wasn't giving out any increases at that particular time.
Q. Were you asked to provide a rent comparability study?
A. No.
Q. Did Kinpit Management provide a rent comparability study in support of a rent adjustment for the year 2000?
A. No. At this time I believe we had changed, we were doing a different worksheet, 2000, if I recall.
(Exhibit 81, Document Bates Stamped PP0580 through 581, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 81. Do you recognize this document?
A. Yes.
Q. What is Exhibit 81?
A. It was just writing to let me know that the procedures had changed. This was for rent adjustment.

Page 31

Q. The change procedure was that you were no longer to be dealing with the Quadel New York City office but rather the Quadel Syracuse office for rent adjustments?
A. Yes, you would submit to Syracuse, that is correct.
Q. What if anything did Kinpit Management do upon receipt of Exhibit 81?
A. We submit a request.
(Exhibit 82, Document Bates Stamped PPAS-QUA-0001, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 82, do you recognize this document?
A. Yes.
Q. Exhibit 82 is a letter dated November 19, 2001 from you to the tenants for St. John's Phase 1, is that correct?
A. That's correct.
Q. The purpose of the letter is to remind the tenants that the Housing Assistance Payments contract between St. John's and HUD would expire on June 30, 2002?
A. That's correct.

Page 32

Q. And the other purpose of the letter is to assure the tenants that St. John's would not be opting out of the Section 8 program and that the contract would be renewed?
A. Yes.
(Exhibit 83, Document Bates Stamped PPAS-QUA-0002, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 83, do you recognize this document?
A. Yes.
Q. Exhibit 83 is a letter dated January 2, 2002 from Camile Ferrell-Knighton of Quadel to St. John's 1 Associates regarding HAP contract renewal for St. John's Phase 1, is that correct?
A. Yes.
Q. The document refers to different options that were available to St. John's in that regard, is that correct?
A. Yes.
Q. What if any action did St. John's take with respect to Exhibit 83?
A. We attempt to renew the contract.

Page 33

(Pause)
(Exhibit 84, Document Bates Stamped PPAS-NYH-00199 through 200, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 84, do you recognize this document?
A. Yes.
Q. Exhibit 84 is a letter dated July 9, 2002 from Mr. Stevens to Mr. Savapoulas of the New York HUD office, correct?
A. Yes.
Q. This letter concerns a one-year extension of the HAP contract relative to St. John's Phase 1, is that correct?
A. Yes.
(Exhibit 85, Document Bates Stamped PPAS-NYH-00208 through 220, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's marked for identification as Exhibit 85, do you recognize this document?
A. Yes.

Page 34

Q. Exhibit 85 is a Housing Assistance Payments interim mark-to-market renewal contract for St. John's Place Phase 1, is that correct?
A. Yes.
Q. Exhibit 85 is the interim mark-to-market renewal contract for the units covered by stage one of the St. John's Phase 1 project, is that correct?
A. Yes.
(Exhibit 86, Document Bates Stamped PPAS-NYH-00221through 236, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 86, do you recognize the document?
A. Yes.
Q. Exhibit 86 is a Housing Assistance Payments Interim (Full) Mark-to-Market Renewal Contract for St. John's Phase 1 for the units covered by stage two of that project, correct?
A. Yes.
(Exhibit 87, Document Bates Stamped PPAS-NYH-00237 through 252, marked for identification)

Page 35

BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 87, do you recognize that document?
A. Yes.
Q. Exhibit 87 is a Housing Assistance Payments Interim (Full) Mark-to-Market Renewal Contract for the units covered by stage three of St. John's Phase 1 project, is that correct?
A. That's correct.
Q. These three interim renewal contracts that are marked for identification as Exhibit 85, Exhibit 86 and Exhibit 87 replaced the original HAP contract for St. John's Phase 1, correct?
A. Correct. That's what the document says, correct.
MR. KELLY: For the record, when I referenced it earlier, that we are not seeking damages after the date of the interim contracts, each of these contracts has a separate effective date with respect to each of the stages, so the damages would run to the effective date of the subsequent applicable contract for each of the stages.

Page 36

(Exhibit 88, Document Bates Stamped PPAS-NYH-00253 through 267, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 88, do you recognize this document?
A. Yes.
Q. Exhibit 88 is a Housing Assistance Payments watch list renewal contract and it has an effective date of August 1, 2003.
Is it your understanding that Exhibit 88 replaced the interim renewal contracts that are marked for identification as Exhibits 85, 86 and 87?
A. Yes.
(Exhibit 89, Document Bates Stamped PP0615 through 633, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 89, do you recognize this document?
A. Yes.
Q. Exhibit 89 is a letter dated September 13, 2004 from Katherine Ozminkowski of Quadel to

Page 37

St. John's, is that correct?
A. Yes.
Q. The subject of the letter is notification of short term HAP contract renewal.
Enclosed with this letter is a Housing Assistance Payments basic renewal contract, is that correct?
A. That's what the document says, speaks for itself.
Q. And this basic renewal contract was effective for a term beginning on August 1, 2004, is that correct?
A. That's correct.
Q. And the basic renewal contract that is enclosed with the letter that is Exhibit 89 replaced the watch list contract which is Exhibit 88, is that correct?
A. Correct.
(Exhibit 90, Document Bates Stamped PPAS-NYH-00283 through 295, marked for identification)
BY MR. KOSLOSKE:
Q. Showing you what's been marked for identification as Exhibit 90, do recognize this document?

A. Yes.
Q. Exhibit 90 is a Housing Assistance Payments renewal contract for markup to market project that -- for a period of five years beginning on August 6, 2004, is that correct?
A. That's correct.
Q. Exhibit 90, that HAP contract replaced what is marked for identification as Exhibit 89?
A. That's correct.
Q. The HAP contract that is marked for identification as Exhibit 90 is the HAP contract that is currently in effect for St. John's Phase 1?
A. Yes.
Q. Mr. Salmond, are you familiar with HUD notice 95-12 that was issued in 1995?
A. I am familiar but I can't recall what the notice says.
Q. Let me show you what's been marked for identification as Exhibit 9.
Do you recognize that document?
A. Yes.
Q. Is that a copy of HUD notice 95-12?
A. That's what it says.
Q. Have you read that document from cover



to cover at any point in time?
A. I don't recall everything in this document but I remember reading this document.
Q. How did you become aware of Exhibit 9?
A. It was mailed to me.
Q. By HUD?
A. Yes.
Q. That would have been in 1995?
A. That's what the record says.
Q. Are you familiar with subsequent HUD notices dealing with the same subject matter as HUD 95-12?
A. The subsequent notice from prior years?
Q. After 95-12.
A. I don't recall right now.
Q. I am showing you what's been marked for identification as Exhibit No. 10. This is a copy of HUD notice 97-14. Can you take a look at that document and tell us whether you have ever seen HUD notice 97-14 before?
A. I don't recall.
MR. KOSLOSKE: I don't have any further questions.
MR. KELLY: Take a short break.



