IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PARK PROPERTIES ASSOCIATES, L.P., et al.<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 1:04-cv-01757-FMA<br>Judge Allegra |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**

Pursuant to Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"), the Plaintiffs, Park Properties Associates, L.P., Valentine Properties Associates, L.P., and St. John's Associates, L.P. (jointly, the "Plaintiffs") respectfully move this Court for an order granting summary judgment on their claim that, consistent with the Court's holding in *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003), the U.S. Department of Housing and Urban Development ("HUD") breached its contractual obligations to the Plaintiffs by failing to make automatic annual rent adjustments due pursuant to the Plaintiffs' respective Housing Assistance Payments Contracts with HUD. In support of their motion, the

Plaintiffs summit herewith a Memorandum of Points and Authorities, a Statement of Uncontroverted Facts, and a proposed order.

Dated: July 29, 2005

Respectfully submitted,

/s/ Harry J. Kelly
Harry J. Kelly, Esq.
NIXON PEABODY LLP
401 Ninth Street, N.W., Suite 900
Washington, D.C. 20004
(202) 585-8000

Counsel for the Plaintiffs

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **PARK PROPERTIES ASSOCIATES, L.P., et al.** | |
| **Plaintiffs,** | |
| **v.** | **No. 1:04-cv-01757-FMA** |
| **THE UNITED STATES OF AMERICA,** | **Judge Allegra** |
| **Defendant.** | |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

Dated: July 29, 2005

Harry J. Kelly, Esq.
NIXON PEABODY LLP
401 Ninth Street, N.W., Suite 900
Washington, D.C. 20004
(202) 585-8000

Counsel for the Plaintiffs

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iv

I. STATEMENT OF THE ISSUE ........ 1

II. INTRODUCTION ........ 1

III. STATEMENT OF THE CASE ........ 2

A. Factual Background. ........ 2

1. The Section 8 Rent Adjustment Mechanism ........ 2

2. 1987 and 1989 Modifications of the Section 8 Rent Adjustment Method ........ 4

3. 1994 Changes to the Section 8 Rent Adjustment Mechanism. ........ 5

a. Comparability Requirement of Notice 95-12. ........ 6

b. 60-Day Requirement. ........ 7

4. Rent Adjustment Experience of the Plaintiffs ........ 8

IV. ARGUMENT ........ 11

A. The Court Should Grant Summary Judgment Where There is No Material Factual Dispute. ........ 11

B. The 1994 Amendments and Notice 95-12 Breached the Rent Adjustment Provisions of the Plaintiffs' HAP Contracts. ........ 11

1. The language of the HAP Contracts shows that the duty to perform burden of conducting comparability studies belongs solely to HUD. ........ 11

2. The statutory history of the Section 8 program underscores that the burden of performing comparability studies is on HUD. ........ 15

C. The "Unmistakability Doctrine" Is Not Applicable Here. ........ 17

1. The unmistakability doctrine does not excuse the government from liability for breach of contract. ........ 17

a. The early development of the unmistakability doctrine. ........ 17

2. The unmistakability doctrine does not shield the Government's breach of contract here. .......... 23

D. The Plaintiffs Are Entitled To Summary Judgment Here .......... 24

V. CONCLUSION .......... 26

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) .......... 6

*Arizona v. United States*, 575 F.2d 855 (Ct. Cl. 1978) .......... 6, 7

*Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 91 L. Ed. 2d 35, 106 S. Ct. 2390 (1986) .......... 14

*Charles River Bridge v. Warren Bridge*, 36 U.S. (11 Pet.) 420, 9 L. Ed. 773 (1837) .......... 12

*Cisneros v. Alpine Ridge Group, 508 U.S. 10, 1243 L. Ed. 2d 572, 113 S. Ct. 1898 (1993)* .......... 7, 8

*Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003) .......... passim

*Cuyahoga Metropolitan Housing Authority v. United States*, 65 Fed. Cl. 534, 2005 U.S. Claims LEXIS 152 (June 2, 2005) .......... 10, 14

*Deming v. United States*, 1 Ct. Cl. 190 (1865) .......... 12

*Gould v. United States*, 935 F.2d 1271 (Fed.Cir. 1991) .......... 6

*Jones v. United States*, 1 Ct. Cl. 383 (1865) .......... 12

*Los Angeles v. Los Angeles Gas & Electric Co.*, 251 U.S. 32, 64 L. Ed. 121, 40 S. Ct. 76 (1919) .......... 13

*Lynch v. United States*, 292 U.S. 571, 78 L. Ed. 1434, 54 S. Ct. 840 (1934) .......... 13

*National Leased Housing Ass'n v. United States*, 22 Cl. Ct. 649 (1991), *aff'd*, 105 F.3d 1423 (Fed. Cir. 1997) .......... 8, 9

*National Leased Housing Ass'n v. United States*, 105 F.3d 1423 (Fed. Cir. 1997) .......... 2

*Park Village Apts. v. United States*, 32 Fed. Cl. 441 (1994), *aff'd (per curiam)*, 152 F.3d 943 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 962 (1998) .......... 8

*Perry v. United States*, 294 U.S. 330, 79 L. Ed. 912, 55 S. Ct. 432 (1935) .......... 13, 14

*Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 7 L. Ed. 939 (1830) ............................12

*United States v. Winstar Corp.*, 518 U.S. 839, 135 L. Ed. 2d 964, 116 S. Ct. 2432 (1996) ............................15, 18, 19

## STATUTES

UNITED STATES CODE

42 U.S.C. §1437(c)(2) ............................4

42 U.S.C. §1437f ............................1, 4, 10, 11

42 U.S.C. §1437f(c)(1) ............................2

24 C.F.R. §888.301 et seq ............................4

PUBLIC LAWS

Housing and Community Development Act of 1987, Pub. L. No. 100-242, §142(c)(2), 101 Stat. 1850 (1988) ............................4

Reform Act, §801(c), Pub. L. No. 101-235, 103 Stat. 1987 (1989) ............................4

Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) ............................ passim

## U.S. CONSTITUTION

*Contracts Clause*, U.S. Const., art. I, §10 ............................13

## I. STATEMENT OF THE ISSUE

Whether, pursuant to legislative enactment in 1994, and the ensuing issuance of Notice 95-12, the U.S. Department of Housing and Urban Development breached its Housing Assistance Payments Contracts with the Plaintiffs in this case when, having failed to perform and deliver rent comparability studies to the Plaintiffs on a timely basis, HUD failed to make certain rent adjustments on the basis of the applicable Automatic Annual Adjustment Factors, as provided in the subject contracts.

