No. 04-1757C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PARK PROPERTIES ASSOCIATES, L.P., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

NANCY CHRISTOPHER
Acting Associate General Counsel

HOWARD SCHMELTZER
Assistant General Counsel

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, DC

AUGUST 31, 2005

# TABLE OF CONTENTS

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. The Section 8 Housing Assistance Payments (HAP) Program . . . . . . . . . . . . . . . 2

A. The Section 8 Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. The Section 8 HAP Programs For New Construction And Substantial Rehabilitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C. Rent Subsidy Payments Under The Section 8 HAP Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D. Annual Rent Adjustments Under The Owners' HAP Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

E. The 1994 Amendments To The Section 8 Statute . . . . . . . . . . . . . . . . . . . 7

F. HUD's Implementation Of The 1994 Amendments To The Section 8 Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I. Summary Judgment Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II. Standards Of Contract Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. The Owners' Application For Summary Judgment With Respect To Their Rent Adjustment Claims Should Be Denied Because The Owners Do Not Allege, Much Less Demonstrate, That The Claimed Factor-Based Annual Rent Adjustments Would Not Have Violated The Overall Limitation Upon Rent Adjustments Contained In Their HAP Contracts . . . . . . 15

## TABLE OF CONTENTS (CONT'D)

IV. The Failure Of HUD, After 1994, To Adjust Contract Rents Under The Owners' HAP Contracts Annually On The Contract Anniversary Dates Did Not Breach, Or Result In A Breach Of, The HAP Contracts . . . . . 16

V. The Requirement Of The 1994 Amendments To The Section 8 Statute That HUD Establish Different AAFs For "Turnover" And "Non-Turnover" Units Did Not Breach The Owners's HAP Contracts . . . . . 25

VI. Assuming For The Sake Of Argument That The 1994 Act And HUD Notice 95-12 Breached, Or Resulted In A Breach Of The HAP Contracts, Park Properties And Valentine Have Not Demonstrated That They Did Not Receive Rent Adjustments During The 1995-2000 Time Frame As A Result Of The Breach Of Contract . . . . . 29

CONCLUSION . . . . . 31

# TABLE OF AUTHORITIES

## CASES

Acacia Villa v. United States,
36 Fed. Cl. 277 (1996) .......... 6

Alaska Pulp & Lumber Co. v. Madigan,
2 F.3d 389 (Fed. Cir. 1993) .......... 14

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 12

Barcamerica International USA Trust v. Tyfield Importers, Inc.,
289 F.3d 589 (9th Cir. 2002) .......... 26

Barseback Kraft AB v. United States,
121 F.3d 1475 (Fed. Cir. 1997) .......... 14

Bowen v. Public Agencies Opposed to Social Security Entrapment,
477 U.S. 41 (1986) .......... 24

Celotex Corp. v. United States,
477 U.S. 317 (1986) .......... 12,13

Centex Corp. v. United States,
395 F.3d 1283 (Fed. Cir. 2005) .......... 24

Charter Federal Savings Bank v. United States,
54 Fed. Cl. 120 (2002) .......... 15

Cisneros v. Alpine Ridge Group,
508 U.S. 10 (1993) .......... passim

Commodities Recovery Corp. v. United States,
34 Fed. Cl. 282 (1995) .......... 12,13

Cuyahoga Metropolitan Housing Authority v. United States,
57 Fed. Cl. 751 (2003) .......... passim

Cuyahoga Metropolitan Housing Authority v. United States,
65 Fed. Cl. 534 (2005) .......... 7,10,20

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Federal Housing Partners IV v. Cisneros,
55 F.3d 362 (8th Cir. 1995) ........ 21

Firestone Tire & Rubber Co. v. United States,
195 Ct. Cl. 21, 444 F.2d 547 (1971) ........ 13

Government Systems Advisors, Inc. v. United States,
847 F.2d 811 (Fed. Cir. 1988) ........ 12

Grumman Data Systems Corp. v. Dalton,
88 F.3d 990 (Fed. Cir. 1996) ........ 13

Haynes v. United States,
61 Fed. Cl. 788 (2004) ........ 29

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 384, 351 F.2d 972 (1965) ........ 13, 14

Hunt Construction Group, Inc. v. United States,
281 F.3d 1369 (Fed. Cir. 2002) ........ 14

Jones v. United States,
49 Fed. Cl. 516 (2001) ........ 16

Keco Industries, Inc. v. United States,
176 Ct. Cl. 983, 364 F.2d 838 (1966), cert. denied, 386 U.S. 958 (1967) ........ 13

L. W. Matteson, Inc. v. United States,
61 Fed. Cl. 296 (2004) ........ 12

Massachusetts Port Authority v. United States,
197 Ct. Cl. 721, 456 F.2d 782 (1972) ........ 13

Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,
475 U.S. 574 (1986) ........ 12

Mayflower Transit Co. v. United States,
162 Ct. Cl. 233 (1963) ........ 14

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

McAbee Construction, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) .......... 13

Merrion v. Jicarilla Apache Tribe,
455 U.S. 130 (1982) .......... 24

Monarch Knitting Machinery Corp. v. Sulzer Morat GMBH,
139 F.3d 877 (Fed. Cir. 1998) .......... 16

National Leased Housing Ass'n v. United States,
105 F.3d 1423 (Fed. Cir. 1997) .......... 10,21,25,28

National Leased Housing Ass'n v. United States,
22 Cl.Ct. 649 (1991) .......... 19

Park Village Apartments v. United States,
32 Fed. Cl. 441 (1994), aff'd, 152 F.3d 943 (Fed. Cir.) (Table),
cert. denied, 525 U.S. 962 (1998) .......... 6, 10

Rainier View Associates v. United States,
848 F.2d 988 (9th Cir. 1993), cert. denied, 490 U.S. 1066 (1989) .......... 21

San Carlos Irrigation and Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) .......... 15

Shelter Insurance Companies v. Hildreth,
255 F.3d 921 (8th Cir. 2001) .......... 16

Spirit Leveling Contractors v. United States,
19 Cl.Ct. 84 (1989) .......... 12

Statesman II Apartments, Inc., et al. v. United States,
Nos. 04-805C, 04-806C (Fed. Cl., July 20, 2005) .......... 7, 20,28,29

Sweats Fashions, Inc. v. Pennill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) .......... 12,13

Unicon Management Corp. v. United States,
179 Ct. Cl. 534, 375 F.2d 804 (1967) .......... 14

## TABLE OF AUTHORITIES (CONT'D)

### CASES (CONT'D)

United States v. Cherokee Nation of Oklahoma,
480 U.S. 700 (1987) .......... 24

United States v. City of Fulton,
475 U.S. 657 (1986) .......... 14

United States v. Winstar Corp.,
518 U.S. 839 (1996) .......... 24

### STATUTES

United States Code:

42 U.S.C. § 1437a(a)(1994) .......... 5

42 U.S.C. § 1437a(b)(6)(A) (2000) .......... 4

42 U.S.C. § 1437f .......... 2

42 U.S.C. § 1437f(a) (1970 & Supp. 1974) .......... 3

42 U.S.C. § 1437f(c)(1) (1970 & Supp. IV 1974) .......... 3

42 U.S.C. § 1437f(c)(2)(1982) .......... 4

42 U.S.C. § 1437f(c)(2)(A) .......... 2,7,18

42 U.S.C. § 1437f(c)(2)(A) (1994) .......... 8

42 U.S.C. § 1437f(c)(2)(A) (2000) .......... 8

42 U.S.C. § 1437f(c)(2)(C) .......... 23

42 U.S.C. § 1437f(c)(3)(A) (1994) .......... 5

Public Laws:

Departments of Veterans Affairs and Housing and Urban Development, and Independent
Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 .......... passim

## TABLE OF AUTHORITIES (CONT'D)

## STATUTES (CONT'D)

Public Laws (cont'd):

Housing and Community Development Act of 1974,
Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 653-67 (1974) .......... 3

Housing and Urban-Rural Recovery Act of 1983,
Pub. L. No. 98-181, § 209(a)(1), 97 Stat. 1155, 1183 (1983) .......... 3

Housing and Community Development Act of 1987,
Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1850 (1988) .......... 23

HUD Reform Act of 1989, Pub. L. No. 101-235, § 801(c) .......... 23

United States Housing Act of 1937, as amended (42 U.S.C. § 1437f) .......... 2

## REGULATIONS

Code of Federal Regulations:

