IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **PARK PROPERTIES ASSOCIATES, L.P., et al.** | |
| **Plaintiffs,** | |
| **v.** | **No. 1:04-cv-01757-FMA** |
| | **Judge Allegra** |
| **THE UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

**PLAINTIFFS' SUMMARY JUDGMENT REPLY BRIEF**

Dated: September 23, 2005

Harry J. Kelly, Esq.
NIXON PEABODY LLP
401 Ninth Street, N.W.
Washington, D.C. 20004
(202) 585-8000

Counsel for the Plaintiffs

W677810.1

TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. UNDER THE DOCTRINE OF COLLATERAL ESTOPPEL, THE COURT SHOULD NOT ALLOW THE GOVERNMENT TO RELITIGATE WHETHER A BREACH OCCURRED HERE. ..... 2

II. THE COURT PROPERLY DETERMINED THAT THE 1994 AMENDMENTS AND THE DIRECTIVE CONSTITUTE A BREACH OF THE PLAINTIFFS' CONTRACTS. ..... 3

A. *Cuyahoga I* Was Properly Decided and The Court Should Adhere To That Decision. ..... 3

1. The Parties Intended that the Plaintiffs Would Receive an Automatic Annual Adjustment Unless HUD Determined That the Adjusted Rent Was Materially Different From Comparable Unassisted Rents. ..... 4

2. In the absence of timely rent comparability studies, HUD's failure to grant AAAF-based rent adjustments breached the plaintiffs' HAP Contracts. ..... 6

3. HUD has no authority to delegate the task of performing rent comparability studies to Section 8 owners. ..... 8

III. THE PLAINTIFFS HAVE DEMONSTRATED THAT A BREACH EXISTS, BECAUSE THE GOVERNMENT PERFORMED NO COMPARABILITY STUDIES ..... 12

IV. HUD's REDUCTION OF THE AAAFs FOR NON-TURNOVER UNITS WAS A BREACH OF THE HAP CONTRACTS. ..... 14

V. THE GOVERNMENT'S FAILURE TO MAKE AUTOMATIC RENT ADJUSTMENTS CAUSED PLAINTIFFS' INJURIES HERE. ..... 15

CONCLUSION ..... 18

## TABLE OF AUTHORITIES

### CASES

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 123 L. Ed. 2d 572, 113 S. Ct. 1898 (1993) .......... passim

*Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 741 (2003) .......... passim

*Cuyahoga Metropolitan Housing Authority v. United States*, 65 Fed. Cl. 534 (2005) .......... 11

*Federal Housing Partners IV v. Cisneros*, 55 F.3d 362 (8th Cir. 1995) .......... 10

*Haynes v. United States*, 61 Fed. Cl. 788 (2004) .......... 16

*Int'l Transducer Corp. v. United States*, 30 Fed. Cl. 522 (1994) .......... 4

*Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443 (2001) .......... 4

*Park Village Apartments v. United States*, 32 Fed. Cl. 441 *aff'd*, 152 F.3d 943 (Fed. Cir.), *cert denied*, 525 U.S. 962 (1998) .......... 11

*Record Steel and Constr., Inc. v. United States*, 62 Fed. Cl. 508 (2004) .......... 4

*Statesman II Apartments, Inc. v. United States*, 2005 U.S. Claims LEXIS 211 (July 20, 2005) .......... passim

*Vardon Golf Co., Inc. v. Karsten Manufacturing Corp.*, 294 F.3d 1330 (Fed. Cir. 2002) .......... 3

### STATUTES

Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) .......... passim

### REGULATIONS

24 CFR § 888.113(a) .......... 8

### OTHER AGENCY ACTION

HUD Notice 95-12 .......... passim

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **PARK PROPERTIES ASSOCIATES, L.P., et al.** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 1:04-cv-01757-FMA** |
| | ) | **Judge Allegra** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' SUMMARY JUDGMENT BRIEF**

## INTRODUCTION

This is, at heart, a simple case in which the plaintiffs, owners of multifamily housing properties that receive rental assistance pursuant to the Section 8 program, seek damages resulting from the breach of their Housing Assistance Payments Contracts ("HAP Contracts") with the U.S. Department of Housing and Urban Development ("HUD"). In its prior decision in *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 741 (2003) ("*Cuyahoga I*"), this Court held that, on the basis of substantially similar allegations, the plaintiffs in that case demonstrated that such a breach occurred when Congress enacted amendments in 1994 to the Section 8 statute that dramatically altered the way in which HUD made annual rent adjustments pursuant to those contracts. *See* Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995. Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) (the "1994 Amendments"). Later, HUD released Directive 95-12 (the "Directive") to carry out the provisions of the 1994 Amendments. A few weeks ago, another member of this court, addressing essentially the same facts, followed this Court's analysis in the

*Cuyahoga I* decision and found those 1994 Amendments and the Doctrine constituted a breach of the rent adjustment provisions of the plaintiffs' HAP Contracts in that case. *Statesman II Apartments, Inc. v. United States*, 2005 U.S. Claims LEXIS 211 (July 20, 2005) ("*Statesman II*").

