# In The United States Court of Federal Claims

No. 04-1757C

(Filed: November 17, 2006)

---

| | |
|---|---|
| PARK PROPERTIES ASSOCS., L.P., VALENTINE PROPERTIES ASSOCS., L.P., ST. JOHN'S I ASSOCIATES, L.P., Plaintiffs, v. THE UNITED STATES, Defendant. | Motion to dismiss; Summary judgment; Breach of contract; HUD Section 8 housing program – HAP contracts; Statute of limitations; Continuing claim doctrine; *Brown Park Estates* and *Hatter*; Nonmutual offense collateral estoppel inapplicable against the United States; *Mendoza;* 1994 amendments to Housing Act of 1937; HUD Directive 95-12; *Cuyahoga*; Repudiation of HAP contracts; Unmistakability doctrine inapplicable; Breach; One-percent rule of 42 U.S.C. § 1437f(c)(2)(A). |

---

**OPINION**

---

*Harry J. Kelly*, Nixon Peabody LLP, Washington, D.C., for plaintiffs.

*John Edgar Kosloske*, U.S. Department of Justice, Washington, D.C., for defendant, with whom was *Peter D. Keisler*, Assistant Attorney General.

**ALLEGRA, Judge:**

This contract case is before the court on various pending motions. Plaintiffs entered rent subsidy agreements with the United States Department of Housing and Urban Development (HUD) known as "Housing Assistance Payment" (HAP) contracts. They allege that the government repudiated those contracts in 1994, when Congress amended the controlling statute to alter the way in which rent increases were to be determined. Defendant objects to the plaintiffs' interpretation of the relevant contracts and, *inter alia*, raises statute of limitations issues. While the court agrees with the latter assertion and that not all of plaintiffs' breach claims are well-taken, as to the main contention, it concludes, relying on its prior decision in *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 753-55 (2003) (*Cuyahoga I*), that Congress, indeed, effectuated a repudiation of the relevant HAP contracts in modifying the mechanism for determining rent increases.

## I. BACKGROUND[1]

In 1974, Congress amended the Housing Act of 1937 (Housing Act) to create what is known as the Section 8 housing program. *See* 42 U.S.C. § 1437f. Under the program, tenants make rental payments based upon their income and ability to pay; HUD then makes "assistance payments" to the private landlords to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD. 42 U.S.C. §§ 1437a(a), 1437f(c)(3); *see also Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1425 (Fed. Cir. 1997) (describing the program); *Cuyahoga I*, 57 Fed. Cl. at 753-55 (same). In 1978 and 1980, three transactions occurred between plaintiffs (or their predecessors in interest) and HUD:

- On September 27, 1978, Jerome Z. Ginsburg d/b/a "Park Property Associates" and HUD entered into a HAP Contract for LaMartine Terrace (the LaMartine HAP Contract). The effective date of the HAP Contract is June 1, 1979. On July 1, 1996, Park Property Associates' interest in the HAP Contract was transferred to Park Properties Associates, L.P., a plaintiff in this case.

- On September 27, 1978, Jerome Z. Ginsburg d/b/a "Valentine Property Associates" and HUD entered into a HAP contract for Valentine's Lane Hill Apartments (the Lane Hill HAP Contract). The Lane Hill HAP contract was executed in two stages: (i) stage 1 became effective on January 2, 1980; and (ii) stage 2 became effective on February 19, 1980. On July 1, 1996, Valentine Property Associates' interest in the HAP Contract was transferred to Valentine Associates, L.P., a plaintiff in this case.

- On September 29, 1980, St. John's I Associates, L.P. (St. John's), also a plaintiff herein, and HUD entered into a HAP contract for St. John's Phase I (the St. John's HAP Contract). The St. John's HAP Contract was executed in three stages: (i) stage 1 became effective on July 1, 1982; (ii) stage 2 became effective on September 22, 1982; and (iii) stage 3 became effective on December 15, 1982.[2]

---

[1] The facts recited in this segment appear without substantial controversy and shall be deemed established for purposes of future proceedings in this case. *See* RCFC 56(e).

[2] St. John's HAP contract ended in 2002 and was initially replaced with three HAP interim renewal contracts, applicable to each of the three stages of the initial contracts. The renewal contracts identified the New York State Housing Trust Fund Corporation, rather than HUD, as contract administrator. These contracts, in turn, were replaced by a series of contracts with the New York State Housing Trust Fund Corporation, to which HUD was not a party.

The framework for these contracts is governed, in part, by 42 U.S.C. § 1437f(c)(1), under which an initial, maximum monthly contract rent was established for each dwelling unit.[3] As originally enacted, 42 U.S.C. § 1437f(c)(2) provided for adjustments in this maximum monthly rent thusly-

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
>
> * * * * *
>
> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary. 42 U.S.C. § 1437f(c)(2)(A) and (C) (1982).

The HAP contracts in question implemented these provisions by providing that adjustment of rents would be made annually on the basis of a reasonable formula, subject to an "overall limitation" preventing adjustments from producing material differences between the rents for comparable assisted and unassisted units.

