No. 04-1757C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PARK PROPERTIES ASSOCIATES, L.P., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO APPLICATION OF OVERALL LIMITATION TO CALCULATION OF DAMAGES AND DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

NANCY CHRISTOPHER
Associate General Counsel

GERALD ALEXANDER
Assistant General Counsel

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, D.C.

MARCH 26, 2007

## TABLE OF CONTENTS

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO APPLICATION OF OVERALL LIMITATION TO CALCULATION OF DAMAGES AND DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT . . . . . 1

BRIEF IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO APPLICATION OF OVERALL LIMITATION TO CALCULATION OF DAMAGES AND DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT . . . . . 2

STATEMENT OF THE ISSUE . . . . . 2

STATEMENT OF THE CASE . . . . . 2

I. Nature Of The Case . . . . . 2

II. The Section 8 Housing Assistance Payments (HAP) Program . . . . . 3

A. The Section 8 Statute . . . . . 3

B. The Section 8 HAP Programs For New Construction And Substantial Rehabilitation . . . . . 4

C. Fair Market Rents . . . . . 4

D. Rent Subsidy Payments Under The Section 8 HAP Program . . . . . 6

E. Annual Rent Adjustments Under The Owners' HAP Contracts . . . . . 6

F. The 1994 Amendments To The Section 8 Statute . . . . . 8

G. HUD's Implementation Of The 1994 Amendments To The Section 8 Statute . . . . . 9

III. The Court's Liability Decision . . . . . 11

STATEMENT OF THE FACTS . . . . . 12

**TABLE OF CONTENTS (CONT'D)**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I. Summary Judgment Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II. Standards Of Contract Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. The Overall Limitation Provision Contained In The Owners' HAP Contracts Is A Constraint Upon The Amount Of Damages That The Owners May Recover For The Breach Of Contract Found By The Court . . . . . . 16

IV. Even If The Court Were To Agree With The Owners That The Overall Limitation Provision Contained In The Owners' HAP Contracts Is Not A Constraint Upon The Calculation Of Damages, The Court Should Not Direct That The Parties Prepare A Stipulation With Respect To Damages . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## TABLE OF AUTHORITIES

### CASES

Acacia Villa v. United States,
36 Fed. Cl. 277 (1996) ........ 22

Alaska Pulp & Lumber Co. v. Madigan,
2 F.3d 389 (Fed. Cir. 1993) ........ 14

Allenfield Associates v. United States,
40 Fed. Cl. 471 (1998) ........ 15

Alvin Ltd. v. United States Postal Service,
816 F.2d 1562 (Fed. Cir. 1987) ........ 15

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ........ 12, 13

Barseback Kraft AB v. United States,
121 F.3d 1475 (Fed. Cir. 1997) ........ 15

Bluebonnet Savings Bank v. United States,
339 F.3d 1341 (Fed. Cir. 2003) ........ 16

Brighton Village Associates v. United States,
52 F.3d 1056 (Fed. Cir. 1995) ........ 17

Celotex Corp. v. United States,
477 U.S. 317 (1986) ........ 12, 13

Chris Berg, Inc. v. United States,
192 Ct. Cl. 176, 426 F.2d 314 (1970) ........ 15

Cisneros v. Alpine Ridge Group,
508 U.S. 10 (1993) ........ 18, 19

Cole v. Burns International Security Services,
105 F.3d 1465 (D.C. Cir. 1997) ........ 15, 16

Commodities Recovery Corp. v. United States,
34 Fed. Cl. 282 (1995) ........ 12, 13

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Cray Research, Inc. v. United States,
44 Fed. Cl. 327 (1999) ........ 15

Cuyahoga Metropolitan Housing Authority v. United States,
57 Fed. Cl. 751 (2003) ........ 15, 21, 27

Cuyahoga Metropolitan Housing Authority v. United States,
65 Fed. Cl. 534 (2005) ........ 16, 22, 27

Federal Housing Administration v. The Darlington, Inc.,
358 U.S. 84 (1958) ........ 25, 26

Federal Housing Partners IV v. Cisneros,
55 F.3d 362 (8th Cir. 1995) ........ 19

Firestone Tire & Rubber Co. v. United States,
195 Ct. Cl. 21, 444 F.2d 547 (1971) ........ 13

Government Systems Advisors, Inc. v. United States,
847 F.2d 811 (Fed. Cir. 1988) ........ 13

Grumman Data Systems Corp. v. Dalton,
88 F.3d 990 (Fed. Cir. 1996) ........ 14

Hart v. United States,
218 Ct. Cl. 212, 585 F.2d 1025 (1978) ........ 26

Hills Transportation Co. v. United States,
204 Ct. Cl. 51, 492 F.2d 1394 (1974) ........ 15

Hobbs v. McLean,
117 U.S. 567 (1886) ........ 15

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 384, 351 F.2d 972 (1965) ........ 14

Home Building & Loan Ass'n v. Blaisdell,
290 U.S. 398 (1934) ........ 15

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Hunt Construction Group, Inc. v. United States,
281 F.3d 1369 (Fed. Cir. 2002) .......... 14

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) .......... 16

Jackson v. United States,
216 Ct. Cl. 25, 573 F.2d 1189 (1978) .......... 15

Keco Industries, Inc. v. United States,
176 Ct. Cl. 983, 364 F.2d 838 (1966), cert. denied, 386 U.S. 958 (1967) .......... 13

L. W. Matteson, Inc. v. United States,
61 Fed. Cl. 296 (2004) .......... 13

LaSalle Tallman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003) .......... 16

Massachusetts Port Authority v. United States,
197 Ct. Cl. 721, 456 F.2d 782 (1972) .......... 13

Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,
475 U.S. 574 (1986) .......... 12

Mayflower Transit Co. v. United States,
162 Ct. Cl. 233 (1963) .......... 14

McAbee Construction, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) .......... 14

National Leased Housing Ass'n v. United States,
24 Cl.Ct. 647 (1991) .......... 19

National Leased Housing Ass'n v. United States,
32 Fed. Cl. 454 (1994) .......... 26, 28

National Leased Housing Ass'n v. United States,
105 F.3d 1423 (Fed. Cir. 1997) .......... 10

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Park Properties Associates, L.P. v. United States,
74 Fed. Cl. 264 (2006) .......... 11

Park Village Apartments v. United States,
32 Fed. Cl. 441 (1994), aff'd, 152 F.3d 943 (Fed. Cir.) (Table),
cert. denied, 525 U.S. 962 (1998) .......... 10

Red Lion Broadcasting Co. v. FCC,
395 U.S. 367 (1969) .......... 25, 26

Spirit Leveling Contractors v. United States,
19 Cl.Ct. 84 (1989) .......... 12, 13

Statesman II Apartments, Inc. v. United States,
71 Fed. Cl. 662 (2006) .......... 16, 20, 23

Sweats Fashions, Inc. v. Pennill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) .......... 12, 13

Unicon Management Corp. v. United States,
179 Ct. Cl. 534, 375 F.2d 804 (1967) .......... 14

United States v. Price,
361 U.S. 304 (1960) .......... 26

Von Hoffman v. City of Quincy,
71 U.S. (4 Wall.) 535 (1866) .......... 15

Winston Bros. Co. v. United States,
198 Ct. Cl. 37, 458 F.2d 49 (1972) .......... 15

