IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PARK PROPERTIES ASSOCIATES, L.P., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 04-1757C |
| v. | ) | |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFFS' RESPONSE TO
DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to RCFC 56(h)(2), the Plaintiffs, by and through undersigned counsel, respectfully submit the following Response to the Defendants' Proposed Findings Of Uncontroverted Fact dated March 26, 2007 (the "Statement").[1] As a general matter, the Statement is composed of a long series of specific facts concerning multiple aspects of the Plaintiffs' rent adjustment history which is of no, or extremely marginal, relevance to the matters that the parties are supposed to address in their current briefing, pursuant to the Court's Order dated December 19, 2006 (the "Order"). Plaintiffs object to the inclusion of such irrelevant facts in connection with the pending briefs, insofar as they appear to be intended to improperly require the Plaintiffs to take positions on factual matters that are not now at issue. The Plaintiffs objections to specific factual statements are noted below:

1 For the reader's convenience, the Plaintiffs retain the naming conventions adopted by the Government in the Statement. Therefore, "Compl. ¶ ____" refers to the referenced paragraph(s) of the "Complaint" filed on December 10, 2004; "Answer ¶ ____" refers to the referenced paragraph(s) of "Defendant's Answer" filed on February 7, 2005; "Def. App. ____" refers to the referenced page(s) of the appendix to "Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment" filed on July 29, 2005; and "Def. Supp. App. ____" refers to the referenced page(s) of the appendix to "Defendant's Opposition to Plaintiffs' Motion for Summary Judgment as to Liability" filed on August 31, 2005.

A. Park Properties Associates, L.P.

1. Plaintiff, Park Properties Associates, L.P. (Park Properties), is a limited partnership organized under the laws of the State of New York. Compl. ¶ 3; Answer ¶ 3.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

2. Park Properties is the owner of a multifamily rental housing project that is known as LaMartine Terrace or Waterview Apartments. Compl. ¶ 3; Answer ¶ 3; Bolduc Depo. 22(10-18), Def. App. 7.[2] LaMartine Terrace is located in Yonkers, New York. Compl. ¶ 3; Answer ¶ 3.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

3. In 1979, Jerome Z. Ginsburg d/b/a Park Properties Associates, the predecessor-in-interest of Park Properties, and the United States, acting through the Department of Housing and Urban Development (HUD), entered a Housing Assistance Payments (HAP) contract with respect to LaMartine Terrace (the Park Properties HAP Contract). See Def. App. 38-55; Bolduc Depo. 33(23-25)-34(1-7), Def. App. 9-10. On July 1, 1996, the interest of Park Properties Associates in the Park Properties HAP Contract was transferred to Park Properties, the plaintiff in the above-captioned action. See "Assignment of HAP Contract," Def. App. 57; Bolduc Depo. 37(325)-38(1-2), Def. App. 10-11.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

4. The Park Properties HAP Contract was entered pursuant to the Section 8 HAP Program for Substantial Rehabilitation. See 24 C.F.R. Part 881 (1979). The Park Properties

---

[2] In this document, "Bolduc Depo. ____(____)" refers to the referenced page(s) and (parenthetically) line(s) of the transcript of the deposition of Stephen Bolduc in this case by the Government on July 1, 2005. Plaintiffs Park Properties Associates, L.P., and Valentine Associates, L.P., designated Mr. Bolduc to testify upon their behalf with respect to deposition topics numbered 1 through 6 set forth in the Government's notice of Rule 30(b)(6) deposition. See Bolduc Depo. 15(21-25)-16(1-6), Def. App. 5; Def. App. 34-37 (Rule 30(b)(6) deposition notice).

HAP Contract covers 82 apartments in LaMartine Terrace: 16 0-bedroom units; 30 one-bedroom units; and 36 two-bedroom units. Def. App. 46.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

5. The term of the Park Properties HAP Contract is five years, renewable at Park Properties' option for five additional terms of five years each for a maximum of 30 years. See Park Properties HAP Contract, Part I, §§ 1.1c, 1.4a (Alternative 2), Def. App. 38, 39; Bolduc Depo. 34(8-13), Def. App. 10..

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

6. The effective date of the Park Properties HAP Contract is June 1, 1979. Def. App. 49. The anniversary date of the Park Properties HAP Contract, thus, is June 1 of each year during the term of the contract. Id.; see also Bolduc Depo. 35(4-18), Def. App. 10.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

7. With respect to rent adjustments, section 1.8 of Part I of the Park Properties HAP Contract provides, in part:

> b. Automatic Annual Adjustments
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

* * * * *

d. Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Def. App. 41.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

8. Effective on June 1, 1994, contract rents under the Park Properties HAP Contract were increased, based upon the application of annual rent adjustment factors published in the Federal Register, to $872 per month for the 0-bedroom units, to $959 per month for the one-bedroom units, and to $1,053 per month for the two-bedroom units. Def. App. 58-60; Bolduc Depo. 39(225)-40(1-12), Def. App. 11.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

