No. 04-1757C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PARK PROPERTIES ASSOCIATES, L.P., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# PLAINTIFFS' BRIEF ON EXPECTATION DAMAGES

---

Dated: September 7, 2007

Harry J. Kelly, Esq.
Nixon Peabody LLP
401 Ninth Street, N.W.
Suite 900
Washington, D.C. 20007
(202) 585-8712

Counsel for the Plaintiffs

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ iii

BACKGROUND ........ 2

1. The Statutory Origin of the Section 8 Rent Adjustment Process........ 2

2. The Rent Adjustment Provisions of the Plaintiffs' HAP Contracts........ 3

3. HUD's Initial Rent Adjustment Practices........ 4

4. Subsequent Congressional Limitations on the Overall Limitation........ 5

ARGUMENT ........ 6

Question A In the context of determining expectation damages, at what point are the expectations assessed? Specifically, should the court assess expectations at the time the contract was entered into or at the time of the breach(es)? ........ 6

Question B Are the parties' expectations measured solely by the terms of the contract, as reasonably construed? Is performance under similar contracts predating the execution of the contract relevant? Is performance under the contract or other similar contracts prior to the date of a breach relevant? ........ 7

1. The Parties' Expectations Are Measured By The Express Terms Of The HAP Contract, Which Are Unambiguous And Support the Plaintiffs' Interpretation Here........ 7

2. The Court Should Reject The Government's Argument that the Overall Limitation Constitutes a Ceiling On The Section 8 Rent Adjustment Process..... 10

   a. HUD was not always required to perform a rent comparability study to double-check the AAAF-adjusted rents........ 10

   b. The overall limitation cannot be used to impose on the Plaintiffs a duty to perform a comparability study........ 12

3. The Same Rule Applies Even If The Experiences Of Other Owners At The Time of the Government's Breach Are Considered. ........ 15

Question C Do questions involving the application [of] the overall limitation in this case involve causation or mitigation? Which party has the burden of proof in demonstrating the parties expectations regarding the use of that clause? ..... 15

Question D Whether, in light of the answers to the questions raised above, the party believes that this case still is amenable to being resolved as a matter of law? ..... 19

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

## CASES

Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348 (Fed. Cir. 2001) .................6

Carabetta Enters., Inc. v. United States, 68 Fed. Cl. 410 (2005) ....................................6, 7

Cisneros v. Alpine Ridge Group, 508 U.S. 10 (1993) ............................................. Passim

Cuyahoga Metro. Housing Auth. v. United States,
57 Fed. Cl. 751 (2003) ........................................................................... Passim

Cuyahoga Metro. Housing Auth. v. United States,
65 Fed. Cl. 534 (2005) ........................................................................... Passim

Franconia Assocs. v. United States, 61 Fed. Cl. 718 (2004) ...........................................16

Glendale Fed. Bank FSB v. United States, 239 F.3d 1374 (Fed. Cir. 2001) .................6, 17

Greco v. Department of the Army, 852 F.2d 558 (Fed. Cir. 1988) ...................................7

Hansen Bancorp, Inc. v. United States, 367 F.3d 1297 (Fed. Cir. 2004) ...........................6

Hol-Gar Mfg. Corp. v. United States, 351 F. 2d 972 (Ct. Cl. 1965) .................................7

Nat'l Austl. Bank v. United States, 63 Fed. Cl. 352 (2004)...............................................6

Park Properties Assocs. L.P. v. United States, 74 Fed. Cl. 264 (2006) ..................... Passim

Perry v. Department of Army, 992 F.2d 1575 (Fed. Cir. 1993) ........................................7

Reynolds v. United States, 158 F. Supp. 719 (Ct. Cl. 1958) ............................................6

San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557
(Fed. Cir. 1997).........................................................................................6

Spodik v. United States, 73 Fed. Cl. 1 (2006) ..................................................................17

Statesman II v. United States, 66 Fed. Cl. 608 (2005).......................................................5

T.C. Bateson Const. Co. v. United States, 162 Ct. Cl. 145 (1963)..................................17

Teg-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329
(Fed. Cir. 2006)....14

**STATUTES**

42 U.S.C. §1437f(c)(2)(A)....3

42 U.S.C. §1437f(c)(2)(C)....3

Department of Housing and Urban Development Reform Act of 1989, Pub. L. 101-235, § 801, 103 Stat. 1987 (1989)....5

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act , 1995, Pub. L. No. 103 - 327, 108 Stat. 2298 (1994)....5

Housing and Community Development Act of 1974, Pub. L. 93-383, Title II, § 201(a), 88 Stat. 633 (1974)....3

