# In The United States Court of Federal Claims

No. 04-1757C

(Filed: May 23, 2008)

| | | |
|---|---|---|
| PARK PROPERTIES ASSOCIATES, L.P., *et al*, | * | Cross-motions for partial summary |
| | * | judgment; Section 8 housing program; |
| | * | Impact on calculation of damages of the |
| Plaintiffs, | * | overall limitation provision in HAP |
| | * | contracts; Doctrine of prevention; *St. Louis* |
| v. | * | *Dressed Beef* and *David J. Joseph Co.* |
| | * | applied; Overall limitation provision did not |
| THE UNITED STATES, | * | survive the repudiation of the HAP |
| | * | contracts; *Alpine Ridge* explained; |
| Defendant. | * | *Statesman II* distinguished; Overall |
| | * | limitation not considered in calculation of |
| | * | damages. |

**OPINION**

*Harry J. Kelley, III,* Nixon Peabody, LLP, Washington, DC, for plaintiffs.

*John Edgar Kosloske*, Civil Division, United States Department of Justice, Washington, D.C., with whom was *Peter D. Keisler*, Assistant Attorney General, for defendant.

**ALLEGRA, Judge:**

"[N]o man may take advantage of his own wrong."[1]

This contract case is before the court on the parties' cross-motions for partial summary judgment. Plaintiffs entered into rent subsidy agreements with the United States Department of Housing and Urban Development (HUD), known as "Housing Assistance Payment" (HAP) contracts. Relying on *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751 (2003) (*Cuyahoga I*), this court previously determined that defendant repudiated those contracts in 1994, when Congress amended the controlling statute to alter the way in which rent increases were to be determined. *Park Properties Assocs., L.P. v. United States*, 74 Fed. Cl. 264, 265-66 (2006) (*Park Properties I*). At issue now is whether, if at all, a limitations provision in the HAP

[1] *Glus v. Brooklyn Eastern Terminal*, 359 U.S. 231, 232-33 (1959) (Black, J.).

contracts affects the amount of damages recoverable in this case. *See* No. 04-1757C, Order of December 19, 2006.

## I. BACKGROUND

A detailed recitation of this case may be found in this court's prior opinion. *Park Properties I,* 74 Fed. Cl. at 266-70.[2] The court will rehearse here only those details necessary to provide context, filling in a few additional facts as necessary.

In 1974, Congress amended the Housing Act of 1937 (Housing Act) to create what is known as the Section 8 housing program. *See* 42 U.S.C. § 1437f. Under the program, tenants make rental payments based upon their income and ability to pay; HUD makes "assistance payments" to the private landlords to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD. 42 U.S.C. §§ 1437a(a), 1437f(c)(3); *see also Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1425 (Fed. Cir. 1997) (describing the program); *Cuyahoga I*, 57 Fed. Cl. at 753-55 (same). In 1978 and 1980, three transactions occurred between plaintiffs (or their predecessors in interest) and HUD:

- On September 27, 1978, Jerome Z. Ginsburg d/b/a "Park Property Associates" and HUD entered into a HAP Contract for Lamartine Terrace (the Lamartine HAP Contract). The effective date of the Lamartine HAP Contract is June 1, 1979. On July 1, 1996, Park Property Associates' interest in this contract was transferred to Park Properties Associates, L.P., a plaintiff in this case.

- On September 27, 1978, Jerome Z. Ginsburg d/b/a "Valentine Property Associates" and HUD entered into a HAP contract for Valentine's Lane Hill Apartments (the Lane Hill HAP Contract). The Lane Hill HAP contract was executed in two stages: (i) stage 1 became effective on January 2, 1980; and (ii) stage 2 became effective on February 19, 1980. On July 1, 1996, Valentine Property Associates' interest in this contract was transferred to Valentine Associates, L.P., a plaintiff in this case.

- On September 29, 1980, St. John's I Associates, L.P. (St. John's), also a plaintiff herein, and HUD entered into a HAP contract for St. John's Phase I (the St. John's HAP Contract). The St. John's HAP Contract was executed in three stages: (i) stage 1 became effective on July 1, 1982; (ii) stage 2 became effective on September 22, 1982; and (iii) stage 3 became effective on December 15, 1982.

[2] In that opinion, the court deemed certain facts established for purposes of future proceedings in this case. *See Park Properties I*, 74 Fed. Cl. at 266 n.1; RCFC 56(e). It does so, as well, here.

The framework for these contracts is governed, in part, by 42 U.S.C. § 1437f(c)(1), under which an initial, maximum monthly contract rent was established for each dwelling unit.[3] As originally enacted, 42 U.S.C. § 1437f(c)(2) provided for adjustments in this maximum monthly rent thusly –

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
>
> * * * * *
>
> (C) Adjustments in the maximum rents under subparagraphs (A) and (B) shall not result in material differences between the rents charged for assisted units and comparable unassisted units, . . . as determined by the Secretary.

42 U.S.C. § 1437f(c)(2)(A) and (C) (1982). The HAP contracts in question implemented these provisions by providing that adjustment of rents would be made annually on the basis of a reasonable formula, subject to an "overall limitation" designed to prevent adjustments from producing material differences between the rents for comparable assisted and unassisted units.

The annual adjustment was implemented through Section 1.8b ("Automatic Annual Adjustments") of the HAP contracts, which, with minor irrelevant variations in the subject contracts, provided, in pertinent part –

> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. . . .
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

Consistent with 42 U.S.C. § 1437f(c)(2)(C), the HAP contracts also contained, in Section 1.8d, an "Overall Limitation," that stated:

---

[3] For a more extensive discussion of the statutory and regulatory framework underlying the HAP contracts, *see Cuyahoga I*, 57 Fed. Cl. at 753-63. The summary herein includes only those features necessary to the resolution of the pending motions.