(Recess)
EXAMINATION
BY MR. KELLY:
Q. Mr. Salmond, after a long day of depositions, occasionally one's hearing isn't what it should be and perhaps I may have misunderstood the question and response with respect to two exhibits that you were shown today, 74 and Exhibit 75.
I believe you identified Exhibit 74 as a rent comparison chart prepared by Eugene Chin in August of 1996.
Do you recall that Exhibit, sir?
A. Yes.
Q. Exhibit 75 was a letter sent to Mr. Troy Stevens -- well, it says Troy Stevenson -- from Rochelle Printz, and I just wanted to confirm, it is my understanding that Exhibit 75 relates to a rent adjustment request that was made in 1995 for a rent adjustment request in that year, is that correct?
A. That's correct.
Q. And Exhibit 74 relates to a rent adjustment request made in 1996?
A. That's correct.



Q. So these two documents are not related, is that correct?
A. That's correct.
MR. KELLY: No further questions.
EXAMINATION
BY MR. KOSLOSKE:
Q. I just wanted to clarify one thing about your college education. It is my understanding that you attended York College which is a part of CUNY?
A. Yes.
Q. And that that is located in Jamaica?
A. Jamaica, New York, yes.
Q. So with that understanding, if you could just go over one more time for us the dates that you attended the school or schools and the degree that you received.
A. York College I start September 1978, I started York College September 1978. I graduated from there June 1982.
Q. And you received a --
A. BS degree in accounting.
Q. I think that covers that.
MR. KOSLOSKE: Anything further?
MR. KELLY: No further questions.

MR. KOSLOSKE: Going to have the witnesses read and sign?

MR. KELLY: Both witnesses will read and sign their depositions.

MR. KOSLOSKE: And the arrangements for getting the transcript to the witnesses should they provide the --

MR. KELLY: You should provide to it me and then I will forward it to the witnesses.

(Time noted: 3:15 p.m.)

______________________________

HENRY SALMOND

______________________________

NOTARY PUBLIC

Subscribed and sworn to before me

this_____day of_____________, 2005.

SUBSTANTIAL REHABILITATION
PART I OF THE
HOUSING ASSISTANCE PAYMENTS CONTRACT
PRIVATE-OWNED OR PHA-OWNED PROJECT

CONTRACT LIST NUMBER AND DATE: 9/29/80 | PROJECT NUMBER: NY36-H110-050

NY80-739
NY 81-441 8/4/81 (Amended)

...is Housing Assistance Payments Contract ("Contract") is entered into by and between the United States of America acting through the Department of Housing and Urban Development ("Government"), and St. Johns T. Associates ("Owner"), to the United States Housing Act of 1937 ("Act"), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 ...1, et seq.

...parties hereto agree as follows:

SIGNIFICANT DATES AND OTHER ITEMS; CONTENTS OF CONTRACT.

Effective Date of Contract. The effective date of this Contract is SEE STAGING ATTACHED, 19__. [This date shall be no earlier than the date of Government acceptance of the project.]

~~Term of Contract Where Relative Cost of Rehabilitation is Less Than 15 Percent of Value. The term of this Contract for any unit (see Section 1.4a Alternative 1) shall be ______ years [not to exceed five years], beginning with the effective date of this Contract for such unit.~~

Term of Contract Where Relative Cost of Rehabilitation Is 15 Percent or More of Value.

(1) ~~Initial Term. The initial term of this Contract for any unit (see Section 1.4a, Alternative 2) shall be ______ years [not to exceed five years], beginning with the effective date of this Contract for each~~ unit.

(2) ~~Number and Length of Optional Additional Terms. The number and length of optional additional terms (see Section 1.4a) shall be ______ terms of ______ years each [not to exceed five years each].~~

(3) Maximum Total Term. The ~~maximum~~ total term of this Contract for any unit, including ~~all renewals~~ (see Section 1.4a), shall be 20 years. [Insert number as authorized by the Government pursuant to 24 CFR, Section 881.109, but in no event more than 20 years, or, in the case of a project owned by, or financed by a loan or a loan guarantee from, a State or local agency, the number, not to exceed 40, which will provide a term ending with the scheduled maturity date for the last payment under such financing.]

Fiscal Year. The ending date of each Fiscal Year (see Section 1.4b) shall be Dec. 31 [insert March 31, June 30, September 30, or December 31, as determined by the Government].

Maximum Housing Assistance Commitment. The maximum amount of the commitment for housing assistance payments under this Contract (see Section 1.5c) is $1,581,804 annum.

Minimum Percentage of Occupancy by Very Low-Income Families. In the initial renting of the Contract Units, the Owner shall lease at least 30 percent [insert 30, or lower number if authorized by the Government in accordance with 24 CFR, Section 881.117] to Very Low-Income Families (determined in accordance with the Government-established schedules and criteria) and shall thereafter exercise his best efforts to achieve and maintain at least 30 percent occupancy of the Contract Units by Very Low-Income Families as determined in accordance with such schedules and criteria.

Contents of Contract. This Contract consists of Part I, Part II, and the following exhibits:

Exhibit A: The schedule showing the number of units by size ("Contract Units") and their applicable rents ("Contract Rents");

Exhibit B: The project description;

Exhibit C: The statement of services, maintenance and utilities to be provided by Owner;

Exhibit D: The Affirmative Fair Housing Marketing Plan, if applicable; and

Additional exhibits: [Specify additional exhibits, if any. If none, insert "None."]

Exhibit E: Daily Debt Service Computation

This Contract, including said exhibits, comprises the entire agreement between the parties hereto with respect to the matters contained herein, and neither party is bound by any representations or agreements of any kind except as contained herein or except agreements entered into in writing which are not inconsistent with this Contract.

...'S WARRANTIES.

Legal Capacity. The Owner warrants that he has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

Completion of Work. The Owner warrants that the project as described in Exhibit B is in good and tenantable condition and that the project has been completed in accordance with the terms and conditions of the Agreement to Enter into Housing Assistance Payments Contract ("Agreement") or will be completed in accordance with the terms on which the project was accepted. The Owner further warrants that he will remedy any defects or omissions covered by this warranty if called to his attention within 12 months of the effective date of this Contract. The Owner and the Government agree that the continuation of this Contract shall be subject to the conditions set forth in Section 1.4f of the Agreement.

UNITS TO BE LEASED; GOVERNMENT ASSISTANCE.

... The Contract Units are to be leased by the Owner to eligible Lower-Income Families ...

EXHIBIT 72

PPAS-NYH-00152

RIDER TO SECTION 1.6 OF HOUSING ASSISTANCE PAYMENTS CONTRACT

DEBT SERVICE PAYMENTS

(1) If a unit continues to be vacant after the 60 day period specified in paragraph b or c of this Section, the Owner may submit a claim to receive additional housing assistance payments on a semiannual basis with respect to such a vacant unit in an amount equal to the principal and interest payments required to amortize the portion of the debt attributable to that unit for the period of the vacancy, whether such vacancy commenced during rent-up or after rent-up.

(2) Additional Payments under this paragraph for any unit shall not be for more than 12 months for any vacancy period, and shall be made only if:

(i) The unit was in decent, safe and sanitary condition during the vacancy period for which payments are claimed.