## II. INTRODUCTION

This case presents legal issues that are substantially similar to those raised in *Cuyahoga Metropolitan Housing Authority v. United States*, Nos. 01-46C, 01-251C, and 01-416C, and addressed in the Court's opinion in that case at 57 Fed. Cl. 751 (2003)("*Cuyahoga I*"). Like the plaintiff in that case, the plaintiffs here, Park Properties Associates L.P. ("Park"), Valentine Properties Associates, L.P. ("Valentine") and St. John's Phase I Associates L.P. ("St. John's") (jointly, Park, Valentine and St. John's are referred to at the "Plaintiffs") are parties to Section 8 Housing Assistance Payments Contracts ("HAP Contracts") with the U.S. Department of Housing and Urban Development ("HUD"), a department of the defendant United States.[1] Also like the plaintiff in the *Cuyahoga* litigation, they were denied automatic annual rent adjustments that they were entitled to pursuant to those HAP Contracts. The Plaintiffs here seek summary judgment on their claim that, by failing to make automatic annual rent adjustments due pursuant to their HAP Contract, the defendant has breached its obligations under those contracts.

---

1 The HAP Contracts of each of the Plaintiffs' HAP Contracts are found as Exhibits 1, 2 and 3 to this Motion.

## III. STATEMENT OF THE CASE

A. Factual Background.

1. *The Section 8 Rent Adjustment Mechanism.* The Plaintiffs are owners of multifamily housing properties that participate in the Section 8 rental subsidy program. *See* 42 U.S.C. §1437f. Although aspects of the program have changed since it became law in 1974, the basic concept of the Section 8 program has remained unchanged: it provides a subsidy to lower income families to make rental housing more affordable. Tenants pay a portion of their income as rents and the government pays the balance, either through vouchers provided to the tenants or through payments made to the owners by the government. *See Cuyahoga I*, 57 Fed. Cl. at 753; *National Leased Housing Ass'n v. United States*, 105 F.3d 1423, 1425 (Fed. Cir. 1997). Although many owners entered into HAP Contracts with local public housing authorities, the Plaintiffs, like the plaintiff in *Cuyahoga*, entered into their respective HAP Contracts with HUD. At the time they entered into the original HAP contracts, a "contract rent" was established. In most Section 8 HAP Contracts, the original contract rents were somewhat higher than market rate rent in the local market, reflecting the additional costs associated with construction and operation of Section 8 properties. *Id.* The difference between the original Section 8 contract rent and the prevailing comparable rents was sometimes referred to as the "Initial Difference."

Each of the Plaintiffs' Section 8 contracts contained provisions requiring HUD to make annual rent adjustments, pursuant to "automatic annual adjustments factors" ("AAAFs") published each year by HUD. 42 U.S.C. §1437f(c)(1); *Cuyahoga I* at 753 – 754. The respective HAP Contracts of each of the Plaintiffs contain identical provisions directing HUD to make automatic annual adjustments:

b. Automatic Annual Adjustments.

> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually . . . .
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

HAP Contracts, § 1.8b (Exhibits 1, 2 and 3).

As § 1.8b explains, rents could be raised, lowered or maintained with each AAAF adjustment, although rents were never to be reduced below the level of the original contract rents. There was a separate "overall limitation" to these rent adjustments, however, which provided that

> Notwithstanding any other provision of this Contact, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rent.

HAP Contracts at §1.8d.[2] The overall limitation thus served to assure that Section 8 rents never exceeded the amount of comparable unassisted rents, except to the extent of the "initial difference" between the original contract rents and comparable unassisted rents. *National Leased Housing Ass'n*, 105 F.3d at 1435.

With the passage of time, the "overall limitation" became a source of concern for HUD. As this Court observed in *Cuyahoga I*, "[i]n the early 1980s, HUD became increasingly

---

[2] This Court has determined that a "material difference" is a difference greater than twenty percent (20%). Acacia Villa v. United States, 36 Fed. Cl. 277, 279 (1996) (citing park Village Apts. v. United States, 32 Fed. Cl. 441, 448 (1994). In other words, the Contract Rent as adjusted cannot exceed the current "fair market rent" for comparable units in the area by more than twenty percent.

concerned that application of the AAAFs was yielding rents well above those for comparable unassisted units." *Cuyahoga I* at 754. As a result, HUD began to experiment with techniques to determine whether in fact the annual Section 8 rental adjustment process yielded rents that were not in excess of the comparable unassisted rents, plus the "initial difference." To address this problem, HUD "began to undertake . . . 'comparability studies' as a means of determining the rents it believed were being charged in comparable unassisted units." *Cuyahoga I* at 754. In these comparability studies, HUD would select a number of comparable projects in the local area of a Section 8 project and

> "conduct appraisals to see whether the rents at those projects were materially different from the *Section 8* project rents. If they were, the rents determined through the comparability studies would serve as a "cap" of the rental increase produced by the more general AAAFs."

*Id.* (italics original).

2. *1987 and 1989 Modifications of the Section 8 Rent Adjustment Method.* HUD's mechanism for performing comparability analyses became a source of controversy with owners and led to further legislative and judicial action. In 1987, Congress amended the Section 8 statute, adding language that imposed limitations on the manner and timing in which HUD conducted its Section 8 comparability studies:

> If the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied.

Housing and Community Development Act of 1987, Pub. L. No. 100-242, §142(c)(2)(B), 101 Stat. 1850 (1988), *codified at* 42 U.S.C. §1437(c)(2)(C).