24 C.F.R. § 813.102 (1994) .......... 10

24 C.F.R. Part 880 (1994) .......... 4

24 C.F.R. § 880.102 (1979) .......... 9

24 C.F.R. § 880.110(b)(1) (1979) .......... 27

24 C.F.R. § 880.110(d) (1979) .......... 7

24 C.F.R. § 880.201(1994) .......... 5

24 C.F.R. §§ 880.301-405 (1994) .......... 4

24 C.F.R. § 880.501(d)(1) (1994) .......... 5

24 C.F.R. Part 881 (1994) .......... 4

24 C.F.R. § 881.102 (1979) .......... 9

24 C.F.R. § 881.110(b)(1) (1979) .......... 27

## TABLE OF AUTHORITIES (CONT'D)

## REGULATIONS (CONT'D)

Code of Federal Regulations (cont'd):

24 C.F.R. § 881.110(d) (1979) .......... 7

24 C.F.R. § 881.201 (1994) .......... 5

24 C.F.R. §§ 881.301-405 (1994) .......... 4

24 C.F.R. § 881.501(d)(1) (1994) .......... 5

24 C.F.R. § 888.203(b) (1978) .......... 6

24 C.F.R. § 888.203(b) (1995) .......... 6

24 C.F.R. § 888.203(b) (2004) .......... 6

## MISCELLANEOUS

HUD Notice 95-12 .......... passim

HUD Notice 97-14 .......... 9,10

# INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX

**Document** **Page**

## A. HUD Notices re: HAP Contract Annual Rent Adjustments

Notice H 95-12 (HUD) (3/7/95) .......... 1

Notice H 97-14 (HUD) (3/17/97) .......... 25

Notice H 98-3 (HUD) (1/23/98) .......... 42

Notice H 99-17 (HUD) (7/8/99) .......... 44

Notice H 00-14 (HUD) (8/9/00) .......... 45

Notice H 2002-10 (HUD) (5/17/02) .......... 46

## B. Fair Market Rents

Fair Market Rents effective 10/1/94 .......... 61

Fair Market Rents: Amendment to Method of Calculating .......... 67

Fair Market Rents effective 9/14/95 .......... 74

Fair Market Rents effective 10/1/95 .......... 80

Fair Market Rents effective 2/21/96 .......... 85

Fair Market Rents effective 10/1/96 .......... 91

Fair Market Rents effective 10/1/97 .......... 94

Fair Market Rents effective 10/1/98 .......... 101

Fair Market Rents effective 10/1/99 .......... 108

Fair Market Rents effective 10/1/00 .......... 115

Fair Market Rents effective 10/1/01 .......... 122

# INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX (CONT'D)

**Document** **Page**

## B. Fair Market Rents (Cont'd)

Fair Market Rents effective 10/1/02 .................................................................. 130

Fair Market Rents effective 10/1/03 .................................................................. 136

Fair Market Rents effective 10/1/04 .................................................................. 143

## C. Contract Rent Annual Adjustment Factors

Annual Adjustment Factors effective 9/7/95 .............................................................. 153

Annual Adjustment Factors effective 10/1/95 ............................................................ 189

Annual Adjustment Factors effective 10/1/96 ............................................................ 214

Annual Adjustment Factors effective 3/11/98 ............................................................ 240

Annual Adjustment Factors effective 10/1/98 ............................................................ 266

Annual Adjustment Factors effective 10/1/99 ............................................................ 291

Annual Adjustment Factors effective 10/1/00 ............................................................ 317

Annual Adjustment Factors effective 10/1/01 ............................................................ 343

Annual Adjustment Factors effective 1/22/03 ............................................................ 371

Annual Adjustment Factors effective 9/16/03 ............................................................ 397

Annual Adjustment Factors effective 1/14/05 ............................................................ 421

## D. Rent Adjustment History: Park Properties (LaMartine Terrace)

Letter dated 2/27/01 from Quadel Consulting Co. (Quadel) (O'Neill) to Park Properties re: Notice of Potential Rent Adjustment (LaMartine Terrace) ................................................................ 445

**INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX (CONT'D)**

**Document** **Page**

**D. Rent Adjustment History: Park Properties (Cont'd)**


Letter dated 5/11/01 from Park Properties (Ginsburg) to Quadel (Cummings) re: Rent Increase for FY 2000 and FY 2001 (LaMartine Terrace) .......... 446

Rent Comparability Study for LaMartine Terrace (4/16/01) .......... 447

Letter dated 7/12/01 from Quadel (Newman) to Friendly Management re: Annual Rent Adjustment (LaMartine Terrace) .......... 509

Letter dated 7/23/01 from Park properties (Ginsburg) to Quadel (Newman) re: Annual Rent Adjustment (LaMartine Terrace) .......... 510

Letter dated 5/21/02 from Quadel (Kim) to Park Properties (Ginsburg) re: Corrected Annual Rent Adjustment (LaMartine Terrace) .......... 513

Rent Schedule effective 7/12/01 (LaMartine Terrace) .......... 514

Letter dated 6/4/02 from Park Properties (Ginsburg) to Quadel (Shirtz) re: Rent Increase for FY 2002 (LaMartine Terrace) .......... 516

Rent Comparability Study for LaMartine Terrace (5/22/02) .......... 517

Letter dated 8/12/02 from Quadel (Kim) to Park Properties (Ginsburg) re: Additional Information Required (LaMartine Terrace) .......... 576

Unit Turnover Data submitted by Park Properties to Quadel on 8/14/02 .......... 577

Letter dated 9/11/02 from Quadel (Kim) to Park Properties (Ginsburg) re: Annual Rent Adjustment (LaMartine Terrace) .......... 579

Rent Schedule effective 10/14/02 (LaMartine Terrace) .......... 581

Letter dated 3/3/03 from Park Properties (Ginsburg) to Quadel (Przywara) re: Rent Increase for FY 2003 (LaMartine Terrace) .......... 583

## INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX (CONT'D)

**Document** **Page**

**D. Rent Adjustment History: Park Properties (Cont'd)**


Letter dated 3/26/03 from Quadel (Locke) to Park Properties (Ginsburg) re: Annual Rent Adjustment (LaMartine Terrace) ........................................... 584

Rent Schedule effective 5/3/03 (LaMartine Terrace) .................................................. 585

Letter dated 3/10/04 from Park Properties (Ginsburg) to Quadel (Przywara) re: Rent Increase for FY 2004 (LaMartine Terrace) ....................................... 588

Rent Comparability Study Update for LaMartine Terrace (3/3/04) ............................. 589

Letter dated 4/28/04 from Quadel (Gravina) to Park Properties (Ginsburg) re: Annual Rent Adjustment (LaMartine Terrace) ........................................... 595

Rent Schedule effective 5/10/04 (LaMartine Terrace) ................................................ 597


**E. Rent Adjustment History: Valentine (Lane Hill Senior Citizen Residence)**


Letter dated 1/18/01 from Quadel (O'Neill) to Valentine re: Notice of Potential Rent Adjustment (Lane Hill) ....................................................... 600

Letter dated 5/11/01 from Valentine (Ginsburg) to Quadel (Cummings) re: Rent Increase for FY 2001 (Lane Hill) ...................................................... 601

Letter dated 7/12/01 from Quadel (Newman) to Friendly Management re: Annual Rent Adjustment (Lane Hill) ........................................................ 602

Letter dated 6/4/02 from Valentine (Ginsburg) to Quadel (Shirtz) re: Rent Increase for FY 2002 (Lane Hill) ..................................................... 603

Rent Comparability Study for Lane Hill (5/20/02) .................................................... 604

Letter dated 8/12/02 from Quadel (Kim) to Valentine (Ginsburg) re: Additional Information Required (Lane Hill) ............................................ 665

Unit Turnover Data submitted by Valentine to Quadel on 8/14/02 ............................ 666

## INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX (CONT'D)

**Document** **Page**

**E. Rent Adjustment History: Valentine (Cont'd)**

Letter dated 9/10/02 from Quadel (Kim) to Valentine (Ginsburg) re: Annual Rent Adjustment (Lane Hill) ........ 669

Rent Schedule effective 10/14/02 (Lane Hill) ........ 671

Letter dated 10/22/02 from Valentine (Ginsburg) to Quadel (Przywara) re: Rent Increase for FY 2003 (Lane Hill) ........ 673

Letter dated 11/26/02 from Quadel (Przywara) to Valentine (Ginsburg) re: Annual Rent Adjustment (Lane Hill) ........ 674

Rent Schedule effective 1/2/03 (Lane Hill) ........ 675

Letter dated 11/11/03 from Valentine (Ginsburg) to Quadel (Przywara) re: Rent Increase for FY 2004 (Lane Hill) ........ 677

Letter dated 11/19/03 from Quadel (Locke) to Valentine (Ginsburg) re: AAF Rent Adjustment Request ........ 678