Despite the unambiguous holdings of these two decisions, the government asks the Court here to invalidate its earlier decision in *Cuyahoga I*, and to conclude that the breach of contract found in that case and *Statesman II* was not in fact a breach. The government has not advanced any persuasive reason to depart from the Court's prior holdings in *Cuyahoga I*, however, nor has it raised any other grounds to suggest that the plaintiffs' motion for summary judgment should not be granted. Where, as here, the Court has already addressed the specific issues at stake and concluded that they demonstrate that a breach occurred, the Court should follow its prior decisions and enter summary judgment on behalf of the plaintiffs.

## ARGUMENT

### I. UNDER THE DOCTRINE OF COLLATERAL ESTOPPEL, THE COURT SHOULD NOT ALLOW THE GOVERNMENT TO RELITIGATE WHETHER A BREACH OCCURRED HERE.

The claim asserted by the plaintiffs here – that in enacting the 1994 Amendments and issuing the Directive, the government breached the rent adjustment provisions of its HAP Contracts with the plaintiffs – have been fully and fairly litigated by the Government in both the *Cuyahoga* and *Statesman* cases. In *Cuyahoga I* and *Statesman II*, the government's arguments were firmly and unambiguously rejected.

Under the doctrine of collateral estoppel, the government should not be allowed to relitigate these issues. Collateral estoppel prevents a party from litigating an issue if: (1) the issue sought to be precluded is same as that involved in earlier action; (2) the issue was actually

litigated; (3) determination of issue was essential to final judgment; and (4) the party against whom estoppel is invoked was represented in the prior action. *Vardon Golf Co., Inc. v. Karsten Manufacturing Corp.*, 294 F.3d 1330 (Fed. Cir. 2002).

As discussed at length in plaintiffs' opening brief, the breach issue in this case is identical to the issue raised in *Cuyahoga I* and *Statesman II*.[1] In each of those cases, plaintiffs claimed that the failure to make automatic annual adjustments as a result of the 1994 Amendments and the Directive resulted in a breach of their HAP Contracts' rent adjustment provisions. Moreover, the issue was fully and vigorously litigated in both cases, and the court's conclusion that the HAP Contracts had been breached was essential to the final judgment. Finally, the government was a party to the prior actions and had every incentive to litigate the issue aggressively in those cases. Under the circumstances, it would be entirely fair to apply, and the court should apply, the doctrine of collateral estoppel to prevent the government from relitigating the breach issue.

## II. THE COURT PROPERLY DETERMINED THAT THE 1994 AMENDMENTS AND THE DIRECTIVE CONSTITUTE A BREACH OF THE PLAINTIFFS' CONTRACTS.

### A. *Cuyahoga I* Was Properly Decided and The Court Should Adhere To That Decision.

In its principal argument, the government unabashedly attempts to persuade the Court that its holding in *Cuyahoga I* – and by inference, the decision in *Statesman II* – was wrongly decided, and that the government's failure to make AAAF-based rent adjustments after 1994 in the absence of timely comparability studies did not constitute a breach of contract. *See* Defendant's Opposition to Plaintiffs' Motion for Summary Judgment as to Liability

[1] *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Adjustment as to Liability ("Opening Brief") at 11-17.

("Opposition Memorandum," cited as "Opp. Mem.") at 16-25. The government offers no compelling argument for overturning *Cuyahoga I* or for subverting its careful reading of the parties' rights and responsibilities under the Section 8 statute and the HAP Contracts. Essentially, the government argues that the Court in *Cuyahoga I* misconstrued the Section 8 statute, the HAP Contracts, the 1994 Amendments, and the Directive, among other things. Plaintiffs disagree and respectfully request that this Court uphold its prior decisions.

While the government is correct that in their Opening Brief, the plaintiffs' argument closely followed this Court's decision in the *Cuyahoga I* decision, the plaintiffs did so because that opinion was correctly decided. Because this Court's prior decisions correctly interpreted the terms of the HAP Contracts, the intentions of the parties and the governing principles of contract construction, the Court should follow those decisions here too.