The annual adjustment was implemented through Section 1.8b ("Automatic Annual Adjustments") of the HAP contracts, which with minor irrelevant variations in the subject contracts, provided, in pertinent part –

> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. . . .
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

---

[3] For a more extensive discussion of the statutory and regulatory framework underlying the HAP contracts, *see Cuyahoga I*, 57 Fed. Cl. at 753-63. The summary herein includes only those features necessary to the resolution of the pending motions.

Consistent with 42 U.S.C. § 1437f(c)(2)(C), the HAP contracts also contained, in Section 1.8d, an "Overall Limitation," that stated:

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HUD regulations in effect at the time the contracts in question were executed mirrored these requirements. *See* 24 C.F.R. § 881.110(d) (1979). To protect the differences which "may have existed with respect to the initial Contract Rents," HUD developed what is known as the "initial difference," equal to the difference between the initial Section 8 contract rents and the original comparables.[4]

In the early 1980s, HUD began using "comparability studies" – surveys of rents at comparable unassisted buildings – to enforce the "overall limitation" in its various HAP contracts. This practice was challenged in court as violating the contracts. Attempting to resolve this controversy, Congress, in 1987, added the following sentence to section 1437f(c)(2)(C): "If the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." Housing and Community Development Act of 1987, Pub.L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1850 (1988), *codified at* 42 U.S.C. 1437f(c)(2)(C). But, litigation over the rent adjustment method continued, prompting Congress, in 1989, to enact Section 801 of the Department of Housing and Urban Development Reform Act

---

[4] On January 14, 1986, HUD's Deputy Assistant Secretary for Multifamily Housing Programs issued a memorandum setting forth two alternate ways for determining whether a material difference exists. This memorandum explained that a material difference would exist "whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference" or where –

> 1. The adjusted Section 8 rent would exceed the correlated unassisted rent for comparable units by more than the initial difference for that unit type.
>
> AND
>
> 2. The adjusted Section 8 rents would exceed the amount needed to 'operate' comparable projects.

An attachment to the memorandum set forth guidelines for determining the amount needed to operate comparable projects.

of 1989 (the Reform Act), Pub.L. No. 101-235, 103 Stat. 2057-2059 (codified at 42 U.S.C. 1437f(c)(2)(C) (Supp. II 1990) and 42 U.S.C. 1437f note (Supp. II 1990)), which prescribed new procedures for calculating rent adjustments. Retrospectively, it required HUD to pay landlords an increased amount, above what the studies required HUD to pay under its interpretation of the contracts; prospectively, it established a limited role, under defined criteria, for HUD's future use of comparability studies.

The Reform Act required HUD to promulgate "regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments . . . would result in such material differences" between assisted and unassisted units, and to use those studies to establish a "modified annual adjustment factor" for a geographically smaller area. Pub.L. No. 101-235§ 801(c), 103 Stat. 2058 (1989). The statute described, in detail, the methodology the Secretary was to use in conducting these studies. It also stated that if a modified adjustment factor could not be established or failed to eliminate material differences between rents at comparable assisted and unassisted units, the Secretary could employ another methodology "for conducting comparability studies in order to establish rents that are not materially different from rents charged for comparable unassisted units." *Id.* In keeping with those provisions, HUD promulgated regulations to govern the conduct and use of comparability studies to generate modified adjustment factors. *See* 24 C.F.R. § 888.301 *et seq*. (1992).

In 1993, the Supreme Court, in *Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993), upheld the amendments made to section 801 by the Reform Act. But, Congress remained concerned that subsidized rents were higher than warranted. In response, it amended section 1437f(c)(2)(A) of Title 42 by adding the following language:

> However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. The immediately foregoing sentence shall be effective only during fiscal year 1995.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub.L. No. 103-327, 108 Stat. 2298, 2315 (1994) ("the 1994 Act" or "1994 amendments"). The 1994 Act provided that the amendment "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under section 8(c)(2)(A) of [the United States Housing Act of 1937] by applying an annual adjustment factor." *Id.* Subsequent amendments cumulatively

made the provision applicable to "fiscal year 1996 prior to April 26, 1996, and fiscal year 1997," "fiscal years 1997 and 1998," and "during fiscal year 1999 and thereafter."[5]

The 1994 Act made at least one other potentially significant change – reducing the annual adjustment factor in situations where a given unit was occupied by the same tenant during a prior year. In this regard, it provided:

> for any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for a unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0.