## STATUTES

United States Code:

42 U.S.C. § 1437a(a) (1994) .......... 6

42 U.S.C. § 1437f .......... 3, 26

42 U.S.C. § 1437f(c)(2)(A) (1994) .......... 27

**TABLE OF AUTHORITIES (CONT'D)**

**STATUTES (CONT'D)**

United States Code (cont'd):

42 U.S.C. § 1437f(a) (Supp. IV 1974) .......... 3

42 U.S.C. § 1437f(c)(1) (Supp. IV 1974) .......... 4, 5, 6

42 U.S.C. § 1437f(c)(2) (Supp. IV 1974) .......... 4

42 U.S.C. § 1437f(c)(2)(A) (1994) .......... 8, 27

42 U.S.C. § 1437f(c)(2)(A) (2000) .......... 8

42 U.S.C. § 1437f(c)(2)(C) .......... 26

42 U.S.C. § 1437f(c)(3)(A) (1994) .......... 6, 8

Public Laws:

Housing and Community Development Act of 1974, § 201(a), Pub. L. No. 93-383, 88 Stat. 633, 653-67 (1974) .......... 3

Housing and Community Development Act of 1987, Pub. L. No. 100-242, 101 Stat. 1815, 1850 (1988) .......... 25, 26, 27, 28

Housing and Urban Development Reform Act of 1989, Pub. L. No. 101-235, 103 Stat. 1987, 2057-59 (1989) .......... 25

Housing and Urban-Rural Recovery Act of 1983, § 209(a)(1), Pub. L. No. 98-181, 97 Stat. 1155, 1183 (1983) .......... 3

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 .......... passim

United States Housing Act of 1937, as amended (codified at 42 U.S.C. § 1437f) .......... passim

## TABLE OF AUTHORITIES (CONT'D)

## REGULATIONS

Code of Federal Regulations:

24 C.F.R. § 813.102 (1994) .......... 9

24 C.F.R. Part 880 (1979) .......... 4

24 C.F.R. § 880.102 (1979) .......... 5, 9

24 C.F.R. § 880.108(a) (1979) .......... 6

24 C.F.R. § 880.110(d) (1979) .......... 7

24 C.F.R. § 880.201 (1994) .......... 6

24 C.F.R. § 880.501(d)(1) (1994) .......... 6, 8

24 C.F.R. Part 881 (1979) .......... 4

24 C.F.R. § 881.102 (1979) .......... 9

24 C.F.R. § 880.108(a) (1979) .......... 6

24 C.F.R. § 881.110(d) (1979) .......... 7

24 C.F.R. § 881.201 (1994) .......... 6

24 C.F.R. § 881.501(d)(1) (1994) .......... 6, 8

24 C.F.R. § 888.203(b) (1994) .......... 7

Federal Register:

42 Fed. Reg. 60508 (11/25/77) .......... 7

44 Fed. Reg. 21769 (4/12/79) .......... 7

## TABLE OF AUTHORITIES (CONT'D)

### MISCELLANEOUS

Rules of the Court of Federal Claims:

Rule 1(a)(2) .................... 12

Rule 56(b) .................... 1

Rule 56(c) .................... 12

HUD Notice 95-12 .................... passim

HUD Notice 97-14 .................... 9, 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PARK PROPERTIES ASSOCIATES, L.P., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 04-1757C |
| v. | ) | |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO APPLICATION OF OVERALL LIMITATION TO CALCULATION OF DAMAGES AND DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to ¶ 2 of the Court's Order filed on December 19, 2006,[1] defendant, the United States, files this response to "Plaintiffs' Motion for Partial Summary Judgment with Respect to Application of Overall Limitation to Calculation of Damages" dated February 23, 2007, and we respectfully request, pursuant to RCFC 56(b),[2] that the Court enter summary judgment for the Government upon the issue of whether the overall limitation provision in plaintiffs' Section 8 Housing Assistance Payments contracts affects the amount of damages recoverable for the breach of contract found by the Court in this case upon the grounds that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law. In support of this application, we rely upon the pleadings and other documents of record and the following brief.

---

[1] The December 19, 2006 Order provides that, "[o]n or before March 26, 2007, defendant shall file its cross-motion for summary judgment and response."

[2] Rule 56(b) provides that "[a] party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."

BRIEF IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO APPLICATION OF OVERALL LIMITATION TO CALCULATION OF DAMAGES AND DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

## STATEMENT OF THE ISSUE

Whether the overall limitation provision contained in plaintiffs' Housing Assistance Payments contracts is a constraint upon the amount of damages that plaintiffs may recover for the breach of contract found by the Court in this case.[3/]

## STATEMENT OF THE CASE

### I. Nature Of The Case

Plaintiffs Park Properties Associates, L.P. ("Park Properties"), Valentine Associates, L.P. ("Valentine"), and St. John's I Associates, L.P. ("St. John's") (collectively referred to herein as "the Owners"), own multifamily rental housing projects in the New York City area. The rents of the low-income tenants in these housing projects are or, in St. John's case, at one time were, subsidized by the Government pursuant to rent subsidy agreements between the Owners and the Government known as "Housing Assistance Payments Contracts" or HAP contracts. The Complaint seeks damages for alleged breaches of contract based upon the failure of the Government to adjust the contract rents annually on the HAP contract anniversary dates for the years 1995-2004. See Compl. ¶¶ 18-20. The Owners allege that, as a result of the putative breaches by the

[3] In this brief, "Compl. ¶ ____" refers to the referenced paragraph(s) of the "Complaint" filed on December 10, 2004; "Pl. Br. ____" refers to the referenced page(s) of "Plaintiffs' Motion for Partial Summary Judgment with Respect to Application of Overall Limitation to Calculation of Damages" dated February 23, 2007; "Pl. App. ____" refers to the referenced page(s) of "Appendix to Plaintiffs' Motion for Partial Summary Judgment with Respect to Application of Overall Limitation to Calculation of Damages" dated February 23, 2007; and "DPFUF ¶ ____" refers to the referenced paragraph(s) of "Defendant's Proposed Findings of Uncontroverted Fact" dated March 26, 2007.

Government of the HAP contracts, they have been damaged in the approximate amount of $2.75 million. Compl. ¶ 21.

II. The Section 8 Housing Assistance Payments (HAP) Program

A. The Section 8 Statute

Section 8 of the United States Housing Act of 1937, as amended (42 U.S.C. § 1437f) (the Section 8 statute),[4/] creates a statutory scheme pursuant to which the United States, through the Department of Housing and Urban Development (HUD), directly or indirectly subsidizes the rents of low-income individuals and families living in privately-owned buildings. This litigation concerns claims by owners of "newly constructed" or "substantially rehabilitated" housing with respect to which, at all relevant times, the Section 8 statute provided that "assistance payments" "may be made . . . in accordance with the provisions" of that statute for "the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a) (Supp. IV 1974).[5/]

As originally enacted and at the time the Owners' HAP contracts were executed, the Section 8 statute specified that "[a]n assistance contract entered into pursuant to this section shall establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit to which such assis-

[4] Section 8 was enacted as part of section 201(a) of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633, 653-67 (1974), which amended the United States Housing Act of 1937 in this and other respects.