9. From June 1, 1994, through July 11, 2001, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Park Properties HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $872 | $959 | $1,053 |

| | | | |
|---|---|---|---|
| Utility Allowance | $ 27 | $ 32 | $ 34 |
| Gross Rent | $899 | $991 | $1,087 |

Def. App. 58; Def. Supp. App. 509.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

10. The New York State Housing Trust Fund Corporation is a "public housing agency" as defined in section 3 of the United States Housing Act of 1937 (42 U.S.C. § 1437a(b)(6)). See "Annual Contributions Contract," § 1 ("Definitions"), at 5, Def. App. 275.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

11. On or about September 28, 2000, the New York State Housing Trust Fund Corporation (the PHA) and HUD entered an "Annual Contributions Contract" (ACC) in which the PHA agreed to provide contract administration services for project-based HAP contracts entered under the Section 8 HAP Program. See ACC, Exhibit A (Scope of Services), at 6-26, Def. App. 298318. Regarding contract administration services, the ACC provides that "[t]he PHA shall enter into or assume HAP contracts with owners of covered units to make housing assistance payments to the owners of such units during the HAP contract term." ACC, § 3a(1), at 7, Def. App. 277. The service area for the PHA under the ACC is the State of New York, including the fair-market rent areas of Westchester County, New York, and the New York, NY PMSA. See ACC, Exhibits D (PHA Service Area), E (PHA Administrative Fee), Def. App. 354-355.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

12. On or about October 4, 2000, the New York State Housing Trust Fund Corporation and Quadel Consulting Corporation (Quadel) entered the “Contract Between Quadel Consulting Corporation and the New York State Housing Trust Fund Corporation” in which Quadel agreed to perform the contract administration services that are the subject of the ACC between the New York State Housing Trust Fund Corporation and HUD. See Def. App. 358-387.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

13. On February 27, 2001, Bill O’Neill, Rent Specialist, Quadel, advised Park Properties that, effective on December 1, 2000, Quadel became the contract administrator for the Park Properties HAP Contract. Def. Supp. App. 445.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

14. By letter dated May 11, 2001, Park Properties requested that Quadel adjust the rents for LaMartine Terrace under the Park Properties HAP Contract. The letter stated: “Subject Rent Increase for Fiscal Years 2000 and 2001,” 2 BR Units below FMR,” and “0 and 1 BR Units Over FMR Increase Applied For Under RCS.” The referenced enclosures to the letter included, among others, a “Rent Comparability Study.” Def. Supp. App. 446.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

15. In or about May 2001, Park Properties submitted a "Rent Comparability Study" to Quadel in support of a request for an adjustment of the rents for LaMartine Terrace under the Park Properties HAP Contract. Def. Supp. App. 447-508; Bolduc Depo. 54(21-25)-55(1-16), Def. App. 15. The rent comparability study was performed by Kenneth L. Golub, MAI, American Property Counselors, Armonk, New York. In the rent comparability study, Mr. Golub opined that, as of April 16, 2001, the comparable, unassisted rent for a 0-bedroom (studio) unit was $875 per month and that the comparable, unassisted rent for a one-bedroom unit was $1,000 per month. Def. Supp. App. 448, 450.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

16. On July 12, 2001, Quadel advised Park Properties that it had "processed an annual adjustment of rents for units covered by [the Park Properties HAP Contract]," effective on August 1, 2001. Under this rent adjustment, monthly contract rents were increased from $872 to $895 for the 0-bedroom units, from $959 to $981 for the one-bedroom units, and from $1,053 to $1,079 for the two-bedroom units. Def. Supp. App. 509.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

17. From July 12, 2001, through October 13, 2002, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Park Properties HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $917 | $1,002 | $1,102 |
| Utility Allowance | $ 27 | $ 32 | $ 34 |
| Gross Rent | $944 | $1,034 | $1,136 |

Def. Supp. App. 513, 514, 579.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

18. In a July 23, 2001 letter to Mr. Tracy S. Newman of Quadel concerning rent adjustments for the years 2000 and 2001, Mr. Jerome Z. Ginsburg, the President of Friendly Management, Inc., the general partner for both Park Properties and Valentine, stated, with respect to the LaMartine Terrace and Lane Hill projects:

> When these projects were originally built and rehabilitated under the Section 8 Turnkey Program, the costs could not be supported based on existing rent levels in the City of Yonkers because of the fact that Yonkers had imposed rent control. Rent control stopped all construction in a market that was in dire need of housing. It effectively froze the rent levels at levels that did not support construction or rehabs.
>
> These Section 8 project[s] were approved at 110% of fair market rent which is really free market, not rent controlled market. Rent increases were thereafter granted on an annual basis.
>
> However, subsequently, [HUD] through its eminent wisdom decided to change the rent increase formula to 70% of the median rental and thereafter lowered it further which impacted on the ability to get rent increases.
>
> The [HUD] action, however, did not freeze the cost of operating the building.