Housing and Community Development Act of 1987, Pub. L. 100 - 242, § 142(c)(2)(B) 101 Stat. 1815....5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PARK PROPERTIES ASSOCIATES, L.P., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 04-1757C |
| v. | ) | |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' BRIEF ON EXPECTATION DAMAGES

The issue before the Court is how to determine the amount of damages to which the Plaintiffs are entitled in this lawsuit. Previously, the Court determined that the Government breached the Plaintiffs' Housing Assistance Payments Contracts ("HAP Contracts") when Congress enacted and HUD implemented changes to the Section 8 program beginning in 1994 that shifted the task of performing rent comparability studies from HUD to owners like the Plaintiffs. Park Properties Assocs. L.P. v. United States, 74 Fed. Cl. 264 (2006). At the Court's request, the parties submitted briefs earlier this year addressing how the so-called "overall limitation" provision of the Plaintiffs' HAP Contracts affected their damages in this case. In its August 2, 2007 Order (the "Order"), the Court directed the parties to file additional briefing responding to specific questions that address how the overall limitation provision relates to the Plaintiffs' expectation damages in this case.

Inevitably, these issues all turn on one central question: Are the Plaintiffs required now to perform a separate comparability study to confirm that the rent adjustments based on the HUD-determined Automatic Annual Adjustment Factors ("AAAFs") do not exceed the so-called "overall limitation" found in Section 1.8d of the HAP Contracts? The answer is no, because at the time they entered into their HAP Contracts, the Plaintiffs expected that they would receive

the annual rent adjustments based on the full AAAFs, which already incorporated comparability-related criteria. As the Supreme Court determined, these AAAFs are the "presumptive adjustments" called for by the HAP Contracts. Cisneros v. Alpine Ridge Group, 508 U.S. 10, 19-20 (1993). The express terms of the HAP Contracts entitle the Plaintiffs to the full AAAF here, because HUD did not make a specific determination that local conditions yielded rents that differed from the "presumptive adjustments" yielded by the AAAFs. Nothing in the HAP Contract itself, or the administration of the Section 8 program by HUD, prohibits the owners from receiving the full AAAF adjustments that HUD previously calculated as appropriate for their areas.

## BACKGROUND

Given the Court's familiarity with the rent adjustment mechanism of the Section 8 program and the extensive briefing in the past concerning the overall limitation provision of the Plaintiffs' HAP Contract in particular, a full recitation of the statutory, programmatic and contract history of this case is unnecessary. Before addressing the specific questions posed in the Order, however, there are some factual and legal matters that have particular relevance here that merit a quick summary.

### 1. The Statutory Origin of the Section 8 Rent Adjustment Process.

First, the Section 8 program was established in 1974 and from the outset, contained provisions that permitted annual adjustments to the contract rents paid to participating owners:

> The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

Housing and Community Development Act of 1974, Pub.L. 93-383, Title II, § 201(a), 88 Stat. 633, 749 (1974) ("1974 Act"), *codified at* 42 U.S.C. §1437f(c)(2)(A) (as amended). At the same time, the 1974 Act contained a provision that assured owners their rents would not lag behind rents charged for comparable unassisted units:

> Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

1974 Act, § 201(c), *codified at* 42 U.S.C. § 1437f(c)(2)(C).

### 2. The Rent Adjustment Provisions of the Plaintiffs' HAP Contracts.

Implementing these provisions, the subject HAP Contracts established a procedure to provide annual rent adjustments, based on the AAAFs to be published by HUD:

> b. Automatic Annual Adjustments.
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually . . . .
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factors most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

HAP Contracts, § 1.8b Appendix to Plaintiffs' Brief on Expectation Damages ("Plfs. App.," Exhibit 1 hereto) 10, 24, 43. The HAP Contracts also contained a provision, referred to as the "overall limitation," that, in modified form, reflected the provisions of § 201(c) of the 1974 Act:

> d. Overall limitation. Notwithstanding any other provision of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HAP Contract, § 1.8d (Plfs. App. 10, 24, 43). The effect of these terms, therefore, was to assure that the full AAAF-adjusted rents would become the contract rents unless HUD made specific determinations that some anomaly in the local rental market caused the AAAF-adjusted rents to be materially different from comparable unassisted rents.