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HUD regulations in effect at the time the contracts in question were executed mirrored these requirements. *See* 24 C.F.R. § 881.110(d) (1979).

In the early 1980s, HUD began using "comparability studies" – surveys of rents at comparable unassisted buildings – to enforce the "overall limitation" in its various HAP contracts. This practice was challenged in court as violating the contracts. Attempting to resolve this controversy, Congress, in 1987, added the following sentence to section 1437f(c)(2)(C): "If the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1815, 1850 (1988), *codified at* 42 U.S.C. 1437f(c)(2)(C). But, litigation over the rent adjustment method continued to brew, prompting Congress, in 1989, to enact Section 801 of the Department of Housing and Urban Development Reform Act of 1989 (the Reform Act), Pub. L. No. 101-235, 103 Stat. 1987, 2057-2059 (codified at 42 U.S.C. 1437f(c)(2)(C) (Supp. II 1990) and 42 U.S.C. 1437f note (Supp. II 1990)), which prescribed new procedures for calculating rent adjustments. Retrospectively, it required HUD to pay landlords an increased amount, above what the studies required HUD to pay under its interpretation of the contracts; prospectively, it established a limited role, under defined criteria, for HUD's future use of comparability studies.

The Reform Act required HUD to promulgate "regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments . . . would result in such material differences" between assisted and unassisted units, and to use those studies to establish a "modified annual adjustment factor" for a geographically smaller area. Pub. L. No. 101-235§ 801(c), 103 Stat. 1987, 2058 (1989). The statute described, in detail, the methodology the Secretary was to use in conducting these studies. It also stated that if a modified adjustment factor could not be established or failed to eliminate material differences between rents at comparable assisted and unassisted units, the Secretary could employ another methodology "for conducting comparability studies in order to establish rents that are not materially different from rents charged for comparable unassisted units." *Id.* In keeping with those provisions, HUD promulgated regulations to govern the conduct and use of comparability studies to generate modified adjustment factors. *See* 24 C.F.R. § 888.301 *et seq.* (1992).

In 1993, the Supreme Court, in *Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993), upheld the amendments made by section 801 of the Reform Act. But, Congress remained concerned that subsidized rents were higher than warranted. In response, it amended section 1437f(c)(2)(A) of Title 42 by adding the following language:

> However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. The immediately foregoing sentence shall be effective only during fiscal year 1995.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) ("the 1994 Act" or "1994 amendments"). The 1994 Act provided that the amendment "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under section 8(c)(2)(A) of [the United States Housing Act of 1937] by applying an annual adjustment factor." *Id.* Subsequent amendments cumulatively made the provision applicable to "fiscal year 1996 prior to April 26, 1996, and fiscal year 1997," "fiscal years 1997 and 1998," and "during fiscal year 1999 and thereafter."[4]

On March 7, 1995, HUD issued Notice 95-12, by its terms designed "[t]o effect all applicable contracts with HAP anniversary dates from [March 7, 1995] to the end of Federal [fiscal year] 1995 (through September 30, 1995)." This directive prescribed, with exceptions not herein relevant –

> If current project rents on a . . . contract (before the application of the AAF) are above the published [fair market rent] for the area then in order to receive a rent increase, the owner must submit, at least 60 days prior to the HAP contract anniversary date, form HUD 92273, Estimates of Market Rent by Comparison, . . . completed by a non-identity of interest, state certified, general appraiser, FOR EACH UNIT TYPE (e.g. 1 BR, 2 BR, etc.). This form must contain at least three examples of unassisted housing in the same market area of similar age, type and quality.

Regarding the consequences of not filing a comparability study, it indicated –

> If the owner fails to submit the information required by this Notice at least 60 days before the contract anniversary date, then the rent levels will not be adjusted on the contract anniversary date, rather the new rent levels will go into effect 60 days after receipt of the required information. However, if the owner fails to submit this information by the date of the FY 1996 HAP contract anniversary, then no increase will be granted for the FY 1995 contract year.

[4] *See* Pub. L. No. 105-33, § 2004, 111 Stat. 251, 257 (1997); Pub. L. No. 105-65, § 201(C)(1), 111 Stat. 1344, 1364 (1997); Pub. L. No. 104-204, § 201(g), 110 Stat. 2874, 2893 (1996).

At several other points, the notice reiterated the consequences of not filing a timely request for an increase.[5] According to the directive, if the owner demonstrated that comparable, unassisted rents were more than five percent over contract rents, HUD would increase contract rents to the lesser of: (i) contract rents adjusted according to the AAAF; or (ii) the comparable, unassisted rent plus the so-called "initial difference." Although Notice 95-12 expired, by its terms, on September 30, 1995, later notices reinstated and made permanent its provisions. *See, e.g.*, HUD Notice 97-14 (March 17, 1997); HUD Notice 00-14 (Aug. 9, 2000).

Pursuant to the application of the published AAAFs, the contract rent for the St. John's HAP contract increased from its initial contract rents in 1979 of $496, $598, $713, and $830 for no-bedroom, one-bedroom, two-bedroom and three-bedroom units, respectively, to $812, $950, $1,082 and $1,257 in 1994. According to plaintiffs, Park Properties has not received annual rent increases for the LaMartine Terrace Property for the years 1995 through 2000; defendant asserts that a rent increase, in fact, was received for 2000. Plaintiffs also state that Valentine Properties has not received annual rent increases for the Lane Hill Property for the years 1996 through 2000, and did not receive a rent increase for two-bedroom units at the Lane Hill Property in 2003. Additionally, plaintiffs allege that the St. John's Property has not received annual rent increases for the years 1996 through 2001. Defendant admits that St. John's did not receive annual rent increases for St. John's Phase I under the St. John's HAP Contract for the years 1997 through 2001, but denies that St. John's did not receive a rent increase for St. John's Phase I in 1996. Effective on July 1, 1996, HUD adjusted the contract rents under the St. John's HAP Contract based upon the application of published AAAFs, to $831 per month for the no-bedroom units, $973 per month for the one-bedroom units, $1,108 per month for the two-bedroom units, and $1,287 per month for the three-bedroom units.