(ii) The Owner has taken and is continuing to take the actions specified in paragraphs b(1)(2) and (3) or paragraphs c(1)(i) and (ii) and c(2) of this Section, as appropriate.

(iii) The Owner has demonstrated in connection with the semiannual claim on a form and in accordance with the standards prescribed by HUD with respect to the period of vacancy, that the project is not providing the Owner with revenues at least equal to the project costs incurred by the Owner, and that the amount of the payments requested is not in excess of that portion of the deficiency which is attributable to the vacant units for the period of the vacancies.

(iv) The Owner has submitted, in connection with the semiannual claim, a statement with relevant supporting evidence that there is a reasonable prospect that the project can achieve financial soundness within a reasonable time. The statement shall indicate the causes of the deficiency; the corrective steps that have been and will be taken; and the time by which it is expected that the project revenues will at least equal project costs without the additional payments provided under this paragraph.

(3) HUD may deny any application for additional payments or suspend or terminate payments if it determines, based on the Owner's statement and other evidence, that there is not a reasonable prospect that the project can achieve financial soundness within a reasonable time.

(2) If there is an Allowance for Utilities and Other Services and if such Allowance exceeds the Gross Family Contribution, the Owne shall pay the Family the amount of such excess on behalf of the Government upon receipt of funds from the Government for th purpose.

TERM OF CONTRACT; FISCAL YEAR.

a. Term of Contract.

[Alternative provisions–Incorporate alternative 1 or 2]

Alternative 1 – Where HUD has determined that the Cost of Rehabilitation Is Less Than 15 Percent of Value.

The term of this Contract for any unit shall be as stated in Section 1.1b, with no option for renewal in either party. If the proj Is completed in stages, this term shall be separately related to the units in each stage; Provided, however, that the total Contract term for all the stages, beginning with the effective date of the Contract with respect to the first stage, shall not exceed said Contrac term plus two years.

Alternative 2 – Where HUD Has Determined that the Cost of Rehabilitation Is 15 Percent or More of Value.

The initial term of this Contract for any unit shall be as stated in Section 1.1c(1). This Contract may be renewed at the sole opt
the Owner, for the number and length of additional terms stated in Section 1.1c(2), provided that the total Contract term for any u
ing all renewals, shall not exceed the number of years stated in Section 1.1c(3). Renewal shall be automatic unless the Owner noti
Government, no later than 60 days prior to the expiration of the current term, of his intention not to renew. If the project is co
ed in stages, the dates for the initial term and renewal terms shall be separately related to the units in each stage; Provided, ho
the total Contract term for all the stages, beginning with the effective date of the Contract with respect to the first stage, sha
exceed the total Contract term stated in Section 1.1c(3), plus two years. In any case where the project is owned by, or financed l
or loan guarantee from, a State or local agency, the housing assistance payments pursuant to this Contract with respect to any duc
shall be payable over a period not to exceed 40 years.

b. Fiscal Year. The Fiscal Year for the project shall be the 12-month period ending on the date stated in Section 1.1d; Provided, however that the first Fiscal Year for the project shall be the period beginning with the effective date of the Contract and ending on the last day said established Fiscal Year which is not less than 12 months after such effective date. If the first Fiscal Year exceeds 12 months, the mum total annual housing assistance payment in Section 1.5a may be adjusted by the addition of the pro rata amount applicable to th period of operation in excess of 12 months.

MAXIMUM HOUSING ASSISTANCE COMMITMENT; PROJECT ACCOUNT.

a. Maximum Housing Assistance Commitment. Notwithstanding any other provisions of this Contract *(other than paragraph b of this Se* or any provisions of any other contract between the Government and the Owner, the Government shall not be obligated to make and not make any housing assistance payments under this Contract in excess of the amount per annum stated in Section 1.1e; Provided, however, that this amount shall be reduced commensurately with any reduction in the number of Contract Units or in the Contract Re or pursuant to any other provisions of this Contract.

b. Project Account. In order to assure that housing assistance payments will be increased on a timely basis to cover increases in Contract or decreases in Family Incomes:

(1) A Project Account shall be established and maintained, in an amount as determined by the Government consistent with its resp bilities under section 8(c)(6) of the Act, out of amounts by which the maximum Contract commitment per year exceeds amou paid under the Contract for any Fiscal Year. This account shall be established and maintained by the Government as a specific identified and segregated account. To the extent funds are available in said account, the maximum total annual housing assista payments for any Fiscal Year may exceed the maximum amount stated in paragraph a of this Section to cover increases in Con Rents or decreases in Family Incomes *(see Section 1.8)*. Any amount remaining in said account after payment of the last housi assistance payment with respect to the project shall be applied by the Government in accordance with law.

(2) Whenever the Government approved estimate of the required Annual Contribution exceeds the maximum Contract commitmen then in effect, and would cause the amount in the Project Account to be less than an amount equal to 40 percent of such maxi Contract commitment, the Government shall, within a reasonable period of time, take such additional steps authorized by secti 8(c)(6) of the Act as may be necessary to carry out this assurance, including *(as provided in that section of the Act)* "the reserv of annual contributions authority for the purpose of amending housing assistance contracts or the allocation of a portion of ne authorizations for the purpose of amending housing assistance contracts."

HOUSING ASSISTANCE PAYMENTS TO OWNERS. See Rider 1

General.

(1) Housing assistance payments shall be paid to the Owner for units under lease by Families in accordance with the Contract. The housing assistance payment will cover the difference between the Contract Rent and that portion of said rent payable by the F as determined in accordance with the Government-established schedules and criteria.

(2) The amount of housing assistance payment payable on behalf of a Family and the amount of rent payable by such Family shal subject to change by reason of changes in Family Income, Family composition, or extent of exceptional medical or other unus expenses, in accordance with the Government-established schedules and criteria; or by reason of adjustment by the Governmer any applicable Allowance for Utilities and Other Services. Any such change shall be effective as of the date stated in a notifica of such change to the Family.

b. Vacancies During Rent-up. If a Contract Unit is not leased as of the effective date of the Contract, the Owner shall be entitled to hou assistance payments in the amount of 80 percent of the Contract Rent for the unit for a vacancy period not exceeding 60 days from t ... Owner (1) commenced marketing and otherwise complied with Section 1.3b of the ...

(2) If the Owner evicts a Family, he shall not be entitled to any payment under paragraph e(1) of this Section unless the request for such payment is supported by a certification that (i) he gave such Family a written notice of the proposed eviction stating the grounds and advising the Family that it had 10 days within which to present its objections to the Owner in writing or in person and (ii) the proposed eviction was not in violation of the Lease or the Contract or any applicable law.

Limitation on Payments for Vacant Units. The Owner shall not be entitled to housing assistance payments with respect to vacant units under this Section to the extent he is entitled to payments from other sources *(e.g., payments for losses of rental income incurred for holding units vacant for relocatees pursuant to Title I of the Housing and Community Development Act of 1974 or payments under Section 1.9b of this Contract).*

Government Not Obligated for Family Rent. The Government has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any Family other than in accordance with Section 1.9b of this Contract. The financial obligation of the Government is limited to making housing assistance payments on behalf of Families in accordance with this Contract.

Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to the Government for housing assistance payments. Each such request shall set forth: (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of units, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contract Rent as set forth in Exhibit A for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit *(or, where applicable, the amount to be paid the Family in accordance with Section 1.3b(2))*; and (v) the total amount of housing assistance payments requested by the Owner.

(2) Each of the Owner's monthly requests shall contain a certification by him that to the best of his knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of this Contract and is payable under the Contract, and (iv) none of the amount claimed has been previously claimed or paid.

(3) If the Owner has received an excessive payment, the Government, in addition to any other rights to recovery, may deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for housing assistance payments shall be made subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Recoupment of Savings in Financing Cost.

(1) In the event that interim financing is continued after the first year of the term of the Contract and the debt service of the interim financing for any period of three months, after such first year, is less than the anticipated debt service under the permanent financing on which the Contract Rents were based, an amount reflecting the savings in financing cost, computed in accordance with paragraph g(2) of this Section, shall be credited by the Government to the Project Account, and withheld from housing assistance payments to the Owner. If during the course of the same year there is any period of three months in which the debt service is greater than the anticipated debt service under the permanent financing, an adjustment shall be made so that only the net amount of savings in financing cost for the year is credited by the Government to the Project Account and withheld from housing assistance payments to the Owner as aforesaid *(no increased payments shall be made to the Owner on account of any net excess for the year of actual interim debt service over the anticipated debt service under the permanent financing)*. Nothing in this paragraph g shall be construed as requiring a reduction in the Contract Rents or precluding adjustments of Contract Rents in accordance with Section 1.8.

(2) The computation and recoupment under this paragraph g may be made on an annual or on a quarterly or other periodic basis, but in any event no later than as of the end of each Fiscal Year; Provided, however, that if recoupment is to be made less often than quarterly, the amounts of recoupment shall be computed on at least a quarterly basis and the funds shall be deposited in a special account from which withdrawals may be made only with the authorization of the Government. The manner of computing the amount of recoupment shall be as follows:

(i) Determine the amount by which the interest cost for the debt service for the period in question is less than the anticipated debt service under the permanent financing on which the Contract Rents were based;

(ii) Determine what percentage the amount found under paragraph g(2)(i) of this Section is of the aggregate Contract Rents for all Contract Units for the period in question;

(iii) Apply the percentage found in paragraph g(2)(ii) of this Section to the aggregate Contract Rents for those Contract Units which are included in the Owner's claim(s) for housing assistance payments for the period in question; and

(iv) The amount found in paragraph g(2)(iii) of this Section shall be credited to the Project Account and withheld from the next housing assistance payment or payments to the Owner.

MAINTENANCE, OPERATION AND INSPECTION.

Maintenance and Operation. The Owner agrees (1) to maintain and operate the Contract Units and related facilities so as to provide Decent, Safe, and Sanitary housing, and (2) to provide all the services, maintenance and utilities set forth in Exhibit C. If the Government determines that the Owner is not meeting one or more of these obligations, the Government shall have the right, in addition to its other rights and remedies under this Contract, to abate housing assistance payments in whole or in part.

Inspection.

(1) Prior to occupancy of any unit by a Family, the Owner and the Family shall inspect the unit and both shall certify, on forms prescribed by the Government, that they have inspected the unit and have determined it to be Decent, Safe, and Sanitary in accordance with the criteria provided in the prescribed forms. Copies of these reports shall be kept on file by the Owner for at least three years.

(2) The Government shall inspect or cause to be inspected each Contract Unit and related facilities at least annually and at such other times *(including prior to initial occupancy and rerenting of any unit)* as may be necessary to assure that the Owner is meeting his obligation to maintain the units in Decent, Safe, and Sanitary condition and to provide the agreed upon utilities and other services. The Government shall take into account complaints by occupants and any other information coming to its attention in scheduling

PPAS-NYH-00155

any of its rights or remedies under the Contract, including abatement of housing assistance payments, even if the Family continues to occupy the unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and the Government does not have other section 8 funds for such purposes, the Government may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. Where this is done, the Owner shall be notified that he will be entitled to resumption of housing assistance payments for the vacated dwelling unit if (1) the unit is restored to Decent, Safe, and Sanitary condition, (2) the Family is willing to and does move back into the restored unit, and (3) a deduction is made for the expenses incurred by the Family for both moves.

d. Notification of Abatement. Any abatement of housing assistance payments shall be effective as provided in written notification to the Owner. The Government shall promptly notify the Family of any such abatement.

e. Overcrowded and Underoccupied Units. If the Government determines that a Contract Unit is not Decent, Safe, and Sanitary by reason increase in Family size, or that a Contract Unit is larger than appropriate for the size of the Family in occupancy, housing assistance payments with respect to such unit will not be abated, unless the Owner fails to offer the Family a suitable unit as soon as one becomes vacant and ready for occupancy. In the case of an overcrowded unit, if the Owner does not have any suitable units or if no vacancy of a suitable unit occurs within a reasonable time, the Government will assist the Family in finding a suitable dwelling unit and require the Family to move to such a unit as soon as possible. The Owner may receive housing assistance payments for the vacated unit if he complies with the requirements of Section 1.6c(1).

RENT ADJUSTMENTS.

a. Funding of Adjustments. Housing assistance payments will be made in increased amounts commensurate with Contract Rent adjustments under this Section, up to the maximum amount authorized under Section 1.5a of this Contract.

b. Automatic Annual Adjustments.

(1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

c. Special Additional Adjustments. Special additional adjustments shall be granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs *(i.e., assessments, and utilities not covered by regulated rates)*, but only if and to the extent that the Owner clearly demonstrates that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments. The Owner shall submit to the Government financial statements which clearly support the increase.

d. Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, That this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Incorporation of Rent Adjustment. Any adjustment in Contract Rents shall be incorporated into Exhibit A by a dated addendum to the exhibit establishing the effective date of the adjustment.

Adjustment to Reflect Actual Cost of Permanent Financing. This paragraph f shall apply if the project is not permanently financed until after the effective date of the Contract. After the project is permanently financed, the Financing Agency shall submit a certification to the Government as to the actual financing terms. If the actual debt service under the permanent financing is lower than the anticipated debt service on which the Contract Rents were based, the Contract Rents currently in effect shall be reduced commensurately, and the amount of the savings shall be credited to the Project Account. The maximum Contract commitment shall not be reduced. If the actual debt service is higher, the Contract Rents shall not be increased.

[illegible]KETING AND LEASING OF UNITS.

Compliance with Equal Opportunity. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's Government-approved Affirmative Fair Housing Marketing Plan, shown as Exhibit D, and with all regulations relating to fair housing advertising.

[illegible]curity and Utility Deposits.