In 1989, Congress adopted additional legislation that provided additional payments to Section 8 owners and also required HUD to publish "regulations for conducting comparability

studies for projects where [HUD] has reasons to believe that the application of the formula adjustments . . . would result in such material differences." Reform Act, §801(c), Pub. L. No. 101-235, 103 Stat. 1987, 2058, *codified at* 42 U.S.C. §1437f(c)(2)(C). Those studies would be used to "establish a 'modified annual adjustment factor' for a geographically smaller area." *Cuyahoga I* at 756. HUD promulgated regulations to explain how comparability studies would be used to calculate the modified adjustment factors and, where those factors failed to yield results that eliminated the differences between comparable assisted and unassisted units, to provide a system for adjusting rents using comparability studies. *See* 24 CFR §888.301 *et seq.*; *Cuyahoga I* at 756.

3. *1994 Changes to the Section 8 Rent Adjustment Mechanism.*

In 1994, Congress again amended the Section 8 rent adjustment mechanism, this time by adding language that

> [W]here the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, [HUD] shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type and age in the same market area, as determined by the Secretary. The immediately foregoing sentence shall be effective only during fiscal year 1995.

Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994)(the "1994 Amendments"). As this Court noted, this provision was subsequently extended to subsequent fiscal years. *Cuyahoga I* at 757.

HUD implemented the 1994 Amendments by adopting Notice 95-12. In HUD Notice 95-12 and its successors ("Notice 95-12"), HUD construed the 1995 Amendment to require the

submission of a comparability study if the unadjusted Contract Rent is more than HUD's published fair market rent for the area. In Notice 95-12, HUD limited any such adjustment to the lesser of (a) the comparable rent determined by the study plus the Initial Difference or (b) the AAAF adjusted rent, but in no event may rent be lower than the current Contract Rent. A true and accurate copy of Notice 95-12 is attached as Exhibit 7.

Finally, even though the new statutory language did not set forth any time limits, Notice 95-12 directed that the required additional information be submitted by HAP Contract owners 60 days before the HAP Contract anniversary date in order to receive an increase for the entire ensuing contract year. Notice 95-12 precluded any increase in Contract Rent if the project owner fails to submit the required information within the contract year.

a. *Comparability Requirement of Notice 95-12.*

Notice 95-12 required that the owner submit a rent comparability study be conducted by a state certified, general appraiser, setting forth at least three examples of unassisted housing in the same market area of similar age, type and quality. Once a comparable rent was determined, the Initial Difference, is added to the comparable rent.[3] This determined the maximum permissible rent level allowed for each unit, otherwise known as the "adjusted comparable rent." If the adjusted comparable rent was less than the contract rent as adjusted by applying the appropriate annual adjustment factor, the adjusted comparable rent would be the new contract rent. If the adjusted comparable rent was greater than the contract rent as adjusted by applying the annual adjustment factor, then the contract rent as adjusted by the annual adjustment factor became the

---

[3] The owner was required by Notice 95-12 to submit evidence of the Initial Difference which existed in the initial contract rents. This too represented a shift in long-standing burdens, since presumably the amount of the Initial Difference was determined by HUD, when it set the original contract rent.

new effective rent. However, in the event that the adjusted comparable rent was lower than the current rent without adjustment, the current rent remained the appropriate rent for that year.

For contracts where the current contract rents did not exceed current published fair market rents, HUD applied the applicable annual adjustment factor for each unit, taking into consideration different annual adjustment factors for units in which turnover of tenants occurred than for units in which no turnover occurred. The rents for turnover and nonturnover units as adjusted were then averaged, resulting in the new contract rent.

b. *60-Day Requirement.*

Notice 95-12 also required that all requests for rent increases be made at least 60 days prior to the effective date of the increase. Accordingly, an owner had to apply at least 60 days prior to the HAP Contract anniversary date in order to receive the rent increases for the full year. If a project owner does not submit the required information at least 60 days prior to the contract anniversary date, the new rent levels (if warranted under the comparability formula) would not go into effect until 60 days after receipt of the information. However, if the project owner failed to submit the required information as of the contract anniversary date in the following year, the project owner was barred from receiving any increase for that year.

The HAP Contracts did not condition the right to receive automatic annual rent adjustments upon submission of additional information to HUD within a 60-day period of time, nor was there language in the HAP Contracts which allows HUD to deny automatic annual adjustments if the additional information required under Notice 95-12 is not submitted within the contract year. In fact, the HAP Contracts required automatic annual rent adjustments to the Contract Rent by HUD based on the HUD published annual adjustment factors. They did not

require the owner to submit additional information to be eligible for the rent increases, and do not place a limit on the time in which a rent increase can be received. By the express terms of the HAP Contracts and 42 U.S.C. §1437f(c)(2)(A) and (C), the rent increases were to be automatic and annual.

Moreover, nothing in the 1994 Amendments authorized HUD to impose a 60-day restriction on the right to receive the required automatic annual rent increase, nor is there language in the 1994 Amendments which would allow HUD to deny a rent increase based on the expiration of the contract year. In short, the provisions of Notice 95-12 imposed even greater, unlawful restrictions on an owner's right to receive annual rent adjustments than did the 1995 Amendment.

4. *Rent Adjustment Experience of the Plaintiffs*. On September 27, 1978, Park Properties entered into a HAP Contract with HUD for LaMartine (the "LaMartine HAP Contract"), which was designated with HUD project number NY 36-0010-003. *See* LaMartine HAP Contract (Exhibit 1). On the same day, Valentine entered into a HAP Contract with HUD for Lane Hill (the "Lane Hill HAP Contract"), which was designated with HUD project number NY 36-0003-011. *See* Lane Hill HAP Contract (Exhibit 2). On September 29, 1980, St. John's entered into a HAP Contract with HUD for St. John's Phase I (the "St. John's HAP Contract"), which was designated with HUD project number NY 36-H110-050 *See* St. John's HAP Contract (Exhibit 3).

The initial contract rents ("Initial Contract Rents") for each property are set forth below:

| Property | Bedrooms per Unit | Initial Contract Rent | Initial Difference |
|---|---|---|---|
| LaMartine | 0 | $415 | $ |
| | 1 | $490 | $ |
| | 2 | $561 | $ |
| Lane Hill | 0 | $420 | $ |
| | 1 | $510 | $ |
| | 2 | $615 | $ |
| St. John's Phase I | 0 | $496 | $ |
| | 1 | $598 | $ |
| | 2 | $713 | $ |
| | 3 | $830 | $ |

Plaintiff's Statement of Uncontroverted Facts ("Statement"), ¶¶ 4-6.