Letter dated 12/8/03 from Quadel (Locke) to Valentine (Ginsburg) re: AAF Rent Increase Request ........ 679

Fax dated 3/10/04 from Quadel (Gravina) to Valentine (Bolduc) re: Lane Hill ........ 680

Letter dated 3/10/04 from Valentine (Ginsburg) to Quadel (Przywara) re: Rent Increase for FY 2004 (Lane Hill) ........ 684

Rent Comparability Study Update for Lane Hill (3/3/04) ........ 685

Letter dated 4/2/04 from Quadel (Locke) to Valentine (Ginsburg) re: Annual Rent Adjustment (Lane Hill) ........ 691

Rent Schedule effective 5/10/04 (Lane Hill) ........ 693

Letter dated 4/28/04 from Quadel (Locke) to Valentine (Ginsburg) re: Corrected Annual Rent Adjustment (Lane Hill) ........ 696

## INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX (CONT'D)

**Document** **Page**

**E. Rent Adjustment History: Valentine (Cont'd)**

Corrected Rent Schedule effective 5/10/04 (Lane Hill) .............................................. 698

**F. Legislative Material**

Excerpt from Report of Hearings before Subcommittee on Veterans Affairs, Housing and Urban Development, and Independent Agencies, Committee on Appropriations, House of Representatives, 103rd Cong., 2nd Sess. ......................................................................... 701

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PARK PROPERTIES ASSOCIATES, L.P., et al., )
Plaintiffs, )
v. ) No. 04-1757C
) (Judge Allegra)
THE UNITED STATES, )
Defendant. )

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

Pursuant to ¶ 4 of the Court's Order filed on April 21, 2005,[1] defendant, the United States, submits the following opposition to "Plaintiffs' Motion for Summary Judgment as to Liability" dated July 29, 2005.[2]

## STATEMENT OF THE ISSUES

1. Whether plaintiffs' application for summary judgment with respect to liability upon their rent adjustment claims should be denied, inasmuch as plaintiffs have not alleged, much less demonstrated, that the claimed factor-based annual rent adjustments would not have violated the overall limitation upon rent adjustments contained in their HAP contracts.

---

[1] The April 21, 2005 Order provides that, "[o]n or before August 31, 2005, the parties shall file oppositions to the dispositive motions."

[2] In this brief, "Pl. Mem. ____" refers to the referenced page(s) of "Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment as to Liability" dated July 29, 2005; "DPFUF ¶ ____" refers to the referenced paragraph(s) of "Defendant's Proposed Findings of Uncontroverted Fact" dated July 29, 2005; "Def. App. ____" refers to the referenced page(s) of the appendix to "Defendant's Motion to Dismiss in Part or, in the Alternative, for Partial Summary Judgment" dated July 29, 2005; "DPFUF Add. ¶ _____" refers to the referenced paragraph(s) of "Defendant's Additional Proposed Findings of Uncontroverted Fact" dated August 31, 2005; and "Def. Supp. App. ____" refers to the referenced page(s) of the appendix to this brief.

2. Whether the 1994 amendments to 42 U.S.C. § 1437f(c)(2)(A) or HUD Notice 95-12 breached, or resulted in the breach of, plaintiffs' HAP contracts.

3. Whether the 1994 amendments to 42 U.S.C. § 1437f(c)(2)(A) or HUD Notice 95-12 caused plaintiffs Park Properties Associates, L.P., and Valentine Associates, L.P., not to receive annual rent adjustments for the years 1995 through 2000.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Plaintiffs Park Properties Associates, L.P. ("Park Properties"), Valentine Associates, L.P. ("Valentine"), and St. John's I Associates, L.P. ("St. John's") (collectively referred to herein as "the Owners"), own multifamily rental housing projects in the New York City area. The rents of the low-income tenants in these housing projects are or, in St. John's case, at one time were, subsidized by the Government pursuant to rent subsidy agreements between the Owners and the Government known as "Housing Assistance Payments Contracts." The Complaint seeks damages for alleged breaches of contract based upon the failure of the Government to adjust the contract rents annually on the HAP contract anniversary dates for the years 1995-2004. See Compl. ¶¶ 18-20. The Owners allege that, as a result of the putative breaches by the Government of the HAP contracts, they have been damaged in the approximate amount of $2.75 million. Compl. ¶ 21.

### II. The Section 8 Housing Assistance Payments (HAP) Program

#### A. The Section 8 Statute

Section 8 of the United States Housing Act of 1937, as amended (42 U.S.C. § 1437f) (the Section 8 statute), creates a statutory scheme pursuant to which the United States, through

HUD, directly or indirectly subsidizes the rents of low-income individuals and families living in privately-owned buildings.[3] This litigation concerns claims by owners of "newly constructed" or "substantially rehabilitated" housing with respect to which, at all relevant times, the Section 8 statute provided that "assistance payments" "may be made . . . in accordance with the provisions" of that statute for "the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a) (1970 & Supp. 1974).[4]

As originally enacted and at the time the Owners' HAP contracts were executed, the Section 8 statute specified that "[a]n assistance contract entered into pursuant to this section shall establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit to which such assistance payments are to be made." 42 U.S.C. § 1437f(c)(1) (1970 & Supp. IV 1974). In addition, section 8(c)(2) provided, in part, with respect to the adjustment of contract rents:

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
>
> * * * * *

---

3 Section 8 was enacted as part of section 201(a) of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633, 653-67 (1974), which amended the United States Housing Act of 1937 in this and other respects.

4 In 1983, Congress amended 42 U.S.C. § 1437f(a) by repealing the Section 8 "newly constructed, and substantially rehabilitated" programs, but grandfathering existing Section 8 New Construction and Substantial Rehabilitation HAP projects, such as the Owners' projects in this case, as being subject to the Section 8 laws. See section 209(a)(1) of the Housing and Urban-Rural Recovery Act of 1983, Pub. L. No. 98-181, 97 Stat. 1155, 1183 (1983).

> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2) (1982).

B. The Section 8 HAP Programs For New Construction And Substantial Rehabilitation

HUD has established by regulations a variety of programs implementing the Section 8 statute, including programs addressing "newly constructed" and "substantially rehabilitated" rental housing projects. See 24 C.F.R. Part 880 (1994) ("Section 8 Housing Assistance Payments Program for New Construction"); 24 C.F.R. Part 881 (1994) ("Section 8 Housing Assistance Payments Program for Substantial Rehabilitation"). In each of these programs, proposals were solicited for the construction or rehabilitation of housing the rents for which would be subsidized under agreements entered into pursuant to the Section 8 statute. Upon selection and approval of a proposal, the project owner and HUD or a "public housing agency,"[5] as the case may be, would execute an "Agreement to Enter into a Housing Assistance Payments Contract" under which they agreed to execute a HAP contract upon the owner's satisfactory completion of the project. See 24 C.F.R. §§ 880.301-405 & 881.301-405 (1994).

C. Rent Subsidy Payments Under The Section 8 HAP Program

The rent subsidy is provided in one of two ways. HUD enters a HAP contract directly with the owner of a housing project, or it enters into an "annual contributions contract" with a

---

[5] A "public housing agency" is defined as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." 42 U.S.C. § 1437a(b)(6)(A) (2000).

"public housing agency" (PHA) which, in turn, enters into a HAP contract with a project owner. In either case, the HAP contract is the vehicle for payment of the Section 8 rent subsidy ("housing assistance payment") to the project owner.

The HAP contract specifies a monthly rent for dwelling units covered by the agreement, termed the "contract rent." 24 C.F.R. §§ 880.201 & 881.201 (1994) ("Contract Rent" defined). Under the HAP contract, the tenant pays the owner a portion of the contract rent, which is based upon the tenant's income. 42 U.S.C. § 1437a(a) (1994); 24 C.F.R. §§ 880.201 & 881.201 (1994) ("tenant rent" defined). The governmental entity with which the owner contracts (either HUD or a PHA) pays a rent subsidy to the owner equal to the difference between the tenant rent and the contract rent. 42 U.S.C. § 1437f(c)(3)(A) (1994); 24 C.F.R. §§ 880.501(d)(1) & 881.501(d)(1) (1994).

D. Annual Rent Adjustments Under The Owners' HAP Contracts

The rent adjustment provisions contained in the Owners' HAP contracts are virtually identical. The HAP contracts provide:

> b. Automatic Annual Adjustments
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall

> the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

HAP Contracts, Part I, § 1.8b, Def. App. 41, 65, 134; see also DPFUF ¶¶ 6, 15, 26.