**1. The Parties Intended that the Plaintiffs Would Receive an Automatic Annual Adjustment Unless HUD Determined That the Adjusted Rent Was Materially Different From Comparable Unassisted Rents.**

"[C]ontract interpretation is a matter of law, and thus issues of contract interpretation can be readily susceptible of resolution by summary judgment." *Record Steel and Constr., Inc. v. United States*, 62 Fed. Cl. 508, 518 (2004). It is also true that "the intent of the parties controls contract interpretation, and the 'primary function of the court is to ascertain the intent of the parties to a contract.'" *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 458 (2001) (*quoting Int'l Transducer Corp. v. United States*, 30 Fed. Cl. 522, 526 (1994)). "Interpretation of a contract begins – and often ends – with the text of the written agreement." *Statesman II* at *22.

The language of the HAP Contract manifests that the plaintiffs were entitled to receive an automatic annual adjustment, unless HUD, on a timely basis, determined that the adjusted rent

was materially different from the comparable, unassisted rent. As noted in plaintiffs' Opening Brief, Section 1.8b of the HAP Contract provided for such automatic annual adjustments:

> b. Automatic Annual Adjustments.
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually . . . .
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

Opening Brief at 3, *quoting* HAP Contracts, § 1.8b (Exhibits 1, 2 and 3 to Opening Brief). Section 1.8b thus called for ***automatic*** annual adjustments of the plaintiffs' contract rents, and required HUD to make those automatic adjustments by applying each year, on the anniversary date of the HAP Contract, an "Automatic Annual Adjustment Factor" (the "AAAF") to the prior year's contract rent. As the Supreme Court has observed, the AAAFs were "the presumptive adjustment called for under the contract." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 19, 123 L. Ed. 2d 572, 113 S. Ct. 1898 (1993).

There was a condition to the application of the AAAF-based adjustment provided by Section 1.8d of the HAP Contract – the so-called "overall limitation," which provided that

> Notwithstanding any other provision of this Contact, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rent.

HAP Contracts at §1.8d. In *Alpine Ridge*, the Supreme Court explained that "it is only in the presumably exceptional cases where [HUD] has reason to suspect that the adjustment factors are

resulting in materially inflated rents that a comparability study would ensue." *Alpine Ridge*, 508 U.S. at 19.

Thus, the rent adjustment provisions of their HAP Contracts called for the plaintiffs to receive the "presumptive adjustment" provided for by the AAAFs, except in those "presumably exceptional cases" where HUD had reason to perform a comparability study due to its belief that the AAAF-based adjustment would result in rents materially different from the comparable unassisted rents. This straightforward approach to rent adjustments was repudiated by the 1994 Amendments and the Directive, however, as the *Cuyahoga I* and *Statesman II* decisions have held.

**2. In the absence of timely rent comparability studies, HUD's failure to grant AAAF-based rent adjustments breached the plaintiffs' HAP Contracts.**

In *Cuyahoga I*, the Court examined these same contract provisions and the same operative facts as in this case. Taking a multi-pronged approach, it reviewed the statutes, the contracts and the dealings between the parties since the start of the program. *Cuyahoga I* at 759-762. As the Court noted in citing the portions of the HAP Contracts that called for HUD to adjust contract rents "by applying the applicable Automatic Annual Adjustment Factor most recently published by the Federal government," the parties bargained for an adjustment that was automatic, without the need for action by the owners:

> The "automatic" references in these provisions as well as the annual periodicity established therein, plainly reveal an intent that the adjustment would occur without [the owner] having to take any significant action.

*Cuyahoga I* at 759.

The Court in *Cuyahoga I* concluded that, under identical HAP Contract provisions, HUD was required to pay the full AAAF-based rent adjustment unless it conducted timely rent comparability studies that indicated the adjusted rent was materially in excess of rents at



W677810.1

comparable unassisted units. As explained in *Cuyahoga I*, the "overall limitation" contained in Section 1.8d "requires HUD to determine whether there is a material difference [between AAAF-adjusted and comparable unassisted rents]." *Id.* at 759. While the HAP Contract does not specifically address who will perform those studies, this court has determined that "[l]ogic . . . suggests that for the adjustments in the first part of the contract to be truly 'automatic,' the burden of demonstrating a material difference must lie on HUD." *Id.* Thus, "from the passage of Section 8 in 1974 until it was modified in 1995, the statutory mechanism clearly envisioned that annual adjustments were to be automatic ***unless HUD promptly performed a comparability study***." *Cuyahoga I* at 761-762 (emphasis added).