Pub.L. No. 103-327, 108 Stat. 2298 at 2315 (1994) (codified at 42 U.S.C. § 1437f(c)(2)(A)). As with the modification above, this "1-percent deduction" was originally applicable only during fiscal year 1995, but subsequently was extended to cover "fiscal year 1996 prior to April 26, 1996, and fiscal year 1997," "fiscal years 1997 and 1998," and "during fiscal year 1999 and thereafter."[6]

On March 7, 1995, HUD issued Notice 95-12, by its terms designed "[t]o effect all applicable contracts with HAP anniversary dates from [March 7, 1995] to the end of Federal [fiscal year] 1995 (through September 30, 1995)." This directive prescribed, with exceptions not herein relevant –

> If current project rents on a . . . contract (before the application of the AAF) are above the published [fair market rent] for the area then in order to receive a rent increase, the owner must submit, at least 60 days prior to the HAP contract anniversary date, form HUD 92273, Estimates of Market Rent by Comparison, . . . completed by a non-identity of interest, state certified, general appraiser, FOR EACH UNIT TYPE (e.g. 1 BR, 2 BR, etc.). This form must contain at least three examples of unassisted housing in the same market area of similar age, type and quality.

Regarding the consequences of not filing a comparability study, it indicated –

---

[5] *See* Pub.L. No. 105-33, § 2004, 111 Stat. 257 (1997); Pub.L. No. 105-65, § 201(C)(1), 111 Stat. 1364 (1997); Pub.L. No. 104-204, § 201(g), 110 Stat. 2893 (1996).

[6] *See* Pub.L. No. 105-33, § 2004, 111 Stat. 257 (1997); Pub.L. No. 105-65, § 201(C)(1), 111 Stat. 1364 (1997); Pub.L. No. 104-204, § 201(g), 110 Stat. 2893 (1996).

> If the owner fails to submit the information required by this Notice at least 60 days before the contract anniversary date, then the rent levels will not be adjusted on the contract anniversary date, rather the new rent levels will go into effect 60 days after receipt of the required information. However, if the owner fails to submit this information by the date of the FY 1996 HAP contract anniversary, then no increase will be granted for the FY 1995 contract year.

At several other points, the notice reiterated the consequences of not filing a timely request for an increase.[7] According to the directive, if the owner demonstrated that comparable, unassisted rents were more than five percent over contract rents, HUD would increase contract rents to the lesser of: (i) contract rents adjusted according to the AAAF; or (ii) the comparable, unassisted rent plus the so-called "initial difference."[8] Although Notice 95-12 expired, by its terms, on September 30, 1995, later notices reinstated and made permanent its provisions. *See, e.g.*, HUD Notice 97-14 (March 17, 1997); HUD Notice 00-14 (Aug. 9, 2000).[9]

Pursuant to the application of the published AAAFs, the contract rent for the St. John's HAP increased from its initial contract rents in 1979 of $496, $598, $713, and $830 for no

---

[7] For example, at another point, it stated that – "[i]f an owner does not request an increase or fails to submit a request based on the guidelines in this chapter, then the rents will remain the same as the current contract rents, unmodified by HUD or the Contract Administrator."

[8] The directive gave several examples of how these rules should be implemented, including one in which the project was eligible to receive the AAAF based on the comparable and another in which the project was eligible only for the comparable rents.

[9] These notices all contain provisions that absolve HUD field offices from revisiting rent increases based on AAAFs approved during periods that notices were not in effect. For example, Notice 95-12 stated:

> If the Field Office has already issued the rent increase approval letter and/or a new Rent Schedule implementing the [AAAF](s) for FY 1995, these rents will remain the approved rents regardless of whether or not they have been made effective at the property by the issuance date of this Notice. If a Field Office has approved the application of the AAF to contract rents, for FY 1995, the approved rents will not be reconsidered under the procedures of this Notice.

Notably, while Notice 95-12 did not provide a procedure for waiving any of its requirements, subsequent notices appear to contain such a provision. For example, HUD Notice 97-14 indicated that "the provisions for comparability where gross project rents exceed FMR and lower [AAAF]s for units with no-turnover" could be waived via "explicit approval of the Assistant Secretary of Housing – FHA Commissioner."

bedroom, 1 bedroom, 2 bedroom and 3 bedroom units, respectively, to $812, $950, $1,082 and $1,257 in 1994. According to plaintiffs, Park Properties has not received annual rent increases for the LaMartine Terrace Property for the years 1995 through 2000; relying on statements made by a Park Properties executive, defendant asserts that a rent increase, in fact, was received for 2000. Plaintiffs also state that Valentine Properties has not received annual rent increases for the Lane Hill Property for the years 1996 through 2000, and did not receive a rent increase for 2bedroom units at the Lane Hill Property in 2003. Additionally, plaintiffs allege that the St. John's Property has not received annual rent increases for the years 1996 through 2001. Defendant admits that St. John's did not receive annual rent increases for St. John's Phase I under the St. John's HAP Contract for the years 1997 through 2001, but denies that it did not receive a rent increase for St. John's Phase I in 1996. Effective on July 1, 1996, HUD adjusted the contract rents under the St. John's HAP Contract based upon the application of published AAAFs, to $831 per month for the 0 bedroom units, $973 per month for the one bedroom units, $1,108 per month for the two bedroom units, and $1,287 per month for the three bedroom units.