[5] In 1983, Congress amended 42 U.S.C. § 1437f(a) by repealing the Section 8 "newly constructed, and substantially rehabilitated" programs, but grandfathering existing Section 8 New Construction and Substantial Rehabilitation HAP projects, such as the Owners' projects in this case, as being subject to the Section 8 laws. See section 209(a)(1) of the Housing and Urban-Rural Recovery Act of 1983, Pub. L. No. 98-181, 97 Stat. 1155, 1183 (1983).

tance payments are to be made." 42 U.S.C. § 1437f(c)(1) (Supp. IV 1974). In addition, section 8(c)(2) provided, in part, with respect to the adjustment of contract rents:

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
>
> * * * * *
>
> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2) (Supp. IV 1974).

B. The Section 8 HAP Programs For New <u>Construction And Substantial Rehabilitation</u>

HUD implemented the Section 8 statute through several housing assistance programs established by regulations, including project-based rent subsidy programs addressed to "newly constructed" rental housing projects, such as the projects owned by plaintiffs Park Properties and St. John's, and "substantially rehabilitated" rental housing projects, such as the project owned by plaintiff Valentine. DPFUF ¶¶ 4, 35, 68; <u>see</u> <u>also</u> 24 C.F.R. Part 880 (1979) ("Section 8 Housing Assistance Payments Program for New Construction"); 24 C.F.R. Part 881 (1979) ("Section 8 Housing Assistance Payments Program for Substantial Rehabilitation").

C. <u>Fair Market Rents</u>

The Section 8 statute required that HUD publish periodically but not less than annually in the Federal Register "fair market rentals" established by HUD for "existing or newly constructed rental dwelling units" of "various sizes and types in the market area suitable for occupancy by

persons assisted under this section." See 42 U.S.C. § 1437f(c)(1) (Supp. IV 1974). HUD regulations defined "fair market rent" as follows:

> The rent, including utilities (except telephone), ranges, refrigerators, parking, and all maintenance, management, and other services, which, as determined at least annually by HUD, would be required to be paid in order to obtain privately developed and owned, newly constructed rental housing of modest (non-luxury) nature with suitable amenities and sound architectural design meeting the objectives of the HUD Minimum Property Standards.

24 C.F.R. § 880.102 (1979). The regulations further provided:

> Separate Fair Market Rents will be established for dwelling units by various sizes (number of bedrooms) and types (e.g., elevator, row, detached, mobile homes; housing designed for the elderly or handicapped shall be a separate type for this purpose). The Fair Market Rents will be published in the FEDERAL REGISTER, and, in order to allow for the period of construction, computation of the published Fair Market Rents will include HUD's estimate of anticipated rent increases during an appropriate future period as stated in the publication. Accordingly, for any given project for which the scheduled construction time will be less than such future period, an appropriate reduction will be made in determining the approvable Contract Rent.

Id.

Fair market rentals were a factor in the setting of initial HAP contract rents. The Section 8 statute provided that a HAP contract "establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit with respect to which such assistance payments are to be made" and it imposed the following limitation upon the initial contract rent:

> The maximum monthly rent shall not exceed by more that 10 per centum the fair market rental established by the Secretary periodically but not less than annually for existing or newly constructed rental dwelling units of various sizes and types in the market area suitable

> for occupancy by persons assisted under this section, except that the maximum monthly rent may exceed the fair market rental (A) by more than 10 but not more than 20 per centum where the Secretary determines that special circumstances warrant such higher maximum rent or that such higher rent is necessary to the implementation of a local housing assistance plan as defined in section 213(a)(5) of the Housing and Community Development Act of 1974.

42 U.S.C. § 1437f(c)(1) (Supp. IV 1974); see also 24 C.F.R. §§ 880.108(a); 881.108(a) (1979) ("*Fair Market Rent Limitation*").

D. Rent Subsidy Payments Under The Section 8 HAP Program

The HAP contract specifies the monthly rent for each of the different sizes of dwelling units covered by the agreement, i.e., the "contract rent." The tenant pays the owner a portion of the contract rent, which is based upon the tenant's income. 42 U.S.C. § 1437a(a) (1994); 24 C.F.R. §§ 880.201 & 881.201 (1994) ("tenant rent" defined). The governmental entity with which the owner contracts (either HUD or a PHA) pays a rent subsidy to the owner equal to the difference between the tenant rent and the contract rent. 42 U.S.C. § 1437f(c)(3)(A) (1994); 24 C.F.R. §§ 880.501(d)(1) & 881.501(d)(1) (1994).

E. Annual Rent Adjustments Under The Owners' HAP Contracts

The rent adjustment provisions contained in the Owners' HAP contracts are virtually identical. The HAP contracts provided:

> b. Automatic Annual Adjustments
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

HAP Contracts, Part I, § 1.8b, DPFUF ¶¶ 7, 39, 72.

This formula-based method of adjusting contract rents is subject to the following "Overall Limitation" provision contained in the Owners' HAP contracts, the wording of which mirrors the applicable HUD regulations:

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HAP Contracts, Part I, § 1.8d, DPFUF ¶¶ 7, 39, 72; see also 24 C.F.R. §§ 880.110(d), 881.110(d) (1979).

HUD regulations specify how annual rent adjustments pursuant to section 1.8b(2) of the Owners' HAP contracts were to be made:

> The adjusted monthly amount of the Contract Rent of a dwelling unit shall be determined by multiplying the Contract Rent in Effect on the anniversary date of the contract by the applicable Automatic Annual Adjustment Factor . . . and rounding the result to the next higher whole dollar amount.

See 24 C.F.R. § 888.203(b) (1994).[6] For example, if the monthly contract rent for a dwelling

[6] This regulation was initially issued on November 25, 1977, and amended on April 12, 1979. See 42 Fed. Reg. 60508 (11/25/77); 44 Fed. Reg. 21769 (4/12/79).

unit in effect on the HAP contract anniversary date is $100 per unit and the applicable AAF is 1.05, the new monthly contract rent adjusted in accordance with the AAF would be $105 (1.05 *x* $100).

F. The 1994 Amendments To The Section 8 Statute

The Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 (the 1994 Act or 1994 Amendments), enacted on September 28, 1994,[7] amended the Section 8 statute to provide, among other things, that, "[w]here the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. . . ." 42 U.S.C. § 1437f(c)(2)(A) (1994). The 1994 Act, thus, established a trigger for invoking the rent comparability limitation applicable to rent adjustments under the Owners' HAP contracts: when the existing contract rent is greater than the published fair market rent for an existing dwelling unit in the relevant housing market. In that case, HUD may increase the HAP contract rent only to the extent that the Owner demon-

[7] The 1994 Act provided that these amendments to the Section 8 statute "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under [section 1437f(c)(2)(A)] by applying an annual adjustment factor," 108 Stat. at 2315, such as the Owners' HAP contracts. The amendments are effective prospectively "during fiscal year 1995, during fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter." 42 U.S.C. § 1437f(c)(2)(A) (2000).

strates that the adjusted rent would not exceed the rent for a comparable, unassisted housing unit, as determined by HUD.