> We sent an employee to various HUD seminars and either through her ignorance or the complexity of the process, she arrived at the conclusion that no increases were possible in this building.
>
> Mr. Bolduc and myself spent a week reviewing the HUD rent increase process and, contrary to her opinion, found that the RCS [Rent Comparability Study] Program would allow us to obtain rent increases since it does account for projects where rent control is imposed.
>
> However, because of this error, approximately seven years went by without an increase . . . .

Def. Supp. App. 511-512; see also Bolduc Depo. 45(18-20), 46(13-22), Def. App. 12, 13.

RESPONSE: Object, to the extent that the statement does not incorporate the full text of the subject letter and is therefore incomplete and misleading. The full text of the letter may be found in the Def. Supp. App. at 5210 – 512.

19. In a May 21, 2002 letter concerning a "Corrected Annual Adjustment Factor Rent Increase," Quadel advised Park Properties that it had "processed an annual adjustment factor rent increase for the units covered by [the Park Properties HAP Contract]," effective on July 12, 2001. Under this rent adjustment, monthly contract rents were increased from $896 to $917 for the 0-bedroom units, from $981 to $1,002 for the one-bedroom units, and from $1,079 to $1,102 for the two-bedroom units. Def. Supp. App. 513; Bolduc Depo. 57(13-23), Def. App. 15; see also "Rent Schedule" effective 7/12/01, Def. Supp. App. 514-515; Bolduc Depo. 60(7-25), Def. App. 16.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

20. By letter dated June 4, 2002, Park Properties requested that Quadel adjust the rents for LaMartine Terrace under the Park Properties HAP Contract. The letter stated: "Subject Rent Increase for Fiscal Year 2002" and "0 BR Units over FMR Increase applied for under RCS

[Rent Comparability Study]." The referenced enclosures to the letter included, among others, the "Rent Comparability Study dated May 22, 2002." Def. Supp. App. 516; Bolduc Depo. 62(5-15), Def. App. 17.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

21. In or about June 2002, Park Properties submitted a "Rent Comparability Study" to Quadel in support of a request for an adjustment of the rents for LaMartine Terrace under the Park Properties HAP Contract. Def. Supp. App. 517-575; Bolduc Depo. 64(19-25)-65(1-7), Def. App. 17. The rent comparability study was performed by Kenneth L. Golub, MAI, American Property Counselors, Armonk, New York. In the rent comparability study, Mr. Golub opined that, as of May 20, 2002, the comparable, unassisted rent for a 0-bedroom (studio) unit was $975 per month and the comparable, unassisted rent for a one-bedroom unit was $1,150 per month. Def. Supp. App. 518, 520.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

22. On August 12, 2002, Quadel advised Park Properties that, in order to calculate the new utility allowance for the various sizes of dwelling units covered by the Park Properties HAP Contract, Quadel needed a list of the dwelling units in LaMartine Terrace by bedroom-size and apartment number. Def. Supp. App. 576; Bolduc Depo. 69(1-5), Def. App. 18. Park Properties provided that information on August 14, 2002. Def. Supp. App. 577-578; Bolduc Depo. 70(7-10, 12-25), Def. App. 19.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

23. On September 11, 2002, Quadel advised Park Properties that it had "processed an annual adjustment factor rent increase and a utility allowance adjustment for the units covered by [the Park Properties HAP Contract]," effective on October 14, 2002. Under this rent adjustment, monthly contract rents were increased from $917 to $956 for the 0-bedroom units, from $1,002 to $1,040 for the one-bedroom units, and from $1,102 to $1,143 for the two-bedroom units. Monthly utility allowances were increased to $39 for the 0-bedroom units, to $40 for the one-bedroom units, and to $50 for the two-bedroom units. Def. Supp. App. 579; Bolduc Depo. 71(5-19), Def. App. 19; see also "Rent Schedule" effective 10/14/02, Def. Supp. App. 581-582; Bolduc Depo. 73(11-19), Def. App. 19.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

24. From October 14, 2002, through May 2, 2003, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Park Properties HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $956 | $1,040 | $1,143 |
| Utility Allowance | $ 39 | $ 40 | $ 50 |
| Gross Rent | $995 | $1,080 | $1,193 |

Def. Supp. App. 579, 581, 584.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

25. By letter dated March 3, 2003, Park Properties requested that Quadel adjust the rents for LaMartine Terrace under the Park Properties HAP Contract. The letter stated: "Subject Rent Increase for Fiscal Year 2003," "2 BR Units below FMR," and "0 and 1 BR Units over FMR Increase applied for under RCS [Rent Comparability Study]." The referenced enclosures to the letter included, among others, the "[c]over sheet of Rent Comparability Study (already on file from earlier years)." Def. Supp. App. 583; Bolduc Depo. 74(7-10, 16-18), Def. App. 20.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