### 3. HUD's Initial Rent Adjustment Practices.

Since the outset of the Section 8 Program, HUD has set annual adjustment factors that incorporated comparability criteria. *See* Alpine Ridge 508 U.S. at 19-20. In the years immediately after the enactment of the 1974 Act, and at the time that the Plaintiffs executed their HAP Contracts, however, HUD routinely granted the full AAAF-based rent adjustments without double-checking those results and did not begin to perform comparability studies on a regular basis until the 1980s. Park Properties, 74 Fed. Cl. at 267. Indeed, it did not begin to exercise that authority until sometime in 1980, when senior HUD officials first considered using comparable rents to limit the AAAF-based rents at two specific properties. *See* HUD Memorandum dated March 5, 1980 (Plfs. App. 4-5). Moreover, as the HAP Contract itself anticipated, HUD routinely established initial contract rents at a level in excess of the comparable unassisted rents, even though § 201(c) of the 1974 Act did not expressly authorize it to do so. HAP Contract, § 1.8d (overall limitation provision does not apply to extent of any "differences [that] may have existed with respect to the initial Contract Rents.") Interestingly, the "overall limitation" provision expressly authorized HUD to preserve these "initial differences" in subsequent rent adjustments. By these actions, HUD demonstrated that the overall limitation did not prohibit HUD from paying rent adjustments that exceeded the rents at comparable unassisted units.

### 4. Subsequent Congressional Limitations on the Overall Limitation.

HUD's decision to perform comparability studies pursuant to the overall limitation provoked a storm of litigation during the 1980s, and numerous attempts by Congress to restrict the scope of that provision. In 1987, Congress enacted provisions to assure that owners would receive the full factor-based rent adjustment unless HUD performed and delivered a comparability study no later than 60-days before the anniversary date. Housing and Community Development Act of 1987, Pub.L. 100 – 242, § 142(c)(2)(B), 101 Stat. 1815, 1850 ("1987 Act"). Later, Congress adopted measures to formalize HUD's comparability program and "required HUD to pay landlords an increased amount, above what the comparability studies required HUD to pay under its interpretation of the [HAP Contracts]." Department of Housing and Urban Development Reform Act of 1989, Pub.L. 101-235, § 801, 103 Stat. 1987, 2057-2059 (1989) (the "Reform Act"); Cuyahoga Metro. Housing Auth. v. United States, 57 Fed. Cl. 751, 756 (2003) ("Cuyahoga I").

Summarizing these changes, the Court previously explained that:

> Thus, from the passage of Section 8 in 1974 until it was modified in 1995, ***the statutory mechanism clearly envisioned that annual adjustments were to be automatic unless HUD promptly performed a comparability study.***

Cuyahoga I at 761-62. It was only in 1994 amendments to the Section 8 statute that Congress for the first time broke the automatic nature of the Section 8 rent adjustment, by attempting to shift the task of performing rent comparability studies from HUD to the owners – a fateful decision that prompted this lawsuit and, as this and other courts have concluded, constituted a breach of the Plaintiffs' HAP Contracts. *See* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act , 1995, Pub.L. No. 103 – 327, 108

Stat. 2298, 2315 (1994) ("1994 Act"); Cuyahoga I at 757; Statesman II v. United States, 66 Fed. Cl. 608 (2005); Park Properties, 74 Fed. Cl. at 273-74.

## ARGUMENT

### Question A In the context of determining expectation damages, at what point are the expectations assessed? Specifically, should the court assess expectations at the time the contract was entered into or at the time of the breach(es)?

At the July 30, 2007 hearing, the Court expressed its desire to analyze the impact of the overall limitation provision on the calculation of the Plaintiffs' expectation damages. Expectation damages are intended to give the non-breaching party "the benefits he expected to receive had the breach not occurred." Carabetta Enters., Inc. v. United States, 68 Fed. Cl. 410, 413 (2005) *quoting* Glendale Fed. Bank FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). "The general rule in common law breach of contract cases, the Federal Circuit has oft-stated, is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." Cuyahoga Metro. Housing Auth. v. United States, 65 Fed. Cl. 534, 543 (2005) ("Cuyahoga II"), *quoting* San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1562 – 63 (Fed. Cir. 1997); Glendale Fed., 239 F.3d at 1380 (expectation damages provide to the injured party reflect "the benefits [it] expected to receive had the breach not occurred"). Expectation damages are distinguished from other form of contractual relief, such as restitution or reliance. *Id.* at 413, *citing* Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1308 (Fed. Cir. 2004). "Expectation damages are recoverable provided they are 'actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty.'" Nat'l Austl. Bank v. United States, 63 Fed. Cl. 352, 355 (2004), *quoting* Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *see* Cuyahoga II at 543.