On December 10, 2004, plaintiffs filed their complaint seeking contract damages of $2.75 million against the United States, alleging breach of that portion of the HAP contracts which plaintiffs claim entitles them to automatic annual rent adjustments. On November 17, 2006, this court held that defendant had repudiated the HAP contracts when Congress amended the Housing Act to require that owners provide HUD with rent comparability studies in order to receive an annual rent adjustment and in issuing the 1995 direction which imposed additional requirements not envisioned by the contracts or the 1994 amendments. *Park Properties I*, 74 Fed. Cl. at 273-76. A second round of cross-motions for partial summary judgment has now been briefed and argued, focusing on the application of the "overall limitation" provision in the HAP contracts on the calculation of damages here.

## II. DISCUSSION

We begin with the general rule that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts

---

[5] For example, it stated that – "[i]f an owner does not request an increase or fails to submit a request based on the guidelines in this chapter, then the rents will remain the same as the current contract rents, unmodified by HUD or the Contract Administrator."

between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also Landmark Land Co., Inc. v. F.D.I.C.*, 256 F.3d 1365, 1371-72 (Fed. Cir. 2001); *Cuyahoga I*, 57 Fed. Cl. at 763. Damages caused by the breach or repudiation of a contract by the United States often take the form of expectancy damages, corresponding to "the benefits the nonbreaching party expected to receive in the absence of a breach." *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005); *see also First Fed. Lincoln Bank v. United States*, 518 F.3d 1308, 1316 (Fed. Cir. 2008); *Glendale Fed. Bank FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001).[6] Such damages are "recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *see also Nat. Australia Bank v. United States*, 452 F.3d 1321, 1326 (Fed. Cir. 2006); *Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed. Cl. 534, 543 (2005) (*Cuyahoga II*).

The question here is how, if at all, the so-called "overall limitation" contained in plaintiffs' HAP contracts impacts the amount of expectancy damages recoverable for the contract breaches that occurred in this case. There are several ways to approach this issue. One centers on the parties' competing interpretations of the clause. Thus, defendant contends that the clause should be read as an absolute limitation on the rents recoverable here, designed to ensure that there was no material difference between those rents and market rents for similar units. Not so, plaintiff rejoins, asseverating that the clause was not self-executing, but had to be invoked by HUD to prevent the annual rent increases based on the AAAFs from automatically occurring. That invocation, plaintiff notes, did not occur here, rendering the clause ineffective in limiting damages now. This last point flows into a second approach that focuses not so much on the clause itself, but on the foreseeability prong of determining expectation damages. On this count, defendant contends that the court should consider what would have happened had it not breached the HAP contracts, while plaintiff asserts that we already know the answer to that question, namely, that defendant would not have invoked the clause. But, there is a third possibility here – one that hinges not on how the overall limitation should be interpreted, but on whether it should be interpreted at all – *to wit*, the possibility that the repudiation of the original overall limitation clause waived or eliminated the limitation altogether. Hence, determining damages here requires the court not only to answer a number of subsidiary questions, but preliminarily to decide which questions need answers.

To help sort this out, consider the following hypothetical. Suppose that A agrees to sell Blackacre to B at a date certain, for an amount corresponding to a base price adjusted to the date of the transfer by some recognized inflation index – that is, ***unless*** B demonstrates, before the transfer date, that the purchase price so adjusted overstates the market value of Blackacre.

---

[6] Similar views are expressed in the Restatement (Second) of Contracts, § 347, cmt. a (1981): "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."

Suppose further that, after the agreement is executed, B repudiates the pricing mechanism therein and instead indicates that it will pay only the unadjusted base price***, unless*** A demonstrates that the inflation-adjusted figure corresponds to the actual market value of Blackacre. Despite the fact that the parties cannot agree on the price, the transfer occurs. A refuses to comply with B's new pricing mechanism, fearful, *inter alia*, that doing so might be viewed as waiving any breach claim it might have. Yet, A, nonetheless, insists that B owes it the higher purchase price established by the original contract, independent of the limitations clause, which, of course, was never invoked by B. B, for its part, asserts, that it owes only the unadjusted base price because A failed to demonstrate that it was entitled to the inflation-adjusted price. B makes its payment on this basis. A sues B.

At first blush, one approaching this hypothetical might be inclined to focus upon foreseeability, the core requirement for awarding expectancy damages. If invocation of the limitations clause was foreseeable at the time the contract was executed, some might say, then that limitation should apply in calculating any damages owed by B to A. But, this result is not easily reconciled with the fact that the price limitations clause in the hypothetical is not self-triggering – it did not apply automatically if the inflation-adjusted price overstated the market value of Blackacre, but only applied if it was properly invoked by B. Because the clause had to be invoked, it would seem wrong to treat the market value of Blackacre as an absolute limit on any damages owed – that result, in many ways, would reward B, giving it the very result it sought when it repudiated the contract. Logic and common-sense both suggest that one ought not blithely assume that the difference between the inflation-adjusted price and the market value of the property would have been enough to prompt B to invoke the clause or even that B had the financial wherewithal to muster the necessary proof. What if, for example, B was unsure whether the benefit of capturing the differential between the inflation-adjusted price and market valuation was worth the cost of determining and demonstrating that differential? But, as hinted above, more is lurking here than a debate over whether B might have invoked the clause. Indeed, initially focusing on whether *vel non* the limitations clause ***would*** have been invoked skitters past a more fundamental question, *to wit*, whether that clause ***could*** be invoked. Should we not ask first whether the condition originally imposed on the inflation-adjusted price survived the repudiation? If it did not, then B would be obliged to pay the inflation-adjusted price whether the clause was invoked or should have been, and no matter what the market value of the property was at the time of the transfer. This result has the advantage, of course, of preventing B from benefiting from its own repudiation – in seeking to limit its exposure, it can rely neither on the assumption that it would have invoked the original limitations clause, nor A's failure to invoke the new limitations clause unilaterally imposed by B, nor even subsequent proof at trial that, had the limitations clause been invoked, the market value of Blackacre would have been lower than the inflation-adjusted price.