The Owner may require Families to pay a security deposit in an amount equal to one month's Gross Family Contribution. If a Family vacates its unit, the Owner, subject to State and local law, may utilize the deposit as reimbursement for any unpaid rent or other amount owed under the Lease. If the Family has provided a security deposit, and it is insufficient for such reimbursement, the Owner may claim reimbursement from HUD, not to exceed an amount equal to the remainder of one month's Contract Rent. Any reimbursement under this Section shall be applied first toward any unpaid rent. If a Family vacates the unit owing no rent or other amount under the Lease or if the amount owed is less than the amount of the security deposit, the Owner shall refund the full amount or the unused balance, as the case may be, to the Family.

In those jurisdictions where interest is payable by the Owner on security deposits, the refunded amount shall include the amount of interest payable. All security deposit funds shall be deposited by the Owner in a segregated bank account, and the balance of this account, at all times, shall be equal to the total amount collected from tenants then in occupancy, plus any accrued interest. The Owner shall comply with all State and local laws regarding interest payments on security deposits.



PPAS-NYH-00156

*of elderly Families]*, and appropriate redeterminations shall be made by the Owner of the amount of Family contribution and the amount of housing assistance payment, all in accordance with schedules and criteria established by the Government. In connection with the reexamination, the Owner shall determine what percentage of Families in occupancy are Very Low-Income Families. If there are fewer than 30 percent Very Low-Income Families in occupancy, the Owner shall report the fact to the Government and shall adopt changes in his admission policies to achieve, as soon as possible, at least 30 percent occupancy by such Families.

Rent Redetermination after Adjustment in Allowance for Utilities and Other Services. In the event that the Owner is notified of a Government determination making an adjustment in the Allowance for Utilities and Other Services applicable to any of the Contract Units, the Owner shall promptly make a corresponding adjustment in the amount of rent to be paid by the affected Families and the amount of housing assistance payments.

Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable Government requirements and shall maintain records and furnish such copies or other information as may be required by the Government.

Government Review; Incorrect Payments. In making housing assistance payments to Owners, the Government will review the Owner's determinations under this Section. If as a result of this review, or other reviews, audits or information received by the Government at any time, it is determined that the Owner has received improper or excessive housing assistance payments, the Government shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise effect recovery thereof.

...RMINATION OF TENANCY.

...e Owner shall be responsible for termination of tenancies, including evictions. However, conditions for payment of housing assistance pay-...nts for any resulting vacancies shall be as set forth in Section 1.6c.

...DUCTION OF NUMBER OF CONTRACT UNITS FOR FAILURE TO LEASE TO ELIGIBLE FAMILIES.

After First Year Of Contract. If at any time, beginning six months after the effective date of this Contract, the Owner fails for a continuous period of six months to have at least 50 percent of the Contract Units leased or available for leasing by Families, the Government may on 30 days notice reduce the number of Contract Units to not less than the number of units under lease or available for leasing by Families, plus 10 percent of such number if the number is 10 or more, rounded to the next highest number.

At End of Initial and Each Renewal Term. At the end of the initial term of the Contract and of each renewal term, the Government may, by notice to the Owner, reduce the number of Contract Units to not less than (1) the number of units under lease or available for leasing by Families at that time or (2) the average number of units so leased or available for leasing during the last year, whichever is the greater number, plus 10 percent of such number if the number is 10 or more, rounded to the next highest number.

Restoration of Units. The Government will agree to an amendment of the Contract to provide for subsequent restoration of any reduction made pursuant to paragraph a or b of this Section if the Government determines that the restoration is justified as a result of changes in demand and in the light of the Owner's record of compliance with his obligations under this Contract and if annual contributions contract authority is available; and the Government will take such steps authorized by section 8(c)(6) of the Act as may be necessary to carry out this assurance *(see Section 1.5)*.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

OWNER St. John's I. Associates

By ______________________

______________________ *(Official Title)*

Date ______________________, 19__

United States of America
Secretary of Housing and Urban Development

By ______________________

Deputy Director, M/F Hsng. Dev.
*(Official Title)*

Date ______________________, 19__

[...ject is to be completed and accepted in stages, execution of the Contract with respect to the several stages appears on the following pages ...act.]

REVISED

Section 8 Staging Schedule

St. Johns Phase I
NY 36 - 4110 - 050 - (Sec 8#)
012 - 57113 - LD - EC (FHANO)

| STAGE I: 76 Units | No of Units | 0 Br | 1 Br | 2 Br | 3 Br |
|---|---|---|---|---|---|
| 1280 St Johns Place | 20 | 0 | 5 | 8 | 7 |
| 1284 St Johns Place | 18 | 0 | 6 | 9 | 3 |
| 1288 St Johns Place | 18 | 0 | 6 | 9 | 3 |
| 1292 St Johns Place | 20 | 0 | 9 | 11 | 0 |
| TOTAL STAGE I | 76 | 0 | 26 | 37 | 13 |
| OCCUPANCY DATE: | June 25, 1982 | | | | |

| STAGE II: 44 Units | | | | | |
|---|---|---|---|---|---|
| 1535 Sterling Place | 16 | 2 | 10 | 0 | 4 |
| 1539 Sterling Place | 28 | 3 | 15 | 10 | - |
| TOTAL STAGE II | 44 | 5 | 25 | 10 | 4 |
| ANTICIPATED OCCUPANCY DATE: | September 15, 1982 | | | | |

| STAGE III: | | | | | |
|---|---|---|---|---|---|
| 1550 Sterling Place | 37 | 5 | 20 | 12 | - |
| 1566 Sterling Place | 34 | 4 | 11 | 19 | - |
| TOTAL STAGE III | 71 | 9 | 31 | 31 | - |
| ANTICIPATED OCCUPANCY DATE: | October 30, 1982 | | | | |

EXECUTION OF CONTRACT WITH RESPECT TO CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES

STAGE 1

Contract is hereby executed with respect to the units described in Exhibit A-1.

DATE. The effective date of this Contract is July 1, 1982, 19___. [Insert date which shall be no earlier than the permanent acceptance of the project.]

SEE STAGING SHEET ATTACHED

OWNER St.Johns I Associates

By [signature]

MANAGING GENERAL PARTNER
(Official Title)

Date 8/23/82, 19___

United States of America
Secretary of Housing and Urban Development

By [signature]

Director of Housing
(Official Title)

Date 8/25, 1982

EXECUTION OF CONTRACT WITH RESPECT TO CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES

STAGE 2

Contract is hereby executed with respect to the units described in Exhibit A-2.

DATE. The effective date of this Contract is September 22, 1982, 19___. [Insert date which shall be no earlier than the permanent acceptance of the project.]

SEE STAGING SHEET ATTACHED

OWNER St.Johns Associates

By [signature]

(Official Title)

Date 11/30, 1982

United States of America
Secretary of Housing and Urban Development

By [signature]

Director of Housing
(Official Title)

Date 12/1, 1982

EXECUTION OF CONTRACT WITH RESPECT TO CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES

~~STAGE 3~~

~~Contract is hereby executed with respect to the units described in Exhibit A-3.~~

CONTINUED ON NEXT PAGE

~~The effective date of this Contract is ___, 19___. [Insert date which shall be no earlier than the acceptance of the project.]~~

~~OWNER~~

~~By~~

~~(Official Title)~~

EXECUTION OF CONTRACT WITH RE... ...T TO CONTRACT UNITS COMPLETED AND AC... ...PTED IN STAGES
STAGE 3

This Contract is hereby executed with respect to the units described in Exhibit A-1.