Between the inception of the HAP Contracts and 1994, the Contract Rents for each property were increased pursuant to the provisions of Section 1.8(b). The 1994 rent for each property was as follows:

| Property | Bedrooms per Unit | 1994 Contract Rent |
|---|---|---|
| LaMartine | 0 | $ 872 |
| | 1 | $ 959 |
| | 2 | $1,053 |
| Lane Hill | 0 | $ 880 |
| | 1 | $ 994 |
| | 2 | $1,138 |
| St. John's Phase I | 0 | $ 812 |
| | 1 | $ 950 |
| | 2 | $1,082 |
| | 3 | $1,257 |

*Id.* Beginning in 1995, HUD ceased making the automatic rent adjustments with respect to the subject properties, notwithstanding the fact that, based upon the provisions of the HAP Contract cited above, the Plaintiffs were entitled to receive automatic Contract Rent adjustments. Park Properties did not request or receive the rent adjustments to which it was entitled for the period

from 1995 to 2000; Valentine did not request or receive rent adjustments for the period from 1996 to 2000. Both Park Properties and Valentine requested and were granted rent adjustments for subsequent years. St. John's requested rent adjustments in each year from 1995 to 2000, but was provided with such an adjustment in 1996 only. St. John's was eligible for increases in each of those years, and for the years 2001 and 2002, which it did not receive.

During the relevant time period, HUD continued to set and publish Automatic Annual Adjustment Factors. The following table shows the applicable AAAF for the relevant years:

| | La Martine/Lane Hill | | St. John's | |
|---|---|---|---|---|
| Year | Turnover Units | Non-Turnover Units | Turnover Units | Non-Turnover Units |
| 1995 | 1.026 | 1.016 | 1.026 | 1.016 |
| 1996 | 1.024 | 1.014 | 1.024 | 1.014 |
| 1997 | 1.026 | 1.016 | 1.026 | 1.016 |
| 1998 | 1.029 | 1.019 | 1.029 | 1.019 |
| 1999 | 1.034 | 1.024 | 1.034 | 1.024 |
| 2000 | 1.033 | 1.023 | 1.032 | 1.022 |
| 2001 | 1.031 | 1.021 | 1.031 | 1.021 |
| 2002 | 1.046 | 1.036 | 1.046 | 1.036 |
| 2003 | 1.039 | 1.030 | 1.039 | 1.030 |
| 2004 | 1.041 | 1.031 | 1.041 | 1.031 |

See Federal Register 60 FR 12594; 60 FR 55934; 61 FR 66132; 63 FR 11956; 63 FR 51224; 64 FR 51860; 65 FR 66888; 66 FR 59052; 68 FR 3116; 68 FR 54270.[4]

---

4 The 1994 Amendments also added a provision that imposed a one-percent reduction in the AAAFs, "for any unit occupied by the same family at the time of the last annual rental adjustment." 42 U.S.C. § 1437f(c)(2)(A). Like the plaintiff in *Cuyahoga*, the Plaintiffs here contend that the application of the one-percent deduction violates their contracts with HUD. While, as this Court has noted, HUD may possess the right to calculate the AAAFs, the legislative one-percent deduction is not consistent with the HAP Contracts' rent adjustment provisions. *Cuyahoga Metropolitan Housing Authority v. United States*, 65 Fed. Cl. 534, ___, 2005 U.S. Claims LEXIS 152, *20 (June 2, 2005). As the Federal Circuit has explained, the AAAFs were intended to operate as an inflation adjustment factor and "are set by HUD based upon certain broad economic indices, the Consumer Price Index and the Bureau of the Census American Housing Surveys." *National Leased Housing Ass'n*, 105 F.3d. at 1426. Costs associated with unit turnover have nothing to do with such inflation-related issues and are not based on "broad economic indices" – eventually, all units turn over. Moreover, units face most of the same operating costs regardless of turnover, so any distinction drawn between them is highly arbitrary and debatable. If anything, one percent should be ***added*** to the AAAFs for turnover units, insofar as

*(Footnote continued on next page)*

HUD did not, however, perform or deliver any comparability studies relative to the Plaintiffs' properties during the relevant years, nor did it pay automatic annual adjustments due to the Plantiffs. Statement, ¶¶ 8-13.

## IV. ARGUMENT

### A. The Court Should Grant Summary Judgment Where There is No Material Factual Dispute.

Pursuant to RCFC 56, "[s]ummary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Cuyahoga I* at 758, *citing Hunt v. Cromartie*, 526 U.S. 541, 549, 143 L.Ed. 2d 731, 110 S.Ct. 1545 (1999) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986). As the following discussion explains, the Plaintiffs are entitled to summary judgment here because there is no genuine issue of material fact that the government has breached their Section 8 HAP Contracts' rent adjustment provisions.

### B. The 1994 Amendments and Notice 95-12 Breached the Rent Adjustment Provisions of the Plaintiffs' HAP Contracts.

#### 1. The language of the HAP Contracts shows that the duty to perform burden of conducting comparability studies belongs solely to HUD.

In *Cuyahoga I*, this Court determined that the 1994 Amendments and Notice 95-12 breached the very rent adjustment provisions that are the subject of this litigation. As this Court explained, the first step in determining whether, in fact, a breach of the Plaintiffs' HAP Contracts occurred, is to determine what the Plaintiffs' rights were under those contracts. *Cuyahoga I* at

---

*(Footnote continued from previous page)*
those units may face ***additional*** costs at the time they are prepared for a new tenant. Thus, like the 1994 Amendments' decision to require owners to conduct comparability studies, the one-percent deduction was a blatant attempt by Congress to save money by rewriting the Government's contractual obligations under the HAP Contracts.

759, *citing San Carlos Irrigation and Drainage District v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). In determining the rights provided in a contract, a court seeks to "'effectuate its spirit and purpose', and "'begins with the plain meaning of the agreement'." *Id., quoting Gould v. United States,* 935 F.2d 1271, 1274 (Fed.Cir. 1991). The court should seek to give a reasonable meaning to all parts of the contract, rather than one that leaves portions "'useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird or whimsical result.'" *Id.*, *quoting Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978).