HUD regulations in effect when the Owners HAP contracts were entered specify how annual rent adjustments pursuant to section 1.8b(2) of the Owners' HAP contracts were to be made:

> The adjusted monthly amount of the Contract Rent of a dwelling unit shall be determined by multiplying the Contract Rent in effect on the anniversary date of the Contract by the applicable Automatic Annual Adjustment Factor . . . and rounding the result to the next higher whole dollar amount.

See 24 C.F.R. § 888.203(b) (1978).[6] For example, if the monthly contract rent for a dwelling unit in effect on the HAP contract anniversary date is $100 per unit and the applicable AAF is 1.05, the new monthly contract rent adjusted in accordance with the AAF would be $105 (1.05 *x* $100).

The Owners' HAP contracts, however, also contain an "Overall Limitation" provision that trumps the other rent adjustment provisions. Cisneros v. Alpine Ridge Group, 508 U.S. 10, 17-19 (1993). The overall limitation clause provides:

> d. Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences[[7]] between the rents charged

---

[6] A substantially identical version of this regulation was in effect during the 1995-2004 interval covered by the Owners' claims. See 24 C.F.R. § 888.203(b) (1995); 24 C.F.R. § 888.203(b) (2004).

[7] The Owners state that "[t]his Court has determined that a 'material difference' is a difference greater than twenty percent (20%)," citing Acacia Villa v. United States, 36 Fed. Cl. 277, 279 (1996), and Park Village Apartments v. United States, 32 Fed. Cl. 441, 448 (1994), aff'd,

(continued...)

> for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HAP Contracts, Part I, § 1.8d, Def. App. 41, 65, 134; see also DPFUF ¶¶ 6, 15, 26.[8]

E. The 1994 Amendments To The Section 8 Statute

The Section 8 statute has been amended several times since the Statesman II and Beach House HAP contracts were executed. The present litigation concerns the effect upon rent adjustments under the Owners' HAP contracts of amendments to the Section 8 statute contained in the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 (the 1994 Act or 1994 Amendments), enacted on September 28, 1994.[9]

---

[7](...continued)
152 F.3d 943 (Fed. Cir.) (Table), cert. denied, 525 U.S. 962 (1998). Pl. Mem. 3 n.2. Recently, however, in Cuyahoga Metropolitan Housing Authority v. United States, 65 Fed. Cl. 534, 548-53 (2005) (Cuyahoga II), the Court held that HUD's current definition of "material difference" reflected in Notice H 95-12 (HUD) (3/7/95) (i.e., whenever a rent adjustment would exceed the sum of the comparable, unassisted rent plus the initial difference to be preserved in rent adjustments, if any) was reasonable as applied to the facts of that case, where the initial difference was about 10 percent of the comparable, unassisted rent. But see Statesman II Apartments, Inc., et al. v. United States, Nos. 04-805C, 04-806C (Fed. Cl., July 20, 2005), slip op. at 21 (HUD Notice 95-12 "reads out the key term 'material differences,' triggering the overall limitation mechanism whenever any difference exists over the fair market rent or over the comparable rent plus initial difference.").

[8] The wording of the overall limitation provision contained in the Owners' HAP contracts tracks the language of the "Overall Limitation" upon rent adjustments contained in governing HUD regulations. See 24 C.F.R. §§ 880.110(d), 881.110(d) (1979).

[9] The 1994 Act provided that these amendments to the Section 8 statute "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under [section 1437f(c)(2)(A)] by applying an annual adjustment
(continued...)

The 1994 Act amended the Section 8 statute in two respects. First, the 1994 Act provided that, "[w]here the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. . . ." 42 U.S.C. § 1437f(c)(2)(A) (1994). The 1994 Act, thus, established a trigger for invoking the rent comparability limitation applicable to rent adjustments under the Owners' HAP contracts: when the existing contract rent is greater than the published fair market rent for an existing dwelling unit in the relevant housing market. In that case, HUD may increase the HAP contract rent only to the extent that the Owner demonstrates that the adjusted rent would not exceed the rent for a comparable, unassisted housing unit, as determined by HUD.

Second, the 1994 Act provided, with respect to annual rent adjustment factors, that, "[f]or any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for the unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0." 42 U.S.C. § 1437f(c)(2)(A) (1994).

---

[9](...continued)
factor," 108 Stat. at 2315, such as the Owners' HAP contracts. The amendments are effective prospectively "during fiscal year 1995, during fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter." 42 U.S.C. § 1437f(c)(2)(A) (2000).

F. HUD's Implementation Of The 1994 Amendments To The Section 8 Statute

On March 7, 1995, HUD issued Notice H 95-12 (HUD) ("Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995") (HUD Notice 95-12), which implemented the 1994 amendments to the Section 8 statute. See Def. Supp. App. 1-24.[10] Notice 95-12 recited that, "[a]mong the many measures developed [in the 1994 Act], emphasis was placed on utilizing the mechanism in the Section 8 contract language which permits an analysis on the reasonableness of the [annual adjustment factor (AAF)] formula as it is applied to each project unit type." Def. Supp. App. 1.

Consistent with the 1994 Act, Notice 95-12 stated that "review of AAF under the Overall Limitation clause of the HAP Contract would apply to Section 8 New Construction and Substantial Rehabilitation Properties where Section 8 rent levels for a unit type presently exceed the published Existing Housing Fair Market Rents (FMR) . . . ." Def. Supp. App. 1. A subsequent document, Notice H 97-14 (HUD) ("Fiscal Year 1997 Annual Adjustment Factor (AAF) Requirements") (HUD Notice 97-14), clarified that the 1994 Act's rent comparability provisions would apply where "the pre-adjustment *gross rent* (current contract rent plus any allowances for tenant-paid utilities) is above the published [fair market rent]." Def. Supp. App. 25 (emphasis added).[11]

---

[10] Although HUD Notice 95-12 expired on September 30, 1995, subsequent notices reinstated and extended its policies and procedures. See Notice H 97-14 (HUD) (3/17/97), Def. Supp. App. 25-41; HUD Notice 98-3 (1/23/98), Def. Supp. App. 42-43; Notice H 99-17 (HUD) (7/8/99), Def. Supp. App. 44; Notice H 00-14 (HUD) (8/9/00), Def. Supp. App. 45; and Notice H 2002-10 (HUD) (5/17/02), Def. Supp. App. 46-60.

[11] As parenthetically noted in HUD Notice 97-14, "gross rent" is the sum of the HAP contract rent and any allowances for tenant-paid utilities. See 24 C.F.R. §§ 880.102 & 881.102 (1979)
(continued...)

Under HUD Notice 95-12 (as clarified by HUD Notice 97-14), thus, if the current gross rent for a unit covered by a HAP contract *exceeds* the applicable fair market rent for the area in which the subsidized unit is located, HUD will not make an annual rent adjustment determination unless the Section 8 project owner submits to HUD a study of the rent charged for a comparable, unassisted unit. See Def. Supp. App. 3. If the rent comparability study provided by the project owner indicates that the comparable, unassisted rent exceeds the contract rent for the assisted unit by more than five percent, HUD will set the contract rent at the lesser of (1) the contract rent adjusted in accordance with the applicable AAF or (2) the comparable, unassisted rent plus any "initial difference"[12] to be preserved in rent adjustments. See Def. Supp. App. 4.

Under HUD Notice 95-12, where the owner provided the rent comparability information 60 days prior to the HAP contract anniversary date, HUD will increase the HAP contract rent for a covered unit effective on the HAP contract anniversary. If, however, the owner provides the rent comparability study less than 60 days before the HAP contract anniversary date, HUD will increase the HAP contract rent effective upon the date 60 days after the owner submitted the rent comparability information. See Def. Supp. App. 3. But where the owner does not provide the

---

[11](...continued)
("Gross Rent" is "[t]he Contract Rent plus any Allowance for Utilities and Other Services" and "Allowance for Utilities and Other Services" is "[a]n amount determined or approved by HUD as an allowance for the cost of utilities (except telephone) and charges for other services payable directly by the Family"); see also 24 C.F.R. § 813.102 (1994) (defining "gross rent" as "[t]he total monthly cost of housing an eligible Family which is the sum of the Contract Rent and any Utility Allowance").

[12] The "initial difference" to be preserved in rent adjustments is the mathematical difference, expressed in dollars, between the initial HAP contract rents and the rents for comparable, unassisted units determined by HUD in establishing the initial contract rents. See National Leased Housing Ass'n v. United States, 105 F.3d 1423, 1435 (Fed. Cir. 1997); Cuyahoga II, 65 Fed. Cl. at 538; Park Village, 32 Fed. Cl. at 446-47.

rent comparability data by the *next* HAP contract anniversary, HUD will not increase the HAP contract rent for the preceding year. Id.