The enactment of the 1994 Amendments and the issuance of the Directive fundamentally altered this mechanism by requiring the plaintiffs and other Section 8 owners for the first time to "demonstrate that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary." 1994 Amendments, 108 Stat. 2298, 2315. The fact that Congress felt compelled to amend the Section 8 statute through the 1994 Amendments to impose the burden to perform comparability studies on the owners itself indicates that that burden "was latent neither in the earlier legislation nor in any contracts based thereupon." *Cuyahoga I* at 762. Indeed, "[e]very indication is that Congress knew it was fundamentally altering the process for determining adjustments in preexisting contracts and was doing so to reduce outlays." *Id.*

The 1994 Amendments and the Directive that implemented it thus violated the carefully constructed rent adjustment mechanism set out in the HAP Contracts. Specifically, as this Court held (1) "the HAP contracts expressly require HUD to provide [the plaintiffs] with annual adjustments barring the agency's invocation of the overall limitation"; (2) "the passage of the



W677810.1

[1994 Amendments] was a repudiation of this contract provision that seemingly caused a failure to perform a contractual duty when it was due, at that point ripening into an apparent breach of contract"; and (3) "[t]hat *prima facie* breach was then exacerbated when HUD, in [the Directive] imposed additional requirements not envisioned in either the HAP contracts or the prior legislation." *Cuyahoga I* at 762. Construing the same contractual language and adopting this Court's *Cuyahoga I* decision, the court in *Statesman II* concurred that the effect of the 1994 Amendments and the Directive "was to abrogate the provisions of the contracts regarding automatic annual adjustment of rents and to breach the contracts." *Statesman II* at *38. For the same reasons, HUD's failure in the present case to make automatic annual rent adjustments, in the absence of performing timely comparability studies, constituted a breach of the plaintiffs' HAP Contracts.[2]

**3. HUD has no authority to delegate the task of performing rent comparability studies to Section 8 owners.**

To avoid the force of the Court's holding in *Cuyahoga I* and the more recent but complementary holding in *Statesman II*, the government adopts the novel position that no breach occurred because it was authorized by the HAP Contracts to split the task of performing

---

2 While the plaintiffs' allegations focus on the failure of HUD to make required rent adjustments pursuant to the HAP Contracts as a result of the 1994 Amendments and the Directive, it is clear that the 1994 Amendments and the Directive shifted other unbargained-for burdens to the plaintiffs. For example, the government contends that the obligation imposed by the 1994 Amendments on owners to perform rent comparability studies "is triggered only where the current HAP contract gross rents exceeds the published ***fair market rents*** for an existing dwelling unit in the relevant housing market." Opp. Mem. at 22 -23 (emphasis added). The use of HUD's "fair market rents" as a reliable measure is extremely problematic. As this Court has recognized, "'the description most often made of FMRs is that they are neither fair nor market. . . ." *Cuyahoga I* at 779, quoting H.Rep. 104-461 at 100-01. Presently, FMRs "are set at either the 40th or 50th percentile rent – the dollar amount below which the rent for 40 or 50 percent of standard quality rental housing units falls." 24 CFR §888.113(a). To paraphrase *Cuyahoga I*, rents that are arbitrarily pegged by HUD at 40 – 50% of the actual rents are not in any sense "fair" or "market" rents; certainly, there is no basis to assume that when owners contracted to have their adjusted rents tested against "comparable, unassisted rents," they understood the comparable rents would be so discounted. The effect is obviously to make it increasingly likely that AAAF-adjusted rents will exceed the improperly discounted FMRs.

comparability studies from the task of making the annual rent adjustment. *See* Opp. Mem. at 18ff. There is simply no support for this position. On the contrary, the analysis supplied by the courts in *Cuyahoga I* and *Statesman II* – and by many earlier decisions that looked at HUD's role in Section 8 rent adjustments – demonstrate that the rent adjustment process was a consolidated task that belonged solely to HUD, no portion of which can be shaved off and forced upon owners to perform.