On December 10, 2004, plaintiffs filed their complaint seeking contract damages of $2.75 million against the United States, alleging breach of that portion of the HAP contracts which plaintiffs claim entitles them to automatic annual rent adjustments. Plaintiffs allege that HUD made no such adjustments and has refused to make them retroactively. On February 7, 2005, defendant filed its answer to the complaint. At the joint preliminary status conference, held on April 21, 2005, the parties proposed that certain issues, namely jurisdiction and liability, could be resolved with limited discovery and dispositive motions. On July 29, 2005, plaintiffs filed their motion for summary judgment as to liability, and defendant filed its partial motion to dismiss, or in the alternative, for partial summary judgment. Parties filed their responses to the opposing motions on August 31, 2005, and their replies on September 23, 2005. The motions were argued on March 16, 2006.

## II. DISCUSSION

The pending motions raise several issues. In its motion, defendant asseverates that this court lacks jurisdiction over plaintiffs' claims for the years 1995 through 1998 because they are barred by the six-year statute of limitations in 28 U.S.C. § 2501. Plaintiffs' motion contends that the 1994 amendments and HUD Notice 95-12 breached the rent adjustment provisions contained in their HAP contracts. They also contend that the one-percent adjustment for non-turnover units breached their HAP contracts. In support of these arguments, plaintiffs argue that defendant should be precluded from relitigating issues in *Cuyahoga I* and *Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608 (2005) (hereinafter "*Statesman II*"), under the doctrine of collateral estoppel. In order to facilitate a somewhat more logical presentation, the court will consider these issues out of their original sequence.

### A. Statute of Limitations

Regarding the statute of limitations for an action under the Tucker Act, 28 U.S.C. § 2501 provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction

shall be barred unless the petition thereon is filed within six years after such claim first accrues." Case law establishes that this statute of limitations "is an express limitation on the Tucker Act's waiver of sovereign immunity," *Hart v. United States*, 910 F.2d 815, 817 (Fed. Cir. 1990), and may not be waived either by the court or the parties. *See John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1355 (Fed. Cir. 2006); *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1378 (Fed. Cir. 2005); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1376-77 (Fed. Cir. 1998).[10] Under this statute, "[a] claim against the United States first accrues on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Oceanic S.S. Co. v. United States*, 165 Ct. Cl. 217, 225 (1964); *see also Indiana Michigan*, 422 F.3d at 1378; *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1243 (1996).

Plaintiffs complaint was filed on December 10, 2004. In light of the statute of limitations, they have jettisoned any claim that they are entitled to damages for breach of contract for the years 1995 through 1998. Relying on the "continuing claim doctrine," however, they assert that this court may take into account the annual adjustment in rent that would have occurred during those years in establishing a baseline for the damages in the subsequent years, over which this court does have jurisdiction. Not so, defendant maintains, relying on *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449 (Fed. Cir. 1997). In that case, as here, the plaintiffs contended that HUD's failure to make a proper rent adjustment constituted a breach of their HAP contracts. *Id.* at 1455. Although the plaintiffs did not claim that such breaches occurred within the six years prior to suit, they invoked, as plaintiffs do here, the continuing claim doctrine, arguing that the earlier breaches "resulted in damages . . . not only during those years in which the alleged breach originally occurred, but also in subsequent years." *Id.* Rejecting this claim, the Federal Circuit reasoned that "for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Id.* at 1456. It held that the doctrine requires recurring "individual actionable wrongs," *id.* at 1459, and does not apply to "a claim based upon a single distinct event, which may have continued ill effects later on." *Id.* at 1456; *see also Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998) (doctrine does not apply where a single event produces "ill effects that continue to accumulate over time").

As in *Brown Park*, the claim made by plaintiffs in the case *sub judice* does not involve a series of independent, distinct wrongs, but rather the effects of events that occurred more than six years prior to the filing of this suit. Plaintiffs, however, assert that this is not determinative inasmuch as the *Brown Park* test for the continuing claim doctrine was modified by the Federal

[10] In explaining the rationale for strictly adhering to the limitations period, the Court of Claims stated that – "Our statute of limitations is jurisdictional and must be strictly construed to avoid prosecution of stale claims which defendant can be prejudiced in contesting because excessive lapse of time dulls memories, accounts for missing witnesses, and occasions periodic, routine destruction of Government records." *Kirby v. United States*, 201 Ct. Cl. 527, 539 (Ct. Cl. 1973), *cert. denied*, 417 U.S. 919 (1974).