G. HUD's Implementation Of The 1994 Amendments To The Section 8 Statute

On March 7, 1995, HUD issued Notice H 95-12 (HUD) ("Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995") (HUD Notice 95-12), which implemented the 1994 amendments to the Section 8 statute. Notice 95-12 recited that, "[a]mong the many measures developed [in the 1994 Act], emphasis was placed on utilizing the mechanism in the Section 8 contract language which permits an analysis on the reasonableness of the [annual adjustment factor (AAF)] formula as it is applied to each project unit type."

Consistent with the 1994 Act, Notice 95-12 stated that "review of AAF under the Overall Limitation clause of the HAP Contract would apply to Section 8 New Construction and Substantial Rehabilitation Properties where Section 8 rent levels for a unit type presently exceed the published Existing Housing Fair Market Rents (FMR) . . . ." A subsequent document, Notice H 97-14 (HUD) ("Fiscal Year 1997 Annual Adjustment Factor (AAF) Requirements") (HUD Notice 97-14), clarified that the 1994 Act's rent comparability provisions would apply where "the pre-adjustment *gross rent* (current contract rent plus any allowances for tenant-paid utilities) is above the published [fair market rent]." (Emphasis added.).[8]

---

[8] As parenthetically noted in HUD Notice 97-14, "gross rent" is the sum of the HAP contract rent and any allowances for tenant-paid utilities. See 24 C.F.R. §§ 880.102 & 881.102 (1979) ("Gross Rent" is "[t]he Contract Rent plus any Allowance for Utilities and Other Services" and "Allowance for Utilities and Other Services" is "[a]n amount determined or approved by HUD as an allowance for the cost of utilities (except telephone) and charges for other services payable directly by the Family"); see also 24 C.F.R. § 813.102 (1994) (defining "gross rent" as "[t]he
(continued...)

Under HUD Notice 95-12 (as clarified by HUD Notice 97-14), thus, if the current gross rent for a unit covered by a HAP contract *exceeded* the applicable fair market rent for the area in which the subsidized unit is located, HUD would not make an annual rent adjustment determination unless the Section 8 project owner submitted to HUD a study of the rent charged for a comparable, unassisted unit. If the rent comparability study provided by the project owner indicated that the comparable, unassisted rent exceeded the contract rent for the assisted unit by more than five percent, HUD would set the contract rent at the lesser of (1) the contract rent adjusted in accordance with the applicable AAF or (2) the comparable, unassisted rent plus any "initial difference" to be preserved in rent adjustments.[9]

Under HUD Notice 95-12, where an owner provided the rent comparability information 60 days prior to the HAP contract anniversary date, HUD would increase the HAP contract rent for a covered unit effective on the HAP contract anniversary. If, however, the owner provided the rent comparability study less than 60 days before the HAP contract anniversary date, HUD would increase the HAP contract rent effective upon the date 60 days after the owner submitted

---

[8](...continued)
total monthly cost of housing an eligible Family which is the sum of the Contract Rent and any Utility Allowance").

[9] As noted above, the rent comparability limitation in the Owners' HAP contracts contains a proviso which states that such limitation "shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents." HAP Contracts, Part I, § 1.8d, DPFUF ¶¶ 7, 39, 72. The "initial difference" to be preserved in rent adjustments is the mathematical difference, expressed in dollars, between the initial HAP contract rents and the rents charged for comparable, unassisted units when HUD established the initial HAP contract rents. National Leased Housing Ass'n v. United States, 105 F.3d 1423, 1435 (Fed. Cir. 1997); Park Village Apartments v. United States, 32 Fed. Cl. 441, 446-47 (1994), aff'd, 152 F.3d 943 (Fed. Cir.) (Table), cert. denied, 525 U.S. 962 (1998).

the rent comparability information. But where the owner did not provide the rent comparability data by the *next* HAP contract anniversary, HUD would not increase the HAP contract rent for the preceding year.

HUD Notice 95-12 (as clarified by HUD Notice 97-14) provided that, where the gross rent for an assisted unit *did not exceed* the applicable fair market rent, the HAP contract rent would be adjusted using the "appropriate AAF." However, Notice 95-12 required that, in order to receive a AAF-based rent adjustment, the project owner provide HUD with "the number of units in which turnover occurred since the last HAP contract anniversary date." If the owner did not submit the tenant turnover data at least 60 days before the HAP contract anniversary date, the contract rents would not be adjusted effective on the contract anniversary date, but would "go into effect 60 days after" HUD's receipt of the required turnover data. But if the owner failed to submit the turnover information by the *next* HAP contract anniversary, HUD would not increase contract rents for the preceding year.

III. The Court's Liability Decision

On November 17, 2006, the Court rendered a decision upon liability issues in which, among other things, the Court held that, "in passing the 1994 amendments and issuing the HUD directive, [the Government] repudiated the HAP contracts here, which repudiation eventually ripened into a breach of those HAP contracts, at least to the extent that it precluded required rent adjustments from being made." Park Properties Associates, L.P. v. United States, 74 Fed. Cl. 264, 274 (2006). The parties then filed a joint status report requesting the Court to order further briefing upon damages issues and, on December 19, 2006, the Court entered an Order directing that such briefing proceed but restricting the briefing "to the issue whether the overall limitation

provision in the HAP contracts affects the amount of damages recoverable for breach of contract in this case."

## STATEMENT OF THE FACTS

For our statement of facts, we respectfully refer the Court to "Defendant's Proposed Findings of Uncontroverted Fact" dated March 26, 2007. In this brief, we reference those facts and other informative facts that are necessary to our argument.

## ARGUMENT

### I. Summary Judgment Standards

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Commodities Recovery Corp. v. United States, 34 Fed. Cl. 282, 287-88 (1995). Summary judgment is not a disfavored procedural shortcut; it is an integral part of the Court's rules as a whole, which are to be construed to secure the just, speedy, and inexpensive determination of every action. Celotex Corp. v. United States, 477 U.S. 317, 327 (1986); Sweats Fashions, Inc. v. Pennill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987); Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 89 (1989); see also RCFC 1(a)(2).

A dispute is "genuine" if, on the entirety of the record, the evidence is such that a reasonable jury could resolve a factual matter in favor of the nonmoving party. Anderson, 477 U.S. at 248; Sweats Fashions, 833 F.2d at 1562. Thus, when the record as a whole would not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Commodities

Recovery, 34 Fed. Cl. at 288. A fact is "material" if it could affect the outcome of the suit and its materiality is determined by the substantive law applicable to the case. Anderson, 477 U.S. at 248; Spirit Leveling, 19 Cl. Ct. at 89. "Contract interpretation is a matter of law and thus amenable to decision on summary judgment." Government Systems Advisors, Inc. v. United States, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988); accord L. W. Matteson, Inc. v. United States, 61 Fed. Cl. 296, 307 (2004) (Contract interpretation is "an appropriate predicate for summary judgment.").

The party moving for summary judgment bears the initial burden of demonstrating either the absence of a genuine issue of material fact or the absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325; Sweats Fashions, 833 F.2d at 1563; Commodities Recovery, 34 Fed. Cl. at 288. If the moving party makes that showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute exists with respect to a material fact by pointing to evidence of record or proffering evidence establishing an essential element of its case upon which it bears the burden of proof. Celotex, 477 U.S. at 322; Commodities Recovery, 34 Fed. Cl. at 288.