26. On March 26, 2003, Quadel advised Park Properties that it had "processed an annual adjustment factor rent increase for the units covered by [the Park Properties HAP Contract]," effective on May 3, 2003. Under this rent adjustment, monthly contract rents were increased from $956 to $988 for the 0-bedroom units, from $1,040 to $1,071 for the one-bedroom units, and from $1,143 to $1,177 for the two-bedroom units. Def. Supp. App. 584; Bolduc Depo. 76(416), Def. App. 20; see also "Rent Schedule" effective 5/13/03, Def. Supp. App. 585-587; Bolduc Depo. 78(20-25)-79(1-3), Def. App. 21.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

27. From May 3, 2003, through May 9, 2004, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Park Properties HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $ 988 | $1,071 | $1,177 |
| Utility Allowance | $ 39 | $ 40 | $ 50 |
| Gross Rent | $1,027 | $1,111 | $1,227 |

Def. Supp. App. 584, 585, 595.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

28. By letter dated March 10, 2004, Park Properties requested that Quadel adjust the rents for LaMartine Terrace under the Park Properties HAP Contract. The letter stated: "Subject Rent Increase for Fiscal Year 2003 [sic]," "2 BR Units below FMR," and "0 and 1 BR Units over FMR Increase applied for under RCS [Rent Comparability Study]." The referenced enclosures to the letter included, among others, the "Rent Comparability Study – Update Letter." Def. Supp. App. 588; Bolduc Depo. 79(17-25)-80(1-2), Def. App. 21.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

29. In or about March 2004, Park Properties submitted a rent comparability study update to Quadel in support of a request for an adjustment of the rents for LaMartine Terrace under the Park Properties HAP Contract. Def. Supp. App. 589-594; Bolduc Depo. 80(21-25)-

81(1-2), Def. App. 21. The rent comparability study update was performed by Kenneth L. Golub, MAI, American Property Counselors, Armonk, New York. Mr. Golub opined that, "under conditions in effect on and around March 1, 2004," the comparable, unassisted rent for a 0-bedroom (studio) unit was "at least" $975 per month and that the comparable, unassisted rent for a one-bedroom unit was "at least" $1,150 per month. Def. Supp. App. 589, 590.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

30. On April 28, 2004, Quadel advised Park Properties that it had "processed an annual adjustment factor rent increase for the units covered by [the Park Properties HAP Contract]," effective on May 10, 2004. Under this rent adjustment, monthly contract rents were increased from $988 to $1,017 for the 0-bedroom units, from $1,071 to $1,105 for the one-bedroom units, and from $1,177 to $1,213 for the two-bedroom units. Def. Supp. App. 595; Bolduc Depo. 83(316), Def. App. 22; see also "Rent Schedule" effective 5/10/04, Def. Supp. App. 597-599; Bolduc Depo. 85(16-25), Def. App. 22.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

31. As of May 10, 2004, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Park Properties HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $1,017 | $1,105 | $1,213 |
| Utility Allowance | $ 39 | $ 40 | $ 50 |
| Gross Rent | $1,056 | $1,145 | $1,263 |

Def. Supp. App. 595, 597.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

B. Valentine Associates, L.P.

32. Plaintiff, Valentine Associates, L.P. (Valentine), is a limited partnership organized under the laws of the State of New York. Compl. ¶ 3; Answer ¶ 3.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

33. Valentine is the owner of a multifamily rental housing project that is known as Lane Hill Senior Citizen Residence (Lane Hill). Compl. ¶ 3; Answer ¶ 3; Bolduc Depo. 29(24-25), Def. App. 8. Lane Hill is located in Yonkers, New York. Compl. ¶ 3; Answer ¶ 3; Bolduc Depo. 30(1-3), Def. App. 9.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

34. In 1980, Jerome Z. Ginsburg d/b/a Valentine Associates, the predecessor-in-interest of Valentine, and the United States, acting through HUD, entered a HAP contract with respect to Lane Hill (the Valentine HAP Contract). See Def. App.61-75; Bolduc Depo. 86(16-25)-87(1), Def. App. 23. On July 1, 1996, the interest of Valentine Associates in the Valentine HAP Contract was transferred to Valentine, the plaintiff in the above-captioned action. See "Assignment of HAP Contract," Def. App. 78; Bolduc Depo. 88(13-23), Def. App. 23.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

35. The Valentine HAP Contract was entered pursuant to the Section 8 HAP Program for New Construction. See 24 C.F.R. Part 880 (1979). The Valentine HAP Contract covers a total of 109 apartments in Lane Hill: nine 0-bedroom units; 99 one-bedroom units; and one two-bedroom unit. Def. App. 68.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

36. The Valentine HAP Contract was executed in two stages. The effective date of Stage 1, which covers 55 dwelling units (three 0-bedroom units, 51 one-bedroom units, and one two-bedroom unit), is January 2, 1980. Def. App. 67; Bolduc Depo. 87(2-15), Def. App. 23. The effective date of Stage 2, which covers 54 dwelling units (six 0-bedroom units and 48 one-bedroom units), is February 19, 1980. Id.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