In answer to the first question posed by the Court, expectation damages themselves are generally measured at the time of the breach. Carabetta, 68 Fed. Cl. at 413, *citing* Reynolds v. United States, 158 F. Supp. 719, 725 (Ct. Cl. 1958). Nevertheless, the expectations of what the non-breaching party would receive if the Contract had been performed fully are based on the express terms of the contract. Perry v. Department of Army, 992 F.2d 1575, 1578-79 (Fed. Cir. 1993). Consequently, the focus of the Court's inquiry should be the expectations of the parties at the time they entered into the HAP Contract.

**Question B** **Are the parties' expectations measured solely by the terms of the contract, as reasonably construed? Is performance under similar contracts predating the execution of the contract relevant? Is performance under the contract or other similar contracts prior to the date of a breach relevant?**

**1. The Parties' Expectations Are Measured By The Express Terms Of The HAP Contract, Which Are Unambiguous And Support the Plaintiffs' Interpretation Here.**

The expectations of the parties – not just with respect to damages, but to all aspects of contract performance – are best reflected in the express terms of the contact into which they entered. "We must 'determine the intent of the parties at the time they contracted, as evidenced by the contract itself.' Perry, 992 F.2d at 1579, *quoting* Greco v. Department of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988). Moreover, "[i]n construing contracts, we assign to words their "ordinary and commonly accepted meaning unless it is shown that the parties intended otherwise." Perry, 992 F.2d at 1579, *quoting* Hol-Gar Mfg. Corp. v. United States, 351 F. 2d 972, 976 (Ct. Cl. 1965). The Court previously concluded that the HAP Contracts here were not ambiguous with respect to the operation of the overall limitation and that, even if it were ambiguous, any ambiguity would be construed against the Government, the drafter of the HAP Contract, pursuant to the doctrine of *contra preferentum*. Cuyahoga I, 57 Fed. Cl. at 760, n. 14.

Determining the parties' expectations thus begins with the HAP Contract itself, including Section 1.8b, which establishes the AAAF-adjustment mechanism, and Section 1.8d, which contains the overall limitation provision:

> B. Automatic Annual Adjustments.
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually . . . .
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factors most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

HAP Contracts, § 1.8b (Plfs. App. 10, 24, 43). Section 1.8d, the overall limitation provision, directs HUD to do something – exactly what is not specified in the text – to assure that the contract rents do not materially differ from comparable unassisted rents:

> Notwithstanding any other provision of this Contact, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rent.

HAP Contract at §1.8d (Plfs. App. 10, 24, 43). A reasonable person, looking at this language, would no doubt conclude that the overall limitation served merely to assure that HUD would construct area-specific AAAFs that incorporate local comparability criteria.

Certainly, this was the way the U.S. Supreme Court construed these provisions in its Alpine Ridge decision, which explained that in calculating the AAAFs, HUD was required to incorporate comparability criteria and that HUD was authorized to "double-check" the results yielded by those factors only when it had specific reason to belief they yielded an incorrect outcome:

> The rent adjustments indicated by the automatic adjustment factors remain the presumptive adjustment called for under the contract. It is only in those presumably exceptional cases where the Secretary has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue. ***Because the automatic adjustment factors are themselves geared to reflect trends in the local or regional housing market, theoretically it should not be often that the comparability studies would suggest material differences between Section 8 and private market rents.***

Alpine Ridge, 506 U.S. at 19 – 20 (emphasis added). Thus, when it published the AAAFs, HUD had already incorporated the comparability requirement of the overall limitation through local and regional comparability criteria. In most cases, there was no need to reconsider what the comparability-driven criteria reflected in the AAAFs yielded. Double-checking those results is allowed only in those "presumptively exceptional cases" where HUD has reason to believe that the AAAFs yield "materially inflated rents." Id. Applying these rules, the Court in Cuyahoga I explained that the "constellation of opinions construing HAP contracts, . . . consistently indicate[s] that a project owner would receive an automatic adjustment ***unless HUD came forward with evidence triggering the limitation***," and that "HUD, and only HUD, [had] the burden of coming forward to show a particular adjustment would violate the limitation." Cuyahoga I at 759-760 (emphasis added). Critical to the issue here, the Cuyahoga I court explained that Alpine Ridge's analysis of the relation between the AAAFs and the overall limitation precluded owners from performing a separate rent comparability study to qualify to receive their AAAF-based adjustment:

> Both the [Supreme] Court's reference to comparability studies being invoked only in "exceptional cases" and to automatic adjustments being "presumptive" clash with the notion, advanced by the government here, that the same contract provision can be construed to require property owners to provide comparability studies as a precondition to receiving an automatic adjustment."