So how similar is the hypothetical to the present case? In large part, that depends upon how similar the limitations clause in the hypothetical is to the original overall limitation clause. Not coincidentally, they are very similar. Like the clause in the hypothetical, the original overall limitation clause in the HAP contracts was not self-executing. Rather, it required HUD to take

affirmative steps to invoke the clause by determining that there was a material difference between the rents adjusted under the inflation adjustment clause and those being paid on comparable unassisted housing. If HUD did not take this action, the increased rents, derived using the AAAFs, automatically took effect.[7] In fact, because it felt that the latter result had occurred too frequently, Congress enacted the 1994 amendments, which precluded HUD from adjusting the rents unless the owner demonstrated that "the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area." Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub.L. No. 103-327, 108 Stat. 2298, 2315 (1994); *see also Statesman II*, 66 Fed. Cl. at 620-21. The amendments not only sought to impose new requirements on the property owners, but also had the effect of precluding HUD from invoking the clauses originally included in the HAP contracts. In the court's view, Congress' action again is similar to that taken by B in the hypothetical which resulted in the repudiation of the pricing mechanism in the original Blackacre contract. In sum, then, the hypothetical appears to be on all fours with the factual setting here.

Accordingly, in calculating the damages owed for the breaches that arose from the repudiation here, the court must preliminarily determine whether the overall limitation in the HAP contracts survived the repudiation. If it did not, then, this court need not resolve questions concerning how expectancy damages are limited by that clause.

**A. Did the Overall Limitation Survive Defendant's Repudiation?**

For reasons that will become increasingly obvious, it is helpful to proceed by further defining the nature of the overall limitation clause. It requires little to conclude that the clause presents a condition – defendant is liable to pay the rents associated with the AAAFs unless it determines that market rents are lower. But, what sort of condition is this?

Traditionally, the law has spoken of conditions precedent and subsequent. "A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or contractual duty arises." 13 Richard A. Lord, Williston on Contracts § 38:7 (4th ed. 2000). By comparison, a "condition subsequent" is "an event which occurs subsequent to a duty of immediate performance, that is, a condition which divests a duty of immediate performance of a contract after it has once accrued and become absolute." 13

---

[7] This view of the contract was pivotal in the opinions concluding that requiring project owners to bring forth documentation in support of rent increases repudiated the HAP contract. *See Park Properties I*, 74 Fed. Cl. at 273-74; *Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608, 616 (2005); *Cuyahoga I*, 57 Fed. Cl. at 759-60 ("the exegeses of the overall limitation provision in these opinions consistently indicate that a project owner would receive an automatic adjustment unless HUD came forward with evidence triggering the limitation"); *id*. at 762 ("the HAP contracts expressly require HUD to provide CMHA with annual adjustments barring the agency's invocation of the overall limitation").

Williston, *supra*, at § 38:9; *see also Magnolia Surf, Inc. v. Comm'r of Internal Revenue*, 636 F.2d 11, 15 (1st Cir. 1980). "True conditions subsequent are very rare in the law of contracts," Williston notes, for "[o]ften what looks like a condition subsequent in form is actually a condition precedent in effect;" this is the case when the failure of a condition to occur increases the obligations of a contracting party. 13 Williston, *supra*, at § 38:9.[8] Save for purposes of pleading and proof, such conditions subsequent are treated the same as conditions precedent. 13 Williston, *supra*, §38.10; 8 Catherine M.A. McCauliff, Corbin on Contracts § 30.7 (rev. ed. 1999).[9] Based on these definitions, it appears that the overall limitation is either a condition precedent framed in negative terms – the higher rent will be paid if something does not happen – or perhaps as a condition subsequent that is a condition precedent in effect. The overall limitation is not a pure condition subsequent because, under the HAP contracts, HUD's obligation to pay the rents adjusted by the AAAFs did not attach absolutely prior to HUD's determination whether or not to invoke the limitation. *See In Re Seminole Walls & Ceiling Corp.*, 2008 WL 879569, at *4 n.5 (M.D. Fla. 2008) ("Conditions subsequent involve the happening of some event *after* the duty to perform under the contract has arisen.") (emphasis in original); 8 Corbin on Contracts, *supra*, at § 39.2.

It is well-settled that a party to a contract cannot escape or minimize its liability on the ground that the other party has failed to perform a condition precedent to the establishment of such liability, where the breaching party has caused that failure. This doctrine, often described as the "doctrine of prevention," has been summarized in Williston thusly:

> Where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform. . . . [I]n

---

[8] As noted in several treatises, bonds often contain conditions framed in subsequent terms that are actually conditions precedent. 13 Williston, *supra*, at §§ 2:19, 38:10; 18 Ohio Jur. 3d § 155 (2008). Under most bonds, the obligor promises absolutely to pay the sum of the bond, but is excused from liability if certain conditions occur. *See State Farm Mut. Auto. Ins. Co. v. Palmer*, 237 F.2d 887, 891 & n.1 (9th Cir. 1956). In practical terms, liability on the bond arises only if the condition does not occur. Essentially, the limitation in this example is a condition precedent expressed in negative terms – the duty under the contract attaches provided that something does not happen.