...CTIVE DATE. The effective date of this Contract is December 15, 1982. [Insert date which shall be no earlier than the ... of Government acceptance of the project.]

SEE STAGING SHEET ATTACHED

OWNER ST. JOHNS I ASSOCIATES

By ______________________

(Official Title)

Date 3/1, 1983

United States of America
Secretary of Housing and Urban Development

By ______________________

DIRECTOR OF HOUSING
(Official Title)

Date 3/1, 1983

EXECUTION OF CONTRACT WITH RESPECT TO CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES
[redacted] 2

This Contract is hereby executed with respect to the units described in Exhibit A-2.

...TIVE DATE. The effective date of this Contract is ____________, 19____. [Insert date which shall be no earlier than the ... Government acceptance of the project.]

OWNER ______________________

By ______________________

(Official Title)

Date ____________, 19____

United States of America
Secretary of Housing and Urban Development

By ______________________

(Official Title)

Date ____________, 19____

EXECUTION OF CONTRACT WITH RESPECT TO CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES
[redacted] 3.

Contract is hereby executed with respect to the units described in Exhibit A-3.

...IVE DATE. The effective date of this Contract is ____________, 19____. [Insert date which shall be no earlier than the ... Government acceptance of the project.]

OWNER ______________________

By ______________________

(Official Title)

Date ____________, 19____

United States of America
Secretary of Housing and urban Development

By ______________________

(Official Title)

Date ____________, 19____

PJR Construction Corporation
122 West End Avenue • Brooklyn, New York 11235 • (212) 332-9859
9070

January 12, 1982.

St. Johns I Assoc.
39 Broadway
New York, N.Y.

Re: St. Johns Phase I
Brooklyn, N.Y.
012-57113-LD-EC

Att: Mr. Joseph Neumann

Gentlemen:

This project, as you are aware, is split into two sites. Site One comprises the buildings on St. Johns Place containing 76 apartments. Site Two comprises the buildings on Sterling Place containing 116 apartments.

We expect the St. Johns Site to be completed prior to the Sterling Place Site. We therefore advise that you plan for occupancy accordingly.

Very truly yours,

PJR CONSTRUCTION CORPORATION
Irving M. Kusnitz

IMK/jm

EXHIBIT A CONTRACT RENTS

| UNIT SIZE | NUMBER OF UNITS | CONTRACT RENT |
|---|---|---|
| 0 BR | 14 | 496 |
| 1 BR | 82 | 598 |
| 2 BR | 78 | 713 |
| 3 BR | 17 | 830 |

EXHIBIT B PROJECT DESCRIPTION

Eight 4 story buildings providing 191 revenue producing units. Buildings are of masonry wall bearing structural system, wood joist floor system and brick exterior finish and have hot water heat. Apartments are walk-up.

EXHIBIT C STATEMENT OF SERVICES

The owner will provide all management and maintenance services in accordance with HUD's Regulatory Agreement and outstanding Section 8 regulations. Equipment and services included in the contract rents are as follows: gas ranges, electric refrig., kitchen exhaust fans, shades, community laundry facilities, heat and hot water.

EXHIBIT D- SEE ATTACHED FOR AFFIRMATIVE MARKETING PLAN

TO : Benjamin Skurnick, Area Counsel, 2.3C

DATE:

IN REPLY REFER TO: 2.3HDH

FROM : Evelyn J. Wolff

SUBJECT: Daily Debt Service Computation

Below is the daily debt service information to be made an exhibit to the Housing Payments Contract for:

St. John's Phase I
NY 36 - H110 - 050

DAILY DEBT SERVICE COMPUTATION WORKSHEET

| Bedroom Size (a) | Number of Units (b) | Contract Rent (c) | Total Contract Rent (d) | Contract Rent Percentage (e) | Debt Service by Bdr. Size (f) | Debt Service by Unit (g) | Daily Debt Service (h) |
|---|---|---|---|---|---|---|---|
| 0 BR | 14 | 496 | 6944 | 5.52 | 42,330 | 3024 | 8.40 |
| 1 BR | 82 | 598 | 49,036 | 39.01 | 279,267 | 3449 | 10.14 |
| 2 BR | 78 | 713 | 55,614 | 44.24 | 330,322 | 4356 | 12.08 |
| 3 BR | 17 | 330 | 14,110 | 11.23 | 80,134 | 5067 | 14.08 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL | | | 125,704 | 100% | 707,002 | | |

Evelyn J. Wolff
Deputy Director for
Multifamily Housing Division

ST. John's-Place

EXHIBIT " D "

The "Owner" agrees that the Affirmative Fair Housing Marketing Plan will be provided by the Department of Housing and Urban Development unless the owner provides such plan as approved by the Department of H.U.D. within the earlier of 60 days or initial closing of the construction loan.

______________________________
Owner

U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
SUBSTANTIAL REHABILITATION

PART II OF THE

# HOUSING ASSISTANCE PAYMENTS CONTRACT

PRIVATE-OWNER OR PHA-OWNER PROJECT

| HAP CONTRACT LIST NUMBER AND DATE: | PROJECT NUMBER: |
| --- | --- |
| NY80-739 9/29/80 | NY36-H110-050 |

NY81-441 - 9/4/78 (Cancelled)

## 2.1 NONDISCRIMINATION IN HOUSING.

a. The Owner shall not in the selection of Families, in the provision of services, or in any other manner, discriminate against any person on the grounds of race, color, creed, religion, sex, or national origin. No person shall be automatically excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program because of membership in a class such as unmarried mothers, recipients of public assistance, etc.

b. The Owner shall comply with all requirements imposed by Title VIII of the Civil Rights Act of 1968, and any rules and regulations pursuant thereto.

c. The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, Public Law 88-352, 78 Stat. 241; the regulations of the Department of Housing and Urban Development issued thereunder, 24 CFR, Subtitle A, Part 1, Section 1.1, et seq.; the requirements of said Department pursuant to said regulations; and Executive Order 11063 to the end that, in accordance with that Act, the regulations and requirements of said Department thereunder, and said Executive Order, no person in the United States shall, on the grounds of race, color, creed, religion or national origin, be excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program, or be otherwise subjected to discrimination. This provision is included pursuant to the regulations of the Department of Housing and Urban Development, 24 CFR, Subtitle A, Part 1, Section 1.1, et seq.; issued under Title VI of the said Civil Rights Act of 1964, and the requirements of said Department pursuant to said regulations; and the obligation of the Owner to comply therewith inures to the benefit of the Government and the said Department, either of which shall be entitled to invoke any remedies available by law to redress any breach thereof or to compel compliance therewith by the Owner.