In examining the HAP Contracts, whose relevant provisions are virtually identical to those in the contracts in this case, this Court held that they required the government to make automatic annual rent adjustments:

> The HAP Contracts at issue indicate that "Automatic Annual Adjustment Factors will be determined by the Government at least annually" and that "on each anniversary date of the Contract, the Contract Rents ***shall be adjusted*** by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." The "automatic" references in these provisions, as well as the annual periodicity established therein, ***plainly reveal an intent that the adjustments would occur without [owners] having to take any significant action.***

*Id* at 759 (emphases added). The Court recognized that the "overall limitation" provision qualifies the automatic aspect of these adjustments. *Id.* Nevertheless, while the overall limitation provision "does not identify whether [HUD] or the project owners must bear the burden of showing, respectfully, that there is or is not a material difference," the Court reasoned that the burden of making that determination belonged solely to HUD:

> Logic . . . suggests that for the adjustment in the first part of the contract to be truly "automatic," the burden of demonstrating a material difference must lie on HUD.

*Id.* In other words, the language of the contract placed the burden on HUD to make the rent adjustments and, when necessary, to perform comparability analyses to satisfy the overall limitation.

In reaching this conclusion, the Court examined a number of earlier decisions from other courts that were called upon to examine the obligations of the parties in HAP Contracts. For example, in Cisneros v. *Alpine Ridge Group,* 508 U.S. 10, 19 – 20. 123 :/ Ed/ 2d 572. 113 S. Ct. 1898 (1993), the Supreme Court observed that ***"[i]t is only those presumably exceptional cases*** where the Secretary has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue." (emphasis added.) The Supreme Court's conclusion that comparability studies would be performed only in "exceptional cases" and that the AAAFs remain the "presumptive" mechanism for annual adjustments, led this Court to reject the government's conclusion that the HAP Contracts "can be construed to require property owners to provide comparability studies as a precondition to receiving an 'automatic adjustment.'"[5] *Cuyahoga I* at 760.

Looking at other decisions that interpreted the role of HUD in making rent adjustments, this Court explained that "***critical statutory language here places on HUD, and only on HUD, the burden of coming forward to show that a particular adjustment would violate the limitation.***" *Id.* (emphasis added), *citing Acacia Villa v. United States*, 36 Fed. Cl. 277, 280 – 281 (1996); *Park Village Apts. v. United States*, 32 Fed. Cl 441, 453 (1994), *aff'd (per curiam),* 152 F.3d 943 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 962 (1998); *National Leased Housing*

5 In the government's opening brief in the *Alpine Ridge* case, which argued that the rent adjustment provisions of the HAP Contracts "***necessarily envisions that HUD will conduct a survey of some kind in order to determine the prevailing rent level in the unassisted market.***" *Id.* at 760, Brief for Petitioner (No. 92-551) at 19 (emphasis added); *Cuyahoga I* at 760, n.13.

*Ass'n v. United States*, 22 Cl. Ct. 649, 656 – 60 (1991), *aff'd*, 105 F.3d 1423 (Fed. Cir. 1997). Indeed, the fact that owners repeatedly went to court to challenge HUD's role in making rent adjustments only served to underscore that the government's contention in those cases "that HUD ***may*** use such comparability studies to limit the automatic adjustments" had metamorphosed into a claim "that the property owners ***must*** use such studies to qualify for them." *Id* (emphases original). As this Court explained, "this conceptualization stretches the language of the contracts and the underlying statute well past its breaking point." *Id.*[6]

The HAP Contracts here contain rent adjustment provisions identical to those discussed in *Cuyahoga I*. In all these cases, the language of the contracts imposed the same burden: to make automatic annual rent adjustments unless HUD took prior steps to intervene by performing comparability studies here. By attempting to shift that burden onto the Section 8 owners, including the Plaintiffs here, the 1994 Amendments and Notice 95-12 breached the terms of the Plaintiffs' HAP Contracts.[7]

---

6 In *Cuyahoga I*, the Court pointed out that while it found nothing ambiguous in the HAP Contracts with respect to the rent adjustment mechanism, if there were any ambiguity, "the doctrine of *contra preferentum* would dictate that any ambiguity in that language be interpreted against the drafter, here, HUD." *Id.* at 760, n. 14. Applying that doctrine, the Court said, would lead to the same interpretation that only HUD had the burden of performing a comparability study to show that an automatic annual adjustment was not appropriate. *Id.*

7 As this Court's decision in *Cuyahoga II* indicates in discussing the rent adjustment process, the question of what in fact constitutes a "material difference" between the Section 8 assisted rents and comparable unassisted rents is related to damages, rather than liability. *Cuyahoga II* at *46 *et seq.* As the Court's decision there indicates, however, HUD has adopted a number of inconsistent definitions of a "material difference" over the life of the Section 8 program. *Id.* Indeed, it is mathematically conceivable that in some circumstances, the material difference between adjusted rents and comparable rents would be zero. *Id.* at *52 – 53. In any event, the application of the "material difference" provision is a highly fact-related inquiry that should be reserved until the damages phase of this case. *Id.* at *63.

2. The statutory history of the Section 8 program underscores that the burden of performing comparability studies is on HUD.

The Section 8 program is a product of specific legislation which, as the Court noted in *Cuyahoga I,* must be considered when construing the terms of the underlying contracts. *Id.* at 761. Analysis of the legislative history of the rent adjustment mechanism only served to reaffirm the Court's conclusion that the burden of performing rent comparability studies is on HUD in this case. The history of the Section 8 program demonstrates that from its inception until 1994, Congress and HUD stressed the importance of performing comparability studies and placed both the decision to undertake those studies, and the task of performing them, squarely in HUD's hands.

At the outset of the program, the Section 8 statute provided that the HAP Contracts "'shall provide for adjustment annually or more frequently,'" subject to the proviso that such adjustment " shall not result in material difference between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.'" *Id, quoting* 42 U.S.C. §1437f(c)(2)(A), (C) (Supp. V. 1975). Based on this language, HUD issued regulations authorizing it use rent comparability studies to "preclude adjustments that would otherwise result in rents materially in excess of rents at comparable unassisted projects." *Cuyahoga I* at 761.