HUD Notice 95-12 (as clarified by HUD Notice 97-14) provided that, where the gross rent for an assisted unit *did not exceed* the applicable fair market rent, the HAP contract rent would be adjusted using the "appropriate AAF." Def. Supp. App. 7. However, consistent with the 1994 Act's requirement that HUD establish separate adjustment factors for turnover and non-turnover units, Notice 95-12 required that, in order to receive a AAF-based rent adjustment, the project owner provide HUD with "the number of units in which turnover occurred since the last HAP contract anniversary date." Id. If the owner did not submit the tenant turnover data at least 60 days before the HAP contract anniversary date, the contract rents would not be adjusted effective on the contract anniversary date, but would "go into effect 60 days after" HUD's receipt of the required turnover data. Id. But if the owner failed to submit the turnover information by the *next* HAP contract anniversary, HUD would not increase contract rents for the preceding year. Id.

## STATEMENT OF THE FACTS

For our statement of facts, we respectfully refer the Court to "Defendant's Proposed Findings of Uncontroverted Fact" dated July 29, 2005, and "Defendant's Additional Proposed Findings of Uncontroverted Fact" dated August 31, 2005. In this brief, we reference those facts and other informative facts that are necessary to our argument.

ARGUMENT

I. Summary Judgment Standards

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Commodities Recovery Corp. v. United States, 34 Fed. Cl. 282, 287-88 (1995). Summary judgment is not a disfavored procedural shortcut; it is an integral part of the Court's rules as a whole, which are to be construed to secure the just, speedy, and inexpensive determination of every action. Celotex Corp. v. United States, 477 U.S. 317, 327 (1986); Sweats Fashions, Inc. v. Pennill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987); Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 89 (1989); see also RCFC 1(a)(2).

A dispute is "genuine" if, on the entirety of the record, the evidence is such that a reasonable jury could resolve a factual matter in favor of the nonmoving party. Anderson, 477 U.S. at 248; Sweats Fashions, 833 F.2d at 1562. Thus, when the record as a whole would not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Commodities Recovery, 34 Fed. Cl. at 288. A fact is "material" if it could affect the outcome of the suit and its materiality is determined by the substantive law applicable to the case. Anderson, 477 U.S. at 248; Spirit Leveling, 19 Cl. Ct. at 89. "Contract interpretation is a matter of law and thus amenable to decision on summary judgment." Government Systems Advisors, Inc. v. United States, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988); accord L. W. Matteson, Inc. v. United States, 61 Fed. Cl. 296, 307 (2004) (Contract interpretation is "an appropriate predicate for summary judgment.").

The party moving for summary judgment bears the initial burden of demonstrating either the absence of a genuine issue of material fact or the absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325; Sweats Fashions, 833 F.2d at 1563; Commodities Recovery, 34 Fed. Cl. at 288. If the moving party makes that showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute exists with respect to a material fact by pointing to evidence of record or proffering evidence establishing an essential element of its case upon which it bears the burden of proof. Celotex, 477 U.S. at 322; Commodities Recovery, 34 Fed. Cl. at 288.

II. Standards Of Contract Interpretation

The "intention of the parties to a contract controls its interpretation." Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971). A court's "ultimate goal is always to give effect to the expressed or implied intentions of the contracting parties." Massachusetts Port Authority v. United States, 197 Ct. Cl. 721, 726, 456 F.2d 782, 784 (1972). A contract, thus, "is to be read from its four corners." Keco Industries, Inc. v. United States, 176 Ct. Cl. 983, 990, 364 F.2d 838, 842-43 (1966), cert. denied, 386 U.S. 958 (1967) (internal quotation marks omitted).

Interpretation of a contract "[b]egins with the plain language." McAbee Construction, Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). The language of a contract "is given its ordinary and commonly accepted meaning unless it is shown that the parties intended otherwise." Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 390, 351 F.2d 972, 975 (1965). "A contract term is unambiguous when there is only one reasonable interpretation." Grumman Data Systems Corp. v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996). "When the contract language

is unambiguous on its face, [the court's] inquiry ends, and the plain language of the contract controls." Hunt Construction Group, Inc. v. United States, 281 F.3d 1369, 1373 (Fed. Cir. 2002); accord Alaska Pulp & Lumber Co. v. Madigan, 2 F.3d 389, 392 (Fed. Cir. 1993) ("Where contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

A "contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." Hunt, 281 F.3d at 1372. An interpretation "which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible." Hol-Gar, 169 Ct. Cl. at 395, 351 F.2d at 979; see also Unicon Management Corp. v. United States, 179 Ct. Cl. 534, 537, 375 F.2d 804, 806 (1967) (Where possible, it is preferable "to interpret the provisions of a contract as coordinate and not contradictory."). Twisted or strained, out-of-context analysis is to be eschewed. Mayflower Transit Co. v. United States, 162 Ct. Cl. 233, 237 (1963).

Contract language that tracks a statute should be interpreted in light of the interpretation by the agency responsible for administering the statute. United States v. City of Fulton, 475 U.S. 657, 672 (1986); see also Barseback Kraft AB v. United States, 121 F.3d 1475, 1480-81 (Fed. Cir. 1997) (construing agreement in light of underlying statute).

## III. The Owners' Application For Summary Judgment With Respect To Their Rent Adjustment Claims Should Be Denied Because The Owners Do Not Allege, Much Less Demonstrate, That The Claimed Factor-Based Annual Rent Adjustments Would Not Have Violated The Overall Limitation Upon Rent Adjustments Contained In Their HAP Contracts.

To recover for breach of contract, the Owners have the burden of establishing: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. See San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); Charter Federal Savings Bank v. United States, 54 Fed. Cl. 120, 129 (2002). Thus, insofar as their rent adjustment claims are concerned, the Owners have the burden of establishing liability, causation, and damages.

The overall limitation upon rent adjustments contained in the Owners' HAP contracts, as noted above, provides that, "[n]otwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences . . . ." HAP Contracts, Part I, § 1.8d, Def. App. 41, 65, 134. The Supreme Court defined what the Owners are entitled to under the HAP contracts with regard to rent adjustments: "[N]o project owner may claim entitlement to formula based rent adjustments that materially exceed market rents for comparable units." Alpine Ridge, 508 U.S. at 21. This means that the overall limitation is exactly that, an overall cap or ceiling upon rent adjustments, so that, even if an owner is entitled to an AAF-adjusted rent, the adjusted rent may not materially differ from the rent of a comparable, unassisted dwelling unit. Consequently, the Supreme Court explained that "we find that respondents have no contract right to unobstructed formula-based rent adjustments." Id.

As proponents of a summary judgment upon a claim as to which they have the burden of proof, the Owners must "bring[] forward *sufficient evidence* to establish that there are no genuine

issues of material fact and that [they] are entitled to judgment as a matter of law." Shelter Insurance Companies v. Hildreth, 255 F.3d 921, 924 (8th Cir. 2001) (emphasis added). "[I]n rendering a decision on a motion for summary judgment, a court must view the evidence through the prism of the substantive evidentiary burden that would inhere at trial." Monarch Knitting Machinery Corp. v. Sulzer Morat GMBH, 139 F.3d 877, 880-81 (Fed. Cir. 1998); accord Jones v. United States, 49 Fed. Cl. 516, 518 (2001).

All the Owners are entitled to are rents that do not materially exceed comparable, unassisted rents, as the Supreme Court held when interpreting the operative provision of the HAP contract. The Owners, however, have not even alleged, much less come forward with evidence, that the claimed factor-based annual rent adjustments would not have resulted in rents that materially differed from the rents of comparable, unassisted units, i.e., that HUD did not provide them with annual rent adjustments that would not have violated the HAP contract's overall limitation provision. The Owners, therefore, have not demonstrated that the Government is liable to them upon their rent adjustment claims. Accordingly, the Owners' motion for summary judgment as to liability upon their rent adjustment claims should be denied.

## IV. The Failure Of HUD, After 1994, To Adjust Contract Rents Under The Owners' HAP Contracts Annually On The Contract Anniversary Dates Did Not Breach, Or Result In A Breach Of, The HAP Contracts.