Indeed, in contending that the "overall limitation" does not "specify which party has the burden of demonstrating that there is or is not a material difference," Opp. Mem. at 18, the government refuses to acknowledge that this Court already settled the matter in *Cuyahoga I*. As noted, that decision explained that "[l]ogic . . . suggests that for the adjustments in the first part of the contract to be truly 'automatic,' ***the burden of demonstrating a material difference must lie on HUD***." *Cuyahoga I* at 759 (emphasis added). After reviewing *Alpine Ridge* and other cases that confirmed HUD's power to perform rent comparability studies pursuant to the "overall limitation," the Court warned that HUD's attempt to impose the burden of performing comparability studies on the owners was unsupported by the overall limitation power contained in Section 1.8d:

> [T]hat this language gave rise to so many *bona fide* disputes concerning HUD's role in setting rents illustrates just how far the government seeks to elasticize those same words in arguing not that HUD ***may*** use such comparability studies to limit the automatic adjustments, but that the property owners ***must*** use such studies to qualify for them.

*Cuyahoga I* at 760 (emphasis original). The Court correctly concluded that "this conceptualization stretches the language of the contracts and the underlying statute well past its breaking point." *Id.* The *Cuyahoga I* decision could not more clearly state that the duty to perform comparability studies belongs solely to HUD.

In *Statesman II*, HUD made, and the court expressly rejected, the same argument. There, the court explained that HUD's duty to grant automatic annual adjustments was

> qualified only by Section 1.8d [of the HAP Contracts], which provides, in part, that "notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, ***as determined by the Government.***"

*Statesman II* at *26, quoting HAP Contract (emphasis added by court). Relying on this Court's decision in *Cuyahoga I*, the *Statesman II* court concluded that "[t]he plain text of Section 1.8d, read in relations to Section 1.8b, 'places on HUD, ***and only on HUD***, the burden of coming forward to show that a particular adjustment would violate the limitation.'" *Statesman II* at *27, *quoting Cuyahoga I* at 760 (emphasis added).[3]

Moreover, the express language of Section 1.8d makes clear that the task of determining those comparable unassisted rents belonged solely to HUD. According to that section, before an AAAF-based adjustment could be approved, the proposed adjusted rent had to be tested against the 'comparable, unassisted rent, ***as determined by the Government***." It is HUD, not the owners, that must determine those comparable rents. Yet, as in *Statesman II*, the government here contends that its "discretion to design and implement comparability studies as a reasonable means of effectuating its mandate" under Section 1.8d, (*Alpine Ridge*, 508 U.S. at 21) is broad enough to include '"the discretion to place the onus of conducting such studies upon the project owner.'" *Statesman II* at *28 – 29 (quoting government brief). As the *Statesman II* court held,

---

[3] The authorities relied upon by the government to support its position are inapposite. In the cases it relies upon – foremost, *Alpine Ridge* and others, including *Federal Housing Partners IV v. Cisneros,* 55 F.3d 362 (8th Cir. 1995) – the issue was whether HUD possessed the right to perform comparability studies at all. In these cases, owners contended that in adopting the AAAF-based model to adjust Section 8 rents, HUD had abandoned the right to conduct comparability studies. While these cases are important in confirming how the Section 8 rent adjustment mechanism works, they do not provide carte blanche to HUD to adopt any procedures it wishes to carry out its duties. Indeed, the ultimate holding of these cases is that it is emphatically HUD's right and duty, under the Section 8 statute and the HAP contracts, to perform rent comparability studies. *See Cuyahoga I* at 759-760.

"[t]he text of Section 1.8d, however, is not as malleable as the government's interpretation would require." Id. at *29. Relying on *Alpine Ridge*, the *Statesman II* court held that HUD's discretion under Section 1.8d in fact required HUD to perform those studies:

> [I]n regard to the discretion vested in HUD by Section 1.8d, the Supreme Court "observed that 1.[8]d expressly assigns to '***the Government***' the determination of whether there exist material differences between the rents charged for assisted and comparable unassisted units."

*Statesman II* at *29 (emphasis added by court), *quoting Alpine Ridge* at 21. HUD may possess discretion to decide "which units are comparable, what rents are charged for those comparable units, and whether AAAF-based adjustments would result in differences between assisted and unassisted rents that are 'material.'" *Statesman II* at *30, *quoting Park Village Apartments v. United States*, 32 Fed. Cl. 441, 447, *aff'd*, 152 F.3d 943 (Fed. Cir.), *cert denied*, 525 U.S. 962 (1998). But nothing in Section 1.8d allows HUD to delegate its duty to perform comparability studies to owners:

> [T]he text of Section 1.8d does not suggest that HUD could abdicate its duty to make any or part of these determinations or could impose that duty on its contracting counterparties by first requiring them to conduct studies and then requiring that the studies show no material differences.