Circuit, sitting *en banc*, in *Hatter v. United States*, 203 F.3d 795 (Fed. Cir. 2000), *aff'd in part*, *rev'd in part*, *on other grounds*, 532 U.S. 557 (2001). In the latter case, however, the Federal Circuit merely amplified its ruling in *Brown Park*, reaffirming the result reached therein as consistent with the earliest opinion to address the continuing claim doctrine, *Friedman v. United States*, 310 F.2d 381 (Ct. Cl. 1962), *cert. denied*, *sub nom.*, *Lipp v. United States*, 373 U.S. 932 (1963). In this regard, the *Hatter* court stated –

> To determine whether a case falls inside or outside of that description, we return, as we must, to the governing considerations set out in *Friedman*, specifically, has Congress entrusted an administrative officer with the determination of the claimant's entitlement (in *Brown Park* Congress had so entrusted the determination to HUD); does the case involve significant factual determinations, or does it turn on pure issues of law or specific facts which the court is to decide for itself (in *Brown Park* the facts in dispute involved complex calculations of area market rents that were within the expertise of HUD); and does the case call upon the court to address broad concepts rather than resolve sharp and narrow factual issues (*Brown Park's* resolution turned on such issues as the "material differences between the rents charged for assisted and comparable unassisted units"). This court concluded, consistent with governing precedent, that *Brown Park* did not involve a continuing claim for statute of limitations purposes. . . .

*Hatter*, 203 F.3d at 799. Accordingly, if anything, *Hatter* bolsters the rationale for concluding that the continuing claim doctrine does not apply here. Moreover, in recent years, *Brown Park* has repeatedly been cited and relied upon for the exact propositions that plaintiffs claim are moribund. *See*, *e.g.*, *Wells v. United States*, 420 F.3d 1343, 1346 (Fed. Cir. 2005); *Weber v. United States*, 71 Fed. Cl. 717, 721 (2006); *The Dallas Irrig. Dist. v. United States*, 71 Fed. Cl. 344, 351 (2006) ("with respect to whether claims fall within the statute of limitations, and specifically the applicability of the continuing claim doctrine, this court is bound by the Federal Circuit's decision in *Brown Park*"); *Simmons v. United States*, 71 Fed. Cl. 188, 192-93 (2006); *Hornback v. United States*, 56 Fed. Cl. 359, 362 n.4 (2003); *Barney v. United States*, 57 Fed. Cl. 76, 86 (2003).

Relying upon these cases, this court recently made short shrift of a virtually identical claim in *Statesman II*, *to wit*, that "the annual adjustments in rents that would have occurred during years 1995 through 1997 [(years barred by the statute of limitations)] may be taken into account in providing a baseline for assessing damages for the years 1998 and thereafter." 66 Fed. Cl. at 626. Finding that its rejection of this claim was "supported by *Brown Park*, which precedent is binding on this court," this court concluded that "[c]onsequently, in considering the damages for breach during the years 1998 and thereafter, the court is foreclosed from taking into account any adjustments of rent that might have been due during the years 1995 through 1997." *Id.*; *see also Davidson v. United States*, 66 Fed. Cl. 206, 210 (2005). Based upon *Statesman II*, and the precedents underlying it, the court here concludes that, in determining damages for the

years properly before the court, it will not consider adjustments that arguably should have been made in the years that are time-barred.[11]

**B. Breach of the HAP Contracts**

We turn now to issues raised in plaintiffs' motion for summary judgment. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). Rather, the court must determine whether the evidence presents a disagreement sufficient to require fact finding, or whether it is so

---

[11] Defendant also asserts that the court should dismiss for lack of jurisdiction: (i) any claim for breach of St. John's HAP Contract, which was executed in stages with different effective dates, with respect to dwelling units to which stage 1 applies based upon HUD's failure to adjust contract rents under the St. John's HAP Contract on or after July 1, 2002; and (ii) any claim for breach of St. John's HAP Contract with respect to dwelling units to which stage 2 or stage 3 applies based upon the failure of HUD to adjust contract rents under the St. John's HAP Contract after the July 1, 2002, contract anniversary date. Plaintiffs admit that: (i) HUD's initial HAP contracts with St. John's expired in stages with respect to specific units, on June 30, 2002, September 21, 2002 and December 14, 2002; and (ii) as those stages of the original HAP Contract expired, St. John's entered into a series of new section 8 contracts with the New York State Housing Trust Fund Corporation, the first of which became effective July 1, 2002. Given these facts, plaintiffs concede that they do not have a claim for contract rents after the expiration dates of the subject HAP contracts. They continue to seek damages for the period from July 1, 2002 to September 21, 2002, with respect to stage 2 of the St. John's HAP contract, and for the period from July 1, 2002, to December 14, 2002, with respect to stage 3. A close examination of defendant's arguments and plaintiffs' response suggests that there is agreement that no damages may be obtained for periods after the various stages of the St. John's HAP Contract expired, but that, presuming a breach is found, damages may be pursued for the period following the anniversary dates of the various stages until such time as that stage expired. As such, the court concludes that to the extent that plaintiffs seek damages beyond those allowed under this formulation, their claims must be dismissed.

one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)); *see also L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

As noted, plaintiffs moved for summary judgment on the issue whether defendant breached it contractual obligations to them by failing to make automatic annual rent adjustments due pursuant to the HAP contracts. Before resolving this claim, however, the court must address plaintiffs' argument that defendant is estopped from contesting these issues.