II. Standards Of Contract Interpretation

The "intention of the parties to a contract controls its interpretation." Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971). A court's "ultimate goal is always to give effect to the expressed or implied intentions of the contracting parties." Massachusetts Port Authority v. United States, 197 Ct. Cl. 721, 726, 456 F.2d 782, 784 (1972). A contract, thus, "is to be read from its four corners." Keco Industries, Inc. v. United States, 176 Ct. Cl. 983, 990, 364 F.2d 838, 842-43 (1966), cert. denied, 386 U.S. 958 (1967) (internal quotation marks omitted).

Interpretation of a contract "[b]egins with the plain language." McAbee Construction, Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). The language of a contract "is given its ordinary and commonly accepted meaning unless it is shown that the parties intended otherwise." Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 390, 351 F.2d 972, 975 (1965). "A contract term is unambiguous when there is only one reasonable interpretation." Grumman Data Systems Corp. v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996). "When the contract language is unambiguous on its face, [the court's] inquiry ends, and the plain language of the contract controls." Hunt Construction Group, Inc. v. United States, 281 F.3d 1369, 1373 (Fed. Cir. 2002); accord Alaska Pulp & Lumber Co. v. Madigan, 2 F.3d 389, 392 (Fed. Cir. 1993) ("Where contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

A "contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." Hunt, 281 F.3d at 1372. An interpretation "which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible." Hol-Gar, 169 Ct. Cl. at 395, 351 F.2d at 979; see also Unicon Management Corp. v. United States, 179 Ct. Cl. 534, 537, 375 F.2d 804, 806 (1967) (Where possible, it is preferable "to interpret the provisions of a contract as coordinate and not contradictory."). Twisted or strained, out-of-context analysis is to be eschewed. Mayflower Transit Co. v. United States, 162 Ct. Cl. 233, 237 (1963).

When construing a contract that has its source in legislation, such as the Owners' HAP contracts, a court should consider the legislation. Cuyahoga Metropolitan Housing Authority v. United States, 57 Fed. Cl. 751, 761 (2003) (Cuyahoga I); accord Barseback Kraft AB v. United States, 121 F.3d 1475, 1480-81 (Fed. Cir. 1997). The "law in effect when a Government contract is made becomes a part of the contract." Jackson v. United States, 216 Ct. Cl. 25, 36, 573 F.2d 1189, 1194 (1978).[10]

The contracting parties "are presumed to have entered into a valid and binding contract." Cray Research, Inc. v. United States, 44 Fed. Cl. 327, 333 (1999) (quoting Alvin Ltd. v. United States Postal Service, 816 F.2d 1562, 1564 (Fed. Cir. 1987)). Therefore, "where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted." Cray, 44 Fed. Cl. at 333 (quoting Hobbs v. McLean, 117 U.S. 567, 576 (1886)); see also Cole v. Burns International Security Services, 105 F.3d 1465, 1485 (D.C. Cir. 1997) ("It is well understood that, where a contract is unclear on a point, an interpretation that makes the contract lawful is preferred to one that renders it unlawful."). For example, in Cray, where the court was presented with competing interpretations of a contract, one of which

---

[10] As the Supreme Court has observed, "the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement." Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 429-30 (1934) (quoting Von Hoffman v. City of Quincy, 71 U.S. (4 Wall.) 535, 550 (1866)); accord Hills Transportation Co. v. United States, 204 Ct. Cl. 51, 55, 492 F.2d 1394, 1396 (1974); Winston Bros. Co. v. United States, 198 Ct. Cl. 37, 44, 458 F.2d 49, 52 (1972); Chris Berg, Inc. v. United States, 192 Ct. Cl. 176, 182, 426 F.2d 314, 317 (1970); see also Allenfield Associates v. United States, 40 Fed. Cl. 471, 482 (1998) ("[A]pplicable laws are binding on parties to a contract, in general, as well as in the context of a contract with the Federal Government, regardless of whether or not the laws are specifically incorporated into the contract.").

would have rendered the contract in violation of the Anti-Deficiency Act, the court adopted the interpretation consistent with that statute, which resulted in an enforceable contract. Id. at 332-33.

### III. The Overall Limitation Provision Contained In The Owners' HAP Contracts Is A Constraint Upon The Amount Of Damages That The Owners May Recover For The Breach Of Contract Found By The Court.

The remedy for a breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed. E.g., Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005); Bluebonnet Savings Bank v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003); Cuyahoga Metropolitan Housing Authority v. United States, 65 Fed. 534, 543 (2005) (Cuyahoga II); see also Statesman II Apartments, Inc. v. United States, 71 Fed. Cl. 662, 667 (2006) ("[T]he purpose of expectancy damages is to put a plaintiff in as good a position as it would have been had the breaching party fully performed."). The non-breaching party, however, "is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." LaSalle Tallman Bank v. United States, 317 F.3d 1363, 1371 (Fed. Cir. 2003); accord Cuyahoga II, 65 Fed. Cl. at 543.

The Owners seek to recover expectancy damages corresponding to the rent adjustments they would have received if HUD had performed.[11/] The Owners contend that the measure of

---

[11] The Owners begin their argument by asserting, incorrectly, that, "[a]ccording to the express terms of the HAP contracts here, the first step to determine [the Owners'] damages is Section 1.8b, which provides that HUD will calculate a new contract rent each year, based on the annual adjustment factors it calculates[.]" Pl. Br. 8. Neither § 1.8b nor any other provision of the Owners' HAP contracts is addressed to damages, compensation, or any other type of relief to which the Owners may be entitled in the event of HUD's failure to adjust contract rents annually. See (continued...)

their damages is the difference between the rents the Owners would have received if, for the years in question, their rents had been adjusted based upon the relevant published AAFs and the rents the Owners received for such years, disregarding the overall limitation upon rent adjustments contained in the HAP contracts. According to the Owners, they are entitled not only to damages calculated in that manner for a contract year as to which there was a breach of contract, but also to damages for the impact of the breach upon subsequent contract years determined in accordance with the higher rents that would have been in effect during the subsequent years if the Owners had received AAF-based rent adjustments for the year in which the breach occurred, once again without any regard for the overall limitation provision or even the results of any rent comparability studies provided by the Owners to HUD in support of rent adjustments received by the Owners for the subsequent years. We disagree.

The Owners' damages position is rooted in the erroneous assumption that the Owners are entitled to AAF-based rent adjustments under the HAP contracts for a given year without regard for the overall limitation upon rent adjustments unless, prior to the HAP contract anniversary date when adjustments are due, HUD invokes the overall limitation and adjusts contract rents in accordance with a "material difference" determination based upon the results of a rent comparability study completed by HUD and provided to the Owners. Under the plain terms of the HAP contracts, interpreted in light of the Section 8 statute in effect when the contracts were entered, and applicable case law, the overall limitation cannot be ignored in fashioning a damage award.

---

[11](...continued)
Brighton Village Associates v. United States, 52 F.3d 1056, 1060 (Fed. Cir. 1995) ("No clause in the HAP contract authorizes any particular form of relief for HUD's failure to adjust rents.").