37. The term of the Valentine HAP Contract is five years, renewable at Valentine's option for five additional terms of five years each for a maximum of 30 years. See Valentine HAP Contract, Part I, §§ 1.1c, 1.4a (Alternative 2), Def. App. 61, 62.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

38. The effective date of the first stage of the Valentine HAP Contract is January 2, 1980. See Valentine HAP Contract, Def. App. 67. The anniversary date of the Valentine HAP Contract, thus, is January 2 of each year during the term of the contract.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

39. With respect to rent adjustments, section 1.8 of Part I of the Valentine HAP Contract provides, in part:

b. Automatic Annual Adjustments

(1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

* * * * *

d. Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Def. App. 65.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

40. Effective on January 2, 1994, contract rents under the Valentine HAP Contract were increased, based upon the application of annual rent adjustment factors published in the Federal Register, to $853 per month for the 0-bedroom units, $963 per month for the one-bedroom units, and $1,103 per month for the two-bedroom units. Def. App. 79-82; Bolduc Depo. 89(2-25)90(1), Def. App. 23-24.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

41. Effective on January 2, 1995, contract rents under the Valentine HAP Contract were increased, based upon the application of annual rent adjustment factors published in the Federal Register, from $853 to $880 per month for the 0-bedroom units, from $963 to $994 per month for the one-bedroom units, and from $1,103 to $1,138 per month for the two-bedroom units. Def. App. 83-86; Bolduc Depo. 90(2-24), Def. App. 24.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

42. From January 2, 1995, through July 31, 2001, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Valentine HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $880 | $ 994 | $1,138 |
| Utility Allowance | $ 24 | $ 26 | $ 30 |
| Gross Rent | $904 | $1,020 | $1,168 |

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

43. On or about January 18, 2001, Quadel advised Valentine that, effective on December 1, 2000, Quadel became the contract administrator for the Valentine HAP Contract. Def. Supp. App. 600.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

44. By letter dated May 11, 2001, Valentine requested that Quadel adjust the rents for Lane Hill under the Valentine HAP Contract. The letter stated: "Subject Rent Increase for Fiscal Year 2001," "2 BR Units below FMR," and "0 and 1 BR Units Over FMR Increase Applied For Under RCS [Rent Comparability Study]." The referenced enclosures to the letter included, among others, a "Rent Comparability Study." Def. Supp. App. 601; Bolduc Depo. 93(23-25)-94(1-10), Def. App. 24-25.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

45. On July 12, 2001, Quadel advised Valentine that Quadel had "processed an annual adjustment of rents for the units covered by [the Valentine HAP Contract]," effective on August 1, 2001. Under this rent adjustment, monthly contract rents were increased from $880 to $892 for the 0-bedroom units, from $994 to $1,016 for the one-bedroom units, and from $1,138 to $1,162 for the two-bedroom units. Def. Supp. App. 602.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

46. From August 1, 2001, through October 13, 2002, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Valentine HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $892 | $1,016 | $1,162 |
| Utility Allowance | $ 24 | $ 26 | $ 30 |
| Gross Rent | $916 | $1,042 | $1,192 |

Def. App. 83; Def. Supp. App. 602.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

47. By letter dated June 4, 2002, Valentine requested that Quadel adjust the rents for Lane Hill under the Valentine HAP Contract. The letter stated: "Subject Rent Increase for Fiscal Year 2002" and "0 BR Units over FMR Increase applied for under RCS [Rent Comparability Study]." The referenced enclosures to the letter included, among others, a "Rent Comparability Study dated May 20, 2002." Def. Supp. App. 603; Bolduc Depo. 96(9-19), Def. App. 25.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

48. In or about June 2002, Valentine submitted a rent comparability study update to Quadel in support of a request for an adjustment of the rents for Lane Hill under the Valentine HAP Contract. Def. Supp. App. 604-664; Bolduc Depo. 99(10-21), Def. App. 26. The rent comparability study update was performed by Kenneth L. Golub, MAI, American Property

Counselors, Armonk, New York. Mr. Golub opined that, as of May 20, 2002, the comparable, unassisted rent for a 0-bedroom (studio) unit was $950 per month and that the comparable, unassisted rent for a one-bedroom unit was $1,100 per month. Def. Supp. App. 605, 607.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

49. On August 12, 2002, Quadel advised Valentine that, in order to calculate the new utility allowance for the various sizes of dwelling units covered by the Valentine HAP Contract, Quadel needed a list of the dwelling units in Lane Hill by bedroom-size and apartment number. Def. Supp. App. 665; Bolduc Depo. 101(5-18), Def. App. 26. Valentine provided that information on August 14, 2002. Def. Supp. App. 666-668; Bolduc Depo. 101(23-25)-102(1-18), Def. App. 26-27.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