Cuyahoga I, 57 Fed. Cl. at 760. Thus, looking at the express terms of the HAP Contract, which the Court previously determined are unambiguous (Cuyahoga I, 57 Fed. Cl. 760, n.14), the Court

determined that the HAP Contract granted the owners the full AAAF-based rent adjustment unless HUD concluded that some anomaly in the local rental market yielded an AAAF-adjusted rent that was materially different from rents at comparable unassisted units, and that the HAP Contract could not be construed to require owners to do a rent comparability study to justify these AAAF-adjusted rents.

### 2. The Court Should Reject The Government's Argument that the Overall Limitation Constitutes a Ceiling On The Section 8 Rent Adjustment Process.

No doubt, the Government will repeat at some point its argument that if the Plaintiffs receive a full AAAF-adjusted rent, they would receive something more than their HAP Contracts allow. See Government's Opposition to Plaintiffs' Motion For Partial Summary Judgment ("Gov't Opp.") at 16. As noted above, the argument is obviously mistaken, since the express terms of the HAP Contract establish that the Plaintiffs are entitled to receive the full AAAF adjustments, unless, notwithstanding the comparability analysis already incorporated into the AAAFs, HUD determined there was an anomaly in the local rental market that required it to double-check those results. That, of course, did not happen here.

#### a. HUD was not always required to perform a rent comparability study to double-check the AAAF-adjusted rents.

HUD's argument could make some sense if HUD were required to conduct comparability studies before making any rent adjustments, but neither the Section 8 statute, nor the HAP Contract, nor any of the many decisions construing the language of the law and contracts, compel HUD to perform a comparability study. It is only in retrospect, after more than 20 years of HUD's performance of comparability studies, that the overall limitation has become synonymous with performing those studies. Certainly at the time the HAP Contracts were signed, that was not the case, because HUD had not started performing comparability studies until the 1980s. *See* Cuyahoga I at 754; *see* HUD Memorandum (Plfs. App. at 4-5). It is

important to avoid the tunnel vision that twenty years of litigation concerning the meaning of the overall limitation provisions has yielded, because it is by no means certain that the present interpretation of Section 1.8d was predestined to occur. Indeed, if a prospective participant in the Section 8 program had looked at a draft HAP Contract at the time the Plaintiffs entered into the subject HAP Contracts, he or she would have reached the conclusion that when it published the relevant local AAAF, HUD had already satisfied the overall limitation's comparability requirements.[1]

The significance of this insight is that, because HUD's AAAFs already incorporated comparability criteria, the use of comparability studies to reduce AAAF-based rent increases was not a preordained outcome, at least at the time the HAP Contracts were signed by the Plaintiffs. Neither the express language of the statute nor the terms of the HAP Contracts required HUD to perform these studies, nor was their any practice of the sort by HUD at the time. Consequently, it is not the case that if HUD failed to perform a comparability study, and the owner received the AAAF-adjusted rent, the owner would receive more than what the HAP Contract allowed, since the overall limitation of the AAAF-adjusted rent already incorporates comparability criteria and the HAP Contract does not specifically require, HUD to perform comparability studies to double-check those results. Clearly, a breach occurred here when HUD attempted to shift that responsibility onto the Plaintiffs, Cuyahoga I at 762; Park Properties, 74 Fed. Cl. at 273-274, but,

---

1 HUD's insistence that it has a right to recheck the results of its own AAAF-based adjustments to comply with the overall limitations underscores why the 1% deduction for non-turnover units imposed by the 1994 Act breaches the Plaintiffs' HAP Contracts. First, there is nothing to indicate that the savings associated with non-turnover units is not already incorporated into the AAAF itself – in other words, the 1% deduction is a form of double-dipping. Second, while the owner of a market rate unit can increase rents at the time of turnover for a new unit, the owner of a Section 8 unit has no ability to make up any of the losses that it incurs each year the 1% turnover deduction is applied. Essentially each year, the rents at non-turnover units erode away from the comparable market rents without any hope of catching up. HUD's argument is essentially "heads I win, tails you lose": On the one hand, according to the Government, the overall limitation requires the Plaintiffs to demonstrate that their rents do not exceed comparable unassisted rents, but, when it comes to the eroding rents for their non-turnover units, HUD has no duty to preserve any such equivalence.

measured by the parties' expectations at the time of the HAP Contracts' execution, ***full performance of the HAP Contract did not require that HUD would perform a comparability study intended to serve as a ceiling on the AAAF-adjusted rents***. Thus, it is not the case that payment of the full AAAF-adjusted rent is providing the Plaintiffs with some sort of windfall, as the Government no doubt will argue. Rather, it is conferring on them, as the Court concluded in Cuyahoga I and Park Properties, exactly what the HAP Contract requires.

b. The overall limitation cannot be used to impose on the Plaintiffs a duty to perform a comparability study.