[9] Indeed, the Restatement (Second) of Contracts has shunned the labels "conditions precedent" and "condition subsequent" in favor of dealing simply with a "condition." The latter it defines as "an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224; *see also id.* at cmt. e; *Heritage Bank & Trust Co. v. Abdnor*, 906 F.2d 292, 298 (7th Cir. 1990); *Hoppe v. Great Western Bus. Servs., LLC*, 536 F. Supp. 2d 888, 895 (N.D. Ill. 2008) (likening attempting to distinguish between conditions precedent and subsequent as wading into a "'bog of logomachy'") (quoting *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 348 (1953).

> such a case, the promisor may not invoke the other party's nonperformance as a defense when sued upon the contract.

13 Williston on Contracts, *supra*, at § 39:3; *see also id*. at 39:4 ("In effect, where one improperly prevents the performance or the happening of a condition of his or her own promissory duty, the offending party thereby eliminates it as a condition or, viewed another way, the condition is considered as waived or fulfilled.").[10] Farnsworth similarly expounds that "[a]n obligor may excuse a condition of its duty by committing a breach that causes the nonoccurrence of the condition," adding that "[w]hen the condition is excused, the obligor's duty becomes absolute." II E. Allan Farnsworth, Farnsworth on Contracts § 8:6 (2d ed. 1998); *see also* 8 Corbin on Contracts, *supra*, at § 40.17 ("One who unjustly prevents the performance or the happening of a condition of promissory duty thereby eliminates it as a condition."). Farnsworth further observes that the breach excusing the performance of the condition "may take the form of a repudiation." Farnsworth, *supra*, at § 8:6.[11] In short, under the doctrine of prevention, "where a party to a contract is the cause of the failure of the performance of the obligation due him or her, that party cannot in any way take advantage of that failure." *Id*.; *see also* Restatement (Second) of Contracts § 245 ("Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.").

"Cases illustrating the prevention principle 'are legion.'" *Shear v. Nat'l Rifle Ass'n of America*, 606 F.2d 1251, 1255 (D.C. Cir. 1979) (quoting 5 Williston on Contracts § 677 at 225 (3d ed. 1961)). In particular, this doctrine has frequently arisen in cases involving insurance contracts. *See, e.g.*, *Charter Oak Fire Ins.*, 45 F.3d at 1176; *Rohde v. Mass. Mut. Life Ins. Co.*, 632 F.2d 667, 669 (6th Cir. 1980); *Arlotte v. National Liberty Ins. Co.*, 167 A. 295 (Pa. 1933). An early illustration is *St. Louis Dressed Beef & P. Co. v. Maryland Casualty Co.*, 201 U.S. 173, 180-81 (1906), in which the defendant-company breached its insurance contract by refusing to

---

[10] *See also Northeast Drilling, Inc. v. Inner Space Servs., Inc.*, 243 F.3d 25, 40 (1st Cir. 2001) ("Under the so-called prevention doctrine, a contractual condition precedent is deemed excused when a promisor hinders or precludes fulfillment of a condition and that hindrance or preclusion contributes materially to the nonoccurrence of the condition."); *Charter Oak Fire Ins. Co. v. Color Converting Indus*., 45 F.3d 1170, 1176 (7th Cir. 1995) ("A party to a contract who without justification prevents the other party from complying with its terms cannot use that breach to get out of his obligations."); *In re Stevenson Assocs., Inc.*, 777 F.2d 415, 419 (8th Cir. 1985) (noting that this rule is a corollary to the "general principle that equity will not permit one to rely on one's own misconduct"); *Spanos v. Skouras Theatres Corp*, 364 F.2d 161, 169 (2d Cir. 1966) (en banc); *Gulf Oil Corp. v. American Louisiana Pipe Line Co.*, 282 F.2d 401, 404 (6th Cir. 1960) ("Where liability under a contract depends upon a condition precedent one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it.").

[11] *See also, e.g.*, *Willbros Engineers, Inc. v. Mastec North America, Inc.*, 2006 WL 1698968, at *6-7 (N.D. Okla. 2006); *In re Food Mgmt. Group, LLC*, 372 B.R. 171, 189-90 (Bankr. S.D.N.Y. 2007).

defend its policy-holder in a lawsuit. When the policy-holder settled the lawsuit, the insurance company claimed that it had not met the contract's condition under which the company was required to pay only such claims as its policy-holder was "compelled" to pay. The Supreme Court held that the defendant-insurer remained liable on its contract, even though the policy-holder had not complied with this condition precedent to liability, finding that the insured's breach of the contract had made the performance of the condition "impossible." Justice Holmes, writing on behalf of the Court, rejected the notion that the insurance company could rely upon the condition precedent requiring compulsion as limiting its liability, stating –

> If the defendant's contention is right, that breach made it impossible for the plaintiff to entitle itself to the payment promised in the policy according to its terms. But the defendant could not set itself free by so simple a device. In general, when one party, by his fault, prevents the other party to a contract from entitling himself to a benefit under it according to its terms, the former is liable for the value of that benefit, less the value or cost of what the plaintiff would have had to do to get it.

*Id*. at 180-81. Explaining further the rationale for this ruling, Justice Holmes wrote –

> Looking at the substance of the matter, it makes no practical difference, no difference in the amount of the defendant's liability, whether we say that the defendant, by its conduct, made performance of the conditions by the plaintiff impossible, and therefore was chargeable for the sum which it would have had to pay if those conditions had been performed, or answer, . . . that the performance of the conditions was waived.