## 2.2 TRAINING, EMPLOYMENT, AND CONTRACTING OPPORTUNITIES FOR BUSINESSES AND LOWER-INCOME PERSONS.[1]

a. The project assisted under this Contract is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

b. Notwithstanding any other provision of this Contract, the Owner shall carry out the provisions of said section 3 and the regulations issued pursuant thereto by the Secretary of Housing and Urban Development set forth in 24 CFR, Part 135 (published in 38 Federal Register 29220, October 23, 1973), and all applicable rules and orders of the Secretary issued thereunder prior to the execution of this Contract. The requirements of said regulations include, but are not limited to, development and implementation of an affirmative action plan for utilizing business concerns located within, or owned in substantial part by persons residing in, the area of the project; the making of a good faith effort, as defined by the regulations, to provide training, employment, and business opportunities required by section 3; and incorporation of the "section 3 clause" specified by section 135.20(b) of the regulations and paragraph d of this Section in all contracts for work in connection with the project. The Owner certifies and agrees that he is under no contractual or other disability which would prevent him from complying with these requirements.

c. Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of the Secretary issued thereunder prior to approval by the Government of the application for this Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, his successors and assigns. Failure to fulfill these requirements shall subject the Owner, his contractors and subcontractors, his successors and assigns to the sanction specified by this Contract, and to such sanctions as are specified by 24 CFR, Section 135.135.

d. The Owner shall incorporate or cause to be incorporated into any contract or subcontract for work pursuant to this Contract in excess of $50,000 cost, the following clause:

"EMPLOYMENT OF PROJECT AREA RESIDENTS AND CONTRACTORS

"A. The work to be performed under this Contract is on a project assisted under a program providing direct Federal financial assistance from the Department of Housing and Urban Development and is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

"B. The parties to this Contract will comply with the provisions of said section 3 and the regulations issued pursuant thereto by the Secretary of Housing and Urban Development set forth in 24 CFR, Part 135, and all applicable rules and orders of the Department issued thereunder prior to the execution of this Contract. The parties to this Contract certify and agree that they are under no contractual or other disability which would prevent them from complying with these requirements.

"C. The contractor will send to each labor organization or representative of workers with which he has a collective bargaining agreement or other contract or understanding, if any, a notice advising the said labor organization or workers' representative of his commitments under this section 3 clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment or training.

"D. The contractor will include this section 3 clause in every subcontract for work in connection with the project and will, at the direction of the applicant for or recipient of Federal financial assistance, take appropriate action pursuant to the subcontract upon a finding that the subcontract is in violation of regulations issued by the Secretary of Housing and Urban Development, 24 CFR, Part 135. The contractor will not subcontract with any subcontractor where it has notice or knowledge that the latter has been found in violation of regulations under 24 CFR, Part 135, and will not let any subcontract unless the subcontractor has first provided it with a preliminary statement of ability to comply with the requirements of these regulations.

"E. Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of the Department issued thereunder prior to the execution of the Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the applicant or recipient for such assistance, its successors, and assigns. Failure to fulfill these requirements shall subject the applicant or recipient, its contractors and subcontractors, its successors, and assigns to those sanctions specified by the grant or loan agreement or contract through which Federal assistance is provided, and to such sanctions as are specified by 24 CFR, Section 135.135."

[1] Strike this Section if the Contract Rents on the effective date of this Contract, over the maximum term of this Contract, are $500,000 or less.

c. The Owner agrees that he will be bound by the above Employment of Project Area Residents and Contractors clause with respect to his own employment practices when he participates in federally assisted work.

2.3 COOPERATION IN EQUAL OPPORTUNITY COMPLIANCE REVIEWS. The Owner shall cooperate with the Government in the conducting of compliance reviews and complaint investigations pursuant to all applicable civil rights statutes, Executive Orders, and rules and regulations pursuant thereto.

2.4 FLOOD INSURANCE. If the project is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and if the sale of flood insurance has been made available under the National Flood Insurance Act of 1968, the Owner agrees that the project will be covered, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less.

2.5 CLEAN AIR ACT AND FEDERAL WATER POLLUTION CONTROL ACT.[1] In compliance with regulations issued by the Environmental Protection Agency ("EPA"), 40 CFR, Part 15, 39 F.R. 11099, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 1857, et seq., the Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 11738, the Owner agrees that:

a. Any facility to be utilized in the performance of this Contract or any subcontract shall not be a facility listed on the EPA List of Violating Facilities pursuant to section 15.20 of said regulations;

b. He will promptly notify the Department of Housing and Urban Development field office director of the receipt of any communication from the EPA indicating that a facility to be utilized for the Contract is under consideration to be listed on the EPA List of Violating Facilities;

c. He will comply with all the requirements of section 114 of the Air Act and section 308 of the Water Act relating to inspection, monitoring, entry, reports, and information, as well as all other requirements specified in section 114 and section 308 of the Air Act and the Water Act, respectively, and all regulations and guidelines issued thereunder; and

d. He will include or cause to be included the provisions of this Section in every nonexempt subcontract, and that he will take such action as the Government may direct as a means of enforcing such provisions.

2.6 REPORTS AND ACCESS TO PREMISES AND RECORDS.

a. The Owner shall furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government.

b. The Owner shall permit the Government or any of its duly authorized representatives to have access to the premises and, for the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent to compliance with this Contract, including the verification of information pertinent to the housing assistance payments.

2.7 DEFAULT BY THE OWNER UNDER CONTRACT.

a. A default by the Owner under this Contract shall result if:

(1) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease; or

(2) The Owner has asserted or demonstrated an intention not to perform some or all of his obligations under this Contract or under any Lease.

b. Upon a determination by the Government that a default has occurred, the Government shall notify the Owner of (1) the nature of the default, (2) the actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default, and, where appropriate, abatement of housing assistance payments in whole or in part and recovery of overpayments), and (3) the time within which the Owner shall respond with a showing that he has taken all the actions required of him. If the Owner fails to respond or take action to the satisfaction of the Government, the Government shall have the right to terminate this Contract in whole or in part or to take other corrective action to achieve compliance.

c. The availability of any remedy under this Contract shall not preclude the exercise of any other remedy available under this Contract or under any provisions of law, nor shall any action taken in the exercise of any remedy be deemed a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

2.8 DISPUTES.

a. Except as otherwise provided herein, any dispute concerning a question of fact arising under this Contract which is not disposed of by agreement between the Department of Housing and Urban Development field office and the Owner may be submitted by the Owner to the Secretary of Housing and Urban Development. The decision of the Secretary or duly authorized representative for the resolution of such disputes shall be final and conclusive, unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any proceeding under this Section, the Owner shall be afforded an opportunity to be heard and to offer evidence in support of his position.

b. This Section does not preclude consideration of questions of law in connection with the decision rendered under paragraph a of this Section: Provided, however, that nothing herein shall be construed as making final the decision of any administrative official, representative, or board, on a question of law.

2.9 INTEREST OF MEMBERS, OFFICERS, OR EMPLOYEES OF PHA, MEMBERS OF LOCAL GOVERNING BODY OR OTHER PUBLIC OFFICIALS. No member, officer, or employee of the PHA, no member of the governing body of the locality (city and county) in which the project is situated, no member of the governing body of the locality in which the PHA was activated, and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the project, during his tenure or for one year thereafter, shall have any interest, direct or indirect, in this Contract or in any proceeds or benefits arising therefrom.