The 1987 legislation (*see* pp. 4-5, above) ratified HUD's power to perform rent comparability studies, but added the condition that if HUD did not perform a comparability study and submit it to the owner within 60 days of the HAP Contract's anniversary date, the full AAAF would apply. *Id, citing* 42 U.S.C. §1437f(c)(2)(C) (1988). In 1989, when it adopted the Reform Act, Congress changed some aspect of the comparability study program, but endorsed the use of comparability studies and retained the requirement that HUD submit comparability studies

within 60 days of the anniversary date, " thus adhering to the view that HUD's failure to perform a comparability study would lead to an automatic adjustment." *Cuyahoga I* at 761, *citing* 42 U.S.C. §1437f(c)(2)(C) (Supp. II 1990). Thus, if HUD failed to perform a comparability study and to submit it to the owner within 60 days of the contract anniversary date, HUD was compelled to grant the AAAF-based rent adjustment.

This mechanism – requiring HUD to grant the automatic rent adjustment unless it performed a timely comparability study – remained in place from the creation of the Section 8 program until the enactment of the 1994 Amendments. Essentially, in its legislative action in 1987 and 1989, Congress confirmed HUD's position from the start: that the initial Section 8 law conferred upon HUD the power to perform comparability studies to limit annual rent adjustments. While these laws made adjustments to the way in which HUD conducted those studies, both the 1984 Act and the Reform Act endorsed the view adopted by HUD that it was authorized, under the original Section 8 law, to perform such studies, "thereby confirming that HUD's view of the statute was Congress' from the start." *Id* at 762, *citing Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 , 92 L.Ed 2d 675, 106 S.Ct. 3245 (1986). At a minimum, the 1994 Amendments marked an abrupt departure from the entire approach to rent adjustments that had previously characterized the Section 8 program. In comparing Congress' approach in the 1994 Amendments to its prior undertakings, this Court explained,

> there is not the slightest hint in the legislative history that Congress believed that eh 1994 amendment confirmed a preexisting right. Per contra. Every indication is that Congress knew it was fundamentally altering the process for determining adjustments in preexisting contracts and was doing so to reduce outlays.

*Id.* The legislative history of the 1994 Amendments are thus clear evidence that Congress knew it was abruptly departing from mechanism that was built into the Section 8 program – and the HAP Contracts at issue here – from the start. Moreover, it did so clearly to save money.

Based on its analysis of the contractual language and the legislative history of the Section 8 rent adjustment mechanism, the Court in *Cuyahoga I* concluded that "the HAP contracts expressly require HUD to provide [an owner] with annual adjustments barring the agency's invocation of the overall limitation," that "the passage of the 1994 amendments was a repudiation of this contract provision that seemingly caused a failure to perform a contractual duty when it was due, at that point ripening into an apparent breach of contract," and that "that *prima facie* breach was then exacerbated" by Notice 95-12, "which imposed additional requirements not envisioned in either the HAP contracts or the prior legislation." *Id* at 762. The same breach occurred here: HUD did not perform the required rent comparability studies, did not deliver them to the Plaintiffs in a timely manner, and did not make the AAAF-based rent adjustments that were otherwise required, as this Court held in *Cuyahoga I.*

C. The "Unmistakability Doctrine" <u>Is Not Applicable Here.</u>

Before reaching the conclusion that a breach had actually occurred, however, the Court addressed the whether Congress had reserved to itself the power to adopt the 1994 Amendments pursuant to the "unmistakability doctrine." *Id. Cuyahoga I's* detailed analysis demonstrates that the unmistakability doctrine does not apply here and that, as a result, a breach occurred.

1. The unmistakability doctrine does not excuse the government from liability for breach of contract.

a. The early development of the unmistakability doctrine.

The unmistakability doctrine begins with a simple concept – that as a sovereign power, the United States reserves the right to amend its laws. Conflicts can arise when, the United States seeks to exercise its sovereign power to change the terms of its contractual relations and shift the costs of operating a federal program onto private parties. As a general matter, "when

the United States enters into contract relations, its rights and duties therein are generally governed by the law applicable to contracts between private individuals." *Cuyahoga I* at 763, *quoting Lynch v. United States*, 292 U.S. 571, 579, 78 L.Ed. 1434, 54 S.Ct. 840 (1934). Nevertheless, the government retains its sovereign power, which, courts explain, "governs all contracts subject to the sovereign jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Cuyahoga I* at 763, *quoting United States v. Winstar Corp.*, 518 U.S. 839, 872, 135 L.Ed. 2d 964, 116 S.Ct. 2432 (1996) (internal quotes omitted).

While this so-called "unmistakability" doctrine may be inherent in any sovereign governmental body, it can wreak havoc with contractual relations between the Federal government and private parties like the Plaintiffs. If, in fact, the government is free to rewrite the terms of its contractual obligations, the concept of a contract obliging the government to any sort of performance becomes illusory. Few private parties would be willing to enter into contracts if they believe that the government is free to change those terms at its option as a sovereign power.

The Court directly addressed this problem in *Cuyahoga I* by reviewing the multiple and often murky opinions rendered by courts concerning the unmistakability doctrine since its emergence from doctrines of Federal constitutional law in the 19th century. The Court traced the development of the unmistakability doctrine back to early cases of the Court of Claims, such as *Deming v. United States*, 1 Ct. Cl. 190 (1865) and *Jones v. United States*, 1 Ct. Cl. 383 (1865), which sought to distinguish the roles of the United States as a contractor from its role as a lawmaker, and to even earlier decisions of the U.S. Supreme Court, in decisions such as *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 7 L. Ed. 939 (1830) and *Charles River Bridge v. Warren Bridge*, 36 U.S. (11 Pet.) 420, 9 L. Ed. 773 (1837), which concluded that the powers

of state governments to tax and to take other sovereign actions are reserved and cannot be restricted by implication. *See Cuyahoga I* at 764. In these and similar cases, the courts recognized that, unless the government surrendered these sovereign powers in some clear manner, they were reserved and therefore the exercise of these powers did not amount to an impairment of contract with the government, in violation of the *Contracts Clause*, U.S. Const., art. I, §10. *Id* at 764 – 765.