The Owners seek damages for alleged breaches of contract based upon the failure of the Government to adjust the contract rents annually on the HAP contract anniversary dates for the years 1995-2004. See Compl. ¶¶ 18-20.[13] They argue that this case presents issues that are sub-

[13] For the reasons stated in "Defendant's Motion to Dismiss in Part or, in the Alternative, for Partial Summary Judgment" dated July 29, 2005, the Court lacks jurisdiction to entertain the rent (continued...)

stantially similar to those raised in Cuyahoga Metropolitan Housing Authority v. United States, Nos. 01-46C, 01-251C, and 01-416C (Fed. Cl.), and addressed by the Court in Cuyahoga Metropolitan Housing Authority v. United States, 57 Fed. Cl. 751 (2003) (Cuyahoga I). The argument set forth in the memorandum of points and authorities in support of the Owners' motion for summary judgment as to liability essentially tracks and adopts the Court's analysis in Cuyahoga I.[14]

The Owners misstate the breach of contract found in Cuyahoga I as follows: "HUD did not perform the required rent comparability studies, did not deliver them to the [Owners] in a timely manner, and did not make the AAAF-based rent adjustments that were otherwise required . . . ." Pl. Mem. 17. Contrary to the Owners' assertion, Cuyahoga I did not hold that a breach of the HAP contract occurs if HUD invokes the overall limitation upon rents with respect to a factor-based rent adjustment without delivering a rent comparability study performed by HUD to the project owner in a timely manner.[15]

---

[13](...continued)
adjustment claims of Park Properties, Valentine, and St. John's for the years 1995 through 1998, any claim for breach of the St. John's HAP Contract, which was executed in stages with different effective dates, with respect to dwelling units to which Stage 1 applies based upon HUD's failure to adjust contract rents under the St. John's HAP Contract on or after July 1, 2002, and any claim for breach of the St. John's HAP Contract with respect to dwelling units to which Stage 2 or 3 applies based upon the failure of HUD to adjust contract rents under the St. John's HAP Contract after the July 1, 2002 contract anniversary date.

[14] The Owners do not suggest that the Government misapplied the requirements of the 1994 Act or HUD Notice 95-12 to them, including the latter's provisions with respect to the effective date of a rent adjustment or the timeliness of a request for a rent adjustment. In every instance in which the Owners did not receive a rent adjustment, they failed to satisfy either the requirement that they submit to HUD (or, after 2000, the HAP contract administrator, Quadel Consulting Corporation) a rent comparability study or unit turnover data or both. See DPFUF Add. ¶¶ 12, 17-19, 21-30, 38, 40-55, 61.

[15] There is nothing in the overall limitation provision that reasonably can be viewed as lim-
(continued...)

In Cuyahoga I, the Court held that HAP contracts which contained rent adjustment provisions substantially identical to the rent adjustment provisions contained in the Owners' contracts in this case "expressly require HUD to provide [the project owner] with annual adjustments barring the agency's invocation of the overall limitation" and that "the passage of the 1994 amendments [to 42 U.S.C. § 1437f(c)(2)(A)] was a repudiation of this contractual provision that seemingly caused a failure to perform a contractual duty when it was due, at that point ripening into a breach of contract." 57 Fed. Cl. at 762. In that connection, the Court opined that, in applying the HAP contract's overall limitation with respect to factor-based, annual rent adjustments, HUD has the burden of demonstrating a material difference, including the responsibility for performing rent comparability studies. Id. at 759-62. We respectfully disagree with the Cuyahoga I holding.

As Cuyahoga I acknowledged, while the HAP contract's overall limitation upon rent adjustments requires HUD to determine whether there is a material difference between an adjusted contract rent and the comparable unassisted rent, that provision does not specify which party has the burden of demonstrating that there is or is not a material difference, as the case may be. See 57 Fed. Cl. at 759. The phrase "as determined by the Government" contained in the overall limitation provision requires only that the ultimate determination of whether a rent adjustment would result in a contract rent materially different from the comparable unassisted rent be made by the

[15](...continued)
iting the basis for a "material difference" determination by the Government to a rent comparability study performed by HUD as opposed to anyone else, including a study performed by, or upon behalf of, an owner that is provided to HUD, such as, for instance, the rent comparability studies provided by the Owners in the present case to HUD during the interval covered by their rent adjustment claims. See DPFUF Add. ¶¶ 18, 23, 29, 40, 43, 53, 58. The Owners' contention that their HAP contracts entitled them "to receive [an] automatic annual rent adjustment at the full AAAF value, unless HUD performed and submitted a timely rent comparability study to the owner," see Pl. Mem. 25, therefore, lacks merit.

Government. That clause does not impose upon the Government a burden of demonstrating that a formula-based rent adjustment would result in a contract rent that is materially different from the comparable unassisted rent or require that rent comparability studies in conjunction with rent adjustments be performed by HUD to the exclusion of anyone else, including project owners.

Nothing in the 1994 amendments to the Section 8 statute or, for that matter, HUD Notice 95-12, abdicates the responsibility imposed by the overall limitation clause upon the Government to determine whether a rent adjustment would result in a contract rent materially different from the comparable unassisted rent. The issue here is whether, as an exercise of the discretion given the Government by the HAP contract's overall limitation provision, the Government may require that the project owner provide the Government with a rent comparability study in order that the Government may discharge its duty to make the material difference determination.

The overall limitation contained in the HAP contracts affords HUD the "discretion to design and implement comparability studies as a reasonable means of effectuating [the overall limitation provision's] mandate." Alpine Ridge, 508 U.S. at 21. The HAP contracts "do not contain any provision limiting HUD to any particular methodology for making its comparability determination." National Leased Housing Ass'n v. United States, 22 Cl. Ct. 649, 659 (1991). HUD's discretion under the overall limitation provision to design and implement rent comparability studies includes the discretion to place the onus of conducting such studies upon the project owner.[16]

---

[16] The HAP contracts, moreover, imposed upon the Owners the duty to "furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government." HAP Contracts, Part II, § 2.6a, Def. App. 54, 74, 144. This provision is consistent with and buttresses the discretion afforded the Government by the overall limitation

(continued...)

The Court's conclusion in Cuyahoga I that the HAP contract imposes upon the Government the burden of *demonstrating* that an annual rent adjustment would run afoul of the rent comparability limitation – as distinguished from the discretionary *determination* of whether a given factor-based adjustment would result in a rent materially different from the comparable, unassisted rent – rests upon an inference drawn from section 1.8b(1) of the HAP contract, which provides that "Automatic Annual Adjustment Factors will be determined by the Government annually," and section 1.8b(2) of the HAP contract, which provides that, "[o]n each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." See HAP Contracts, Part I, § 1.8b(2), Def. App. 41, 65, 134. Cuyahoga I opines that "[t]he 'automatic' references in these provisions, as well as the annual periodicity established therein, plainly reveal an intent that the adjustments would occur without [the project owner] having to take any significant action" and that "[l]ogic . . . suggests that for the adjustments in the first part of the contract to be truly 'automatic,' the burden of demonstrating a material difference must lie on HUD." 57 Fed. Cl. at 759.

---

[16](...continued)
provision to require that the Owners provide HUD with rent comparability studies in order to receive an annual rent adjustment. The requirement that the Owners provide rent comparability data to HUD is reasonable because that information is necessary for the Government to make the ultimate determination of whether an AAF-based rent adjustment would differ materially from rents charged for comparable unassisted housing. It also avoids what had been a claim by Section 8 HAP project owners in the past that HUD performed rent comparability studies in an arbitrary and capricious manner. See Alpine Ridge, 508 U.S. at 20; but see Statesman II, slip op. at 15 n.15 (section 2.6a of the HAP contract does not require owners to provide HUD with rent comparability studies); Cuyahoga II, 65 Fed. Cl. at 542 n.10 (same).

The overall limitation clause, however, trumps the "automatic" annual rent adjustment provisions, limiting both rent adjustments and rent payments under the HAP contracts. National Leased Housing, 105 F.3d at 1434. Thus, a project owner "cannot claim entitlement to formula-based rent adjustments that materially exceed market rents for comparable units." Alpine Ridge, 508 U.S. at 19.

In support of their interpretation of the HAP contracts, the Owners appear to assert that there is a legal presumption under the HAP contracts that the factor-based method for annual rent adjustments, citing Alpine Ridge. See Pl. Mem. 13. In Alpine Ridge, the Supreme Court observed:

> The rent adjustments indicated by the automatic adjustment factors remain the presumptive adjustment called for under the contract. It is only in those presumably exceptional cases where the Secretary has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue.

508 U.S. at 19. By that statement, however, the Supreme Court was not interpreting the HAP contracts to create a legal presumption with respect to factor-based rent adjustments that must be rebutted. Rather, the Supreme Court was presuming that, as a matter of fact, it would be an exceptional situation when the overall limitation provision would have to be invoked, in order to rebut the Ninth Circuit's statement in Rainier View Associates v. United States, 848 F.2d 988, 991 (9th Cir. 1988), cert. denied, 490 U.S. 1066 (1989), that HUD's interpretation of the overall limitation, supposedly, would "render the formula method [of adjusting rents] authorized by the [Section 8 statute] and elected in the [HAP] contract a nullity."