*Statesman II* at *30.[4]

Pursuant to their HAP Contracts, the plaintiffs therefore were entitled to receive an automatic rent adjustment unless HUD performed a timely rent comparability study, pursuant to

---

[4] The HAP Contract provision requiring Owners to furnish "such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government" provides no support for the government's position here. HAP Contract, Part II, §2.6a (Exhibits 1-3 to Opening Brief). This bootstrapping argument has been specifically rejected by the court in *Cuyahoga* and *Statesman II*. As this Court explained, "taken in the context of the entire contract, and particularly given the detailed adjustment provisions therein, there is no way that [Section 2.6a] could reasonably be construed to require owners to provide comparability studies as part of a revised adjustment regime." *Cuyahoga Metropolitan Housing Authority v. United States*, 65 Fed. Cl. 534, 542 n. 10 ("*Cuyahoga II*"). Similarly, the *Statesman II* court reasoned that because Section 1.8d does not confer upon HUD discretion to make the Section 8 owners perform comparability studies, "it is not reasonable to construe the term 'reports' in section 2.6a as including rent comparability studies." *Statesman II* at *35, n. 15.

the "overall limitation" contained in Section 1.8d. *Cuyahoga I* and *Statesman II* confirm that there was no statutory or contractual basis to shift the burden of performing those analyses onto the plaintiffs. There is no dispute that the plaintiffs did not receive their automatic annual adjustments for the subject years, or that HUD performed the required comparability studies. As a result of the 1994 Amendments and the Directive, HUD breached the plaintiffs' HAP Contracts, by denying them the automatic rent adjustments they were otherwise entitled to receive. The plaintiffs are therefore entitled to summary judgment as to liability here.[5]

## III. THE PLAINTIFFS HAVE DEMONSTRATED THAT A BREACH EXISTS, BECAUSE THE GOVERNMENT PERFORMED NO COMPARABILITY STUDIES

As explained above, the plaintiffs are entitled to summary judgment because, as a result of enacting the 1994 Amendments and issuing the Directive, the government breached its obligation to make AAAF-based rent adjustments. In attempting to avoid the obvious consequences of its misconduct and the holdings on *Cuyahoga I* and *Statesman II*, the government misstates both the nature of the claim asserted by the plaintiffs and the elements needed for them to prove their claim, contending that in order to demonstrate a breach of contract, the plaintiffs must allege that the adjusted rent would not have materially exceeded the comparable, unassisted rent. *See* Opp. Mem. at 15 – 16.

Specifically, the government confuses the plaintiffs' right to an annual AAAF-based rent adjustment with its own obligation to conduct comparability analyses. As noted above (pg. 5),

---

5 The Opposition Memorandum's invocation of the unmistakability doctrine (at 24, n. 19) is unconvincing and fails to addresses the authoritative conclusions reached in *Cuyahoga I* (at 763 – 780) and *Statesman II* ( at *59 – 64) that the unmistakability doctrine does not apply here. Although this analysis was discussed in our Opening Brief (at 17 – 23), the government's contentions are dispatched effectively by *Cuyahoga I*, where the Court held that "[h]ere, of course, the impact of the 1994 amendments fell not substantially, but exclusively upon the government's contracting partners, with an avowed intent to reduce outlays during times of budget constraints. ***As such, defendant's suggestion that this action was protected by the unmistakability doctrine is wholly unconvincing***." *Cuyahoga I* at 780 (emphasis added).



W677810.1

these plaintiffs were "presumptively entitled" to an AAF-based adjustment, except in the "presumably exception cases" where HUD was required to perform a rent comparability study. *See Cuyahoga I* at 760; *Alpine Ridge* at 19-20.

Indeed, the Supreme Court's decision in *Alpine Ridge* is consistent with plaintiffs' claims. In *Alpine Ridge*, the owners asserted that HUD had no right to perform a comparability analysis at all. In rejecting that claim, the Supreme Court concluded that HUD had the power to conduct rent comparability studies as part of the Section 8 rent adjustment process. Plaintiffs are not claiming such an absolute right to a rent adjustment. In fact, plaintiffs are insisting that the government be held to the letter of what *Alpine Ridge* conferred on it – the power to conduct rent comparability studies. Thus, the issue is whether, when HUD fails or refuses to conduct the rent comparability studies endorsed by *Alpine Ridge*, it must pay the AAAF-adjusted rent, as this court explained in *Cuyahoga I.* There is no dispute here that HUD did not conduct those rent comparability studies pursuant to the HAP Contract.