**1. Collateral Estoppel**

The answer to the latter contention is actually relatively straightforward. Plaintiffs were parties neither in *Cuyahoga I* nor *Statesman II*. Accordingly, in claiming that defendant should be collaterally estopped from challenging the rulings in those decisions, plaintiffs *sub silentio* invoke a preclusion doctrine known as "nonmutual offensive collateral estoppel" – "nonmutual" because plaintiffs were not parties to the earlier actions and "offensive" because they seek to establish, rather than defend against, certain principles. The doctrine of nonmutual offensive collateral estoppel was conditionally approved by the Supreme Court in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329-32 (1979). It arises "when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Id*. at 326n.4 ; *see also Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 322-27 (1971). However, in *United States v. Mendoza*, 464 U.S. 154, 160-63 (1984), the Supreme Court held that this doctrine is generally unavailable in litigation against the United States. *See also, e.g., Harris v. Martin*, 834 F.2d 361, 365 (3d Cir. 1987); *Sun Towers, Inc. v. Heckler*, 725 F.2d 315, 322 (5th Cir. 1984), *cert. denied*, 469 U.S. 823 (1984); *Alexander Hosp. Inc. v. United States*, 5 Cl. Ct. 62, 66 (1984). The Supreme Court has since reaffirmed *Mendoza*, holding that the only exception thereto might occur in a case within that court's original jurisdiction. *See United States v. Alaska*, 521 U.S. 1, 13 (1997). Obviously, this is not such a case. As such, this case is controlled by *Mendoza* and its progeny and, consequently, plaintiffs' collateral estoppel claim must fail.

**2. Failure to Make Adjustments under the HAP Contracts**

In *Cuyahoga I*, this court held that the plaintiff's rights under their HAP contracts were repudiated by Congress when it amended the Housing Act in 1994 to alter how rent subsidies were to be determined. In this regard, the court held that –

> the HAP contracts expressly require HUD to provide CMHA with annual adjustments barring the agency's invocation of the overall limitation. As such, the passage of the 1994 amendments was a repudiation of this contract provision that

> seemingly caused a failure to perform a contractual duty when it was due, at that point ripening into an apparent breach of contract. . . .

*Cuyahoga I*, 57 Fed. Cl. at 762 (citations omitted). In particular, the court rejected the notion that various sections of the contract could reasonably be construed as allowing the government to require that the owners provide HUD with rent comparability studies in order to receive an annual rent. *Id.*; *see also Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed. Cl. 534, 542 n.10 (2005) (*Cuyahoga II*) ("[T]aken in the context of the entire contract, and particularly given the detailed adjustment provisions therein, there is no way that [Section 2.6a] could reasonably be construed to require owners to provide comparability studies as part of a revised adjustment regime."). The *prima facie* breach effected by the statute "was then exacerbated," this court further opined, "when HUD, in its 1995 directive, imposed additional requirements not envisioned in either the HAP contracts or the prior legislation." *Cuyahoga I*, 57 Fed. Cl. at 762. In so concluding, the court extensively analyzed and ultimately rejected defendant's banner defense – that no repudiation or breach arose under the so-called unmistakability doctrine. *Id.* at 777-80.

Although presented with considerable birr, defendant's legal arguments amount to little more than the points rehearsed and soundly rejected in *Cuyahoga I*. While the court has carefully considered defendant's arguments anew, they are no more persuasive *denuo*. Indeed, in the interim, the holding in *Cuyahoga I* has been reaffirmed in at least two regards. First, the court in *Statesman II*, specifically adopting the opinion in *Cuyahoga I*, reaffirmed the basic conclusion that "the effect of the 1994 amendments to Section 1473f(c)(2)(A) and of HUD Notice 95-12 was to abrogate the provisions of the contracts regarding automatic annual adjustment of rents and to breach the contracts." *Statesman II*, 66 Fed. Cl. at 620. And both *Statesman II*, *id.* at 626, and, more important, the Federal Circuit in *Centex Corp v. United States*, 395 F.3d 1283, 1306-07 (Fed. Cir. 2005), have adopted this court's conclusion that the unmistakability doctrine does not apply where, as here, the repudiation was not effectuated through a sovereign act. In this regard, *Centex* explicitly stated that "[a] prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated." *Id.*; *see also Grass Valley Terrace v. United States*, 51 Fed. Cl. 436, 440-41 (2002); *General Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 542 (2000). While defendant asserts that these decisions are all wrongly decided, it offers nothing fresh, either in terms of arguments or citations, to support that blithe claim.[12] Contrary to its importunings, subsequent events only serve to reinforce this court's view that *Cuyahoga I* was correctly decided and that a similar analysis should be employed here.

---

[12] Of course, even if this court were inclined to agree with defendant's arguments – which it is not – it could not ignore the binding precedent of *Centex*. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006); *Crowley v. United States*, 398 F.3d 1329, 1335 (Fed. Cir. 2005).