The overall limitation unambiguously reflects that the ceiling upon rent adjustments imposed by that provision supersedes any other rent adjustments indicated in the HAP contracts, such as factor-based rent adjustments. The overall limitation provides that, "[n]otwithstanding *any* other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government . . . ." HAP Contracts, Part I, § 1.8d (emphasis added). As the Supreme Court observed in Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993), "the use of such a 'notwithstanding' clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." Thus, "no project owner may claim entitlement to formula-based rent adjustments that materially exceed market rents for comparable units." Id. at 21. The Owners simply "have no contract right to unobstructed formula-based rent adjustments." Id.

The Owners note that the overall limitation imposes a cap upon a rent adjustment that would result in a material difference between assisted (subsidized) and comparable unassisted (market) rents "as determined by the Government." The Owners interpret the "as determined by the Government" phrase to mean that they are entitled to a factor-based annual rent adjustment unless, prior to the HAP contract anniversary date, the Government makes a rent comparability ("material difference") determination. Pl. Br. 9. But the overall limitation provision does not state that an owner will receive a AAF-based annual rent adjustment "unless" HUD makes a rent comparability determination before the anniversary date or even that a factor-based rent adjustment shall not result in material differences between the rents charged for assisted and comparable unassisted units "if" so determined by HUD prior to the anniversary date. The overall limi-

tation provides, rather, that rent adjustments under section 1.8 of the HAP contract, including annual adjustments under section 1.8b and "special additional adjustments" under section 1.8c, shall not result in material differences between the rents charged for assisted and comparable unassisted units, "*as*" determined by the Government. The "as determined by the Government" language in the overall limitation assigns to the Government the responsibility for the "material differences" determination, see Alpine Ridge, 508 U.S. at 21, but it does not affect the reach of the prohibition contained in that provision. Interpreting the "as determined by the Government" language in that manner is consistent with the explicit intent of the HAP contract that the overall limitation in section 1.8d trumps the automatic adjustment provisions of section 1.8b. The Supreme Court made this clear in Alpine Ridge when it stated that "we think it clear beyond peradventure that § 1.9d provides that contract rents 'shall not' be adjusted so as to exceed materially the rents charged for 'comparable unassisted units' on the private rental market–even if other provisions of the contracts might seem to require such a result." 508 U.S. at 18-19.[12]

The only decisions of this Court to have examined whether the overall limitation upon rent adjustments may be disregarded in calculating breach-of-contract damages for the failure to make an annual rent adjustment have concluded that the overall limitation cannot be ignored in that context. In National Leased Housing Ass'n v. United States, 24 Cl.Ct. 647 (1991), the

---

[12] See also Federal Housing Partners IV v. Cisneros, 55 F.3d 362, 367-68 (8th Cir. 1995) ("The contention that AAAFs are the presumptive method of adjusting is incorrect by the terms of the contracts. While AAAFs might be the norm for practical reasons, the overriding principle set forth in the contracts is that '[AAAFs] shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government[.]' . . . The landlords have argued for an AAAF increase without a showing on the issue of comparability. Their attempt to case doubt upon the studies does not entitle them to AAAFs, since the remedy for an improper study is simply a better study.").

plaintiffs challenged rent adjustment determinations by HUD based upon the overall limitation provision, seeking the full rent increases that would have been awarded had HUD based the rent adjustments upon AAFs. The plaintiffs in that case alleged that procedures employed by HUD in conducting the rent comparability studies upon which the rent adjustment determinations were made were defective, resulting in the breach of their HAP contracts. Id. at 649. The plaintiffs argued that, because of such deficiencies, HUD could not rely upon the rent comparability studies and instead was obliged to grant adjustments based upon applicable AAFs. Id. at 650. The court, however, disagreed:

> The "Overall Limitation" provision establishes the extent of plaintiffs' contractual entitlement. It provides that rent adjustments "shall not result in material differences between the rents charged for assisted and comparable unassisted units." Hence, if, as alleged here, the comparability studies were conducted improperly and in violation of the contract requirements, the solution would not be to return blindly to the AAAFs. Rather, to give effect to the "Overall Limitation," it is necessary for the court to consider the issue of comparable rents and assure that any rent that it allows is not materially different from the rents charged at the time for comparable unassisted units.

Id. at 651.

More recently, in Statesman II Apartments, where, as in the present case, the court held that the 1994 Amendments and HUD Notice 95-12 breached the HAP contracts, the plaintiffs argued that the overall limitation was not a constraint upon the calculation of damages because the Government failed properly to invoke that clause at the time performance was due, i.e., on the anniversary date, and that, consequently, they were entitled to the "presumptive" or "automatic" AAF-based rent adjustments. Id. at 666-67. The court, however, concluded that it could not "simply read a term out of the contract because the government misapplied that term," that

"[i]gnoring the 'overall limitation' clause in calculating damages would put plaintiffs in a better position than they would have held had the breach not occurred," and that the "[p]laintiffs' attempt to reduce the overall contract limitation to a nullity must therefore be rejected." Id. at 667. "Instead," the court stated, "the resulting issue for the court is how the government would or should have applied that contractual term in the absence of the breach, *i.e.*, how the government would have applied the 'overall limitation' clause absent the 1994 amendments to [the Section 8 statute]." Id.

In support of their contention that damages should be calculated without regard for the overall limitation provision, the Owners assert that, in Cuyahoga I, the Court "already answered the sole issue presented in this briefing[.]" Pl. Br. 7. They point to the holding in Cuyahoga I that "the HAP contracts expressly require HUD to provide [the owner] with annual adjustments barring the agency's invocation of the overall limitation." 57 Fed. Cl. at 762.

The Owners' reliance upon Cuyahoga I is misplaced for three reasons. First, nowhere does Cuyahoga I state that, if HUD does not invoke the overall limitation, the HAP contract requires that the owner receive a AAF-adjusted rent. At most, Cuyahoga I suggests that some sort of annual rent adjustment may be appropriate without such an invocation, but this allows for a rent adjustment that results in a rent that is higher than the previous year's rent which is capped at the comparable unassisted rent plus any initial difference to be preserved in rent adjustments. Such an analysis does not render the overall limitation provision, which is intended to trump all other provisions of the HAP contract, a nullity.

Second, Cuyahoga I addressed the Government's liability not the measure of damages for the breach of contract found by the Court in that case, including the role of the overall limit-

ation provision in the calculation of damages. The damages issues in the Cuyahoga litigation are addressed in Cuyahoga II. Cuyahoga II did not resolve the damage issue presently before the Court because the parties in that case had agreed, among other things, that "to the extent expectation damages are allowable, the overall limitation should apply even though HUD did not prepare comparability studies during any of the relevant years and plaintiff supplied such studies later." 65 Fed. Cl. at 543 (noting that this represented a "significant concession" by the owner, "which, while seeking the equivalent of the rent adjustments, cedes that those adjustments remain subject to the overall limitation in the HAP contracts").