50. On September 10, 2002, Quadel advised Valentine that Quadel had "processed an annual adjustment factor rent increase and a utility allowance adjustment for the units covered by [the Valentine HAP Contract]," effective on October 14, 2002. Under this rent adjustment, monthly contract rents were increased from $892 to $928 for the 0-bedroom units, from $1,016 to $1,053 for the one-bedroom units, and from $1,162 to $1,204 for the two-bedroom units. Monthly utility allowances were increased from $26 to $33 for the one-bedroom units and from $30 to $42 for the two-bedroom units. Quadel did not approve a change in the utility allowance

for the 0-bedroom units. Def. Supp. App. 669-670; Bolduc Depo. 102(23-25)-103(1-6), Def. App. 27; see also "Rent Schedule" effective 10/14/02, Def. Supp. App. 671-672; Bolduc Depo. 105(13-22), Def. App. 27.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

51. From October 14, 2002, through January 1, 2003, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Valentine HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $928 | $1,053 | $1,204 |
| Utility Allowance | $ 24 | $ 33 | $ 42 |
| Gross Rent | $952 | $1,086 | $1,246 |

Def. Supp. App. 602, 669.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

52. By letter dated October 22, 2002, Valentine requested that Quadel adjust the rents for Lane Hill under the Valentine HAP Contract. The letter stated: "Subject Rent Increase for Fiscal Year 2003," "2 BR Units below FMR," and "0 and 1 BR Units over FMR Increase applied for under RCS [Rent Comparability Study]." The referenced enclosures to the letter included, among others, the "[c]over sheet of Rent Comparability Study, (already on file from earlier this year)." Def. Supp. App. 673; Bolduc Depo. 106(23-25)-107(1-9), Def. App. 28.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

53. On November 26, 2002, Quadel advised Valentine that Quadel had approved an annual adjustment factor rent increase for the 0-bedroom and one-bedroom units covered by the Valentine HAP Contract],” effective on January 2, 2003. Under this rent adjustment, monthly contract rents were increased from $928 to $964 for the 0-bedroom units and from $1,053 to $1,092 for the one-bedroom units. The monthly contract rent for the two-bedroom units, i.e., $1,204, was not adjusted. Def. Supp. App. 674; Bolduc Depo. 108(14-19), Def. App. 28; see also “Rent Schedule” effective 1/2/03, Def. Supp. App. 675-676; Bolduc Depo. 110(10-18), Def. App. 29.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

54. From January 2, 2003, through May 9, 2004, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Valentine HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $964 | $1,092 | $1,204 |
| Utility Allowance | $ 24 | $ 33 | $ 42 |
| Gross Rent | $988 | $1,125 | $1,246 |

Def. Supp. App. 674, 675, 691.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

55. By letter dated November 11, 2003, Valentine requested that Quadel adjust the rents for Lane Hill under the Valentine HAP Contract. The letter stated: "Subject Rent Increase for Fiscal Year 2004," "2 BR Units below FMR," and "0 and 1 BR Units over FMR Increase applied for under RCS [Rent Comparability Study]." The referenced enclosures to the letter stated: "Cover Sheet of Rent Comparability Study, (already on file from previous year)." Def. Supp. App. 677; Bolduc Depo. 111(6-18), Def. App. 29.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

56. On November 19, 2003, Quadel acknowledged receipt of Valentine's November 11, 2003 AAF rent adjustment request and responded to that request as follows:

> In order to complete the processing of your request additional information is required. Please submit the following by December 4, 2003:
>
> 1. Rent Comparability Study – Although a study was done last year, an updated version must be submitted this year as per page 5 of the attached HUD Notice H 2002-10.
>
> 2. Owner Report of Unit Turnover – Again, although one was submitted, we will need a corrected one. Please fill out the attached form for the total move ins from the HAP anniversary date (January 2, 2003) to current date.

Def. Supp. App. 678; Bolduc Depo. 112(7-18), Def. App. 29.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

57. On December 8, 2003, Quadel returned to Valentine the latter's November 11, 2003 AAF rent adjustment request submission, stating that the submission was not complete because it did not contain a rent comparability study or a report of unit turnover. Quadel stated

that Valentine "may wish to submit a new AAF rent increase request that includes all required items." Def. Supp. App. 679; Bolduc Depo. 112(22-25)-113(1-11), Def. App. 29.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

58. On March 10, 2004, in response to a request by Valentine, Quadel sent Valentine a blank Form HUD-92273-A (Owner Format for Reporting Unit Turnover). Def. Supp. App. 680-683.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

59. By letter dated March 10, 2004, Valentine requested that Quadel adjust the rents for Lane Hill under the Valentine HAP Contract. The letter stated: "Subject Rent Increase for Fiscal Year 2004," "2 BR Units below FMR," and "0 and 1 BR Units over FMR Increase applied for under RCS [Rent Comparability Study]." The referenced enclosures to the letter included, among others, "Rent Comparability Study – Update letter." Def. Supp. App. 684; Bolduc Depo. 114(15-25)-115(1-2), Def. App. 30.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

60. In or about March 2004, Valentine submitted a rent comparability study update to Quadel in support of a request for an adjustment of the rents for Lane Hill under the Valentine HAP Contract. Def. Supp. App. 685-690; Bolduc Depo. 115(20-25)-116(1), Def. App. 30.