There is no support for the Government's contention that the overall limitation requires someone – either the Government or the Plaintiffs – to confirm now that the AAAF-adjusted rents would not materially differ from rents at comparable unassisted units. First, the terms of the overall limitation do not themselves bar to the Plaintiffs recovering AAAF-based damages here and do not constitute a ceiling on their recovery. In the Government's view, performance of a comparability study is some sort of a requirement – a cap which, if the Plaintiffs do not satisfy, precludes them from receiving the damages to which they are entitled. That is incorrect: As the Supreme Court has made clear, the AAAFs are the "presumptive adjustment called for under the contract." Alpine Ridge, 508 U.S. at 581. As explained above (pp. 8-9), the Supreme Court determined that comparability studies would be performed "only in those presumably exceptional cases where [HUD] has reason to suspect that the [AAAFs] are resulting in materially inflated rents." *Id*. at 581-82. Nothing in Alpine Ridge supports such a duty – indeed, the Supreme Court thought comparability studies would only be done in "presumably exceptional cases" (*id*.) – and the prior analysis demonstrates that the plain language of the HAP Contract cannot be construed to turn such "exceptional cases" into a requirement that would bar recovery here.

Other contract provisions support this view. Thus, §1.8b(2) provides that "[o]n the anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable [AAAF] most recently published by the Government," and § 1.8e of the HAP Contract, entitled "Incorporation of Rent Adjustment," provides that "[a]ny adjustment in Contract Rents shall be incorporated into Exhibit A by a dated addendum to the exhibit establishing the effective date of the adjustment." HAP Contract, §§ 1.8b(2) and 1.8e (emphasis added) (Plfs. App.10, 24, 43). Leaving aside the fact that § 142(c)(2)(B) of the 1987 Act precludes HUD from doing comparability studies now, the unambiguous operation of these two clauses means that the AAAF-adjusted rent took effect on the next succeeding anniversary date and became the Contract Rent, where, as here, HUD did nothing to prevent it. The Government's position would read these provisions out of the HAP Contract, essentially saying that the rents do not take effect unless the Plaintiffs here undertake a comparability study years after the relevant anniversary date. There is no support for such a misreading of the rent adjustment provisions of these HAP Contracts.[2]

Second, to the extent that a rent comparability study needed to be done, it already has been, in the form of the AAAFs. These numbers were not plucked from the ether by HUD; as the Supreme Court has established, "the automatic adjustment factors ***are themselves*** geared to reflect trends in the local or regional housing market." Alpine Ridge, 508 U.S. at 19 (emphasis added). Essentially, HUD is arguing that it has a right to double-check its prior determination,

---

[2] Since HUD was not required to perform comparability studies, the fact that it did not perform them after the 1994 Act took effect is irrelevant The rents granted prior to the 1980s, when HUD began to perform comparability studies, are just as valid as those granted after it began to exercise that power. HUD chose to conduct or not to conduct comparability studies for any number of reasons over the years; the essential point is that, regardless of the reasons that led HUD not to conduct comparability studies in these cases, the HAP Contract requires that the AAAF-adjusted rents must be the contract rents here.

even though it is presumed to be correct. There is no basis under Alpine Ridge to perform any further analysis now.

Third, the historical experience demonstrates that on many occasions, HUD set rents and made rent adjustments without regard to the overall limitation itself. Despite the language of § 201(c) of the 1974 Act, HUD routinely set initial rents in excess of the comparable unassisted market rents. For at least the first six years of the Section 8 program, HUD did not perform any separate comparability studies under § 1.8d to double-check the rents yielded by the AAAFs. Later, in the 1987 Act, Congress adopted time limits on HUD's ability to perform comparability studies, recognizing that, if HUD did not comply with those time restrictions, the full AAAF would take effect, regardless of the overall limitation. And in the Reform Act, Congress agreed to pay owners additional rent adjustment sums, above whatever the overall limitation would have allowed according to HUD's comparability studies. All of these examples demonstrate that, throughout the history of the Section 8 program, the overall limitation hardly functioned as the "cap" or "ceiling" that HUD now insists.

Essentially, in raising the overall limitation as a barrier to the Plaintiffs' damages here, the Government is making the same argument that it pressed unsuccessfully in Cuyahoga II: that in order to recover their damages, the Plaintiffs must perform the very acts – conducting a comparability study – that were the source of the breach that prompted this litigation. The answer is that the required comparability analysis has already been performed through the AAAFs and there is nothing in the express terms of the HAP Contract to require the Plaintiffs to do another analysis to qualify for those AAAF-adjusted rents.