*Id*. at 181. The Court concluded that by breaching the contract, the insurance company "cut at the very root of the mutual obligation, and put an end to its right to demand further compliance with the supposed term of the contract on the other side." *Id*. It further held that, while the policy holder might have defended the suit, it acted reasonably under the circumstances and, therefore, was entitled to recover damages notwithstanding its failure to comply with the contract's condition precedent. *Id*. at 181-82.

Drawing on precedents such as these, later cases in the Court of Claims and this court have applied the prevention doctrine in cases involving the United States. A prime example is *David J. Joseph Co. v. United States*, 82 F. Supp. 345 (Ct. Cl. 1949), in which the Court of Claims held that defendant's cancellation of a scrap iron contract had contributed to the seller's failure to meet a condition of the contract under which it was to reserve ships to carry all of the iron. Finding that the United States could not limit its liability based on the seller's failure to meet the condition, the court reasoned that "'[i]t is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure.'" *Id*. at 350 (quoting 3 Williston on Contracts, §677). Later, in *Industrial Uranium Co. v. United*

*States*, 376 F.2d 868, 872 (Ct. Cl. 1967), the Court of Claims held that defendant was fully liable for breaching a contract to acquire uranium ore, even though some of that ore had been delivered to a location other than that specified in the contract, because defendant had caused the specified mills to refuse to accept any more of plaintiff's ore. The court found that the latter condition had been excused, stating that "[t]he defendant, which thus prevented performance of the alleged condition, cannot now stand on it as a bar to recovery." *See also Hansen Bancorp, Inc. v. United States*, 67 Fed. Cl. 411, 424 (2005); *Tenn. Valley Auth. v. United States*, 60 Fed. Cl. 665, 672 (2004); *Bank of Advance v. United States*, 6 Cl. Ct. 535, 538 n.3 (1984) (defendant could not limited damages based on the failure of a client of the plaintiff bank to close a loan – a condition precedent in the contract between the bank and defendant – where defendant caused the loan not to be closed).[12]

While the pedigree and wisdom of the prevention doctrine are unquestionable, it remains to determine whether that doctrine applies here. As noted, the overall limitation clause in the original HAP contracts incorporates a condition precedent that, if properly triggered, limited HUD's obligation to pay the rent increases that otherwise would be generated under the AAAFs formula. The United States, through Congress' passage of the 1994 amendments, effectively prevented HUD from invoking that clause on behalf of the United States. Via this repudiation of the original HAP contracts, defendant prevented a condition precedent from occurring that might or might not have limited its liability in this breach action. Under the prevention doctrine, that action may be viewed as either waiving or eliminating the original overall limitation, thereby preventing defendant from invoking that clause now to limit plaintiff's damages, and leaving it liable for the rent increases generated by the application of the AAAFs. In so concluding, the court need not dwell on whether the legislation made it impossible or impracticable for HUD to invoke the original clause, or merely substantially hindered it from invoking that clause. While defendant, to be sure, has essentially argued that the legislation left it unable to invoke the original clause, it is sufficient that the passage of that legislation contributed materially to the

---

[12] Similarly to this effect *see Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 634 (3d Cir. 1998) ("when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure"); *Swaback v. Am. Inf. Tech. Corp.*, 103 F.3d 535, 542 (7th Cir. 1996) ("It is basic contract law that a party who prevents the occurrence of a condition precedent may not stand on that condition's non-occurrence to refuse to perform his part of the contract."); *Rohde*, 632 F.2d at 670 ("the nonoccurrence or nonperformance of a condition is excused where the failure of the condition is caused by the party against whom the condition operates to impose a duty."); *Ballard v. El Dorado Tire Co.*, 512 F.2d 901, 907 & n.4 (5th Cir. 1975); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 393 (4th Cir. 1950) ("It would seem to be elementary that, where a contract contemplates action by a party, he cannot absolve himself of liability by failing or refusing to take the action.").

nonoccurrence of the overall limitation being invoked.[13] Nor does it appear to make any difference whatsoever under the law that the condition precedent here, if triggered, might have lessened, rather than eliminated, defendant's liability for paying additional rent. *See* 8 Corbin, *supra*, § 40.17, at 584-85. The question, rather, is whether the fundamental requirement for triggering the prevention doctrine – that defendant hindered the performance of a condition precedent – is satisfied. And it is.

Application of the prevention doctrine here fulfills the twin rationales underlying the doctrine. That doctrine first is based upon the "long-established principle of law that one should not be able to take advantage of his or her own wrongful act." 13 Williston, *supra*, at § 39:6.[14] As once noted by the Supreme Court, "[i]t is a principle of the widest application that equity will not permit one to rely on his own wrongful act." *Deltrick v. Greaney*, 309 U.S. 190, 196 (1940).[15] Yet, contrary to this deeply-rooted principle, defendant plainly seeks to benefit from its breach here – it seeks to have every advantage that might have been conferred by the original overall limitation clause even though the legislative history of the 1994 amendments makes clear that such clauses were not consistently invoked by HUD and even though the passage of those amendments essentially prevented HUD from actually invoking the clause here. Under the prevention doctrine, this court will not reward defendant's repudiation of the original contract by allowing it to limit its damages in this fashion. The prevention doctrine is also based on the implied agreement of the parties not to hinder performance of a contract – the theory that "[a]n express promise to perform on the happening of an event warrants implication of a promise to refrain from actively impeding its happening, and breach of this implied promise is legally as

---

[13] *See* Restatement (Second) of Contracts § 245; *see also* 13 Williston, *supra*, at § 39:9 ("Under the doctrine of prevention, interference by one party to a contract need not make performance . . . legally impossible or impracticable in order for the interference to amount to prevention and constitute an excuse for nonperformance. Rather, it is as effective an excuse for nonperformance of a condition precedent to a promisor's obligation that the promisor has wrongfully hindered performance of the condition."); *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000) ("The prevention doctrine does not require proof that the condition would have occurred 'but for' the wrongful conduct of the promisor; instead it only requires that the conduct have 'contributed materially' to the non-occurrence of the condition."); *Willbros Engineers*, 2006 WL 1698968, at *7.