2.10 INTEREST OF MEMBER OF OR DELEGATE TO CONGRESS. No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise therefrom.

[1] Strike this Section if the Contract Rents on the effective date of this Contract, over the maximum total term of this Contract, are $100,000 or less.

HUD-52522B (11-75)





PPAS-NYH-00166

2.11 ASSIGNMENT, SALE, OR FORECLOSURE.

a. The Owner agrees that he has not made and will not make any sale, assignment, or conveyance or transfer in any other form, of this Contract or the project or any part thereof or any of his interest therein, without the prior consent of the Government; Provided, however, that in the case of an assignment as security for the purpose of obtaining financing of the project, the Government shall consent in writing if the terms of the financing have been approved by the Government.

b. The Owner agrees to notify the Government promptly of any proposed action covered by paragraph a of this Section. The Owner further agrees to request the written consent of the Government in regard thereto.

c. (1) A transfer by the Owner, in whole or in part, or a transfer by a party having a substantial interest in said Owner, or transfers by more than one party of interests aggregating a substantial interest in said Owner, or any other similarly significant change in the ownership of interests in the Owner, or in the relative distribution thereof, or with respect to the parties in control of the Owner or the degree thereof, by any other method or means (e.g., increased capitalization, merger with another corporation or other entity, corporate or other amendments, issuance of new or additional ownership interests or reclassification of ownership interests or otherwise) shall be deemed an assignment, conveyance, or transfer for purposes of this Section 2.11. An assignment by the Owner to a limited partnership, in which no limited partner has a 25 percent or more interest and of which the Owner is the sole general partner, shall not be considered an assignment, conveyance, or transfer.

(2) The term "substantial interest" means the interest of any general partner, any limited partner having a 25 percent or more interest in the organization, any corporate officer or director, and any stockholder having a 10 percent or more interest in the organization.

(3) The Owner, and the party signing this Contract on behalf of said Owner, represent that they have the authority of all of the parties having ownership interests in the Owner to agree to this provision on their behalf and to bind them with respect thereto.

d. In the event of foreclosure, including foreclosure by the Government, and in the event of assignment or sale agreed to by the Government or made to the Government, housing assistance payments shall continue in accordance with the terms of the Contract.

[If the project is subject to 24 CFR, Section 881.125, paragraph d above shall be stricken and the following shall be used instead:

e. In the event of foreclosure, or assignment or sale to the financing agency in lieu of foreclosure, or in the event of assignment or sale agreed to by the financing agency and approved by the Government (which approval shall not be unreasonably delayed or withheld), housing assistance payments shall continue in accordance with the terms of the Contract.]

HUD-52672B (11-7

VI 36-H110-050

EXHIBIT " D "

The "Owner" agrees that the Affirmative Fair Housing Marketing Plan will be provided by the Department of Housing and Urban Development unless the owner provides such plan as approved by the Department of H.U.D. within the earlier of 60 days or initial closing of the construction loan.

U.S. Department of Housing and Urban Development
New York Regional Office, Region II
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068
2HMA

OCT 0 7 1994

Troy Stevens, Jr.
President
Kinpit Management
599 Broadway, Suite 800
New York, N.Y. 10012

Dear Mr. Stevens:

Subject: Project Name: St. John's Phase I
Project No: NY36-H110-050/012-57113
Approval of Rent Increase
Annual Adjustment Factors (AAF)
April 26, 1994 Federal Register

We have processed an annual rent adjustment for the units covered by the Section 8 contract referenced above. As a result of that adjustment, we are approving and you may implement the new rents shown in columns (d), of the following chart. You may make the new rents effective on/after 7-1-94. If, based on your utility survey we have revised the utility allowances for tenants in your project, the revised allowances will be shown in column (e). You must implement the revised utility allowances for tenants no later than 75 days after the date of this letter.

| (a) Unit Type | | (b) Current Section 8 Contract Rents | (c) AAF From Register Dated 4-26-94 | | (d) New Section 8 Contract Rents | | (e) Revised Utility Allowances |
|---|---|---|---|---|---|---|---|
| 0 | 14 | 787 | 1.032 | 14 X | 812 | 11368 | 30 |
| 1 | 82 | 921 | 1.032 | 82 X | 950 | 77900 | 34 |
| 2 | 78+1 | 1048 | 1.032 | 78 | 1082 | 84396 | 40 |
| 3 | 17 | 1218 | 1.032 | 17 | 1257 | 21369 | 47 |
| | 192 | | | | | | |

195,033 gross monthly
X 12
2,340,396 gross yearly potential

* Please note that for future requests for rent increases, owners must analyze all utility rates and recommend what utility allowances should be for the upcoming year. (Handbook 4350.3, Chapter 5, Para. 5-10 b.)

EXHIBIT
73

The revised Section 8 regulations require you to increase your monthly deposit to the replacement reserve account beginning ~~7-1-94~~ ________________.

The Loan Management Branch will revise your monthly deposit and will notify your mortgagee by form HUD-9250 of the approved change.

| New Monthly Contract Rent Potential / Old Monthly Contract Rent Potential | X | Current Monthly Deposit to the Replacement Reserve | = | New Monthly Deposit to the Replacement Reserve |
|---|---|---|---|---|
| 1.032 | X | $ 3528.47 | = | $ 3641.38 |

Rent increase claims must be separated from the regular assistance payments. Use the <u>first page</u> of the voucher form 52670A Part I to write out the calculations, and enter the totals at the bottom of the page as an adjustment. Bring forward the full amount of the rent increase claim to the face of the form 52670. Strike out Line 4, 1983 HURRA Rent Refunds or Credits* and type in *Rent Increase (AAF).

Any approved increase must be claimed by following the steps below:

-Begin by labeling the first page of the voucher form 52670A part I *Rent Increase as Approved by letter dated (<u>enter date of approved letter</u>).*

-State the effective date of the increase (as noted on page 1 of this letter).

-State the date of the Annual Adjustment Factor.

-State the Unit Type.

-State your present rents and the adjusted rents.

Use the second and remaining pages of the 52670A Part I to show the increase in your regular tenant assistance payments for the month. Enter code "GR" in column (13) for each tenant, and increase your prior month's HAP by the amount of the approved increase for each unit.

Any other adjustments to Housing Assistance Payments must follow your listing of regular tenant assistance payments on the 52670A Part I and must be clearly explained as noted in Handbook 4350.3 CHG-1, Appendix 29, Step II.

If you are claiming a retroactive increase and you claimed vacancies during that retroactive period, you are not entitled to a full rent increase for the vacancy period. You may only claim 80% of the contract rent for those units for the month in which you claim a retroactive increase.

For projects whose HAP anniversary date is effective the first of the month, the full Housing Assistance Payment increase may be claimed retroactively beginning with that month, unless your rent increase request was late. In that case, the effective date of your increase may not be the anniversary date. (See effective date, page 1 of this letter).

For projects whose HAP anniversary date is effective other than the first of the month, the Housing Assistance Payment increase must be prorated for that month. If your rent increase request was late the effective date of your increase may not be ... effective date, page 1 of this letter)