There is, however, another line of cases – espousing the so-called "rule of congruence" – which drew distinctions between exercises of sovereign powers such as the power to tax or take property by eminent domain, and "other actions taken by the government in more of a corporate, proprietary or business role." *Id* at 765, *citing, inter alia, Cleveland v. Cleveland City Railway*, 194 U.S. 517, 48 L. Ed. 1102, 24 S. Ct. 756 (1904) and *Los Angeles v. Los Angeles Gas & Electric Co.* 251 U.S. 32, 64 L. Ed. 121, 40 S. Ct. 76 (1919). In these cases, which involved attempts to regulate the operations of utilities, the courts appeared more willing to apply traditional rules of contract law to actions by local governments. As this Court observed, actions involving proprietary or business-type actions by the government "were deemed more susceptible to the traditional rules of contracts:" 'If [the government comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same rules that govern individuals there.'" *Id.* at 765, *quoting Cooke v. United States*, 91 U.S. 389, 398, 23 L. Ed. 237 (1895).

In the course of the 20th century, these twin theories of jurisprudence – the unmistakability doctrine and the rule of congruence – coexisted, but the courts began to scrutinize the purpose of the allegedly impairing legislative action in greater detail. In cases such as *Lynch v. United States*, 292 U.S. 571, 78 L Ed. 1434, 54 S. Ct. 840 (1934) and *Perry v. United*

*States*, 294 U.S. 330, 79 L. Ed. 912, 55 S. Ct. 432 (1935), for example, the Supreme Court addressed the powers of the Federal government as a sovereign to alter its contractual relations, and explained that where the government's "sovereign" action affected its own obligations, as opposed to the relations between purely private parties subject to that sovereign power, an impermissible impairment occurs:

> There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of Congress to alter or repudiate the substance of its own engagements. . . .

*Perry*; 294 U.S. at 350 – 51; *see Cuyahoga I* at 767. Cases like *Lynch* and *Perry* indicated the central importance of the motivation of the subsequent legislative act – whether it was intended to serve a broad public purpose or whether it sought to alter the government's bargain with specific parties on an *ex post facto* basis.

b. Recent cases show that the unmistakability doctrine does not apply to protect legislation that rewrites the Government's contractual bargain with private parties.

While they have not ultimately resolved the full extent of the unmistakability doctrine, more recent cases have clarified when the exercise of governmental power amounts to a breach of its contractual obligations. In *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 91 L. Ed. 2d 35, 106 S. Ct. 2390 (1986) )("*POSSE*"), the Supreme Court upheld Federal legislation that retroactively cancelled the right of states to terminate their participation in the Social Security program, reaffirming that "contractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign." *Id.* at 52, *quoting Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 147, 71 L. Ed. 2d 21, 102 S. Ct. 894 (1982). While the *POSSE* decision may be seen as a broad endorsement of the unmistakability doctrine, it acknowledged the persistent impact of cases like

*Lynch* and *Perry*, recognizing that there were limits on the government's ability to alter its contractual relations. 477 U.S. at 55.

Those limitations were made clearer in *Winstar*, one of the Supreme Court's most recent explorations of these matters. Speaking for the plurality, Justice Souter sought to identify common threads from the court's various rulings on the impact of the government's sovereign power on its contracts with private parties. According to Justice Souter, "[t]he application of the [unmistakability] doctrine . . . turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government." *Winstar*, 518 U.S. at 878-79.

The multiple opinions in *Winstar* found a common theme, however, in condemning acts by Congress that seek to strike a more favorable contractual bargain with private parties. Justice Souter was particularly concerned about laws that appeared to advance the self-interest of the government at the expense of private contracting parties, noting that it may be permissible for the government to enact laws "that are 'relatively free of Government self-interest,' but not 'statutes tainted by a governmental object of self-relief.'" *Cuyahoga* I at 771, *quoting Winstar* at 896. Surveying the concurring opinions of Justices Breyer and Scalia in *Winstar*, this Court identified a similar willingness to examine the "nature of the government's breaching act." Justice Breyer did not, for example, find that an "unmistakable' promise, beyond that discernible using ordinary principles of contract interpretation, was necessary before liability could be imposed on the Government," warning that the government's ability to "obtain needed goods and services from parties who might otherwise, quite rightly, be unwilling to undertake the risk of government contracting" could be frustrated. *Winstar*, 518 U.S. at 912 and 913. Likewise, Justice Scalia explained that if the government were "'free to make its own performance impossible thought its

manner of regulation," it would mean that the government alone controlled performance of the contract, which would amount to "an absolutely classic description of an illusory promise." *Id.* at 921. Even Chief Justice Rehnquist, in his dissent, observed that "the law is well established that Congress may not simply abrogate a statutory provision obligating performance without breaching the contract and rendering itself liable for damages." *Id.* at 929.

Summarizing the principles derived from *Winstar*, the Court in *Cuyahoga I* said that the "application of the unmistakability doctrine hinges on whether the challenged legislation subsidiarily involves the exercise of a 'sovereign power' protected by that doctrine," that the "sovereign powers" powers protected by that doctrine are not unlimited, but rather focus on "'unique features of sovereignty' warranting 'special caution,' and that "each opinion [in *Winstar*] plainly excludes from the doctrine's protection legislation modifying what Congress simply perceives as a bad deal." *Cuyahoga I* at 772*, quoting Winstar*, 518 U.S. at 918. As this Court explained,

> In the end . . . *Winstar* confirms that, in deciding whether the unmistakability doctrine applies in a given case, the nature of the legislation alleged to have breached the contract in question is truly pivotal.

*Cuyahoga I* at 773. Ultimately, "the unmistakability doctrine applies only when the Congress invokes one of the sovereign powers protected by the doctrine" and that, like the related sovereign acts doctrine,

> both apply when the Congress acts to protect public safety, morals or the economy; neither applies when the Congress instead targets the government contractual obligations in an effort to obtain a better deal.

*Id* at 774.