In Federal Housing Partners IV v. Cisneros, 55 F.3d 362 (8th Cir. 1995), the Eighth Circuit rejected the notion that AAFs are the presumptive method of adjusting rents under the HAP

contracts. The plaintiffs in that case, owners of Section 8 rental housing projects with HAP contracts similar to the HAP contracts in the present litigation, sought a declaratory judgment that HUD's attempt to execute rent comparability studies violated their right to procedural due process, arguing that, as a result of HUD's failure to create nationwide standards for implementing rent comparability studies, the studies violated constitutional standards and the plaintiffs' right to AAF-based annual rent adjustments vested because, the plaintiffs asserted, AAFs were the "presumptive" method of calculating rents under the HAP contracts. The Eighth Circuit, however, disagreed:

> The contention that the AAAFs are the presumptive method of adjusting rents is incorrect by the terms of the contracts. While AAAFs might be the norm for practical reasons, the overriding principle set forth in the contracts is that '[AAAFs] shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government[.].' Because of this contractual clause, 'no project owner may claim entitlement to formula-based rent adjustments that materially exceed market rents for comparable units." [Alpine Ridge, 508 U.S. at 21]. HUD's discretion to make rental comparisons and rent adjustments under the contracts prevented AAAFs from ever becoming a property right vested in landlords whose rents were materially different from comparable unassisted units.

Id. at 367-68.

The Government's reading of the 1994 Act and HUD Notice 95-12, moreover, does not render the factor-based method of adjusting rents set forth in section 1.8b of the HAP contracts useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous. The requirement of the 1994 Act and HUD Notice 95-12 that project owners perform rent comparability studies demonstrating that AAF-based rent adjustments will not violate the overall limitation upon rent adjustments is triggered only where the current HAP contract gross rent exceeds the

published fair market rent for an existing dwelling unit in the relevant housing market. Where gross rents do not exceed the applicable fair market rents, the owners receive AAF-based rent adjustments.

The Owners assert that "[t]he history of the Section 8 program demonstrates that from its inception until 1994, Congress and HUD stressed the importance of performing comparability studies and placed both the decision to undertake those studies, and the task of performing them, squarely in HUD's hands." Pl. Mem. 15; see also Cuyahoga I, 57 Fed. Cl. at 762 ("Congress' view of the [Section 8 statute], prior to the 1994 amendments, comports with [the] court's interpretation of the contract provisions at issue."). In support of that contention, the Owners point to the 1987 amendment of the Section 8 statute and the 1989 Reform Act, which ratified HUD's authority under the HAP contracts to perform rent comparability studies. Pl. Mem. 15-16.[17] This legislation, however, was enacted in an environment where HUD had been performing rent comparability studies. The legislation is addressed to HUD's authority to perform rent comparability studies in conjunction with rent adjustments, *not* to the question of whether, in administering the overall limitation provision, HUD could require that owners provide HUD with rent com-

---

[17] The 1987 amendment added the following sentence to 42 U.S.C. § 1437f(c)(2)(C): "If the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1850 (1988). Among other things, the HUD Reform Act of 1989 required that HUD promulgate "regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments" would result in material differences between assisted and comparable, unassisted units. See HUD Reform Act of 1989, Pub. L. No. 101-235, § 801(c), 103 Stat. 2058 (1990).

parability studies demonstrating entitlement to factor-based rent adjustments.[18]

Therefore, the requirement in the 1994 Act's amendments that owners demonstrate that AAF-adjusted rents would not materially differ from the rents for comparable unassisted units is is consistent with, and not a breach of, the Owners' HAP contracts. Pursuant to the 1994 Act and HUD Notice 95-12, HUD continues to determine whether, upon the basis of rent comparability studies, factor-based rent adjustments would differ materially from comparable, unassisted rents.[19]

---

[18] The reliance of Cuyahoga I upon Alpine Ridge and other cited decisions as supporting the proposition that HUD has "the burden of coming forward to show that a particular adjustment would violate the [overall] limitation," 57 Fed. Cl. at 760, is similarly misplaced. Those decisions involved challenges to HUD's authority to implement the overall limitation through rent comparability studies, not whether HUD, as opposed to an owner, may be required to demonstrate that a given rent adjustment would or would not violate the overall limitation provision.

[19] Even assuming for the sake of argument that the 1994 Act and/or HUD Notice 95-12 are inconsistent with the Owners' HAP contracts, the "unmistakability doctrine" precludes a breach-of-contract finding in this case. Under that doctrine, "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power." United States v. Winstar Corp., 518 U.S. 839, 878 (1996). The HAP contracts do not expressly exempt the Owners from the application of the 1994 amendment or otherwise purport to shift the risk of any future legislative acts to the Government. We are mindful of Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005), in particular, its holding that "[a] prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated." Id. at 1307. However, we respectfully disagree with that holding. No case involving the Contract Clause required a sovereign act before applying the unmistakability doctrine. In Winstar, the plurality discusses three cases in which the unmistakability doctrine was applied to non-state governments: United States v. Cherokee Nation of Oklahoma, 480 U.S. 700 (1987); Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41 (1986); and Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982). None of those decisions imposes the sovereign acts doctrine as a precondition to application of the unmistakability doctrine and all three remain good law. As far as legislation that targets contracts is concerned, Merrion and Bowen (and, so far as we can tell, every case involving the states applying the unmistakability doctrine) involved targeted legislation that would not have satisfied the sovereign acts doctrine.

V. The Requirement Of The 1994 Amendments To The Section 8 Statute That HUD Establish Different AAFs For "Turnover" And "Non-Turnover" Units Did Not Breach The Owners's HAP Contracts.

As noted above, the 1994 Act provided, with respect to AAFs, that, "[f]or any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for the unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0." 42 U.S.C. § 1437f(c)(2)(A) (1994). Consistent with that requirement, HUD Notice 95-12 required that, in order to receive a AAF-based rent adjustment, the project owner provide HUD with "the number of units in which turnover occurred since the last HAP contract anniversary date." Def. App. 9.[20]

In a footnote to their brief, the Owners state that, "[l]ike the plaintiff in Cuyahoga, the [Owners] here contend that the application of the one-percent deduction violates their contracts with HUD." Pl. Mem. 10 n.4. According to the Owners, "the AAAFs were intended to operate as an inflation adjustment factor and 'are set by HUD based upon certain broad economic indices, the Consumer Price Index and the Bureau of the Census American Housing Surveys,'" quoting National Leased Housing, 105 F.3d at 1426. Id. The Owners assert, without any evidentiary

[20] As noted above, at section 2.6a of their HAP contracts, the Owners agreed to provide HUD with "such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government." Def. App. 54, 74, 144. This would include "the number of units in which turnover occurred since the last HAP contract anniversary date" required by HUD Notice 95-12. Any cost incurred by a project owner associated with providing such data to HUD is a type of extra cost of managing or administering a Section 8 rental housing project that is intended to be covered by the difference between the comparable, unassisted rent and the initial HAP contract rent that is to be preserved in subsequent adjustments of the contract rents.

support:

> Costs associated with unit turnover have nothing to do with such inflation-related issues and are not based on "broad economic indices" – eventually, all units turn over. Moreover, units face most of the same operating costs regardless of turnover, so any distinction drawn between them is highly arbitrary and debatable. If anything, one percent should be ***added*** to the AAAFs for turnover units, insofar as those units may face ***additional*** costs at the time they are prepared for a new tenant.

Pl. Mem. 10-11 n.4 (emphases in original).

As noted above, to recover for breach of contract, the Owners have the burden of establishing a valid contract between the parties, an obligation or duty arising out of the contract, a breach of that duty, and damages caused by the breach. The Owners, however, have not come forward with any *evidence* to support their contentions that "units face most of the same operating costs regardless of turnover, so any distinction drawn between them is highly arbitrary and debatable" and that, "[i]f anything, one percent should be ***added*** to the AAAFs for turnover units, insofar as those units may face ***additional*** costs at the time they are prepared for a new tenant," much less demonstrated that there is no genuine issue of material fact with respect to those bald assertions. The arguments and statements of counsel are not evidence. Barcamerica International USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 593 n.4 (9th Cir. 2002).

In any event, the Government disagrees that the 1994 Act's requirement for a lower AAF for non-turnover units than for turnover units breached the Owners' HAP contracts. The Owners do not even identify the provision(s) of the HAP contract that they assert are in conflict with and were breached by the 1994 Act's provision regarding AAFs for turnover units.