In fact, the government's argument here is nothing more than an attempt to impose surreptiously upon the plaintiffs a burden – performing rent comparability studies – that exclusively belongs to HUD, as the *Cuyahoga I* and *Statesman II* decisions affirm. Essentially, the government is claiming that HAP Contract required what the 1994 Amendments made the law: that the plaintiffs had to justify their entitlement to a rent adjustment by showing that their AAAF-adjusted rents were less than the overall limitation.

But as explained above, *Cuyahoga I* and *Statesman II* made clear that Section 8 owners were under no such duty and that instead it was the government's duty to perform timely comparability studies if it wished to raise the overall limitation as grounds to deny an AAAF-

based adjustment. Where, as here, the government adopted policies that attempted to force this obligation onto the plaintiffs, it breached its contract with them.

The plaintiffs have met their burden of showing that they are entitled to summary judgment because they have demonstrated that in the absence of timely rent comparability studies performed by HUD, they did not receive their AAAF-based rent adjustment. According to *Cuyahoga I* and *Statesman II*, that is sufficient evidence to determine that a breach of contract occurred here and that the plaintiffs are entitled to summary judgment.

## IV. HUD's REDUCTION OF THE AAAFs FOR NON-TURNOVER UNITS WAS A BREACH OF THE HAP CONTRACTS.

As plaintiffs explained in their Opening Brief (at 10, n.4), HUD erred in setting different AAAF rates for units whose tenants changed during the course of a year ("turnover units") and units where the occupying tenant remained the same ("non-turnover units"). Although the *Cuyahoga II* court determined that HUD had the authority to draw such a distinction, *Cuyahoga II*, 65 Fed. Cl. at 542, HUD has failed to explain adequately the basis for the distinction, as it was required to do under Section 1.8b(1) of the HAP Contracts. HUD's scheme of treating turnover and non-turnover units differently, therefore, is a breach of the HAP Contracts.[6]

HUD's failure to comply with required procedures in making this distinction was squarely addressed in the *Statesman II* decision. The court took note of the fact that while HUD may have discretion in determining AAAFs, Section 1.8b(1) of the HAP Contracts requires that "[s]uch Factors and the basis for their determination will be published in the Federal Register."

---

6 Plaintiffs note that, as stated in their Opening Brief, this issue is really more appropriately considered at the damages phase of the case. That is to say, the distinction between turnover and non-turnover AAAFs becomes important only after the court has determined that the government is liable and that the AAAFs should be applied to plaintiffs' rents. Plaintiffs address the issue in this brief in response to the government's argument. Opp. Mem. at 25 – 29.

*Statesman II*, at *55. HUD has not complied with this requirement. *Id.* at *56. Of course, it is clear that HUD could not provide a factually sufficient basis for making a distinction between the adjustment factor for units that turn over versus those that do not. As *Statesman II* explains, "HUD has not published any findings that correlate the one percent reduction to an owner's costs and expenses associated with turnover." *Statesman II* at *57. For example, per unit charges for taxes, mortgage payments, advertising and most other costs are the same for an apartment unit, whether or not it "turns over" in any given year. The burden is not on the plaintiffs to come forward with factual evidence as to these matters; rather, as the *Statesman II* decision makes clear, the burden was on HUD pursuant to Section 1.8b(1) of the HAP Contracts to publish its justifications for the action it took – a burden which it never attempted to meet. [7]

On the basis of HUD's failure to publish those justifications in the Federal Register as required by the HAP Contract, the court in *Statesman II* held that HUD breached the HAP Contracts with respect to the announced one percent reduction for non-turnover tenants' rents. *Id.* at 58. The court should do likewise here.

## V. THE GOVERNMENT'S FAILURE TO MAKE AUTOMATIC RENT ADJUSTMENTS CAUSED PLAINTIFFS' INJURIES HERE.

In its final argument, the government asserts that, assuming it breached the HAP Contracts, its breach did not cause injuries to two of the instant plaintiffs. In doing so, the

---

[7] The government argues that by indicating that the turnover/non-turnover distinction was made in response to the 1994 Amendment, HUD did, in fact state the *legal basis* for the reduction. The HAP Contracts, however, clearly did not intend for HUD to be able to satisfy section 1.8b(1) by stating merely the legal basis for determination of the AAAFs. The "legal basis for the determination" of the factors was always the Section 8 statute. The only legislative basis for the nonturnover deduction is the 1994 Amendments, which the Courts have already determined was primarily intended to save the government's money. *See Cuyahoga I* at 778 (Congress "concerned about reducing outlays") and *Statesman II* at *58 ("Congress was primarily concerned with reducing the overall cost of the program."). The *Statesman II* court was correct that the failure to provide factual grounds to justify the nonturnover deduction was fatal under the HAP Contracts.

government correctly states that "[i]n a breach of contract case, the plaintiff has the burden of proving that injury occurred as a result of the breach." Opp. Br. at 29 (*quoting Haynes v. United States*, 61 Fed. Cl. 788, 790 (2004) (internal quotes omitted)). The government then alleges that the failure of plaintiffs Park Properties and Valentine Properties to obtain rent increases from 1995 to 2000 was caused by their failure to apply for annual rent increases, based on their mistaken belief that they were not entitled to such increases.