The undisputed, determinative facts are essentially the same here as in *Cuyahoga I* and *Statesman II*. Therefore, the court concludes, as a matter of law, that in passing the 1994 amendments and issuing the HUD directive, defendant repudiated the HAP contracts here, which repudiation eventually ripened into a breach of those contracts, at least to the extent that it precluded required rent adjustments from being made.[13]

### 3. Reduction of AAAFs for Non-Turnover Units

Although they initially asserted that this issue could await the damages phase of this case, plaintiffs now also argue that the 1994 Act effectuated a breach by reducing the AAAFs by 1 percent "for any unit occupied by the same family at the time of the last annual rental adjustment." 42 U.S.C. § 1437f(c)(2)(A). This court, however, rejected the same argument in *Cuyahoga II*, reasoning:

> In relevant terms, those contracts merely provide that "Automatic Adjustment Factors" will be determined by the Government at least annually," and that "[s]uch Factors and the basis for their determination will be published in the Federal Register." Nothing in this language suggests that there will be a single, monolithic factor for all units at a given property or that Congress could not authorize HUD, in determining the AAAF for a given unit, to make a different adjustment[] for those in which no turnover occurred.

*Cuyahoga II*, 65 Fed. Cl. at 542. This court accordingly concluded that "there is no indication that the statutory 1-percent deduction constituted the abrogation of any rights or obligations established under the HAP contracts," *Id*.

Plaintiffs ask this court to reconsider *Cuyahoga II* in light of *Statesman II*, in which Judge Lettow concluded that the reduction effectuated a breach. Identifying the issue as "whether HUD has discretion to include turnover within the constellation of factors it may take into account in setting AAFs," Judge Lettow focused on language in section 1.8b(1) which requires that the adjustment "[f]actors and the basis for their determination will be published in the Federal Register. *Id*. at 625. The court concluded that defendant had breached this section of the contract, finding –

---

[13] Defendant asserts that the court should deny plaintiffs' motion because it has not been shown that the "claimed factor-based annual rental adjustments would not have resulted in rents that materially differed from the rents of comparable, unassisted units." While arguably this issue involves liability, in the court's view, it is better viewed as involving the extent of the breach and the resulting damages owed, and will not be resolved at this time. *See Cuyahoga II*, 65 Fed. Cl. at 543; *see also Statesman II*, 66 Fed. Cl. at 620-22. Among the issues that will need to be decided is how the limitation should apply in the case *sub judice*. Should ultimately it be determined that because of the proper application of the limitation, no damages whatsoever are owed, the court will revisit its liability finding.

> HUD has not published any findings that correlate the one-percent reduction to an owner's costs and expenses associated with turnover. HUD merely adopted the statutory reduction introduced by the 1994 amendments. On a different record, HUD might argue that its determination was based upon its adoption of congressional findings that a one-percent reduction in allowable rents for non-turnover tenants was justified by cost considerations. However, Congress's action to amend the statute in 1994 was not accompanied by findings stated in the statute itself about turnover costs, and the parties have not pointed to any pertinent legislative history. The court's review of the legislative history suggests that Congress was primarily concerned with reducing the overall cost of the program. . . . In these circumstances, the statutory amendment, standing alone, cannot trump a binding contract entered by the government and a private party some years before the amendment was enacted.

*Id*. "For these reasons," the court concluded, "HUD has breached [the] contracts . . . with relation to the announced one-percent reduction for non-turnover tenants' rents." *Id*.

With all due respect, the court cannot agree with *Statesman II*'s analysis on this point. In the court's view, *Statesman II* overreads that portion of the contract which requires HUD to publish in the Federal Register "the basis for their determination" of the adjustment factor. This court, of course, examined the same language in *Cuyahoga II*, 65 Fed. Cl. at 542, and concluded that neither the 1994 Act nor the HUD directives effectuated a breach thereof. Indeed, neither this clause nor any other part of the contract requires or even suggests that the published "basis" must be described in factual terms, requiring a demonstration that costs are lower for holdover tenants or some other "findings" in the traditional sense. *See Louisiana-Pacific Corp. Western Div. v. N.L.R.B.*, 52 F.3d 255, 258-59 (9th Cir. 1995) (a "finding" "relates to matters of fact," while a "'basis' for an agency's order relates to the agency's grounds, or reasons, for reaching the legal rulings and conclusions it did"). Rather, for want of a limiting modifier, it appears that the contract permits HUD to describe the "basis" for its determination in either factual or legal terms – as it did here, in indicating that the basis for the lower AAAFs for non-turnover units was the 1994 amendments.[14] Certainly, nothing in the contracts explicitly precludes HUD from citing, as the basis for a rate determination, legislation that effected a modification of the adjustment factors, provided that the law did not repudiate or breach the contract. To hold otherwise would be to conclude that the contract anticipated that HUD would periodically publish *ad hoc* factual rationalizations for legislation previously passed by Congress, without any conceivable purpose