Third, the present case involves a situation where the Government *invoked* the overall limitation provision in connection with the rent adjustments sought by the Owners, albeit improperly in the Court's view, rather than a situation where the Government failed to adjust contract rents for reasons unrelated to the rent comparability limitation.[13] The 1994 Amendments to the Section 8 statute (as implemented by HUD Notice 95-12) triggers the overall limitation with respect to an annual rent adjustment whenever the existing contract rent exceeds the published fair market rent for an existing dwelling unit in the relevant housing market. That is to say, the Government has reason to suspect that granting a AAF-based rent adjustment in such case may violate the overall limitation provision. The 1994 Amendments (as implemented by HUD Notice

---

[13] Acacia Villa v. United States, 36 Fed. Cl. 277 (1996), is similarly distinguishable. The 1994 Amendments and HUD Notice 95-12 were not at issue in that case. The issue there was whether HUD breached the plaintiffs' HAP contracts where the failure to grant AAF-based rent adjustments was not based upon any determination, direct or indirect, by HUD under the overall limitation provision that such adjustments would result in material differences between the rents of assisted and comparable unassisted units, i.e., where HUD had not attempted to invoke the overall limitation to deny rent adjustments on or before the HAP contract anniversary dates. Id. at 279.

95-12) require that, to receive a AAF-based rent increase in such case, an owner provide HUD with a rent comparability study demonstrating that an AAF adjustment would not violate the rent comparability limitation. From a damages perspective, the question is what measure of damages is required to put the owner in as good a position as the owner would have been if the Government had fully performed, i.e., if the Government had properly implemented the overall limitation by performing a rent comparability study and making a "material difference" determination based upon that study. Statesman II Apartments, 71 Fed. Cl. at 666-67.

It does not make sense to reduce the overall limitation provision to a nullity in the damages context simply because the Court has held that the Government improperly implemented the overall limitation by requiring that the Owners rather than the Government perform rent comparability studies by which to gauge whether a AAF-based rent adjustment would violate the rent comparability limitation. The reason is that, under the Court's analysis, the very source of the contractual obligation for HUD to perform comparability studies is the phrase "as determined by the Government" appearing in the overall limitation clause. It would be circular reasoning to contend that the overall limitation clause has no relevance to determining the measure of damages when the reason for this conclusion is HUD's purported failure to comply with the obligation in the overall limitation clause to perform comparability studies. But, if the overall limitation clause, i.e., the "as determined by the Government" language, is what imposes upon HUD the obligation to perform comparability studies, then clearly, this contention is premised upon the continued applicability of the overall limitation provision, which should be as applicable to the determination of the measure of damages as it is to the determination of whether there has been a breach of contract.

In support of their contention that damages may be calculated without regard for the overall limitation provision, the Owners also argue that "HUD's own contemporaneous interpretation of the Section 8 statutes and the HAP Contracts allowed it to make annual rent adjustments without regard to the overall limitation provision." Pl. Br. 14. We disagree. First, even if HUD did not invoke the rent comparability limitation before 1980, that says nothing about HUD's authority to do so or about how, exactly, invocation of the rent comparability limitation should occur.

Second, the Owners have not pointed to anything that reflects such a "contemporaneous interpretation" by HUD. They cite a March 5, 1980 internal memorandum by a HUD field official, which hardly qualifies as an authoritative interpretation by HUD of the overall limitation provision and which, in any case, does not suggest that HUD has the authority to grant a AAF-based rent adjustment where it has reason to suspect that doing so would offend the overall limitation upon rent adjustments. The March 5, 1980 memorandum merely states that "[i]t is probable that the application of the [AAAFs] in making contract rent adjustments for Section 8 . . . projects will, *after a period of time*, result in rents higher than those allowed under [the overall limitation provision] contained in the HAP contract." Pl. App. 67 (emphasis added). This document goes on to state that "[i]t has been *determined* by this [Field Office], in our two oldest Section 8 projects, that the use of adjustment factors has resulted in contract rents which are in excess of those allowed by the rent adjustment provisions of Section 1.8 of the HAP Contract," that "the owners of these two projects have been notified that the contract rents have been adjusted to reflect those rents which are justified by the rents for comparable unassisted units," and that, "[a]s a *result* of our *finding* that use of the factors has resulted in higher than allowable rents, we

have instituted a procedure *to ensure that* rent adjustments for all Section 8 projects meet the comparability test." Pl. App. 67-68 (emphases added).

In support of their contention that the overall limitation may be disregarded in calculating damages for the breach of contract found by the Court, the Owners also rely upon provisions of the Housing and Community Development Act of 1987, Pub. L. No. 100-242, 101 Stat. 1815, 1850 (1988), and the Housing and Urban Development Reform Act of 1989, Pub. L. No. 101-235, 103 Stat. 1987, 2057-59 (1989). Pl. Br. 15-18. The Owners' HAP contracts, however, precede this legislation and should be interpreted in light of the Section 8 statute in effect in 1979 (Park Properties), 1980 (Valentine), and 1982 (St. John's), i.e., in light of the Section 8 statute as originally enacted.

Occasionally, courts, in interpreting a statute, have accorded weight to subsequent legislation that expressly declares the intent of the earlier statute. See, e.g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81 (1969) (1959 amendment of requirement of section 315 of Communications Act of 1934 that equal time be accorded political candidates to except certain appearances on news programs with a proviso that this constituted no exception "from the obligation imposed upon them under this Act to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance"); Federal Housing Administration v. The Darlington, Inc., 358 U.S. 84, 90 (1958) (1954 amendment of the National Housing Act declaring "intent" of Congress "since the enactment of the National Housing Act" in 1934 with respect to the use of insured housing for "transient or hotel purposes").[14]

---

[14] But see Hart v. United States, 218 Ct. Cl. 212, 225, 585 F.2d 1025, 1032 (1978) ("courts have consistently stated that the expression of opinion by a subsequent Congress on the meaning (continued...)

The provisions of the Housing and Community Development Act of 1987 and the HUD Reform Act of 1989 cited by the Owners, unlike the statutes in Red Lion Broadcasting and The Darlington, do not purport to declare the intent of the Congress that enacted the Section 8 statute in 1974. At any rate, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." United States v. Price, 361 U.S. 304, 313 (1960); accord National Leased Housing Ass'n v. United States, 32 Fed. Cl. 454, 467 (1994) (discounting use of legislative history of amendments to Section 8 statute incorporated in Housing and Community Development Act of 1987 to demonstrate intent of Congress in 1974 when Section 8 statute originally enacted).

The Owners also argue that section 142(c)(2)(B) of the Housing and Community Development Act of 1987 "expressly prohibits" application of the overall limitation to the calculation of their damages claims. Section 142(c)(2)(B) added the following provision to the Section 8 statute (codified at 42 U.S.C. § 1437f(c)(2)(C)): "If the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." The Owners assert that section 142(c)(2)(B) survived the 1994 Act, arguing that, "[w]hatever else Congress did with respect to HUD's authority under the overall limitation provision in the 1994 Act, . . . it retained the rule that if HUD did not conduct timely comparability studies, the annual adjustment factors would take effect." Pl. Br. 19. Again, we disagree.

---

[14](...continued)
of an act adopted by an earlier Congress [has] little, if any, significance" because, "[i]n effect, such statements represent an attempt to usurp the role of the judiciary in interpreting the intent of the [earlier] enactment.").

The requirement of section 142(c)(2)(B) that contract rents be adjusted based upon AAFs if HUD does not provide the owner with a rent comparability study 60 days before the HAP contract's anniversary date is totally inconsistent with the 1994 Amendments to the Section 8 statute which provided that, where the rent to be adjusted using an AAF is greater than the published fair market rent, "the Secretary shall adjust the rent *only to the extent that the owner demonstrates* that the adjusted rent would exceed the rent for an unassisted unit similar quality, type, and age in the same market area, as determined by the Secretary . . . ." 42 U.S.C. § 1437f(c)(2)(A) (1994) (emphasis added). The 1994 Act's prohibition of a AAF-based rent adjustment unless the owner demonstrates that such an adjustment would not exceed the comparable unassisted rent cannot be reconciled with the requirement of section 142(c)(2)(B) that contract rents be adjusted using AAFs unless *HUD* provides the owner with a rent comparability study. The later-enacted 1994 Amendments, therefore, effectively repealed or superseded section 142(c)(2)(B) of the Housing and Community Development Act of 1987.[15]

A further problem with the Owners' argument regarding section 142(c)(2)(B) of the Housing and Community Development Act of 1987 is that this legislation is not part of the Owners' HAP contracts. As discussed above, the law in effect when a Government contract is made becomes a part of the contract. The Section 8 statute in effect at the time the Owners' HAP contracts were executed did not require that contract rents be adjusted based upon AAFs unless HUD provided an owner with a completed rent comparability study 60 days before the

---

[15] The legality of the 1994 Act is not disputed. See Cuyahoga II, 65 Fed. Cl. at 544 ("There is no real debate that the 1994 Act is the law of the land."); Cuyahoga I, 57 Fed. Cl. at 781 ("this court does not hold that either the 1994 amendments or the 1995 HUD directive are inapplicable to [the plaintiff], as would be the case, for example, were such amendments unconstitutional or the directive invalid").

contract anniversary date when the adjustment was due.[16] The Owners' entitlement in this contract breach action is based upon the HAP contracts, not section 142(c)(2)(B) of the Housing and Community Development Act of 1987.

Expectancy damages for the breach of contract found by the Court, therefore, must be determined in light of the reasonable expectations of the Owners based upon the terms of the HAP contracts, not subsequently-enacted legislation such as section 142(c)(2)(B). Interpreting the overall limitation provision "to require adjustment of the contract rents in order to eliminate any material difference between the rents charged for assisted and comparable unassisted units would be generally consistent with the reasonable expectations of both HUD and the project owners as to the value of the rented units." National Leased Housing, 32 Fed. Cl. at 466.

Acceptance of the Owners' contention that damages must be calculated without regard for the overall limitation provision also has the following anomalous consequence for the calculation of damages: the Court would have to turn a blind eye to rent comparability studies submitted by Park Properties and Valentine to HUD in 2001 and 2002 in support of AAF-based annual adjustments that they received,[17] irrespective of whether the calculation of damages predicated

---

[16] The Owners' HAP contracts do not provide that they are subject to or otherwise purport to incorporate subsequently enacted changes to the Section 8 statute, such as, for example, section 142(c)(2)(B) of the Housing and Community Development Act of 1987. If they had so provided, there would not have been a finding of liability in this case based upon the 1994 Act.

[17] Park Properties submitted a rent comparability study to HUD in May 2001 for 0-bedroom and 1-bedroom units which reflected that the comparable unassisted rent for the 0-bedroom unit was $875 per month and that the comparable unassisted rent for the 1-bedroom unit was $1,000 per month. DPFUF ¶ 15. Park Properties submitted another rent comparability study to HUD in June 2002 which reflected that the comparable unassisted rent for the 0-bedroom unit was $975 per month and that the comparable unassisted rent for the 1-bedroom unit was $1,150 per month. DPFUF ¶ 21. Valentine submitted a rent comparability study to HUD in June 2002 for 0-bed-
(continued...)

upon the assumption that the Owners were entitled to AAF-based rent adjustments throughout the damages interval produces contract rent values that exceed the market rents reflected in the comparability studies submitted by the Owners to HUD. The Court's holding in this case that the 1994 Amendments and HUD Notice 95-12 breached the HAP contracts by imposing upon the Owners the requirement to provide HUD with rent comparability studies in support of AAF rent adjustments does not in any way impugn the rent comparability studies submitted by the Owners. There is, moreover, nothing in the HAP contracts that would preclude HUD from making a material difference determination under the overall limitation provision based upon a rent comparability study submitted by an owner to HUD. The Court only has held that, to receive a rent adjustment, the Owners may not be required to provide HUD with a rent comparability study demonstrating that the resulting rent would not violate the overall limitation provision.

## IV. Even If The Court Were To Agree With The Owners That The Overall Limitation Provision Contained In The Owners' HAP Contracts Is Not A Constraint Upon The Calculation Of Damages, The Court Should Not Direct That The Parties Prepare A Stipulation With Respect To Damages.

The Owners assert that because, in their view, "there is no basis to apply the overall limitation to restrict the recovery of damages in this case," the "other issues raised in the [December 11, 2006] Joint Status Report" are issues that "do not arise unless the overall limitation applies, and therefore do not need to be addressed[.]" Pl. Br. 20. We disagree.

One of the issues identified in the Joint Status Report that is not tied to the determination of whether the overall limitation provision is a constraint upon the calculation of damages is the

---

[17](...continued)
room and 1-bedroom units which reflected that the comparable unassisted rent for the 0-bedroom unit was $950 per month and that the comparable unassisted rent for the 1-bedroom unit was $1,100 per month. DPFUF ¶ 48.

issue whether the failure of plaintiffs Park Properties and Valentine to receive annual rent adjustments for the years 1999 and 2000 was not the direct or proximate consequence of the requirements of the 1994 Amendments to the Section 8 statute or HUD Notice 95-12, but, rather, the result of plaintiffs' mistaken belief that they were not eligible for rent increases because their rental housing projects (LaMartine Terrace, Lane Hill Senior Citizen Residence) were located in a housing market subject to local rent control regulation. The Government raised this issue in its response to the Owners' motion for summary judgment as to liability,[18] but the Court did not resolve that issue in its November 17, 2006 Opinion. At the March 16, 2006 hearing upon the Owners' motion for summary judgment as to liability, the Court indicated that it viewed the issue as "a mitigation point that [the Court] can take up in the context of damages as well as at the appropriate time." Tr. 44 (11-13).

It also would be inappropriate to direct the parties to prepare a stipulation "with respect to the damages recoverable here," Pl. Br. 20, without any further opportunity for discovery. Even assuming for the sake of discussion that the overall limitation provision is not a constraint in the calculation of damages, the Government would need discovery from the Owners with respect to the number of turnover and non-turnover units and vacancy rate for the Owners' rental housing projects for each of the relevant years. The Government does not possess such information and should be afforded the opportunity to obtain such information from the Owners under the Court's discovery rules.

[18] See "Defendant's Opposition to Plaintiffs' Motion for Summary Judgment as to Liability" dated August 31, 2005, at 29-31.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment with respect to application of the overall limitation provision contained in their HAP contracts to the calculation of damages should be denied and defendant's cross-motion for partial summary upon that issue should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

NANCY CHRISTOPHER
Associate General Counsel

GERALD ALEXANDER
Assistant General Counsel

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, D.C.

MARCH 26, 2007

CERTIFICATE OF FILING

I hereby certify that on this 26th day of MARCH, 2007, a copy of "DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO APPLICATION OF OVERALL LIMITATION TO CALCULATION OF DAMAGES AND DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/John E. Kosloske