The rent comparability study update was performed by Kenneth L. Golub, MAI, American Property Counselors, Armonk, New York. Mr. Golub opined that, "under conditions in effect on and around March 1, 2004," the comparable, unassisted rent for a 0-bedroom (studio) unit was "at least" $950 per month and that the comparable, unassisted rent for a one-bedroom unit was "at least" $1,100 per month. Def. Supp. App. 685, 686.

<u>RESPONSE</u>: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

61. On April 2, 2004, Quadel advised Valentine that Quadel had "processed an annual adjustment factor rent increase for the units covered by [the Valentine HAP Contract]," effective on May 10, 2004. Under this rent adjustment, monthly contract rents were increased from $964 to $994 for the 0-bedroom units, from $1,092 to $1,128 for the one-bedroom units, and from $1,204 to $1,241 for the two-bedroom units. Def. Supp. App. 691-692; Bolduc Depo. 116(22-25)-117(1), Def. App. 30; see also "Rent Schedule" effective 5/10/04, Def. Supp. App. 693-695; Bolduc Depo. 119(12-20), Def. App. 31.

<u>RESPONSE</u>: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

62. On April 28, 2004, Quadel advised Valentine that Quadel had "reviewed and corrected the annual adjustment factor rent increase" for the 0-bedroom units under the Valentine HAP Contract. The monthly contract rent for the 0-bedroom units was changed from $994 to $992. Def. Supp. App. 696-697; Bolduc Depo. 120(20-25), Def. App. 31; see also corrected

"Rent Schedule" effective 5/10/04, Def. Supp. App. 698-700; Bolduc Depo. 121(25)-122(1-19), Def. App. 31-32.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

63. As of May 10, 2004, the contract rents, utility allowances, and gross rents for the dwelling units covered by the Valentine HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom |
|---|---|---|---|
| Contract Rent | $ 992 | $1,128 | $1,241 |
| Utility Allowance | $ 24 | $ 33 | $ 42 |
| Gross Rent | $1,016 | $1,161 | $1,283 |

Def. Supp. App. 691, 693.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

C. St. John's I Associates, L.P.

64. Plaintiff, St. John's Associates I, L.P. (St. John's), is a limited partnership organized under the laws of the State of New York. Compl. ¶ 3; Answer ¶ 3; Salmond Depo. 15(2-5), Def. App. 122.[3]

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

65. St. John's is the owner of a multifamily rental housing project known as St. John's Phase I located in Brooklyn, New York. Compl. ¶ 3; Answer ¶ 3; Salmond Depo. 15(13-18), Def. App. 122.

[3] For the readers' convenience, "Salmond Depo. ____(____)" refers to the referenced page(s) and (parenthetically) line(s) of the transcript of the deposition of Henry Salmond in this case by the Government on July 1, 2005.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

66. St. John's Phase I is a substantial rehabilitation project that was developed with a private loan secured by a mortgage insured by HUD pursuant to section 221(d)(4) of the National Housing Act, as amended. See "Commitment for Insurance of Advances," Def. App. 87-91, "Mortgage," Def. App. 92-98, and "Mortgage Note," Def. App. 99-102.[4]

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

67. As initially organized, the general partners of St. John's were Unitroy Construction Corp. and Mr. Joseph Neumann. See "Certificate of Limited Partnership," Def. App. 104-112. The President of Unitroy Construction Corp. was Troy D. Stevens, Jr. See "Previous Participation Certificate," Def. App. 113-114. On March 2, 1993, Mr. Neumann assigned his general partnership interest in St. John's to Mr. Stevens. See "Assignment of Partnership Interest," Def. App. 115; "Amended Certificate of Limited Partnership," Def. App. 116-117.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

68. In 1982, St. John's and the United States, acting through HUD, entered a HAP contract with respect to St. John's Phase I (the St. John's HAP Contract), pursuant to the Section 8 HAP Program for Substantial Rehabilitation (24 C.F.R. Part 881 (1979)). See Def. App. 130146; Salmond Depo. 18(7-17), Def. App. 123. The St. John's HAP Contract applies

---

4 St. John's prepaid the mortgage loan in full on December 4, 2003. See Def. App. 103.

to a total of 191 apartments in St. John's Phase I: 14 0-bedroom units; 82 one-bedroom units; 78 two-bedroom units; and 17 three-bedroom units. Def. App. 136.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

69. The St. John's HAP Contract was executed in three stages. The effective date of Stage 1, which covered 76 dwelling units (26 one-bedroom units, 37 two-bedroom units, and St. John's prepaid the mortgage loan in full on December 4, 2003. See Def. App. 103. 13 three-bedroom units) was July 1, 1982. Def. App. 137. The effective date of Stage 2, which covered 44 dwelling units (five 0-bedroom units, 25 one-bedroom units, 10 two-bedroom units, and 4 three-bedroom units) was September 22, 1982. Def. App. 137. The effective date of Stage 3, which covered 71 dwelling units (nine 0-bedroom units, 31 one-bedroom units, and 31 two-bedroom units), was December 15, 1982. Def. App. 138.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

70. The term of the St. John's HAP Contract was 20 years. See St. John's HAP Contract, Part I, § 1.1c(3), Def. App. 130.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

71. The effective date of the first stage of the St. John's HAP Contract was July 1, 1982. See St. John's HAP Contract, Def. App. 137. The anniversary date of the St. John's HAP Contract, thus, was July 1 of each year during the term of the contract.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

72. With respect to rent adjustments, section 1.8 of Part I of the St. John's HAP Contract provided, in part:

> b. Automatic Annual Adjustments
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.
>
> * * * * *
>
> d. Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Def. App. 134.

RESPONSE: Admitted to the extent this statement is consistent with the sources cited.

73. Effective on July 1, 1994, contract rents under the St. John's HAP Contract were increased, based upon the application of annual rent adjustment factors published in the Federal Register, to $812 per month for the 0-bedroom units, $950 per month for the one-bedroom units,

$1,082 per month for the two-bedroom units, and $1,257 per month for the three-bedroom units. Def. App. 147-149; Salmond Depo. 19(2-18), Def. App. 123.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

74. In or about August 1996, St. John's submitted to HUD a rent comparability study for St. John's Phase I. The rent comparability study was prepared by Mr. Eugene Chin, Certified General License #45-24084 (New York), and dated August 2, 1996. Mr. Chin opined that the comparable, unassisted rent for 0-bedroom units was $515 per month, the comparable, unassisted rent for one-bedroom units was $630 per month, the comparable, unassisted rent for two-bedroom units was $800 per month, and the comparable, unassisted rent for three-bedroom units was $970 per month. See Def. App. 150-153; Salmond Depo. 19(23-25)-20(1-6), Def. App. 123.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

75. In light of the rent comparability study for St. John's Phase I submitted by St. John's to HUD in or about August 1996,[5] HUD determined that, based upon the overall limitation upon contract rents contained in the St. John's HAP Contract, St. John's was not entitled to an adjustment of the contract rents under the HAP Contract on the July 1, 1995 contract anniversary date. Def. App. 154-172; Salmond Depo. 20(21-25)-21(1-4), Def. App. 123.

---

5 See Def. App. 150-153; Salmond Depo. 19(23-25)-20(1-6), Def. App. 123.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

76. From July 1, 1994, through June 30, 1996, the contract rents, utility allowances, and gross rents for the dwelling units covered by the St. John's HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom | 3-Bedroom |
|---|---|---|---|---|
| Contract Rent | $812 | $950 | $1,082 | $1,257 |
| Utility Allowance | $ 30 | $ 34 | $ 40 | $ 47 |
| Gross Rent | $842 | $984 | $1,122 | $1,304 |

Def. App. 147.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

77. Effective on July 1, 1996, the contract rents under the St. John's HAP Contract were increased, based upon the application of annual rent adjustment factors published in the Federal Register, to $831 per month for the 0-bedroom units, to $973 per month for the one-bedroom units, to $1,108 per month for the two-bedroom units, and to $1,287 per month for the three-bedroom units. Def. App. 173-176; Salmond Depo. 22(17-25)-23(1-10), Def. App. 124.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

78. From July 1, 1996, until the expiration or termination of the St. John's HAP Contract in 2002, the contract rents, utility allowances, and gross rents for the dwelling units covered by the St. John's HAP Contract were as follows:

| | 0-Bedroom | 1-Bedroom | 2-Bedroom | 3-Bedroom |
|---|---|---|---|---|
| Contract Rent | $831 | $ 973 | $1,108 | $1,287 |
| Utility Allowance | $ 32 | $ 38 | $ 44 | $ 50 |
| Gross Rent | $863 | $1,011 | $1,152 | $1,337 |

Def. App. 173.

RESPONSE: The Plaintiffs object to this statement, to the extent that it is not relevant to the submit matter of the present briefing, pursuant to the Order. Otherwise, admitted to the extent it is consistent with the sources cited.

Dated: May 3, 2007

Respectfully submitted,

/s/Harry J. Kelly
HARRY J. KELLY, ESQ.
Nixon Peabody LLP
401 9th Street, N.W., Suite 900
Washington, D.C. 20004
Tele: (202) 585-8000

Attorney for Plaintiffs

**CERTIFICATE OF FILING**

I hereby certify that on this 3rd day of May, 2007, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Harry J. Kelly