### 3. The Same Rule Applies Even If The Experiences Of Other Owners At The Time of the Government's Breach Are Considered.

Significantly, the answer is no different if the experience of other owners are considered in determining the Plaintiffs' expectations at the time of the breach. "Even when a contract is unambiguous, it may be appropriate to turn to one common form of extrinsic evidence – evidence of trade practice and custom." Teg-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006). If anything, the experiences of other owners would only reinforce the conclusion that, if HUD did not perform a comparability study, the Plaintiffs would receive the full AAAF-adjusted rent. Certainly, at the time they executed the HAP Contracts, the Plaintiffs would not have reason to believe that their damages here would be less than the full AAAF-adjusted rent, because at that time, HUD was not performing any comparability studies. As this Court explained in Cuyahoga I, the legislative and administrative history of the Section 8 program only served to reinforce its original conclusion, based on the express language of the HAP Contract, that an owner should have receive the full AAAF-adjusted rent unless HUD took some positive action to restrain those adjustments:

> Thus, from the passage of Section 8 in 1974 until it was modified in 1995, ***the statutory mechanism clearly envisioned that annual adjustments were to be automatic, unless HUD promptly performed a comparability study.***

Cuyahoga I, 57 Fed. Cl. at 761-62 (emphasis added). Examination of the experience of the Section 8 industry at the time this Plaintiff entered into their HAP Contracts thus would confirm that they would receive the full AAAF unless HUD determined there were anomalies in the local rental market and that, absent such action, they would be entitled to receive the AAAF-adjusted rents.

## Question C Do questions involving the application [of] the overall limitation in this case involve causation or mitigation?

**Which party has the burden of proof in demonstrating the parties expectations regarding the use of that clause?**

The issues of causation and mitigation in the context of the overall limitation are not new, and were addressed in the Cuyahoga II case. The Court in Cuyahoga II recognized that these standards of causation and mitigation should not be confused and should not be applied too strenuously against a non-breaching party:

> While "in the workaday world, the conceptual distinctions between damage, 'duty' to minimize, mitigation and proximate cause are frequently blurred," . . . the fact is these concepts have distinct purposes and definitions. ***In order to prove that losses were "proximately caused " by defendant's breach, plaintiffs need not show that they might have avoided or minimized such losses or that defendant's conduct was the "sole" cause of their damages***. . . . Rather, they must only show that the breach was a "substantial factor" and that the damages flowed "inevitably and naturally" therefrom. Thus, plaintiffs need not show that each dollar claimed was entirely unaffected by outside events. By comparison, where instead the question presented involves an injured party's failure to act to lessen damages, the issue does not involve proximate causation, but rather mitigation. As one leading commentator has summarized, "although the injured party's own failure to avoid a loss may bar recovery for that loss, this is not thought of a consequence of causation, but of a limitation under a 'mitigation' rule."

Cuyahoga II, 65 Fed. Cl. at 545, *quoting* Franconia Assocs. v. United States, 61 Fed. Cl. 718, 750 (2004) (emphasis added; intervening citations omitted).

Certainly here, the overall limitation does not raise the significant causation issues that were addressed in Cuyahoga II. In that case, the Government argued that "the rents in question were lost neither because of the passage of the 1994 amendments nor the adoption of Notice 95-12, but because plaintiff did not timely comply with the post-1994 regime for obtaining rent increases." Cuyahoga II at 543. In other words, the Government argued that the actual cause of the Plaintiff's injury there was their failure to comply with the 1994, not HUD's attempt to force them to perform comparability studies. The Government has never asserted such a "fast-fish, loose-fish" distinction here. *Id*. Nevertheless, it has argued that in order to calculate damages

here, the overall limitation must be satisfied, even if that required the Plaintiffs to perform comparability studies. Government's Reply to Plaintiffs' Opposition to Defendant's Cross-Motion for Summary Judgment at 2, n. 2. Essentially, this amounts to the same argument that the Court rejected in Cuyahoga II. As the Court explained there, "expectation damages, by design, provide a claimant 'the benefits [it] expected to receive had the breach not occurred,'" and therefore "[l]ogic suggests that, consistent with the theory of expectation damages, this court cannot afford controlling and preclusive effect to the very statutory provisions that trigger the breach." Cuyahoga II, 65 Fed. Cl. at 544, ***quoting*** Glendale Fed., 239 F.3d. at 1390 In other words, the Government could not compel the plaintiffs there to undertake the very act – performing separate comparability studies, beyond those built into the AAAFs, pursuant to the 1994 Act – that was the cause of the breach.[3] The same logic applies here. The Government cannot demand that, to demonstrate the Government's breach caused the Plaintiffs' damages, the Plaintiffs must perform the same sort of comparability studies that it refused to require the plaintiffs to perform in Cuyahoga II.

Nor should the overall limitation be applied here in mitigation of the Plaintiffs' damages. Mitigation requires a non-breaching party to reduce the damages that result from the breach. Spodik v. United States, 73 Fed. Cl. 1, 19 (2006). For example, a defaulting tenant can argue that an owner had a duty to tale reasonable steps to rent a vacated unit in order to reduce the damages arising from the tenant's breach of the lease. At the outset, the burden is on the

[3] In a prior brief, the Government argued that the intervening cause of the injuries suffered by Plaintiffs Park Properties L.P. ("Park") and Valentine Associates L.P. ("Valentine") was due to their belief that local rent stabilization laws would have precluded them from receiving HUD rent adjustments. Gov't Opp. at 28 – 30. As the Plaintiffs previously responded, the Government's argument mistakes cause for effect. *See* Opp. at 15 – 17. If HUD had not improperly attempted to shift the burden of performing comparability studies to the Plaintiffs, the Plaintiffs would never have had to decide whether to perform comparability studies. Moreover, the Government cannot demonstrate that the actions of Park and Valentine were unreasonable, since their decision was based on information they received from HUD and its contractor, New York Quadel Consulting. *See* Letter of Jerome Ginsburg to Tracy E. Newman dated July 23, 2001 at 2 (Plfs. App. at 56-58).

Government, as the breaching party, to demonstrate that the Plaintiffs could have mitigated their damages here. T.C. Bateson Const. Co. v. United States, 162 Ct. Cl. 145, 188 (1963) ("The burden of proof with respect to a plaintiff's asserted failure to mitigate damages rests upon the defendant who asserts it.")

In this instance, however, mitigation is simply not applicable because there is no way that the Plaintiffs could have reduced the damages caused by the Government. First, as noted above, the HAP Contracts provide that the Plaintiffs will receive the AAAF-adjusted rents unless HUD takes action pursuant to the overall limitation. The AAAFs are HUD's best guess of how rents should be adjusted each year; as the Supreme Court said in Alpine Ridge, they are "geared to reflect trends in the local or regional housing market" and are the "presumptive adjustment called for under the contract." Alpine Ridge, 508 U.S. at 19. In this case, HUD has calculated applicable AAAFs for the Plaintiffs' properties, and those AAAF-adjusted rents are the "presumptive adjustment called for under the contract." Nothing in the HAP Contract empowers the Plaintiffs to reduce the AAAF adjustments that HUD calculates and that, in the absence of comparability studies, must apply. Moreover, as noted, the only way that something less than the AAAF-adjusted rent can apply here is if HUD conducts a comparability study. But as the Court has determined, HUD, and only HUD, can perform a comparability study. Cuyahoga I at 759-760. HUD is responsible for both setting the AAAFs and for performing any separate comparability study. Because there is no way under the Plaintiffs could have exercised that power expressly reserved to HUD, there is no way that the Plaintiffs could have mitigated their damages here.

**Question D Whether, in light of the answers to the questions raised above, the party believes that this case still is amenable to being resolved as a matter of law?**

Nothing in the foregoing analysis precludes the Court reaching a determination on the outstanding issues of this case as a matter of law.

## CONCLUSION

The foregoing analysis demonstrates that in determining the Plaintiffs' expectation damages here, a new round of comparability studies is not permitted, because the AAAF-adjusted rent is the "presumptive adjustment called for under the contract" (Alpine Ridge, 508 U.S. at 19), the HAP Contract does not impose requirement on HUD to double-check the AAAF-adjusted rents in all cases, and HUD has historically established rents that materially differ from the comparable unassisted rents. Under these circumstances, the Plaintiffs are entitled to receive the full AAAF-based rents as their expectation damages.

Dated: September 7, 2007

Respectfully submitted,

/s/ Harry J. Kelly

Harry J. Kelly, ESQ.
NIXON PEABODY LLP
401 9th Street, N.W., Suite 900
Washington, D.C. 20004
Tele: (202) 585-8000
Fax: (202) 585-8080

Counsel for the Plaintiffs

**CERTIFICATE OF FILING**

I hereby certify that on the 7th day of September, 2007, a copy of the foregoing Plaintiff's Brief on Expectation Damages was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. Additionally, a copy of this filing has been transmitted by facsimile to the Government's counsel, John Kosloske, Esq.

Dated: September 7, 2007

Respectfully submitted,

/s/ Harry J. Kelly