[14] *See also Apalucci*, 145 F.3d at 634; *Spanos*, 364 F.2d at 169; *Resolution Trust Corp. v. Winchester Inns, Inc.*, 1993 WL 189577, at *4 (D. Kan. 1993); *A.I.C. Ltd. v. Mapco Petroleum, Inc.*, 711 F. Supp. 1230, 1238 (D. Del. 1989); *In re Trace Intern. Holdings, Inc.*, 284 B.R. 32, 37 (Bankr. S.D.N.Y. 2002) ("The rationale is obvious; a party should not be able to take advantage of his own wrong.").

[15] *See also Glus*, 359 U.S. at 232-33; *Ind. Coal & Coke Co. v. United States*, 274 U.S. 640, 648 (1927); *United States v. Dunn*, 268 U.S. 121, 133 (1925). This proposition, of course, has ancient roots – as the Romans said, "*nemo ex suo delicto mellorem suam conditionem facere potest*."

serious as the breach of the express." 13 Williston, *supra*, at § 39:6; *see also In re Trace Intern. Holdings*, 284 B.R. at 37.[16] Yet, there is no doubt that defendant's unilateral modification of the original HAP contracts here was intended to impede plaintiffs from receiving the higher rents generated under the AAAF formula. Indeed, relying on the legislative history of the 1994 amendments, this court, in its original opinion in this case, as well as in *Cuyahoga I*, found that "[Congress] deliberately targeted, at HUD's behest, that agency's contractual obligations under preexisting HAP contracts in an effort to reduce outlays under the Section 8 program." *Cuyahoga I*, 57 Fed. Cl. at 778; *see also Park Properties I*, 74 Fed. Cl. at 274.

In sum, based on the foregoing, the court finds that defendant's repudiation of the original overall limitation clause prevents it from relying on that clause in seeking to limit its liability for increased rents. The court thus need not consider whether that clause would or should have been invoked.

**B. Defendant's Remaining Arguments.**

On brief, defendant contends that the Supreme Court, in *Alpine Ridge*, held that the overall limitation clause caps the rent adjustments irrespective of whether it was invoked by HUD. It points to the Court's statement that "we think it clear beyond peradventure that [the overall limitation] provides that contract rents 'shall not' be adjusted so as to exceed materially the rents charged for 'comparable unassisted units' on the private rental market – even if other provisions of the contracts might seem to require such result." 508 U.S. at 18-19. Like Old Dobbins, however, defendant dons blinders to the legal context in which this statement was made. For one thing, this statement was made by the Court only in finding that HUD could employ rent caps based on comparability studies and, correspondingly, in rejecting the claim that "the contract forbids HUD from capping rents based on accurate and fair comparability studies." *Id*. at 20. The Court certainly did not suggest that, despite plain language in the clause to the contrary, the limitation was effective without HUD making a determination based upon a comparability study. Far from it. The Court observed that the automatic annual adjustment factors are "the presumptive adjustment called for under the contract," adding that "[i]t is only in those presumably exceptional cases where the Secretary has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue." *Id*. at 19. Further signifying its disagreement with defendant's position in this case, the Court stated that the overall limitation "expressly assigns to 'the Government' the determination of whether there exist material differences between the rents charged for assisted and comparable unassisted units." *Id*. at 21. Relying on these passages, as well as other provisions in the HAP contracts, this court has repeatedly held that the original overall limitation was not self-effectuating – rather, that the limitation "places on HUD and only on HUD, the burden of coming forward to

---

[16] *See also Dohanyos v. Prudential Ins. Co.*, 952 F.2d 947, 951 (6th Cir. 1992) ("Where a contract is performable on the occurrence of a future event, there is an implied agreement that the promisor will place no obstacle in the way of the happening of such event, particularly where it is dependent in whole or in part on his own act.").

show that a particular adjustment would violate the limitation." *Cuyahoga I*, 57 Fed. Cl. at 760; *see also Park Properties I*, 74 Fed. Cl. at 266-67; *Park Village Apartments v. United States*, 32 Fed. Cl. 441, 446-47 (1994).[17]

Such, indeed, was the holding rendered in the first opinion in *Statesman II*, 66 Fed. Cl. at 616-20, which explicitly followed *Cuyahoga I*, *id*. at 620. In that case, defendant asserted that the 1994 amendments did not repudiate the original overall limitation because that provision allowed HUD the discretion to "'place the onus of conducting [comparability] studies upon the project owners.'" *Statesman II*, 66 Fed. Cl. at 617 (quoting defendant's brief). Making short shrift of that claim, the court held:

> In the HAP contracts at issue in the instant case, Section 1.8 plainly manifests the parties' intent that HUD would *automatically* adjust the contract rents on the contracts' anniversary dates absent a determination by the *government* that such adjustments would result in rental amounts *materially* different from those for comparable unassisted units.

66 Fed. Cl. at 616 (emphasis in original). Further construing the overall limitation, the court opined "in Section 1.8d the phrase '*adjustments as provided in this Section shall not* result in material differences' refers to HUD's affirmative duty to make such adjustment as provided in Section 1.8b and places on HUD a concomitant negative duty." *Id*. at 617 (emphasis in original). "In short," the court found, "Section 1.8d places the duty of enforcing the overall limitation on the government." *Id.* at 619; *see also id*. at 616 ("Section 1.8b plainly demonstrates the parties' intent that making the adjustment was mandatory on the part of HUD."). These interpretations of the overall limitation were central to the court's ultimate conclusion that "the effect of the 1994 amendments to Section 1473f(c)(2)(A) and of HUD Notice 95-12 was to abrogate the provisions

---

[17] In contending otherwise, defendant also cites *National Leased Housing Ass'n v. United States*, 24 Cl. Ct. 647 (1991), *aff'd*, 105 F.3d 1423 (Fed. Cir. 1997). But that case was decided three years prior to the passage of the 1994 amendments and obviously did not deal with the extent of the damages recoverable based upon the repudiation effectuated by those amendments. Rather, the main issue presented in that case – whether HUD's use of comparability studies violated due process – was similar to that considered two years later in *Alpine Ridge*. *See Nat'l Leased Housing Ass'n*, 105 F.3d at 1430-31. As such, in stating that the overall limitation "establishe[d] the extent of plaintiffs' contractual entitlement," *Nat'l Leased Housing Ass'n*, 24 Cl. Ct. at 651, this court only meant that the property-owner's rents were subject to the overall limitation clause, not that the clause should be presumed to operate in situations where HUD had failed to take the necessary steps to invoke it. Indeed, the court recognized this in describing the history of HUD's use of the overall limitation, noting that "[p]rior to 1981, the comparability limitation in the HAP contracts was largely unenforced and annual adjustments to the contract rents routinely were based on the most recently published AAAFs" and that efforts to use comparability studies after 1981 initially were "sporadic." *Id*. at 652.

of the contracts regarding automatic annual adjustment of rents and to breach the contracts." *Id*. at 620.

To be sure, defendant correctly notes that, in a second opinion, the *Statesman II* court held that the overall limitation should be applied to limit the expectancy damages recoverable upon the breach effectuated by the 1994 amendments.[18] The property-owner in that case asserted that "the overall limitation constitutes no constraint on plaintiff's allowable rents because the government failed properly to invoke that contractual provision at the time performance was due." *Statesman II Apartments, Inc. v. United States*, 71 Fed. Cl. 662, 666 (2006). Rejecting "[p]laintiff's attempt to reduce the overall limitation to a nullity," the court held that it "cannot simply read a term of the contract because the government misapplied the term," as that "would put plaintiffs in a better position than they would have held had the breach not occurred." *Id*. at 667. Instead, the court concluded that "[t]he overall limitation set out in Section 1.8d of the contracts thus acts as a separate, independent cap on the allowable rents that may be charged under the contracts." *Id*. at 666. Based upon this analysis, the court viewed its task as determining "how the government would have applied the 'overall limitation' clause absent the 1994 amendments to 42 U.S.C. § 1437f(c)(2)(A)." *Id*. at 667. The court proceeded to analyze various formulations of what was meant by the phrase "material difference," as employed in the overall limitation, ultimately adopting a definition of that phrase to be applied by the parties in determining damages. *Id*. at 667-69.

There is undeniably some tension between the result reached here and that in the second opinion in *Statesman II.* Yet, contrary to defendant's claims, that second opinion is more conspicuous for what it does not say. First, the court in that opinion did not consider whether the repudiation waived or eliminated the limitation clause under the prevention of conditions doctrine. There is, indeed, no indication that the court was alerted to this issue. Second, while the court in *Statesman II* analyzed what would have happened had HUD invoked the overall limitation, it did not consider whether it was foreseeable that the clause actually would have been invoked had Congress not repudiated the original HAP contract provisions. In the court's view, the latter inquiry was a precondition to applying the overall limitation clause again because that clause was not an absolute limitation, but had to be invoked by HUD. Yet, the *Statesman II* court – again perhaps because the issue was not raised – moved immediately to a construction of the "material difference" language in the clause, presuming, for whatever reasons, that the clause would have been invoked. Certainly, nothing in this second *Statesman II* opinion can be read as negating the same judge's views, expressed repeatedly in the first opinion in *Statesman II*, that

---

[18] As plaintiff notes, this court did not reach the issue of the applicability of the overall limitation in the damages opinion in *Cuyahoga II*, *supra*, because the plaintiff there stipulated that "the overall limitation should apply even though HUD did not prepare comparability studies during any of the relevant years and plaintiff supplied such studies later." 65 Fed. Cl. at 543. At the time, the court offered that this "represents a significant concession by CMHA, which, while seeking the equivalent of the rent adjustments, cedes that those adjustments remain subject to the overall limitation in the HAP contracts." *Id.*

the overall limitation clause was not self-effectuating and was to be invoked "only in those presumably exceptional cases where the Secretary [of HUD] has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue." *Statesman II*, 66 Fed. Cl. at 617 (quoting *Alpine Ridge*, 508 U.S. at 19). Accordingly, the second opinion in *Statesman II* does not persuade the court to depart from its conclusion (supported by the first opinion in that same case) that the effect of the repudiation of the pricing mechanism in the HAP contracts was to deprive the overall limitation of any continuing vitality.

## III. CONCLUSION

Defendant cannot squash its contractual cake and eat it too. That is to say, it cannot repudiate the rent adjustment provisions in the HAP contracts via legislation that significantly modified them in its favor and then, later, seek to cap its damages via a limitation that, for all intents and purposes, effectuates the breaching modification. To hold otherwise would be to reward defendant for its repudiation in a way that the law simply does not permit. Instead, the court holds that, having repudiated the overall limitation provision in the original HAP contracts, defendant may not rely upon that clause in limiting its damages. Based on the foregoing, the court **GRANTS**, in part, plaintiff's motion for partial summary judgment and **DENIES** defendant's cross-motion for partial summary judgment.[19] On or before June 27, 2008, the parties shall file a joint status report on how this case should proceed, with a proposed schedule that anticipates either settlement or a trial on damages.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

[19] The court declines to direct entry of damages for the plaintiffs on the basis of the AAAF-adjusted rents based on the existence of genuine issues of material fact.