2. The unmistakability doctrine does not shield the Government's breach of contract here.

On the strength of this analysis, the Court in *Cuyahoga I* held that the unmistakability doctrine did not protect the 1994 Amendments or Notice 95-12. On the contrary, the Court found that in passing the 1994 Amendments, Congress's motivation was to save money:

> the Congress did not act to protect public safety, morals or the economy, through the exercise, for example, of its police powers. Rather, in an appropriation measure, it deliberately targeted, at HUD's behest, that agency's contractual obligations under preexisting HAP contract in an effort to reduce outlays under the Section 8 program

*Id.* at 777. The Court reported at length portions of the legislative history of the 1994 Amendments demonstrating that Congress' goal was to reduce outlays in the face of growing deficits in the mid-1990s, noting, among other things, that the restrictions on automatic annual adjustments could "'generate[] $110,000,000 in outlay savings in 1995'". *Id* at 777 – 78, *quoting* S. Rep. 103-311 at 70. The Court also reported that the restrictions contained in the 1998 Act were adopted "because the Administration had unsuccessfully attempted to freeze outright the AAAFs for Section 8 projects." *Id.* at 778.

The Court rejected the government's contention that the 1994 Amendments were a legitimate exercise of the government's sovereign power to protect the integrity of the Section 8 program. First, those claims were undermined by the "halting, pock-marked structure" of the amendment, which was initially adopted only for fiscal year 1995 and was not made permanent until late in 1997. *Id.* According to this Court, all this legislation "accomplished was to shift the responsibility and risk of demonstrating that a particular annual adjustment is warranted from HUD to the project owners, notwithstanding prior agreements to the contrary." *Id.* at 779. Second, Congress' announced goal of bringing Section 8 rents into parity with "fair market rents" was misleading, since "'[d]espite its best efforts, HUD's [fair market rents] FMRs do not

always accurately reflect true market rents for certain areas and submarkets within broadly defined areas. In fact, the description most often made of FMRs is that they are neither fair nor market. . . ." *Id.* at 779, *quoting* H. Rep. 104-461 at 100 – 01. Finally, the Court rejected "categorically any claim that the [1994 Amendments] come under the unmistakability doctrine because they saved money that, in turn, could be employed for the general welfare." *Id.* The Court condemned that argument as essentially attempting to wrap a repudiation of contract in the flag of a sovereign act:

> Such a bootstrapping argument would reduce to a nullity any limitations on the scope of the doctrine, for it would be the rare case, indeed, in which Congress could not resort to the safe harbor while targeting undesirable contract provisions.

*Id.* On the contrary, the 1994 Amendments present "exactly the concerns that Justice Souter had in mind when he indicated that ordinary breach of contract principles ought to apply to 'instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties.'" *Id., quoting Winstar*, 518 U.S. at 896. Indeed, while *Winstar* dealt with an attempt by the government to adopt a wide-ranging reform to resolve the nation's savings and loan crisis,

> [h]ere, of course, the impact of the [1994 Amendments] fell not substantially, but exclusively upon the government's contracting partners, with an avowed intent to reduce outlays during times of budget constraints. As such, defendant's suggestion that his action was protected by the unmistakability doctrine is wholly unconvincing.

*Id.* at 780.

D. <u>The Plaintiffs Are Entitled To Summary Judgment Here.</u>

After finding that the unmistakability doctrine did not excuse the government from liability in *Cuyahoga I,* this Court held that the government "has plainly rendered its performance under the HAP contracts impossible" and that therefore, it held "that the United

States is liable to [the plaintiff] for breach of contract." *Id.* The same result should apply in this case, for the following reasons:

1. First, the language of the HAP Contacts here is identical to the language in the contracts in *Cuyahoga I*, which, the Court established *(id.* at 759-760), entitled the plaintiff there to receive its automatic annual rent adjustment at the full AAAF value, unless HUD performed and submitted a timely rent comparability study to the owner. No such comparability studies were performed here.
2. As the Court found in *Cuyahoga I (id.* at 760-762), the legislative history of the Section 8 program from its inception to the 1994 Amendments confirm that both HUD and Congress understood that owners like the Plaintiffs here were entitled to receive their AAAF-based rent adjustment unless HUD submitted a timely rent comparability study.
3. The 1994 Amendments and Notice 95-12 had exactly the same impact on these Plaintiffs as they had on the *Cuyahoga* plaintiff, depriving all of them of their contractually-secured automatic annual rent adjustment. As in *Cuyahoga I*, the passage of the 1994 "was a repudiation of this contract provision that seemingly caused a failure to perform a contractual duty when it was due, at that point ripening into an apparent breach of contract." *Id.* at 762.
4. Finally, as the Court concluded in *Cuyahoga I*, the purpose of the 1994 Amendments was not an exercise of a "important sovereign power" (*id.* at 778), but rather was admittedly to reduce governmental expenditures, shifting the burden of the Section 8 program from the government to owners such as the Plaintiffs. As in *Cuyahoga I*, the unmistakability doctrine cannot be invoked here to absolve the government from liability.

## V. CONCLUSION

For the foregoing reasons, the enactment of the 1994 Amendments and the promulgation of Notice 95-12 constituted a breach of the Plaintiffs' HAP Contracts because, having failed to produce rent comparability studies and deliver them to the Plaintiffs on a timely basis, HUD failed to pay the AAAF-based rent adjustment required by the Plaintiffs' HAP Contracts. Summary judgment as to liability therefore should be granted to them.

Dated: July 29, 2005

/s/ Harry J. Kelly

Harry J. Kelly, Esq.
NIXON PEABODY LLP
401 Ninth Street, N.W., Suite 900
Washington, D.C. 20004
(202) 585-8000

Counsel for the Plaintiffs

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY THIS 29th day of July, 2005, that a copy of the foregoing Plaintiffs' Motion of Summary Judgment as to Liability, with supporting Memorandum of Points and Authorities and Plaintiffs' Proposed Findings of Uncontroverted Facts, was served by U.S. Postal Service, first class mail, postage prepaid, upon:

John Edgar Kosloske
U.S. Department of Justice
Civil Div. – Commercial Litigation Br.
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530

/s/ Harry J. Kelly