HUD's issuance of different AAFs for "turnover" and "non-turnover" units, which the 1994 Act required, did not breach the Owners' HAP contracts. The rent adjustment provision contained in the Owners' HAP contracts, which tracks the controlling regulations, see 24 C.F.R. §§ 880.110(b)(1), 881.110(b)(1) (1979), states, in relevant part:

> Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

HAP Contracts, Part I, § 1.8b(1), Def. App. 41, 65, 134.

Section 1.8b(1) of the HAP contracts requires only that the Government determine the AAFs annually and publish "the basis" for that determination in the Federal Register. The 1994 is not inconsistent with that contract term. HUD complied with section 1.8b(1) of the Owners' HAP contracts (and the regulations governing the Section 8 New Construction and Substantial HAP Programs) by determining AAFs at least annually and publishing the AAFs and the basis for their determination in the Federal Register during the interval covered by the Owners' rent adjustment claims. See DPFUF Add. ¶¶ 5, 6; Def. Supp. App. 154-155 (3/7/95 AAFs), 190-192 (FY 1996 AAFs), 215-217 (FY 1997 AAFs), 241-243 (FY 1998 AAFs), 267-269 (1999 AAFs), 292-294 (FY 2000 AAFs), 318-320 (FY 2001 AAFs), 344-346 (FY 2002 AAFs), 372-374 (FY 2003 AAFs), 398-400 (FY 2004 AAFs), 422-424 (FY 2005 AAFs).

There is nothing in the language of section 1.8b(1) of the Owners' HAP contracts which mandates how the AAFs will be determined by the Government or that otherwise imposes limits upon the manner of calculating, or the basis of, the AAFs. Nor does the Federal Circuit's deci-

sion in National Leased Housing indicate otherwise. The court of appeals merely observed, in the "background" portion of the decision, that "[t]he AAAFs are set by HUD based upon certain broad economic indices, the Consumer Price Index and the Bureau of the Census American Housing Surveys," 105 F.3d at 1426, without in any way suggesting that, by virtue of anything contained in HUD regulations or the Section 8 statute let alone the HAP contracts, AAFs must be established upon that basis. National Leased Housing did not involve a challenge by the Section 8 rental housing owners in that case to the propriety of the AAFs themselves, including the basis for their determination.

As the Court opined in Cuyahoga II, 65 Fed. Cl. at 542, which rejected a similar claim by the plaintiffs in that case, "there is no indication that the statutory 1-percent deduction constituted the abrogation of any right or obligation established under the HAP contracts:"

> [T]hat the 1-percent modification of the AAAF formula for occupied properties reduced program costs does not, *ipso facto*, mean that it was inconsistent with any of the provisions of the HAP contracts. In relevant terms, those contracts merely provide that "Automatic Adjustment Factors will be determined by the Government at least annually," and that "[s]uch Factors and the basis for their determination will be published in the Federal Register."

Id. Section 1.8b(1) of the HAP contracts, thus, gives the Government the discretion to establish different AAFs for a given type of dwelling unit such as, for example, a one-bedroom apartment, depending upon the circumstances.[21/]

---

[21] In Statesman II, slip op. at 22-24, the court held that HUD breached the plaintiffs' HAP contracts "with relation to the announced one-percent reduction for non-turnover tenants' rents" when it published in HUD Notice 95-12 separate tables for turnover and non-turnover units without providing a basis for that determination. The court stated that "HUD has not published any findings that correlate the one-percent reduction to an owner's costs and expenses associated with turnover." Id. at 23. And Statesman II further states that "Congress's action to amend the (continued...)

The 1994 Act's provision with respect to lower AAFs for non-turnover units and HUD's implementation of that mandate by publishing separate AAFs for "turnover" and "non-turnover" units, therefore, is consistent with and did not breach or result in the breach of the Owners' HAP contracts.

VI. Assuming For The Sake Of Argument That The 1994 Act And HUD Notice 95-12 Breached, Or Resulted In A Breach Of The HAP Contracts, Park Properties And Valentine Have Not Demonstrated That They Did Not Receive Rent Adjustments During The 1995-2000 Time Frame As A Result Of The Breach Of Contract.

It is well-established that, "[i]n a breach of contract case, the plaintiff has the burden of proving that injury occurred as a result of the breach." Haynes v. United States, 61 Fed. Cl. 788, 790 (2004). In a July 23, 2001 letter to Mr. Tracy S. Newman of Quadel Consulting Corp., the

---

[21](...continued)
[Section 8] statute in 1994 was not accompanied by any findings stated in the statute itself about turnover costs, and the parties have not pointed to any pertinent legislative history." Id. We do not agree with the analysis or holding of Statesman II. HUD in fact published the basis for the lower AAFs for non-turnover units in the Federal Register. The prefatory comments to the AAFs published in the Federal Register are explicit: The basis for the lower AAFs for non-turnover units is the 1994 Act's amendment of 42 U.S.C. § 1437f(c)(2)(A). See Def. Supp. App. 154 (3/7/95 AAFs); Def. Supp. App. 190 (FY 1996 AAFs); Def. Supp. App. 215 (FY 1997 AAFs); Def. Supp. App. 241 (FY 1998 AAFs); Def. Supp. App. 267 (FY 1999 AAFs); Def. Supp. App. 292 (FY 2000 AAFs); Def. Supp. App. 318 (FY 2001 AAFs); Def. Supp. App. 344 (FY 2002 AAFs); Def. Supp. App. 372 (FY 2003 AAFs); Def. Supp. App. 398 (FY 2004 AAFs). The Statesman II court incorrectly interprets the HAP contract as requiring that the basis for AAFs published in the Federal Register must be a factual ("costs and expenses") basis. The HAP contracts, however, are not written that restrictively. The contractual requirement is to *publish* the "basis" for AAFs, *not* to circumscribe or otherwise define what is an adequate or permissible basis for the AAFs. The published basis for AAFs, thus, can be a legal basis, such as the 1994 Act. Also, contrary to the statement in Statesman II, the reduction of the AAFs for non-turnover units *is* addressed in the legislative history of the 1994 Act. See Report of Hearings Before a Subcommittee of the Committee on Appropriations, Part 6, 103d Cong. 2d Sess., at 591 ("Reduce AAF Rent Increases for 'Stayers.' Based on the rationale that operating costs are less if tenant turnover is less, this proposal would limit the rent increases for Section 8 housing subject to an AAF to the full inflation adjustment minus one percentage point in those cases where the tenant stays in the same unit for [one] year."), Def. Supp. App. 704.

contract administrator for the Owners' HAP contracts as of December 2000, Mr. Jerome Z. Ginsburg, the President of Friendly Management, Inc., general partner for Park Properties and Valentine, admitted that Park Properties and Valentine did not obtain rent adjustments for LaMartine Terrace and Lane Hill during the 1995-2000 period because of a mistaken belief that those projects, which were located in a housing market that was subject to rent control, were not eligible for rent increases:

> When these projects were originally built and rehabilitated under the Section 8 Turnkey Program, the costs could not be supported based on existing rent levels in the City of Yonkers because of the fact that Yonkers had imposed rent control. Rent control stopped all construction in a market that was in dire need of housing. It effectively froze the rent levels at levels that did not support construction or rehabs.
>
> These Section 8 project[s] were approved at 110% of fair market rent which is really free market, not rent controlled market. Rent increases were thereafter granted on an annual basis.
>
> However, subsequently, [HUD] through its eminent wisdom decided to change the rent increase formula to 70% of the median rental and thereafter lowered it further which impacted on the ability to get rent increases.
>
> The [HUD] action, however, did not freeze the cost of operating the building.
>
> *We sent an employee to various HUD seminars and either through her ignorance or the complexity of the process, she arrived at the conclusion that no increases were possible in this building.*
>
> *Mr. Bolduc and myself spent a week reviewing the HUD rent increase process and, contrary to her opinion, found that the RCS [Rent Comparability Study] Program would allow us to obtain rent increases since it does account for projects where rent control is imposed.*

> *However, because of this error, approximately seven years went by without an increase . . . .*

Def. Supp. App. 511-512 (emphasis added); see also DPFUF Add. ¶ 20.

The Owners, therefore, cannot demonstrate that, for the 1995-2000 interval, the failure of Park Properties and Valentine to receive annual rent adjustments was the direct or proximate consequence of the requirements of the 1994 Act or HUD Notice 95-12. Hence, the breach-of-contract claims of Park Properties and Valentine for those years are without merit.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment as to liability should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

NANCY CHRISTOPHER
Acting Associate General Counsel

HOWARD SCHMELTZER
Assistant General Counsel

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, DC

AUGUST 31, 2005