The existence of a causal link between the government's breach and plaintiffs' injuries could not be clearer. The breach in this case is the government's failure to fulfill its contractual obligation to increase rents automatically. The injury to the plaintiffs is the difference between the lower, unadjusted rents they received and the higher, adjusted rents they should have received. There is no question that the government's failure to adjust plaintiffs' rents automatically (the breach) caused the plaintiffs to receive lower rents than they were entitled to receive under the HAP Contracts (the injury). Put another way, if the government had fulfilled its contractual obligation to adjust plaintiffs' rents, then plaintiffs would have received the higher rents to which they were entitled and would not have suffered their injuries.

The letter between Mr. Ginsburg and Mr. Newman cited by the government does not interrupt the causal link between the government's breach and the plaintiffs' injuries. First, the Ginsburg letter is not even relevant to the government's argument. At its base, the government's causation argument is that it was really the failure of the plaintiffs to apply for rent increases pursuant to the 1994 Amendments that caused them not to receive the rent increases. Under this

argument, however, the plaintiffs' *reasons* for not applying for rent increases, which is all that the government claims the Ginsburg letter demonstrates, is not relevant to determining liability.[8]

Second, the plaintiffs' decision not to apply for rent increases pursuant to the 1994 Amendments does nothing to interrupt the causal link between the government's breach and plaintiffs' injuries. Had the government honored its contractual obligation to make AAAF-based rent adjustments, plaintiffs would have received the rent adjustments they were due, regardless of whether they applied for them. That the government's failure to make the required rent adjustments caused plaintiffs not to receive those rent adjustments could not be clearer. Moreover, if the government had made the AAAF-based adjustments pursuant to the HAP Contracts, there would not have been any need for the plaintiffs to have complied with the procedure instituted by the 1994 Amendments, as the government now insists they should have. In arguing that plaintiffs' failure to apply for AAAF-based adjustments was an intervening cause of their not receiving the rent adjustments, the government is attempting to use its own breach as a basis to deny plaintiffs the rent adjustments to which they are entitled.

The fact is the government had a contractual obligation to deliver a benefit, i.e. AAAF-adjusted rents, to the plaintiffs in the absence of a HUD-generated comparability study. Indeed, part of the contracted-for benefit to the plaintiffs was that the rent adjustments would occur automatically each year, thus sparing plaintiffs the expense and administrative burden of having to apply for them. In requiring plaintiffs to apply for rent adjustments and provide comparability studies in violation of the HAP Contracts, the government erected procedural barriers to its delivery of those benefits. Now it argues that the plaintiffs are the cause of their own injuries for

---

8 Under *Cuyahoga II*, this Court determined that facts relating to whether the Plaintiffs sought rent adjustments pursuant to the 1994 Amendments go to mitigation only, not to damages. *Cuyahoga II* at 545. Any discussion of the post-1994 conduct of the plaintiffs with respect to compliance with the 1994 Amendments should be deferred until the damages phase of this case.

not complying with the very procedures that constituted the breach. Plaintiffs were under no obligation to continue to try to wrest from the government the benefits to which they already were entitled under the HAP Contracts, and their reasons for not doing so are not relevant. The government's failure to adjust plaintiffs' rents as required under the HAP Contracts plainly caused the plaintiffs not to receive the rent increases to which they were entitled and any attempt to blame plaintiffs for the government's breach is misguided.

**CONCLUSION**

For the foregoing reasons, the plaintiffs' motion for summary judgment as to liability should be granted.

Dated: September 23, 2005

Harry J. Kelly, Esq.
NIXON PEABODY LLP
401 Ninth Street, N.W.
Washington, D.C. 20004
(202) 585-8000

Counsel for the Plaintiffs

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of September, 2005, two copies of the foregoing Reply Brief were served by U.S. Postal Service, first class mail, postage prepaid upon the following person:

John Kosloske
U.S. Department of Justice
Civil Div. – Commercial Litigation Br.
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530

Harry J. Kelly



W677810.1