---

[14] *See, e.g.*, Section 8 Housing Assistance Payments Program – Contract Rent Annual Adjustment Factors, Fiscal Year 2000, 64 Fed. Reg. 72730 (1999) (indicating that the reduction was "in accordance with Section 8(c)(2)(A) of the United States Housing Act of 1937," quoting the law and indicating that "[t]his statutory language is now permanent law"); Section 8 Housing Assistance Payments Program – contract Rent Annual Adjustment Factors, Fiscal Year 1999, 63 Fed. Reg. 51224 (1998) (same); Section 8 Housing Assistance Payments Program – Contract Rent Annual Adjustment Factors, Fiscal Year 1998, 63 Fed. Reg. 11956 (1998) (same).

being served by such a requirement, let alone the studies that would be necessary to meet that mandate.[15]

Moreover, in the case *sub judice,* rationalizations of the legislation passed by Congress were unnecessary inasmuch as, contrary to the ruling in *Statesman II*, a host of materials submitted to Congress in 1994 explained that the reduction provision was "[b]ased on the rationale that operating costs are less if tenant turnover is less." Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations for 1995, Hearings Before a Subcomm. of the H. Comm. on Appropriations, 103d Cong., 2d Sess. 591 (1994) (HUD, "Congressional Justifications for 1995 Estimates" (March 1994).[16] Indeed, upon introducing S. 2409, from which the one-percent rule eventually derived,[17] Senators Riegle and Sarbanes submitted for the record a fuller explanation of this provision, *see* 140 Cong. Rec. 8659 (1994), including a HUD report that stated –

---

[15] In construing whether HUD's explanation conforms with the contract, this court must extend at least some deference to HUD's choice of an explanation, operating on a presumption of regularity. *See generally, Int'l Broth. of Teamsters et al. v. United States*, 735 F.2d 1525, 1534 (D.C. Cir. 1984) (applying deference in an analogous setting); *Albany Apartments Tenants' Ass'n v. Veneman*, 2003 WL 1571576, at *10 (D. Minn. 2003).

[16] *See also* Hearings Before a Subcomm. of the S. Comm. on Appropriations, 103d Cong., 2d Sess. 451 (1994) (statement of HUD Sec. Cisneros) ("Less turnover means less cost to owners."); Hearings Before the Subcommittee on VA, HUD and Independent Agencies of the House Committee on Appropriations 103d Cong., 2d Sess. 59-60 (1994) (statement of HUD Sec. Cisneros) (same).

[17] S. 2049 contained the following language:

> For any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for a unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0.

S.2049 103rd Cong. § 804 (as introduced in the Senate, April 11, 1994). The 1994 Act originated as a bill, H.R.4624, which was amended in the Senate to incorporate identical language to the provision cited above. H.R.4624, 103rd Cong. Amendment 50 (engrossed amendment as agreed to by Senate, August 4, 1994). This same language ultimately appears in the 1994 Act. Pub.L. No. 103-327, 108 Stat. 2298 at 2315 (1994), *codified at* 42 U.S.C. § 1437f(c)(2)(A) (1995).

> For the section 8 new construction, substantial rehabilitation, moderate rehabilitation, LMSA, PD, and certificate programs, section 804 would amend section 8(c)(2)(A) of the 1937 Act to permit adjustment of contract rents using the published AAF, adjusted so that any rent increase would be one percentage point less than the adjustment based on the published factor, for any unit occupied by the same family at the time of the last contract rent adjustment. . . . This reduction for "stayers" would only apply to contract rent adjustments that would otherwise be granted in full.
>
> Because the cost to owners of turnover-related vacancies, maintenance, and marketing are lower for long-term stable tenants, these tenants are typically charged less than recent movers in the unassisted market. Since HUD pays the full amount of any rent increases for assisted tenants in section 8 projects and under the Certificate program, HUD should expect to benefit from this "tenure discount." Turnover is lower in assisted properties than in the unassisted market, so the effect of the current inconsistency with market-based rent increases is exacerbated.

*Id*. at 8693 (HUD, Explanation and Justification for the Housing Choice and Community Investment Act of 1994). Given this legislative history, which apparently was not presented in *Statesman II*, this court cannot reasonably view the contracts as requiring HUD to publish findings "validating" Congress' decision to enact the one-percent reduction. Indeed, even if HUD somehow could be viewed as having failed to publish the "basis" for its determination in the Federal Register, it is far from obvious that the result would be a breach that, in terms of damages, would preclude the reduction altogether – a point that neither *Statesman II* nor plaintiff addresses.

Accordingly, *Statesman II* does not persuade the court that its prior ruling in *Cuyahoga II* was mistaken. The court adheres to the latter ruling and thus holds that the one-percent reduction did not effectuate a further breach of the HAP contracts.

## III. CONCLUSION

Based on the foregoing, the court **GRANTS**, **in part**, defendant's motion to dismiss and **GRANTS, in part**, plaintiff's motion for partial summary judgment. On or before December 11, 2006, the parties shall file a joint status report indicating how this case should proceed, with an appropriate proposed schedule.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge